Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Eric E. Wall (Bar No. 248692)
ericwall@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Fred G. Bennett (Bar No. 059135)
fredbennett@quinnemanuel.com
Vincent M. Pollmeier (Bar No. 210684)
vincentpollmeier@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S Figueroa Street 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

Attorneys for Plaintiffs ViaSat, Inc. and ViaSat
Communications, Inc. f/k/a WildBlue
Communications, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.,<br>VIASAT COMMUNICATIONS, INC., f/k/a<br>WILDBLUE COMMUNICATIONS, INC.,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>SPACE SYSTEMS/LORAL, INC.,<br><br>                    Defendant. | CASE NO.    '12CV0260 LAB WVG<br><br>**COMPLAINT FOR:**<br><br>PATENT INFRINGEMENT AND<br>BREACH OF CONTRACT<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This is an action for patent infringement and breach of contract relating to

groundbreaking satellite communications technology ViaSat, Inc. ("ViaSat") confidentially

provided to Space Systems/Loral, Inc. ("SS/L") in connection with the manufacture of ViaSat's

revolutionary first satellite (known as "ViaSat-1").  Recognizing that this technology represented a

1  great leap forward in the satellite communications field, SS/L took ViaSat's ideas as its own by

2  not only attempting to patent those ideas but by also incorporating them into its satellite designs,

3  including a satellite currently being built for one of ViaSat's key competitors.  SS/L's

4  misappropriation of proprietary information was not limited to ViaSat, as SS/L's pattern of using

5  the proprietary information of other companies for its own benefit extended to ViaSat's former

6  business partner and now subsidiary, ViaSat Communications, Inc. f/k/a WildBlue

7  Communications, Inc. ("WildBlue," collectively with ViaSat, "Plaintiffs"), as well.  This

8  exploitation of ViaSat's and WildBlue's technologies by SS/L was in disregard of the strict

9  confidentiality agreements signed by SS/L.

10         2.     Beginning in the mid-2000s, ViaSat developed next generation satellite and ground

11  equipment technologies that achieved data-carrying capacities more than ten times that of prior

12  generation satellites.  ViaSat's design was truly ahead of its time.  Not only did ViaSat's 100+

13  Gigabits per second ("Gbps") design greatly surpass the capacity of any single commercial

14  satellite ever built, ViaSat-1 ultimately provided more data capacity at its launch than all 40+

15  existing commercial data satellites over North America combined (a substantial portion of which

16  had been designed by SS/L).  ViaSat's design was equally groundbreaking in that it was highly

17  cost-effective.  ViaSat-1 achieved a ratio of cost-to-capacity that is one tenth of any commercial

18  satellite previously launched into orbit over North America.  In recognition of ViaSat's innovation

19  in designing ViaSat-1, the TechAmerica Foundation awarded ViaSat the 2011 American

20  Technology Award in the field of telecommunications.

21         3.     Beginning in September 2006, ViaSat filed multiple patent applications to protect

22  its technological breakthroughs.  Shortly after filing those applications, ViaSat initiated a bid

23  process and conducted meetings with multiple satellite manufacturers, including SS/L, concerning

24  construction of a satellite incorporating these new technologies.  Recognizing that premature

25  public disclosure or third party use of these technologies could severely compromise the

26  competitive advantage provided by ViaSat-1, ViaSat disclosed the ViaSat-1 architecture

27  incorporating its innovative satellite technologies to SS/L and the other manufacturers under the

28  terms of strict confidentiality agreements.  Nearly seven months after ViaSat filed its patent

applications, SS/L, unbeknownst to ViaSat (and apparently hoping that ViaSat had not filed any patent applications), filed the first of three patent applications using the confidential information ViaSat provided to SS/L in a deliberate attempt by SS/L to claim ViaSat's ideas as its own.

4.      Unaware of all of this, ViaSat ultimately selected SS/L to manufacture ViaSat-1 in early 2008, at a cost in excess of $200 million.  ViaSat's award of the contract to SS/L was contingent on SS/L's continued agreement to keep ViaSat's revolutionary design and technology confidential.

5.      SS/L did not keep the technology confidential.  Instead, in June 2009, SS/L announced to ViaSat's surprise that it was building a high capacity satellite at a price in excess of $200 million, named "Jupiter," for a direct competitor of ViaSat.  Jupiter's design is almost identical to ViaSat-1.  As a result of having its own technology used against it, ViaSat now stands to lose market advantage, including hundreds of thousands of customers that otherwise would have been customers on ViaSat-1 or subsequent ViaSat satellites.

6.      Moreover, SS/L's misappropriation of valuable technology was not limited to ViaSat.  SS/L also misappropriated a highly innovative utility gateway design patented by WildBlue and disclosed to SS/L under a confidentiality agreement.  Despite having received this proprietary information under terms of strict confidentiality, SS/L included this valuable feature in the Jupiter satellite as well.

7.      ViaSat is informed and believes that SS/L is preparing to take orders for additional high-capacity satellites incorporating ViaSat's and WildBlue's misappropriated technology. ViaSat is further informed and believes that SS/L is incorporating aspects of ViaSat's proprietary information and techniques as standard elements of SS/L's broadcast and data satellites.  ViaSat is informed and believes that many, if not all, of the satellites constructed by SS/L after receiving ViaSat's groundbreaking designs improperly incorporate ViaSat's proprietary information and technology.  ViaSat is informed and believes that this unrestrained behavior of misappropriating technologies in disregard of confidentiality protections will provide SS/L with more than one billion dollars of ill-gotten gains.

**COMPLAINT; DEMAND FOR JURY TRIAL**

8.      Because SS/L has infringed, and continues to infringe, ViaSat's and WildBlue's patents, and has breached its contracts with ViaSat and WildBlue, ViaSat and WildBlue seek relief from this Court as detailed below.

## THE PARTIES

9.      ViaSat, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 6155 El Camino Real, Carlsbad, California 92009.

10.      ViaSat Communications, Inc., formerly known as WildBlue Communications, Inc., is a subsidiary of ViaSat, Inc. and is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 349 Inverness Drive South, Englewood, Colorado 80112.

11.      ViaSat is a world leader in innovative commercial and military satellite and digital communication technologies.  ViaSat employs over 2,100 individuals and has annual revenues in excess of $800 million.  Space News has consistently ranked ViaSat as one of the Top 50 Space Companies in the world.

12.      On information and belief, Space Systems/Loral, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 3825 Fabian Way, Palo Alto, California 94303.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over Plaintiffs' claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101, *et seq.* and 28 U.S.C. §§ 1338(a), 2201, and 2202.  This Court has supplemental jurisdiction over Plaintiffs' claims for breach of contract pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or controversy and derive from a common nucleus of operative fact as Plaintiffs' claims of patent infringement.

14.     This Court has personal jurisdiction over SS/L for at least the following reasons: (i) SS/L has committed acts of patent infringement and breach of contract in this State; (ii) SS/L is headquartered, regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in this State; (iii) the ViaSat NDA and Build Contract (as defined below) were negotiated and executed in this State; and (iv) SS/L has purposefully established substantial, systematic, and continuous contacts with this District and expects, or should reasonably expect, to be haled into court here.  Thus, this Court's exercise of jurisdiction over SS/L will not offend traditional notions of fair play and substantial justice.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because SS/L does business in this District, a substantial part of the events or omissions giving rise to this Complaint occurred in this District, and SS/L is subject to personal jurisdiction in this District.

## **FACTUAL BACKGROUND**

16.     The key components of a broadband satellite communications system include: (1) a satellite, which relays communications signals to and from the users and gateways, (2) gateways, which control the satellite network and connect the satellite to the internet backbone, and (3) user terminals (indoor and outdoor units) connecting users to the satellite network.  A communications satellite, in essence, provides the ability to relay a communications signal through the sky.  Signals are sent from gateways on the ground to the satellite, which then amplifies the signals and transmits the amplified signals back to end-users on the ground and vice versa.



-5-

17.     For the last 25 years, ViaSat has been a leading provider of innovative satellite and wireless communications networks and equipment for commercial and government users. Building on its years of experience, in the early 2000s ViaSat developed the first Ka-band broadband satellite internet service network for its partner (and now subsidiary) WildBlue. Although the launch of the WildBlue network in the mid-2000s was fairly popular, this popularity was limited to users with no broadband internet alternatives.  These market limitations were due to the capacity limitations and service level capabilities of WildBlue's two satellites, Anik F-2 and WildBlue-1, which together provide approximately 10 Gbps of capacity.  Based on the launch of its SpaceWay 3 satellite with approximately 10 Gbps of capacity in 2007, Hughes Communications, Inc. ("Hughes") achieved similar popularity with unserved users (that is, those without a broadband internet option).  WildBlue's two satellites today support approximately 400,000 users, and Hughes' satellite supports approximately 600,000 users, each with a lower speed broadband service (for example, 1-2 Megabits per second ("Mbps")).

### ViaSat's Development of 100+ Gbps Satellite

18.     Based on the popularity of first generation satellite broadband services, ViaSat recognized a much larger market opportunity existed for satellite broadband through the development of broadband satellites with considerably more capacity that were capable of offering a superior level of service to more customers.  Building on its experience developing some of the most advanced satellite networking and ground equipment technologies in the world, ViaSat realized that a breakthrough in satellite capacity could be achieved by throwing out many conventional assumptions with respect to satellite design.  Some of these conventional assumptions related to levels of frequency reuse, user coverage requirements, interference, satellite power, beam spacing and individual beam optimization.

19.     ViaSat's unique insights and engineering efforts resulted in the development of several ground-breaking inventions that substantially increased the overall capacity of the satellite system while maintaining the same level of cost.

**COMPLAINT; DEMAND FOR JURY TRIAL**

20.     First, in a traditional satellite system, the gateway and user beam signals co-exist in the same geographic space.  Interference is avoided by using different frequencies for gateway beams and user beams.  For example, previous systems, like WildBlue's WildBlue-1 satellite and Hughes' Spaceway 3, located gateways within the same geographic space as the user beams.

21.     ViaSat developed novel strategies to roughly double the limited frequency bandwidth (and therefore capacity) by combining the gateway and user beam frequencies and using the combined frequencies for both user beams and gateways.  This doubling of frequency bandwidth was achieved in part by placing the gateway beams in one portion of the United States and the user beams in other portions of the United States.  This separation of user beams and gateway beams reduced the user coverage of the ViaSat-1 system to approximately 50% of the geography of the continental U.S.  However, by strategically focusing the user beams over the highest population areas, ViaSat-1 was still able to achieve user coverage for approximately 75% of the population and market in the continental U.S.

22.     ViaSat also realized that the capacity increase from doubling the frequencies more than offset the capacity loss from the additional interference created by having to place the gateway beams and user beams in closer proximity in this system.  ViaSat used proprietary tools and techniques to address interference related to the placement of gateway beams near user beams.  Thus, while prior generation broadband satellite systems, including WildBlue-1 and Spaceway 3, have 100% user coverage of the continental U.S. and much less interference, they only have capacity in the range of 10 Gbps (meaning 1-2 Mbps-type services to 400,000-600,000 customers).  In contrast, ViaSat-1 maintains coverage of approximately 75% of the continental U.S. population and incurs higher levels of interference, but has capacity in excess of 100 Gbps (meaning 12 Mbps-type services to in excess of one million customers).  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research investment and its business and technical foresight.  This invention is described in United

States Patent No. 8,107,875 ("the '875 patent"), entitled "Placement of Gateways Near Service Beams," which was duly issued on January 31, 2012.[1]

23.    Second, ViaSat developed pioneering technology to allow ViaSat-1 to exploit then-untapped frequency spectrum.  The Federal Communications Commission ("FCC") had set aside certain frequency spectrum primarily for use by a different type of satellite system ("non-geostationary satellites" or "NGSO satellites"), but allowed for secondary use of this frequency spectrum by geostationary satellites ("GSO satellites") like ViaSat-1 only if they did not interfere with NGSO satellite system signals.  Prior proposed uses of the NGSO spectrum by GSO systems required the entire beam to cease communications during an interference event thereby cutting off services to all users in the beam during each interference event—an unacceptable result for consumer and enterprise based services.

24.    ViaSat recognized that because ViaSat-1 was geostationary—that is, it stayed in the same place in the sky—the potential period of interference with an NGSO satellite, which moves across the sky, would be temporary and relatively short, even if they utilized the same frequency. ViaSat developed innovative technology that dynamically used the NGSO spectrum by enabling a GSO satellite, such as ViaSat-1, to transmit and receive in both the standard GSO and NGSO frequency blocks during periods of non-interference with NGSO satellite signals.  The ViaSat technology automatically ceases any potentially interfering transmissions in a beam whenever an NGSO satellite comes into range of interference while continuing to operate in the standard GSO frequencies.  During such an interference event, each of the beams on the satellite continues to operate, although at lower capacity levels.  Using this technology, ViaSat could add further additional capacity to the satellite using this valuable additional spectrum while still satisfying the FCC's interference regulations in a workable business manner.  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research

---

[1] On January 31, 2012, ViaSat filed a Request to Amend Inventorship Under 35 U.S.C. § 256 and 37 C.F.R. § 1.324 to add Mark Dankberg as an inventor on the '875 patent.  When the Certificate of Correction issues, the change will be retroactive to the original issue date of January 31, 2012.

investment and its business and technical foresight.  This invention is described in United States Patent No. 8,068,827, ("the '827 patent"), entitled "Non-Interfering Utilization of Non-Geostationary Satellite Frequency Band for Geostationary Satellite Communication," which was duly issued on November 29, 2011.

25.     Third, ViaSat recognized that some of the chief capacity limitations from then-state-of-the-art satellites were due to the improper evaluation of the combination of and trade-offs among key satellite parameters, including interference levels, user coverage, spacing between gateway beams, number of gateways, satellite power and individual beam optimization.  Against long-held conventional wisdom, ViaSat developed a system architecture that was comprised of a unique combination of these key satellite parameters to further increase the capacity of the network.  ViaSat was able to achieve these additional capacity increases in part due to the knowledge gained through development of its highly advanced ground network, which was optimized to deal with the same unique combination of satellite parameters.  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research investment and its business and technical foresight.  This invention is described in United States Patent No. 8,010,043, ("the '043 patent"), entitled "Capacity Maximization for a Unicast Spot Beam Satellite System," which was duly issued on August 30, 2011.

26.     Fourth, ViaSat developed a sophisticated, multi-dimensional software tool, the "Capacity Measurement Tool," for modeling and statistically simulating the effects, efficiency and ultimate capacity of a satellite, including the ViaSat-1 design.  ViaSat developed the Capacity Measurement Tool, in part, because SS/L was unable to analyze the sophisticated mathematical relationships between and among these satellite parameters.  No later than April 2008, ViaSat licensed its Capacity Measurement Tool to SS/L for use solely with the ViaSat-1 satellite.  This innovative tool was invaluable in that it confirmed that the unconventional, yet pioneering satellite design techniques developed by ViaSat would actually produce a functioning 100+ Gbps satellite. In addition, the Capacity Measurement Tool enabled ViaSat to fine-tune the satellite parameters to achieve further improvements to satellite capacity.

-9-

27.     The combination of these and other patent-pending innovations allowed ViaSat to develop a single 100+ Gbps satellite that was not only the highest capacity satellite in the world, but represented a single source of capacity well in excess of the capacity of all 40+ commercial data satellites over North America combined (a good portion of which were designed by SS/L). This revolutionary capacity improvement would provide ViaSat the ability to provide a higher quality (for example, 12 Mbps) service to more than one million customers.  ViaSat's design was equally groundbreaking in that it was highly cost-effective.  ViaSat-1 achieved a ratio of cost-to-capacity that is one tenth any commercial satellite previously launched into orbit over North America.  Because prior generation satellites offered fairly limited service to a fraction of the customers, ViaSat stood to create a significant market advantage using its new technology.

**ViaSat's NDA with SS/L**

28.     To safeguard its intellectual property and proprietary information during the bid process for ViaSat-1, ViaSat entered into non-disclosure agreements with a number of satellite manufacturers, including, among others, SS/L.

29.     ViaSat disclosed its proprietary inventions and technologies to SS/L pursuant to an NDA with SS/L signed on March 8, 2006 (the "ViaSat NDA").  The ViaSat NDA explicitly provides, in part, that "the receiving party shall not disclose any Proprietary Information it receives from the disclosing party to any person or entity except its employees and consultants who have a need to know and who have been informed of the obligations under this [agreement]." The ViaSat NDA further specifies that "Proprietary Information shall be used only for the purpose of mutually desirable business purposes, or as the disclosing party otherwise authorizes in writing."  The ViaSat NDA also states that because "Proprietary Information is valuable and unique . . . disclosure in breach of this Non-Disclosure Agreement may result in irreparable injury to the disclosing party."  Accordingly, the ViaSat NDA provides that "in the event of a breach or threatened breach of the terms of this Non-Disclosure Agreement, the disclosing part shall be entitled to seek an injunction prohibiting any such breach . . . in addition to and not in lieu of any . . . monetary damages."

30.     In October 2006 (the month after ViaSat filed its initial patent applications), ViaSat commenced a process to evaluate certain satellite manufacturers as candidates for the construction of its satellite, and engaged in detailed discussions with SS/L related to its ViaSat-1 satellite and its proprietary inventions.  ViaSat identified its confidential information, including technical specifications that detailed its innovative technology, as proprietary on numerous occasions and disclosed the information in strict confidence with the explicit understanding that SS/L would use the information only in furtherance of ViaSat's relationship with SS/L.

### SS/L's Patent Filing

31.     Nearly seven months after ViaSat filed its initial patent applications and while SS/L and ViaSat were discussing the possibility of SS/L building ViaSat-1, SS/L, unbeknownst to ViaSat, filed the first of three patent applications in an attempt to claim ViaSat's ground-breaking inventions as its own.  On April 13, 2007, Douglas Burr, an employee of SS/L, filed United States Provisional Application No. 60/923,263, entitled "Multi-Beam Satellite Network to Maximize Bandwidth Utilization" ("the '263 application").  Mr. Burr was one of the lead engineers from SS/L on the ViaSat-1 bid team and project.  Mr. Burr also received confidential emails and other disclosures from ViaSat describing its 100+ Gbps satellite design throughout the bid process and construction of ViaSat-1.

32.     The '263 application states under the heading "Architecture and Performance Objectives": "Capacity of 100 Gb/sec for a single satellite with low cost user terminals."  The provisional application further states under "Solutions may use," "(a) conventional Fixed Satellite Service (FSS) Ka-band (1 GHz per polarization)" and "(b) conventional FSS Ka-band plus Non Geostationary Orbit (NGSO) Ka-band."

33.     The '263 application states under the heading "Bandwidth Limitations and Reuse": "In order to provide maximum bandwidth per beam (with 4 color re-use) all or most of this bandwidth must be made available for user beams."

04568.51904/4582291.1

**COMPLAINT; DEMAND FOR JURY TRIAL**

34.     The '263 application further discloses spatial separation of user beams and gateways, stating "[l]ocate user beams in the Eastern US and gateway beams in the Western US," and provides the following image illustrating the spatial separation concept ViaSat had developed.



35.     The '263 application also states under the heading "Summary": "A multi-beam Satellite System has been designed to maximize the total bandwidth available to many small terminal users." The application continues: "[i]n order for this to work without interference, the gateways are located outside of the user region with which they share bandwidth, and sufficiently far apart from each other that they may be served by antenna beams that are spatially isolated from each other. This approach not only maximizes the available bandwidth in each user beam, but also minimizes the number of gateways required."

36.     As evidenced by the foregoing exemplary citations, by filing the '263 application without ViaSat's consent, SS/L misappropriated and misused ViaSat's confidential and proprietary information regarding its design for a 100+ Gbps satellite, including the spatial separation of user beams and gateways with frequency reuse and the dynamic use of the NGSO spectrum.

37.     Following its improper filing of the '263 application in April 2007, Mr. Burr filed two additional related patent applications on behalf of SS/L: (1) United States Patent Application No. 11/891,086, entitled "Multi-Beam Satellite Network To Maximize Bandwidth Utilization" ("the '086 application") in August 2007; and (2) United States Patent Application No. 12/861,702, entitled "Multi-Beam Satellite Network To Maximize Bandwidth Utilization" ("the '702

04568.51904/4582291.1

**COMPLAINT; DEMAND FOR JURY TRIAL**

application") in August 2010. On information and belief, SS/L misappropriated and misused information in breach of its confidentiality agreements by filing the '263 application and by filing and prosecuting the '086 application and the '702 application. In particular, the '086 application, which issued to SS/L on September 7, 2010 as United States Patent No. 7,792,070, ("the '070 patent"), entitled "Multi-beam Satellite Network to Maximize Bandwidth Utilization," improperly describes ViaSat's proprietary technology as SS/L's own.

### ViaSat's Build Contract with SS/L

38.     After evaluating final proposals from various satellite manufacturers, and unaware that SS/L had tried to pass ViaSat's inventions off as its own through the '263 and '086 patent applications, ViaSat awarded the contract to manufacture the ViaSat-1 satellite to SS/L (the "Build Contract"). On January 6, 2008, ViaSat and SS/L signed the Build Contract, which outlines the parties' rights and responsibilities with respect to the manufacture of the ViaSat-1 satellite. Of particular relevance here, the Build Contract contains three provisions regarding the use of information provided under the Build Contract.

39.     First, the Build Contract limits a party's use of the other's intellectual property. In Article 39.2, ViaSat grants SS/L a limited license for the term of the Build Contract, to use "Purchaser [ViaSat] Intellectual Property . . . to the extent necessary to provide Work under the Contract." "Purchaser Intellectual Property" is defined, in relevant part, as "Intellectual Property owned by the Purchaser [ViaSat] and provided to Contractor [SS/L] related to this Contract (before or after EDC [effective date of contract, January 7, 2008]) and all Intellectual Property Rights related thereto." Under Section 1.101, "Purchaser Intellectual Property" also includes "any derivatives, improvements, or modifications made by Purchaser [ViaSat] or Contractor [SS/L] thereto, except for derivatives, improvements or modifications that can be used by Contractor [SS/L] without infringing or violating the preexisting Intellectual Property Rights of Purchaser [ViaSat]." "Intellectual Property," in turn, is defined as including "all designs, techniques, analyses, methods, concepts, formulae, layouts, software, inventions (whether patented or patentable), discoveries, improvements, processes, ideas, technical data and documentation,

technical information, engineering, manufacturing and other drawings, specification and other similar matter in which an Intellectual Property Right subsists, regardless of whether any of the forgoing has been reduced to writing or practice."  "Intellectual Property Rights," as used in Article 39.2, is defined as "all common law and statutory proprietary rights with respect to Intellectual Property, including patent, patent application, copyright, trademark, service mark, trade secret, mask work rights, data rights, moral rights, and similar rights existing from time to time under the intellectual property laws of the United States, any state or foreign jurisdiction, or international treaty regime, regardless of whether such rights exist as of the date hereof or arise or are required at any time in the future."

40.     Second, the Build Contract contains specific provisions restricting SS/L's use of the Capacity Measurement Tool.  Section 22.2.3 grants SS/L a limited license to use the Capacity Measurement Tool "solely for the purposes of Contractor's [SS/L's] measurement of the capacity of the Satellite. . . ."  Section 22.2.3 provides that "upon termination of the license, Contractor [SS/L] will either destroy (or permanently erase) all copies of the Capacity Measurement Tool, or return the original Capacity Measurement Tool to Purchaser [ViaSat]."  Section 22.2.4 further provides that ViaSat retains exclusive ownership of "all Intellectual Property Rights" in the Capacity Measurement Tool during the licensing period; that SS/L is not granted any rights in the Capacity Measurement Tool other than the limited license rights described; and that SS/L "will not modify, adapt, create a derivative work of, merge, translate, decompile, disassemble or otherwise reverse engineer Purchaser's [ViaSat's] Capacity Measurement Tool."

41.     Third, the Build Contract contains a "catch-all" provision restricting the disclosure of "Proprietary Information" by either party to the Build Contract.  Article 28.1 defines "Proprietary Information" as "all confidential and proprietary information (other than Deliverable Data which is subject to the provisions of Article 39), in whatever form transmitted, that is disclosed or made available to directly or indirectly by [either party] . . . and (i) is identified as proprietary by means of a written legend thereon or (ii) if disclosed orally, is identified as proprietary at the time of initial disclosure and then summarized in a written document, with the Proprietary Information specifically identified, that is supplied to the receiving party within ten

COMPLAINT; DEMAND FOR JURY TRIAL

1  (10) days of initial disclosure."  Article 28.2 precludes either party from disclosing Proprietary

2  Information it receives from the other for ten years after receipt.  Article 28.6 further specifies that

3  "in addition to any other rights and remedies that exist under this Contract, in the event of a breach

4  or threatened breach of this Article, the disclosing party shall be entitled to seek an injunction

5  prohibiting any such breach."

6

7  <center>**WildBlue's Utility Gateway Back Up Invention**</center>

8       42.    Based on its experience operating the first Ka-band broadband network in the

9  world, WildBlue engineers in mid-2006 developed a valuable invention related to using one or

10  more utility gateways to back up the other gateways in a satellite network.  This invention

11  provides increased network reliability without the need for expensive back up facilities in each

12  gateway beam.  For example, if any gateway loses its signal (for instance due to heavy rains), the

13  satellite can route signals from the non-functioning gateway to a single, specified back up

14  gateway.

15       43.    WildBlue filed a non-provisional patent application on this invention on August 29,

16  2007, which claimed priority to a provisional application filed on August 29, 2006.  The non-

17  provisional filing resulted in the issuance of United States Patent No. 7,773,942, ("the '942

18  patent," collectively with the '875, '043, and '827 patents, "the Patents-in-Suit"), entitled

19  "Redundant Communication Path for Satellite Communication Data," on August 10, 2010.  The

20  '942 patent is directed to systems and methods for using a common utility gateway to provide

21  back-up to a plurality of stations.

22       44.    On April 19, 2007, WildBlue disclosed this invention to SS/L in anticipation of

23  procuring its next broadband satellite.  WildBlue disclosed this utility gateway invention to SS/L

24  under terms of a non-disclosure agreement dated April 18, 2007 between WildBlue and SS/L (the

25  "WildBlue NDA").  The WildBlue NDA explicitly provides, in part, that SS/L and WildBlue

26  "each agree to keep in confidence and prevent the disclosure to any person(s) outside their

27  respective organizations . . . or any person(s) within their organizations . . . not having a need to

28  know, all Proprietary Information received from the other."  The WildBlue NDA further specifies

that "[a] Party receiving Proprietary Information will not use such Proprietary Information for purposes other than the Purpose" of the WildBlue NDA. The WildBlue NDA also states that "[b]oth Parties agree and understand that money damages would not be a sufficient remedy for breach of [the WildBlue NDA] . . . and that effective enforcement of this Agreement requires that the remedies available for any breach by a Party or its Representatives must include specific performance and/or injunctive relief." On July 21, 2009, the parties amended the WildBlue NDA to extend its term.

**SS/L's Patent Infringement and Breach of Contract**

45. On information and belief, SS/L has infringed, and continues to infringe, the Patents-in-Suit and has breached, and continues to breach, the terms of the ViaSat NDA, Build Contract and WildBlue NDA by making, using, offering to sell or selling high-capacity broadband satellites.

46. For example, on or about June 16, 2009, nearly 18 months after SS/L commenced building ViaSat-1, ViaSat learned that SS/L was building a high capacity Ka-band, bent-pipe satellite, named "Jupiter," for ViaSat's direct competitor, Hughes. This represented a significant shift for Hughes as it had spent the last decade developing three on-board processing satellites with Boeing Satellite Systems for itself and its sister company, DirecTV, Inc. On-board processing satellites provide additional flexibility in the network due to the fact that the satellite is able to route data to specific gateways and users. In addition, these satellites include the flexibility to move some portion of the satellite's capacity from one area to another. Although "bent-pipe" satellites, like ViaSat-1, have fixed transmission links and do not have the flexibility of on-board processed satellites, the additional equipment required on these on-board processing satellites to achieve this flexibility makes it difficult for the satellite to be optimized for capacity.

47. Jupiter's design is strikingly similar to ViaSat-1, incorporating, for example, (1) the additional frequency reuse obtained by the spatial separation of user beams and gateway terminals, (2) nearly identical user beam coverage of the continental United States, (3) dynamic use of NGSO spectrum, (4) ViaSat's inventions for optimizing the capacity of the satellite system where

interference is greater than noise, (5) ViaSat's inventions for minimizing interference where spot beams are proximate to gateway terminals, and (6) substantially similar gateway beam and gateway facility locations.  In designing Jupiter, SS/L utilized design features, which were originally conceived by ViaSat, initially utilized in ViaSat-1 and whose advantages were made apparent only by ViaSat's proprietary simulation and modeling capabilities.

48.     More specifically, on information and belief, Jupiter uses spatial separation of user beams and gateway beams and placement of user beams and gateway beams substantially similar to ViaSat-1's design.  The figures below compare the placement of ViaSat-1's user beams and gateway beams (left) with the placement of Jupiter's user beams and gateway beams (right).



49.     Thus, 18 months after SS/L agreed to manufacture ViaSat-1, SS/L sold a satellite to Hughes that was (1) the first satellite ever sold by SS/L to Hughes, (2) a significant departure from the on-board processed satellites developed by Hughes over the prior decade, and (3) nearly identical to the ViaSat-1 satellite in terms of architecture, design and capacity.

50.     Indeed, the single most distinct difference between ViaSat-1 and Jupiter is the utility gateway feature included solely in the Jupiter satellite.  However, consistent with SS/L's pattern and practice of using its customers' proprietary information for its own use, SS/L unlawfully included the utility gateway feature in the Jupiter design in breach of the WildBlue NDA.  Further, the inclusion of the utility gateway invention in the Jupiter satellite not only violates the WildBlue NDA, but also infringes the '942 patent.

51.     Further, on information and belief, SS/L had notice of at least the '942, '043, and '827 patents.  Notwithstanding such notice, SS/L continued to infringe these patents in willful and deliberate disregard of ViaSat and WildBlue's rights and without any objective basis for its actions.

52.     SS/L's infringement of Plaintiffs' patents and its intentional breach of its agreements with ViaSat and WildBlue are ongoing and will continue unabated, unless enjoined through this action.  On information and belief, SS/L is preparing to take orders for additional broadband satellites that will both infringe the Patents-in-Suit and lead to further breaches of the ViaSat NDA, Build Contract and WildBlue NDA, amounting to more than one billion dollars of ill-gotten revenues for SS/L.

53.     Further, ViaSat is informed and believes that SS/L has incorporated aspects of ViaSat's proprietary satellite design technologies as standard elements of SS/L's broadcast and data satellites.  For example, ViaSat believes that SS/L has incorporated satellite capacity and efficiency improving techniques learned from the Capacity Management Tool into many, if not all, of the satellites constructed by SS/L since 2008, and SS/L plans to continue to improperly use these valuable techniques in breach of the ViaSat NDA and Build Contract.

**FIRST CLAIM FOR RELIEF**

**(Infringement of Patent No. 8,107,875)**

54.     Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-53.

55.     The '875 patent, entitled "Placement of Gateways Near Service Beams," was duly and lawfully issued on January 31, 2012.  A true and correct copy of the '875 patent is attached to this Complaint as Exhibit A.

56.     ViaSat is the owner of all rights, title, and interest in the '875 patent, including the right to bring this suit for injunctive relief and damages.

57.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly infringe one or more claims of the '875 patent by making, using, offering to

**COMPLAINT; DEMAND FOR JURY TRIAL**

sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '875 patent.

58.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

59.     SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

60.     ViaSat has been and continues to be damaged by SS/L's infringement of the '875 patent in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Infringement of Patent No. 8,010,043)

61.     Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-60.

62.     The '043 patent, entitled "Capacity Maximization for a Unicast Spot Beam Satellite System," was duly and lawfully issued on August 30, 2011.  A true and correct copy of the '043 patent is attached to this Complaint as Exhibit B.

63.     ViaSat is the owner of all rights, title, and interest in the '043 patent, including the right to bring this suit for injunctive relief and damages.

64.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly infringe one or more claims of the '043 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '043 patent.

65.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

**COMPLAINT; DEMAND FOR JURY TRIAL**

66.     SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

67.     ViaSat has been and continues to be damaged by SS/L's infringement of the '043 patent in an amount to be determined at trial.

68.     On information and belief, SS/L's infringement of the '043 patent was and is willful and deliberate, entitling ViaSat to enhanced damages and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Infringement of Patent No. 8,068,827)

69.     Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-68.

70.     The '827 patent, entitled "Non-interfering Utilization of Non-Geostationary Satellite Frequency Band for Geostationary Satellite Communication," was duly and lawfully issued on November 29, 2011.  A true and correct copy of the '827 patent is attached to this Complaint as Exhibit C.

71.     ViaSat is the owner of all rights, title, and interest in the '827 patent, including the right to bring this suit for injunctive relief and damages.

72.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly infringe one or more claims of the '827 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '827 patent.

73.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

74.     SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

75.     ViaSat has been and continues to be damaged by SS/L's infringement of the '827 patent in an amount to be determined at trial.

76.     On information and belief, SS/L's infringement of the '827 patent was and is willful and deliberate, entitling ViaSat to enhanced damages and attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### (Infringement of Patent No. 7,773,942)

77.     Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-76.

78.     The '942 patent, entitled "Redundant Communication Path for Satellite Communication Data," was duly and lawfully issued on August 10, 2010.  A true and correct copy of the '942 patent is attached to this Complaint as Exhibit D.

79.     WildBlue is the owner of all rights, title, and interest in the '942 patent, including the right to bring this suit for injunctive relief and damages.

80.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly infringe one or more claims of the '942 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '942 patent.

81.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

82.     SS/L's infringing activities have caused and will continue to cause WildBlue irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

83.     WildBlue has been and continues to be damaged by SS/L's infringement of the '942 patent in an amount to be determined at trial.

84.     On information and belief, SS/L's infringement of the '942 patent was and is willful and deliberate, entitling WildBlue to enhanced damages and attorneys' fees.

**FIFTH CLAIM FOR RELIEF**

**(Breach of Contract)**

85.     Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-84.

86.     On March 8, 2006, ViaSat and SS/L executed the Non-Disclosure Agreement.

87.     On April 27, 2007, ViaSat and SS/L executed Amendment Number 1 To Non-Disclosure Agreement.

88.     On January 7, 2008, ViaSat and SS/L executed the Build Contract.

89.     On April 18, 2007, WildBlue and SS/L executed the WildBlue NDA.

90.     On July 21, 2009, WildBlue and SS/L executed Amendment Number 1 To the WildBlue NDA.

91.     On information and belief, SS/L breached the ViaSat NDA by using and disclosing ViaSat's proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to file its own patent applications, to further its relationship with ViaSat competitors, and to develop the Jupiter and other high-capacity satellites, without ViaSat's consent and in direct violation of the terms of the ViaSat NDA.

92.     On information and belief, SS/L breached the Build Contract by using and disclosing ViaSat's intellectual property and proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to file and prosecute its own patent applications, to further its relationship with ViaSat competitors, and to develop the Jupiter and other high-capacity satellites, without ViaSat's consent and in direct violation of the terms of the Build Contract.

93.     On information and belief, SS/L breached the WildBlue NDA by using and disclosing WildBlue's proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to further its relationship with WildBlue's competitors, and to develop aspects of the Jupiter and other high-capacity satellites, without WildBlue's consent and in direct violation of the terms of the WildBlue NDA.

94. As a direct and proximate result of SS/L's above breaches, ViaSat and WildBlue have been damaged in an amount to be proven at trial, including but not limited to lost profits, loss of business, indirect, special, incidental, exemplary, consequential, and/or punitive damages. As specified in the ViaSat NDA, the Build Contract and the WildBlue NDA and acknowledged by the parties, the damages incurred by ViaSat and WildBlue due to SS/L's unlawful use and disclosure of ViaSat and WildBlue's intellectual property and proprietary and confidential information cannot be adequately remedied by damages alone, and ViaSat and WildBlue are also entitled to equitable relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

A. Judgment be entered that SS/L has infringed one or more claims of each of the Patents-in-Suit;

B. Judgment be entered permanently enjoining SS/L, its directors, officers, agents, servants, and employees, and those acting in privity or in concert with them, and their subsidiaries, divisions, successors and assigns, from further acts of infringement of the Patents-in-Suit;

C. Judgment be entered awarding Plaintiffs all damages adequate to compensate them for SS/L's infringement of the Patents-in-Suit, including trebling of all damages awarded with respect to infringement of the '827, '043, and '942 patents, and all pre-judgment and post-judgment interest on all damages awarded for infringement of the Patents-in-Suit at the maximum rate permitted by law;

D. Judgment be entered that this is an exceptional case and awarding Plaintiffs attorneys' fees and costs;

E. Judgment be entered that SS/L has breached its contracts with Plaintiffs;

F. Judgment be entered permanently enjoining SS/L from further breach of its contracts with Plaintiffs;

G. Judgment be entered awarding Plaintiffs all appropriate damages for SS/L's breach of its contracts with SS/L;

1    H.    Judgment be entered awarding all other relief as the Court deems proper.

2

3

DATED: February 1, 2012          Respectfully submitted,

4
                                 QUINN EMANUEL URQUHART &
5                                SULLIVAN, LLP

6

7                                By  /s/ Sean S. Pak
                                     Sean S. Pak
8
                                    Attorneys for Plaintiffs ViaSat, Inc. and ViaSat
9                                   Communications, Inc. f/k/a WildBlue
                                    Communications, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-

**COMPLAINT; DEMAND FOR JURY TRIAL**

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs ViaSat, Inc. and ViaSat Communications, Inc. f/k/a WildBlue Communications, Inc. demand a trial by jury on all issues triable by jury.

DATED:  February 1, 2012           QUINN EMANUEL URQUHART &
                                   SULLIVAN, LLP


                                   By  /s/ Sean S. Pak
                                       Sean S. Pak

                                       Attorneys for Plaintiffs ViaSat, Inc. and ViaSat
                                       Communications, Inc. f/k/a WildBlue
                                       Communications, Inc.

☙JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
VIASAT, INC., VIASAT COMMUNICATIONS, INC., f/k/a WILDBLUE COMMUNICATIONS, INC.,

**(b)** County of Residence of First Listed Plaintiff  San Diego County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
[SEE ATTACHMENT]

## DEFENDANTS
SPACE SYSTEMS/LORAL, INC.

County of Residence of First Listed Defendant  Santa Clara County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

'12CV0260 LAB WVG

## II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☒ 3   Federal Question
        (U.S. Government Not a Party)

☐ 2   U.S. Government
        Defendant

☐ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                            and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V.  ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original
        Proceeding

☐ 2   Removed from
        State Court

☐ 3   Remanded from
        Appellate Court

☐ 4   Reinstated or
        Reopened

☐ 5   Transferred from
        another district
        (specify)

☐ 6   Multidistrict
        Litigation

☐ 7   Appeal to District
        Judge from
        Magistrate
        Judgment

## VI.  CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 271, et seq., 28 U.S.C. §§ 1338(a), 2201, and 2202
Brief description of cause:
Patent infringement and breach of contract

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY   (See instructions):
JUDGE                                DOCKET NUMBER

DATE
02/01/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Sean S. Pak

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

ATTACHMENT TO CIVIL COVER SHEET

I. (c) Attorney's (Firm Name, Address and Telephone Number)

Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Eric E. Wall (Bar No. 248692)
ericwall@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Fred G. Bennett (Bar No. 059135)
fredbennett@quinnemanuel.com
Vincent M. Pollmeier (Bar No. 210684)
vincentpollmeier@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S Figueroa Street 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Attorneys for Plaintiffs ViaSat, Inc. and ViaSat Communications, Inc. f/k/a WildBlue
Communications, Inc.