Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Eric E. Wall (Bar No. 248692)
ericwall@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Yury Kapgan (Bar No. 218366)
yurykapgan@quinnemanuel.com
Vincent M. Pollmeier (Bar No. 210684)
vincentpollmeier@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S Figueroa Street 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

Attorneys for Plaintiff ViaSat, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.,<br><br>               Plaintiff,<br><br>       vs.<br><br>SPACE SYSTEMS/LORAL, INC.,<br>LORAL SPACE & COMMUNICATIONS<br>INC.,<br><br>               Defendants. | CASE NO. 3:12-cv-00260-H-WVG<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>PATENT INFRINGEMENT AND<br>BREACH OF CONTRACT<br><br>**DEMAND FOR JURY TRIAL** |

## **INTRODUCTION**

1.      This is an action for patent infringement and breach of contract relating to

groundbreaking satellite communications technology ViaSat, Inc. ("ViaSat" or "Plaintiff")

confidentially provided to Space Systems/Loral, Inc. ("SS/L") and its parent corporation, Loral

Space & Communications Inc. ("Loral," collectively with SS/L, "Defendants") in connection with

the manufacture of ViaSat's revolutionary first satellite (known as "ViaSat-1").  Recognizing that this technology represented a great leap forward in the satellite communications field, Defendants took ViaSat's ideas as their own by not only attempting to patent those ideas but by also incorporating them into satellites manufactured and sold by Defendants, including a satellite currently being built for one of ViaSat's key competitors.  Defendants' misappropriation of proprietary information was not limited to ViaSat, as Defendants' pattern of using the proprietary information of other companies for their own benefit extended to WildBlue Communications, Inc. ("WildBlue"), which was ViaSat's former business partner, then subsidiary, and finally merged entity for which ViaSat is the successor in interest and assignee of all rights and obligations.  This exploitation of ViaSat's and WildBlue's technologies by Defendants was in disregard of the strict confidentiality agreements signed by SS/L and Loral.

2.    Beginning in the mid-2000s, ViaSat developed next generation satellite and ground equipment technologies that achieved data-carrying capacities more than ten times that of prior generation satellites.  ViaSat's design was truly ahead of its time.  Not only did ViaSat's 100+ Gigabits per second ("Gbps") design greatly surpass the capacity of any single commercial satellite ever built, ViaSat-1 ultimately provided more data capacity at its launch than all 40+ existing commercial data satellites over North America combined (a substantial portion of which had been designed by SS/L).  ViaSat's design was equally groundbreaking in that it was highly cost-effective.  ViaSat-1 achieved a ratio of cost-to-capacity that is one tenth of any commercial satellite previously launched into orbit over North America.  In recognition of ViaSat's innovation in designing ViaSat-1, the TechAmerica Foundation awarded ViaSat the 2011 American Technology Award in the field of telecommunications.

3.    Beginning in September 2006, ViaSat filed multiple patent applications to protect its technological breakthroughs.  Shortly after filing those applications, ViaSat initiated a bid process and conducted meetings with multiple satellite manufacturers, including SS/L and its parent Loral, concerning construction of a satellite incorporating these new technologies.  Recognizing that premature public disclosure or third party use of these technologies could severely compromise the competitive advantage provided by ViaSat-1, ViaSat disclosed the

-2-

1   ViaSat-1 architecture incorporating its innovative satellite technologies to Defendants and the

2   other manufacturers under the terms of strict confidentiality agreements.  Nearly seven months

3   after ViaSat filed its patent applications, SS/L, unbeknownst to ViaSat (and apparently hoping that

4   ViaSat had not filed any patent applications), filed the first of three patent applications using the

5   confidential information ViaSat provided to Defendants in a deliberate attempt by Defendants to

6   claim ViaSat's ideas as their own.

7        4.     Unaware of all of this, ViaSat ultimately selected SS/L to manufacture ViaSat-1 in

8   early 2008, at a cost in excess of $200 million.  ViaSat's award of the contract to SS/L was

9   contingent on SS/L's continued agreement to keep ViaSat's revolutionary design and technology

10  confidential.  ViaSat selected SS/L to manufacture its satellite as a result of Loral's direct

11  involvement in negotiating the sale contract and Loral's agreement to substantially reduce the

12  price of the ViaSat-1 satellite in exchange for the rights to approximately 15% of the satellite's

13  capacity after launch.  Without Loral's direct participation in SS/L's offer for sale, ViaSat would

14  have contracted with a different satellite manufacturer.  This deal was proposed and negotiated

15  primarily by Michael Targoff, Loral's CEO, in response to ViaSat's notifying Loral that ViaSat

16  had selected another satellite vendor to manufacture the ViaSat-1 satellite at the conclusion of its

17  bid process.  This revised bid was eventually described and embodied in a term sheet handwritten

18  by Mr. Targoff himself.

19        5.     Defendants did not keep the technology confidential.  Instead, in June 2009, they

20  announced to ViaSat's surprise that SS/L was building a high capacity satellite at a price in excess

21  of $200 million, named "Jupiter" (now known as "EchoStar XVII"), for a direct competitor of

22  ViaSat.[1]  Jupiter's design is almost identical to ViaSat-1.  As a result of having its own technology

[1]   Subsequent to the Court's May 7, 2012 Order regarding Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Without Prejudice (Dkt. 22), SS/L issued a press release in which it identified the official name of the Jupiter satellite as "EchoStar XVII With Jupiter High-Throughput Technology." For the sake of consistency with the Court's Order and ViaSat's First Amended Complaint, ViaSat continues to refer to this satellite as "Jupiter."

-3-

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

used against it, ViaSat now stands to lose market advantage, including hundreds of thousands of customers that otherwise would have been customers on ViaSat-1 or subsequent ViaSat satellites.

6.      Moreover, Defendants' misappropriation of valuable technology was not limited to ViaSat.  Defendants also misappropriated a highly innovative utility gateway design patented by WildBlue and disclosed to SS/L under a confidentiality agreement.  Despite having received this proprietary information under terms of strict confidentiality, Defendants included this valuable feature in the Jupiter satellite as well.

7.      ViaSat is informed and believes that Defendants are preparing to take orders for additional high-capacity satellites incorporating ViaSat's and WildBlue's misappropriated technology.  ViaSat is further informed and believes that Defendants are incorporating aspects of ViaSat's proprietary information and techniques as standard elements of SS/L's broadcast and data satellites.  ViaSat is informed and believes that many, if not all, of the satellites constructed by SS/L after receiving ViaSat's groundbreaking designs improperly incorporate ViaSat's proprietary information and technology.  ViaSat is informed and believes that this unrestrained behavior of misappropriating technologies in disregard of confidentiality protections will provide Defendants with more than one billion dollars of ill-gotten gains.

8.      Because Defendants have infringed, and continue to infringe, ViaSat's and WildBlue's patents, and have breached SS/L's and Loral's respective contracts with ViaSat and WildBlue, ViaSat and WildBlue seek relief from this Court as detailed below.

## THE PARTIES

9.      ViaSat, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 6155 El Camino Real, Carlsbad, California 92009.

10.      ViaSat Communications, Inc., formerly known as WildBlue Communications, Inc., was a subsidiary of ViaSat, Inc. and a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 349 Inverness Drive South, Englewood, Colorado 80112.  On October 2, 2013, ViaSat Communications, Inc. was merged into ViaSat Inc.,

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

the latter of which acquired all of the assets and liabilities of the former.  Prior to its merger, ViaSat Communications, Inc. also transferred all of its rights in its patents, including the '942 Patent (defined below) at issue in this action to ViaSat Inc.  Due to this respective merger and assignment, ViaSat Inc. owns all rights to ViaSat Communications, Inc.'s causes of action alleged herein.

11.     ViaSat is a world leader in innovative commercial and military satellite and digital communication technologies.  ViaSat employs over 2,100 individuals and has annual revenues in excess of $800 million.  Space News has consistently ranked ViaSat as one of the Top 50 Space Companies in the world.

12.     On information and belief, Space Systems/Loral, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 3825 Fabian Way, Palo Alto, California 94303.

13.     On information and belief, Loral Space & Communications, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 600 Third Avenue, New York, New York 10016.

14.     On information and belief, SS/L is a wholly-owned subsidiary of Loral, responsible for manufacturing communications satellites for commercial and government customers.  Loral and SS/L hold themselves out as a unified "satellite communications company."  On information and belief, Loral's executive officers have been and are actively involved in SS/L's management and SS/L's procurement of commercial satellite manufacturing contracts.  In this regard, Loral has been directly involved in negotiations for SS/L's sales contracts for ViaSat-1, two satellites for NBN Co., and, on information and belief, Jupiter and others.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over ViaSat's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101, *et seq.* and 28 U.S.C. §§ 1338(a), 2201, and 2202.  This Court has supplemental jurisdiction over ViaSat's claims for breach of contract pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or

controversy and derive from a common nucleus of operative fact as ViaSat's claims of patent infringement.

16.     This Court has personal jurisdiction over SS/L and Loral for at least the following reasons:  (i) SS/L and Loral have committed acts of patent infringement and breach of contract in this State; (ii) SS/L is headquartered, regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in this State; (iii) the ViaSat NDA and Build Contract (as defined below) were negotiated and executed in this State; (iv) SS/L and Loral have purposefully established substantial, systematic, and continuous contacts with this District and expect, or should reasonably expect, to be haled into court here; (v) Loral exercises sufficient control over SS/L so as to render SS/L an instrumentality of Loral; (vi) SS/L performs services so important to Loral that, should SS/L cease to exist, Loral would undertake such services itself; (vii) Loral and SS/L possess a unity of interest and ownership such that separate entities do not truly exist; (viii) Loral is registered to do business and has designated a registered agent in this State; (ix) Loral has purposefully established substantial, systematic, and continuous contacts with this State and expects, or should reasonably expect, to be haled into court here; and (x) Loral negotiated and entered into contracts related to ViaSat-1 and the Build Contract in this State. Thus, this Court's exercise of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because SS/L does business in this District, a substantial part of the events or omissions giving rise to this Complaint occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

18.     The key components of a broadband satellite communications system include: (1) a satellite, which relays communications signals to and from the users and gateways, (2) gateways, which control the satellite network and connect the satellite to the internet backbone, and (3) user

FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

terminals (indoor and outdoor units) connecting users to the satellite network.  A communications satellite, in essence, provides the ability to relay a communications signal through the sky.  Signals are sent from gateways on the ground to the satellite, which then amplifies the signals and transmits the amplified signals back to end-users on the ground and vice versa.



19.     For the last 25 years, ViaSat has been a leading provider of innovative satellite and wireless communications networks and equipment for commercial and government users. Building on its years of experience, in the early 2000s ViaSat developed the first Ka-band broadband satellite internet service network for its partner (and now subsidiary) WildBlue. Although the launch of the WildBlue network in the mid-2000s was fairly popular, this popularity was limited to users with no broadband internet alternatives.  These market limitations were due to the capacity limitations and service level capabilities of WildBlue's two satellites, Anik F-2 and WildBlue-1, which together provide approximately 10 Gbps of capacity.  Based on the launch of its SpaceWay 3 satellite with approximately 10 Gbps of capacity in 2007, Hughes Communications, Inc. (collectively with Hughes Network Systems, LLC, "Hughes") achieved similar popularity with unserved users (that is, those without a broadband internet option). WildBlue's two satellites today support approximately 400,000 users, and Hughes' satellite supports approximately 600,000 users, each with a lower speed broadband service (for example, 1-2 Megabits per second ("Mbps")).

**ViaSat's Development of 100+ Gbps Satellite**

20.     Based on the popularity of first generation satellite broadband services, ViaSat recognized a much larger market opportunity existed for satellite broadband through the

04568.51904/5619249.1

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

1   development of broadband satellites with considerably more capacity that were capable of offering

2   a superior level of service to more customers.  Building on its experience developing some of the

3   most advanced satellite networking and ground equipment technologies in the world, ViaSat

4   realized that a breakthrough in satellite capacity could be achieved by throwing out many

5   conventional assumptions with respect to satellite design.  Some of these conventional

6   assumptions related to levels of frequency reuse, user coverage requirements, interference, satellite

7   power, beam spacing and individual beam optimization.

8       21.   ViaSat's unique insights and engineering efforts resulted in the development of

9   several ground-breaking inventions that substantially increased the overall capacity of the satellite

10   system while maintaining the same level of cost.

11       22.   First, in a traditional satellite system, the gateway and user beam signals co-exist in

12   the same geographic space.  Interference is avoided by using different frequencies for gateway

13   beams and user beams.  For example, previous systems, like WildBlue's WildBlue-1 satellite and

14   Hughes' Spaceway 3, located gateways within the same geographic space as the user beams.

15       23.   ViaSat developed novel strategies to roughly double the limited frequency

16   bandwidth (and therefore capacity) by combining the gateway and user beam frequencies and

17   using the combined frequencies for both user beams and gateways.  This doubling of frequency

18   bandwidth was achieved in part by placing the gateway beams in one portion of the United States

19   and the user beams in other portions of the United States.  This separation of user beams and

20   gateway beams reduced the user coverage of the ViaSat-1 system to approximately 50% of the

21   geography of the continental U.S.  However, by strategically focusing the user beams over the

22   highest population areas, ViaSat-1 was still able to achieve user coverage for approximately 75%

23   of the population and market in the continental U.S.

24       24.   ViaSat also realized that the capacity increase from doubling the frequencies more

25   than offset the capacity loss from the additional interference created by having to place the

26   gateway beams and user beams in closer proximity in this system.  ViaSat used proprietary tools

27   and techniques to address interference related to the placement of gateway beams near user beams.

28   Thus, while prior generation broadband satellite systems, including WildBlue-1 and Spaceway 3,

have 100% user coverage of the continental U.S. and much less interference, they only have capacity in the range of 10 Gbps (meaning 1-2 Mbps-type services to 400,000-600,000 customers).  In contrast, ViaSat-1 maintains coverage of approximately 75% of the continental U.S. population and incurs higher levels of interference, but has capacity in excess of 100 Gbps (meaning 12 Mbps-type services to in excess of one million customers).  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research investment and its business and technical foresight.  This invention is described in United States Patent No. 8,107,875 ("the '875 patent"), entitled "Placement of Gateways Near Service Beams," which was duly issued on January 31, 2012.[2]

25.     Second, ViaSat developed pioneering technology to allow ViaSat-1 to exploit then-untapped frequency spectrum.  The Federal Communications Commission ("FCC") had set aside certain frequency spectrum primarily for use by a different type of satellite system ("non-geostationary satellites" or "NGSO satellites"), but allowed for secondary use of this frequency spectrum by geostationary satellites ("GSO satellites") like ViaSat-1 only if they did not interfere with NGSO satellite system signals.  Prior proposed uses of the NGSO spectrum by GSO systems required the entire beam to cease communications during an interference event thereby cutting off services to all users in the beam during each interference event—an unacceptable result for consumer and enterprise based services.

26.     ViaSat recognized that because ViaSat-1 was geostationary—that is, it stayed in the same place in the sky—the potential period of interference with an NGSO satellite, which moves across the sky, would be temporary and relatively short, even if they utilized the same frequency.  ViaSat developed innovative technology that dynamically used the NGSO spectrum by enabling a GSO satellite, such as ViaSat-1, to transmit and receive in both the standard GSO and NGSO frequency blocks during periods of non-interference with NGSO satellite signals.  The ViaSat

---

[2] On January 31, 2012, ViaSat filed a Request to Amend Inventorship Under 35 U.S.C. § 256 and 37 C.F.R. § 1.324 to add Mark Dankberg as an inventor on the '875 patent.  ViaSat's petition was recently granted and, when the Certificate of Correction issues, the change will be retroactive to the original issue date of January 31, 2012.

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

technology automatically ceases any potentially interfering transmissions in a beam whenever an NGSO satellite comes into range of interference while continuing to operate in the standard GSO frequencies.  During such an interference event, each of the beams on the satellite continues to operate, although at lower capacity levels.  Using this technology, ViaSat could add further additional capacity to the satellite using this valuable additional spectrum while still satisfying the FCC's interference regulations in a workable business manner.  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research investment and its business and technical foresight.  This invention is described in United States Patent No. 8,068,827 ("the '827 patent"), entitled "Non-Interfering Utilization of Non-Geostationary Satellite Frequency Band for Geostationary Satellite Communication," which was duly issued on November 29, 2011.

27.     Third, ViaSat recognized that some of the chief capacity limitations from then-state-of-the-art satellites were due to the improper evaluation of the combination of and trade-offs among key satellite parameters, including interference levels, user coverage, spacing between gateway beams, number of gateways, satellite power and individual beam optimization.  Against long-held conventional wisdom, ViaSat developed a system architecture that was comprised of a unique combination of these key satellite parameters to further increase the capacity of the network.  ViaSat was able to achieve these additional capacity increases in part due to the knowledge gained through development of its highly advanced ground network, which was optimized to deal with the same unique combination of satellite parameters.  Recognizing the revolutionary nature of this invention, ViaSat applied for, and received, a patent to protect its research investment and its business and technical foresight.  This invention is described in United States Patent No. 8,010,043 ("the '043 patent"), entitled "Capacity Maximization for a Unicast Spot Beam Satellite System," which was duly issued on August 30, 2011.

28.     Fourth, ViaSat developed a sophisticated, multi-dimensional software tool, the "Capacity Measurement Tool," for modeling and statistically simulating the effects, efficiency and ultimate capacity of a satellite, including the ViaSat-1 design.  ViaSat developed the Capacity Measurement Tool, in part, because SS/L was unable to analyze the sophisticated mathematical

-10-

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

relationships between and among these satellite parameters.  No later than April 2008, ViaSat licensed its Capacity Measurement Tool to SS/L for use solely with the ViaSat-1 satellite.  This innovative tool was invaluable in that it confirmed that the unconventional, yet pioneering satellite design techniques developed by ViaSat would actually produce a functioning 100+ Gbps satellite. In addition, the Capacity Measurement Tool enabled ViaSat to fine-tune the satellite parameters to achieve further improvements to satellite capacity.

29.     The combination of these and other patent-pending innovations allowed ViaSat to develop a single 100+ Gbps satellite that was not only the highest capacity satellite in the world, but represented a single source of capacity well in excess of the capacity of all 40+ commercial data satellites over North America combined (a good portion of which were designed by SS/L). This revolutionary capacity improvement would provide ViaSat the ability to provide a higher quality (for example, 12 Mbps) service to more than one million customers.  ViaSat's design was equally groundbreaking in that it was highly cost-effective.  ViaSat-1 achieved a ratio of cost-to-capacity that is one tenth any commercial satellite previously launched into orbit over North America.  Because prior generation satellites offered fairly limited service to a fraction of the customers, ViaSat stood to create a significant market advantage using its new technology.

**ViaSat's NDA with SS/L**

30.     To safeguard its intellectual property and proprietary information during the bid process for ViaSat-1, ViaSat entered into non-disclosure agreements with a number of satellite manufacturers, including, among others, SS/L.

31.     ViaSat disclosed its proprietary inventions and technologies to SS/L pursuant to an NDA with SS/L signed on March 8, 2006 (the "ViaSat NDA").  The ViaSat NDA explicitly provides, in part, that "the receiving party shall not disclose any Proprietary Information it receives from the disclosing party to any person or entity except its employees and consultants who have a need to know and who have been informed of the obligations under this [agreement]." The ViaSat NDA further specifies that "Proprietary Information shall be used only for the purpose of mutually desirable business purposes, or as the disclosing party otherwise authorizes in

writing."  The ViaSat NDA also states that because "Proprietary Information is valuable and unique . . . disclosure in breach of this Non-Disclosure Agreement may result in irreparable injury to the disclosing party."  Accordingly, the ViaSat NDA provides that "in the event of a breach or threatened breach of the terms of this Non-Disclosure Agreement, the disclosing party shall be entitled to seek an injunction prohibiting any such breach . . . in addition to and not in lieu of any . . . monetary damages."

32.     In October 2006 (the month after ViaSat filed its initial patent applications), ViaSat commenced a process to evaluate certain satellite manufacturers as candidates for the construction of its satellite, and engaged in detailed discussions with SS/L and Loral related to its ViaSat-1 satellite and its proprietary inventions.  ViaSat identified its confidential information, including technical specifications that detailed its innovative technology, as proprietary on numerous occasions and disclosed the information in strict confidence with the explicit understanding that SS/L would use the information only in furtherance of ViaSat's relationship with SS/L.

## SS/L's Patent Filing

33.     Nearly seven months after ViaSat filed its initial patent applications and while Defendants and ViaSat were discussing the possibility of SS/L building ViaSat-1, SS/L, unbeknownst to ViaSat, filed the first of three patent applications in an attempt to claim ViaSat's ground-breaking inventions as its own.  On April 13, 2007, Douglas Burr, an employee of SS/L, filed United States Provisional Application No. 60/923,263, entitled "Multi-Beam Satellite Network to Maximize Bandwidth Utilization" ("the '263 application").  Mr. Burr was one of the lead engineers from SS/L on the ViaSat-1 bid team and project.  Mr. Burr also received confidential emails and other disclosures from ViaSat describing its 100+ Gbps satellite design throughout the bid process and construction of ViaSat-1.

34.     The '263 application states under the heading "Architecture and Performance Objectives": "Capacity of 100 Gb/sec for a single satellite with low cost user terminals."  The provisional application further states under "Solutions may use," "(a) conventional Fixed Satellite

04568.51904/5619249.1
**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

Service (FSS) Ka-band (1 GHz per polarization)" and "(b) conventional FSS Ka-band plus Non Geostationary Orbit (NGSO) Ka-band."

35.     The '263 application states under the heading "Bandwidth Limitations and Reuse": "In order to provide maximum bandwidth per beam (with 4 color re-use) all or most of this bandwidth must be made available for user beams."

36.     The '263 application further discloses spatial separation of user beams and gateways, stating "[l]ocate user beams in the Eastern US and gateway beams in the Western US," and provides the following image illustrating the spatial separation concept ViaSat had developed.



37.     The '263 application also states under the heading "Summary": "A multi-beam Satellite System has been designed to maximize the total bandwidth available to many small terminal users."  The application continues: "[i]n order for this to work without interference, the gateways are located outside of the user region with which they share bandwidth, and sufficiently far apart from each other that they may be served by antenna beams that are spatially isolated from each other.  This approach not only maximizes the available bandwidth in each user beam, but also minimizes the number of gateways required."

38.     As evidenced by the foregoing exemplary citations, by filing the '263 application without ViaSat's consent, SS/L misappropriated and misused ViaSat's confidential and proprietary information regarding its design for a 100+ Gbps satellite, including the spatial separation of user beams and gateways with frequency reuse and the dynamic use of the NGSO spectrum.

39.     Following its improper filing of the '263 application in April 2007, Mr. Burr filed two additional related patent applications on behalf of SS/L:  (1) United States Patent Application No. 11/891,086, entitled "Multi-Beam Satellite Network To Maximize Bandwidth Utilization" ("the '086 application") in August 2007; and (2) United States Patent Application No. 12/861,702, entitled "Multi-Beam Satellite Network To Maximize Bandwidth Utilization" ("the '702 application") in August 2010.  On information and belief, SS/L misappropriated and misused information in breach of its confidentiality agreements by filing the '263 application and by filing and prosecuting the '086 application and the '702 application.  In particular, the '086 application, which issued to SS/L on September 7, 2010 as United States Patent No. 7,792,070, ("the '070 patent"), entitled "Multi-beam Satellite Network to Maximize Bandwidth Utilization," improperly describes ViaSat's proprietary technology as SS/L's own.

**ViaSat's Build Contract with SS/L**

40.     After evaluating final proposals from various satellite manufacturers and negotiating with both SS/L and Loral—and unaware that SS/L had tried to pass ViaSat's inventions off as its own through the '263 and '086 patent applications—ViaSat awarded the contract to manufacture the ViaSat-1 satellite to SS/L (the "Build Contract").

41.     In selecting SS/L as its satellite manufacturer, ViaSat negotiated directly with Loral regarding the terms and conditions of the manufacturing services SS/L would provide to ViaSat. In this respect, ViaSat dealt directly with Michael B. Targoff, Loral's CEO.  Mr. Targoff does not hold any positions at SS/L.  ViaSat also dealt with Arnold Friedman, Loral's Vice President of Satellite Marketing, who also acts as SS/L's Senior Vice President of Worldwide Marketing & Sales.  In these negotiations, Mr. Friedman made clear that he was acting on both Loral and SS/L's behalf.  In addition, a Loral Board member (who also served as a consultant for Loral) participated in multiple meetings and engaged in various negotiations with ViaSat on Defendants' behalf during the ViaSat-1 bid process.

42.     At the conclusion of the bid process, ViaSat selected a manufacturer other than Defendants and communicated to Defendants that they had not been selected to manufacture

-14-

ViaSat-1.  Shortly after receiving this news, Mr. Targoff and Mr. Friedman approached ViaSat with a revised offer regarding ViaSat-1.  Under this revised proposal, Loral agreed to significantly reduce the price of the satellite as well as pay for a portion of the ViaSat-1 launch and insurance costs.  In exchange, Loral negotiated the rights to approximately 15% of ViaSat-1's capacity once it was in orbit (the "Loral Proposal").  Based on this and related representations from Mr. Targoff and Loral, ViaSat reversed its prior decision and commenced exclusive negotiations with Defendants for the ViaSat-1 contract award.

43.     Over the next several weeks and months, ViaSat negotiated directly with Mr. Targoff, other Loral representatives, and SS/L regarding the specific terms of the Loral Proposal and the ViaSat-1 manufacturing contract.  On January 6, 2008, ViaSat and SS/L signed the Build Contract, which outlines the parties' rights and responsibilities with respect to the manufacture of the ViaSat-1 satellite.  ViaSat also signed several related agreements with Loral defining the Loral Proposal, including agreements between Loral and ViaSat related to the orbital slot ViaSat-1 now occupies, Loral's purchase of certain beams and capacity on the ViaSat-1 satellite, and Loral's contribution to the ViaSat-1 launch, insurance, and other program costs.  The ViaSat-1 satellite capacity Loral acquired as a result of the Loral Proposal consisted of nine beams with coverage in Canada and was referred to in the Build Contract as the "Loral Space Payload," which Loral subsequently transferred to its own subsidiary (and SS/L's affiliate), Telesat.  As noted previously, these additional contracts were directly offered by Loral in order to induce ViaSat to select SS/L as its satellite manufacturer.  Of particular relevance here, the Build Contract contains three provisions regarding the use of information provided under the Build Contract.

44.     First, the Build Contract contains terms limiting each party's use of the other's intellectual property.  These provisions in the Build Contract were drafted to reflect an agreement in principle reached at an in person meeting between Mr. Targoff, SS/L, and ViaSat.  In Article 39.2, ViaSat grants SS/L a limited license for the term of the Build Contract, to use "Purchaser [ViaSat] Intellectual Property . . . to the extent necessary to provide Work under the Contract."  "Purchaser Intellectual Property" is defined, in relevant part, as "Intellectual Property owned by the Purchaser [ViaSat] and provided to Contractor [SS/L] related to this Contract (before or after

EDC [effective date of contract, January 7, 2008]) and all Intellectual Property Rights related thereto." Under Section 1.101, "Purchaser Intellectual Property" also includes "any derivatives, improvements, or modifications made by Purchaser [ViaSat] or Contractor [SS/L] thereto, except for derivatives, improvements or modifications that can be used by Contractor [SS/L] without infringing or violating the preexisting Intellectual Property Rights of Purchaser [ViaSat]." "Intellectual Property," in turn, is defined as including "all designs, techniques, analyses, methods, concepts, formulae, layouts, software, inventions (whether patented or patentable), discoveries, improvements, processes, ideas, technical data and documentation, technical information, engineering, manufacturing and other drawings, specification and other similar matter in which an Intellectual Property Right subsists, regardless of whether any of the forgoing has been reduced to writing or practice." "Intellectual Property Rights," as used in Article 39.2, is defined as "all common law and statutory proprietary rights with respect to Intellectual Property, including patent, patent application, copyright, trademark, service mark, trade secret, mask work rights, data rights, moral rights, and similar rights existing from time to time under the intellectual property laws of the United States, any state or foreign jurisdiction, or international treaty regime, regardless of whether such rights exist as of the date hereof or arise or are required at any time in the future."

45. Second, the Build Contract contains specific provisions restricting SS/L's use of the Capacity Measurement Tool. Section 22.2.3 grants SS/L a limited license to use the Capacity Measurement Tool "solely for the purposes of Contractor's [SS/L's] measurement of the capacity of the Satellite. . . ." Section 22.2.3 provides that "upon termination of the license, Contractor [SS/L] will either destroy (or permanently erase) all copies of the Capacity Measurement Tool, or return the original Capacity Measurement Tool to Purchaser [ViaSat]." Section 22.2.4 further provides that ViaSat retains exclusive ownership of "all Intellectual Property Rights" in the Capacity Measurement Tool during the licensing period; that SS/L is not granted any rights in the Capacity Measurement Tool other than the limited license rights described; and that SS/L "will not modify, adapt, create a derivative work of, merge, translate, decompile, disassemble or otherwise reverse engineer Purchaser's [ViaSat's] Capacity Measurement Tool."

04568.51904/5619249.1

46.     Third, the Build Contract contains a "catch-all" provision restricting the disclosure of "Proprietary Information" by either party to the Build Contract.  Article 28.1 defines "Proprietary Information" as "all confidential and proprietary information (other than Deliverable Data which is subject to the provisions of Article 39), in whatever form transmitted, that is disclosed or made available to directly or indirectly by [either party] . . . and (i) is identified as proprietary by means of a written legend thereon or (ii) if disclosed orally, is identified as proprietary at the time of initial disclosure and then summarized in a written document, with the Proprietary Information specifically identified, that is supplied to the receiving party within ten (10) days of initial disclosure."  Article 28.2 precludes either party from disclosing Proprietary Information it receives from the other for ten years after receipt.  Article 28.6 further specifies that "in addition to any other rights and remedies that exist under this Contract, in the event of a breach or threatened breach of this Article, the disclosing party shall be entitled to seek an injunction prohibiting any such breach."

**Loral's NDA with ViaSat**

47.     Three weeks after negotiating and obtaining the Loral Proposal contracts and the Build Contract, Loral entered into a non-disclosure agreement with ViaSat regarding information disclosed as part of the ViaSat-1 project.  This agreement, dated January 28, 2008 (the "Loral NDA"), noted that ViaSat and Loral (both defined in the contract to include their respective subsidiaries; *e.g.*, SS/L had entered into, "among other agreements," a beam sharing agreement and cooperation agreement "relating to a project (the 'Project') to construct, launch and operate a satellite at the 115 W.L. orbital position."  The Project, of course, was ViaSat-1, and the agreements referenced in the Loral NDA were the contracts embodying the Loral Proposal and the Build Contract itself.  To this point, the Loral NDA specifically noted that it did not alter the "Satellite Contract" or "any confidentiality agreement" between ViaSat and SS/L.

48.     The Loral NDA contemplated that Loral and ViaSat "may exchange information with each other" as part of the Project.  In order to protect such information's confidentiality, the disclosing party need to either identify proprietary information provided in written form "as

-17-

proprietary or confidential by means of a written legend," or "if disclosed orally or in a form that is not susceptible of being provided with a written legend, [identify the information] as proprietary or confidential at the time of initial disclosure…."  The Loral NDA applied to proprietary information "provided before or after the date of this Agreement in connection with the Project," meaning that Loral agreed that it would protect proprietary information that had been disclosed to it before the contract's effective date, so long as the disclosure complied with the requirements for proprietary treatment under the contract itself.

49.     In defining what constituted proprietary information under the Loral NDA, Loral agreed that any information it had received from SS/L, but which SS/L had agreed to keep confidential—whether under the ViaSat NDA, WildBlue NDA (defined below), or the Build Contract—retained its confidentiality and could not be properly disclosed without violating the Loral NDA.

50.     Under the ViaSat NDA, Build Contract, and Loral NDA, ViaSat identified its confidential information, including technical specifications that detailed its innovative technology, as proprietary on numerous occasions and disclosed the information in strict confidence with the explicit understanding that Defendants would use the information only in furtherance of ViaSat's relationship with Defendants.  To the extent ViaSat disclosed confidential information to SS/L under the ViaSat NDA and Build Contract, the Loral NDA provided ViaSat comfort that SS/L's subsequent disclosure of that information to Loral would safeguard the information from misuse. On information and belief, SS/L disclosed the confidential information it obtained from ViaSat to Loral.

51.     On December 4, 2009, Loral and ViaSat entered into a supplemental agreement that clarified the Loral NDA.  In this supplement, Loral and ViaSat agreed to clarify the defined terms "Project" and "Loral Assignee," and clarified that the confidentiality restrictions embodied in the Loral NDA applied to information exchanged as part of several enumerated contracts and "other agreements into which the parties may enter from time to time related to the Project."  None of these clarifications changed the substance of the Loral NDA in a way that permitted Loral to use

ViaSat's proprietary information for purposes other than the ViaSat-1 project, nor did these clarifications absolve Loral from breaches that had already occurred.

### WildBlue's Utility Gateway Back Up Invention

52.     Based on its experience operating the first Ka-band broadband network in the world, WildBlue engineers in mid-2006 developed a valuable invention related to using one or more utility gateways to back up the other gateways in a satellite network.  This invention provides increased network reliability without the need for expensive back up facilities in each gateway beam.  For example, if any gateway loses its signal (for instance due to heavy rains), the satellite can route signals from the non-functioning gateway to a single, specified back up gateway.

53.     WildBlue filed a non-provisional patent application on this invention on August 29, 2007, which claimed priority to a provisional application filed on August 29, 2006.  The non-provisional filing resulted in the issuance of United States Patent No. 7,773,942, ("the '942 patent," collectively with the '875, '043, and '827 patents, "the Patents-in-Suit"), entitled "Redundant Communication Path for Satellite Communication Data," on August 10, 2010.  The '942 patent is directed to systems and methods for using a common utility gateway to provide back-up to a plurality of stations.

54.     On April 19, 2007, WildBlue disclosed this invention to SS/L in anticipation of procuring its next broadband satellite.  WildBlue disclosed this utility gateway invention to SS/L under terms of a non-disclosure agreement dated April 18, 2007 between WildBlue and SS/L (the "WildBlue NDA").  The WildBlue NDA explicitly provides, in part, that SS/L and WildBlue "each agree to keep in confidence and prevent the disclosure to any person(s) outside their respective organizations . . . or any person(s) within their organizations . . . not having a need to know, all Proprietary Information received from the other."  The WildBlue NDA further specifies that "[a] Party receiving Proprietary Information will not use such Proprietary Information for purposes other than the Purpose" of the WildBlue NDA.  The WildBlue NDA also states that "[b]oth Parties agree and understand that money damages would not be a sufficient remedy for

breach of [the WildBlue NDA] . . . and that effective enforcement of this Agreement requires that the remedies available for any breach by a Party or its Representatives must include specific performance and/or injunctive relief."  On July 21, 2009, the parties amended the WildBlue NDA to extend its term.

**Defendants' Patent Infringement and Breach of Contract**

55.     On information and belief, Defendants have infringed, and continue to infringe, the Patents-in-Suit and have breached, and continue to breach, the terms of the ViaSat NDA, Build Contract, Loral NDA, and WildBlue NDA by making, using, offering to sell or selling high-capacity broadband satellites.

56.     For example, on or about June 16, 2009, nearly 18 months after SS/L commenced building ViaSat-1, ViaSat learned that Defendants had sold a high capacity Ka-band, bent-pipe satellite, named "Jupiter," for ViaSat's direct competitor, Hughes.  This represented a significant shift for Hughes as it had spent the last decade developing three on-board processing satellites with Boeing Satellite Systems for itself and its sister company, DirecTV, Inc.  On-board processing satellites provide additional flexibility in the network due to the fact that the satellite is able to route data to specific gateways and users.  In addition, these satellites include the flexibility to move some portion of the satellite's capacity from one area to another.  Although "bent-pipe" satellites, like ViaSat-1, have fixed transmission links and do not have the flexibility of on-board processed satellites, the additional equipment required on these on-board processing satellites to achieve this flexibility makes it difficult for the satellite to be optimized for capacity.

57.     Jupiter's design is strikingly similar to ViaSat-1, incorporating, for example, (1) the additional frequency reuse obtained by the spatial separation of user beams and gateway terminals, (2) nearly identical user beam coverage of the continental United States, (3) dynamic use of NGSO spectrum, (4) ViaSat's inventions for optimizing the capacity of the satellite system where interference is greater than noise, (5) ViaSat's inventions for minimizing interference where spot beams are proximate to gateway terminals, and (6) substantially similar gateway beam and gateway facility locations.  In designing Jupiter, SS/L utilized design features, which were

originally conceived by ViaSat, initially utilized in ViaSat-1 and whose advantages were made apparent only by ViaSat's proprietary simulation and modeling capabilities.

58.     More specifically, on information and belief, Jupiter uses spatial separation of user beams and gateway beams and placement of user beams and gateway beams substantially similar to ViaSat-1's design.  The figures below compare the placement of ViaSat-1's user beams and gateway beams (left) with the placement of Jupiter's user beams and gateway beams (right).



59.     Thus, 18 months after Defendants agreed to manufacture ViaSat-1, Defendants sold a satellite to Hughes that was (1) the first satellite ever sold by Defendants to Hughes, (2) a significant departure from the on-board processed satellites developed by Hughes over the prior decade, and (3) nearly identical to the ViaSat-1 satellite in terms of architecture, design and capacity.

60.     Indeed, the single most distinct difference between ViaSat-1 and Jupiter is the utility gateway feature included solely in the Jupiter satellite.  However, consistent with Defendants' pattern and practice of using their customers' proprietary information for their own use, Defendants unlawfully included the utility gateway feature in the Jupiter design in breach of the WildBlue NDA.  Further, the inclusion of the utility gateway invention in the Jupiter satellite not only violates the WildBlue NDA, but also infringes the '942 patent.

61.     Further, Defendants have been provided notice of at least the '875, '043, '827 and '942 patents.  The U.S. Patent and Trademark Office published the applications that issued as the Patents-in-Suit on the following dates: March 6, 2008 ('942 patent); January 22, 2009 ('043

patent); April 9, 2009 ('827 patent); and November 19, 2009 ('875 patent).  No later than August 28, 2009, ViaSat specifically informed SS/L of the patent applications that issued as the '043, '827, and '875 patents and its concerns that SS/L was using the disclosed technology described in those applications in the design of the Jupiter satellite.  In addition, the Build Contract required SS/L to be aware of ViaSat's intellectual property.  For example, SS/L agreed in the Build Contract "not to file for patents covering the Intellectual Property Rights owned by the other Party hereto."  Thus, on information and belief, Defendants knew of the Patents-in-Suit shortly after their issuance or were willfully blind to their existence.  At a minimum, Defendants became aware of the Patents-in-Suit no later than the service of the complaint on February 21, 2012, to which the Patents-in-Suit were attached.  Notwithstanding such notice, Defendants continue to infringe these patents in willful and deliberate disregard of ViaSat and WildBlue's rights and without any objective basis for their actions.

62.     Moreover, SS/L has been, is currently, and unless enjoined, will continue to actively induce and encourage infringement of the Patents-in-Suit.  The Patents-in-Suit have been, are currently, and will continue to be infringed by at least SS/L's customers, including Hughes, using the satellites manufactured by SS/L, including the Jupiter satellite.  For example, on information and belief the Jupiter satellite was launched on or about July 5, 2012 and has since been put into operation by Hughes, directly infringing the Patents-in-Suit.  On information and belief, SS/L actively encouraged and encourages users of its satellites, including Hughes, to infringe the Patents-in-Suit by providing satellites specifically designed and configured to perform infringing functions as part of their use in a satellite system.  Further, on information and belief, SS/L provided and provides technical assistance and instruction to its high-capacity satellite customers, including Hughes, to intentionally aid, assist, enable, and encourage infringement.  As described previously, SS/L was specifically informed on or before August 28, 2009 of the patent applications that issued as the '043, '827, and '875 patents and was aware of the Patents-in-Suit no later than the service of the complaint on February 1, 2012.  SS/L therefore induced and encouraged the infringement of the Patents-in-Suit with specific intent or at a minimum with deliberate indifference to the known risk of such infringement.

63.     In addition, SS/L has been, is currently, and unless enjoined, will continue to contribute to the infringement of the Patents-in-Suit by selling and offering to sell high capacity satellites, including Jupiter.  On information and belief, these satellites and/or their components are designed to be used in a manner that infringes, and are designed with specific technologies and functions that infringe the Patents-in-Suit, including those described in paragraphs 56 - 60, and are not suitable for substantial non-infringing use.  SS/L's satellites, including Jupiter, and/or their components constitute at least a material part of the inventions recited in one or more claims of the Patents-in-Suit and are especially made or adapted for use in infringing the Patents-in-Suit.  Further, SS/L's high capacity satellites, including Jupiter, and/or their components are not staple articles or commodities of commerce suitable for substantial non-infringing use.  SS/L knows and has known that its satellites are especially made or adapted for use in infringing the Patents-in-Suit.  As described previously, SS/L was specifically informed on or before August 28, 2009 of the patent applications that issued as the '043, '827, and '875 patents and was aware of the Patents-in-Suit no later than the service of the complaint on February 1, 2012.

64.     In addition, Loral actively induced, directly participated in, directly controlled, directly benefited from, and is liable for the wrongful actions of SS/L.  As described previously, Loral was actively involved in the bid process for ViaSat-1.  Loral senior executives, notably including Mr. Targoff and Mr. Friedman, marketed SS/L's and Loral's capabilities, and directly negotiated the Build Contract with ViaSat.

65.     On information and belief, Loral is similarly involved with the negotiation of contracts for the sale of other satellites that incorporate ViaSat's inventions and proprietary information.  For example, Loral was directly involved in the sale process for two high capacity broadband satellites to NBN Co., recently announced on February 8, 2012 as a contract for which SS/L was chosen as the satellite manufacturer.  In the lead up to NBN's announcement, Mr. Targoff met directly with senior NBN executives as part of the negotiations for the manufacturing deal.  Mr. Targoff further requested that ViaSat team up with Loral to pitch and work on the NBN satellite project.  ViaSat refused.  After ViaSat filed its initial complaint in this action, it was reported in the media that NBN sought reassurances from Loral, and, specifically, Mr. Targoff,

-23-

that this lawsuit would not jeopardize the manufacturing contracts.  Mr. Targoff reportedly provided such assurances to NBN.

66.    Loral has also historically offered performance guarantees for SS/L's obligations under satellite construction contracts.  These guarantees were offered and provided to potential SS/L customers in order to incentivize them to choose SS/L as their satellite manufacturer and provide financial support assurances that helped solidify the manufacturing contracts.  For example, Loral announced in its SEC Form 10-Q for the quarter ending March 31, 2012 that it had provided "a $60 million performance guarantee that was provided through a surety company" for what ViaSat understands is the NBN satellite manufacturing contract.  On information and belief, and given that it was Loral's reported practice to provide such guarantees, Loral also provided such guarantees on contracts for satellites that infringe ViaSat's inventions and incorporate its proprietary information.

67.    Based on these facts, as well as ViaSat's collaboration with and opposite Mr. Targoff and other senior Loral executives over the past decade, ViaSat alleges on information and belief that Loral and Mr. Targoff were also integrally involved in offering, negotiating, and obtaining the manufacturing contract for the Jupiter satellite with Hughes.  Plaintiffs are also informed and believe that Loral and Mr. Targoff have, or are in the process of offering, negotiating, and obtaining additional contracts for more infringing satellites.  In each such instance, Loral controlled SS/L's activities with respect to its marketing efforts—including what technologies to include in the offered satellites—and final agreement to sell its customers an infringing satellite.  Further, Loral induced SS/L to seek out and enter these contracts despite its knowledge of the Patents-in-Suit.  Without Loral's inducement and support, SS/L would not have offered or obtained the manufacturing contracts.

68.    In addition to its direct involvement in the sale process for SS/L's satellite manufacturing services, there is no meaningful legal difference between Loral and SS/L.  As noted in the preceding Paragraphs, which are incorporated herein by reference, Loral controls SS/L's marketing and the services it offers with respect to satellite manufacturing.  Loral holds itself out as a unified "satellite communications company" and misrepresents to the public on its website,

SEC filings, and other materials that it is "a world-class leader in the design and manufacture of satellites…." This is despite the fact that Loral has no manufacturing operations apart from SS/L. Loral owns 100% of SS/L, and the companies maintain consolidated financial statements. Loral is a holding company with no operations apart from managing SS/L and Loral's affiliates, for which Loral receives a management fee. SS/L and Loral further have overlapping executive officers.

69. Following the initiation of this lawsuit, Mr. Targoff provided several interviews to the media that demonstrated the control Loral exerts over all of SS/L's affairs, including its marketing and sale efforts and its response to this lawsuit. In February 2012, for example, Mr. Targoff gave several interviews in which he referred to SS/L and Loral as "we" despite the fact that Loral had not yet been named as a defendant in the lawsuit. Similarly, in April 2012, Mr. Targoff again gave interviews in which he indicated that he controlled SS/L's response in this lawsuit because he was the CEO of "this company," and that he thought "our counterclaim"— referring to SS/L's separately-filed lawsuit against ViaSat, *Space Systems/Loral, Inc. v. ViaSat, Inc., et al.*, 12-cv-0874-H-WVG (S.D. Cal.) (the "SS/L Lawsuit")—should give Plaintiffs pause.

70. In addition to these facts, there would be an injustice if Loral were not included in this lawsuit because Loral, despite not being a signatory to the contracts, has received, from SS/L, information that was disclosed to SS/L under the ViaSat NDA, Build Contract, and WildBlue NDA. Loral has subsequently put this proprietary information to its own use, including, by way of example and upon information and belief, in the Jupiter sale process, the NBN sale process, and the sale process for several other satellites. If SS/L were the only party enjoined as the result of this lawsuit, Loral would still have access to and use this proprietary information by itself or through one of its other subsidiaries, despite improperly obtaining this information from its subsidiary, SS/L, in violation of the contracts at issue in this case.

71. Defendants' infringement of ViaSat's patents and their intentional breach of SS/L's agreements with ViaSat and WildBlue are ongoing and will continue unabated, unless enjoined through this action. On information and belief, SS/L is preparing to take orders for additional broadband satellites that will both infringe the Patents-in-Suit and lead to further breaches of the ViaSat NDA, Build Contract and WildBlue NDA, amounting to more than one billion dollars of

1    ill-gotten revenues for SS/L.  On information and belief, Loral has offered and negotiated the sales

2    contract for each of these additional broadband satellites.

3          72.    Further, ViaSat is informed and believes that Defendants have incorporated aspects

4    of ViaSat's proprietary satellite design technologies as standard elements of SS/L's broadcast and

5    data satellites.  For example, ViaSat believes based on its own experience and SS/L's declaratory

6    judgment allegations regarding the Build Contract asserted in the recently-filed SS/L Lawsuit, that

7    SS/L has incorporated satellite capacity and efficiency improving techniques learned from the

8    Capacity Management Tool into many, if not all, of the satellites constructed by SS/L since 2008,

9    and Defendants plan to continue to improperly use these valuable techniques in breach of the

10   ViaSat NDA and Build Contract.

## FIRST CLAIM FOR RELIEF

### (Infringement of Patent No. 8,107,875 by SS/L)

14         73.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-

15   72.

16         74.    The '875 patent, entitled "Placement of Gateways Near Service Beams," was duly

17   and lawfully issued on January 31, 2012.  A true and correct copy of the '875 patent is attached to

18   this Complaint as Exhibit A.

19         75.    ViaSat is the owner of all rights, title, and interest in the '875 patent, including the

20   right to bring this suit for injunctive relief and damages.

21         76.    On information and belief, SS/L has been, is currently, and unless enjoined, will

22   continue to directly and indirectly infringe one or more claims of the '875 patent by making,

23   using, offering to sell, and selling within the United States and/or importing into the United States

24   certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or

25   practice one or more claims of the '875 patent.

26         77.    On information and belief, SS/L has been, is currently, and unless enjoined, will

27   continue to actively induce and encourage infringement of the '875 patent.  The '875 patent has

28   been, is currently, and will continue to be infringed by at least SS/L's customers, including

Hughes, using the satellites manufactured by SS/L, including the Jupiter satellite. SS/L was aware of the '875 Patent no later than February 1, 2012, and has actively encouraged and continues to actively encourage infringement with specific intent or at a minimum with willful blindness to the known risk of such infringement.

78.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to contribute to the infringement of the '875 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States, satellites that constitute at least a material part of the inventions recited in one or more claims of the ViaSat Patents, that are and are known by SS/L to be especially made or adapted for use in an infringement of the ViaSat Patents, and that are not a staple article or commodity of commerce suitable for substantial non-infringing use.  On information and belief, at least some components and/or technologies of SS/L's satellites, including Jupiter, are used only to infringe the '875 patent.

79.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

80.     SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

81.     ViaSat has been and continues to be damaged by SS/L's infringement of the '875 patent in an amount to be determined at trial.

82.     On information and belief, SS/L's infringement of the '875 patent was and is willful and deliberate because SS/L knew or should have known of the '875 patent and that its acts described above would infringe the '875 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

## SECOND CLAIM FOR RELIEF

### (Infringement of Patent No. 8,107,875 by Loral)

83.     ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-82.

**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**

84.     Loral has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '875 patent.  Loral is liable for SS/L's infringement as, on information and belief, Loral formulates, directs and/or controls SS/L's operations, management and/or policies.  Further, Loral knowingly induced infringement and possessed specific intent to encourage SS/L's direct infringement.  On information and belief, Loral induced SS/L to make, use, sell, or offer for sale certain devices, including but not limited to the Jupiter satellite, knowing or willfully blind to the fact that such acts constituted patent infringement.

85.     On information and belief, Loral's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

86.     Loral's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless Loral's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

87.     ViaSat has been and continues to be damaged by Loral's infringement of the '875 patent in an amount to be determined at trial.

88.     On information and belief, Loral's infringement of the '875 patent was and is willful and deliberate because Loral knew or should have known of the '875 patent and that its acts described above would infringe the '875 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

### THIRD CLAIM FOR RELIEF

### (Infringement of Patent No. 8,010,043 by SS/L)

89.     ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-88.

90.     The '043 patent, entitled "Capacity Maximization for a Unicast Spot Beam Satellite System," was duly and lawfully issued on August 30, 2011.  A true and correct copy of the '043 patent is attached to this Complaint as Exhibit B.

91.     ViaSat is the owner of all rights, title, and interest in the '043 patent, including the right to bring this suit for injunctive relief and damages.

92.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '043 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '043 patent.

93.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to actively induce and encourage infringement of the '043 patent.  The '043 patent has been, is currently, and will continue to be infringed by at least SS/L's customers, including Hughes, using the satellites manufactured by SS/L, including the Jupiter satellite. SS/L was aware of the '043 Patent no later than February 1, 2012, and has actively encouraged and continues to actively encourage infringement with specific intent or at a minimum with willful blindness to the known risk of such infringement.

94.     On information and belief, SS/L has been, is currently, and unless enjoined, will continue to contribute to the infringement of the '043 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States, satellites that constitute at least a material part of the inventions recited in one or more claims of the ViaSat Patents, that are and are known by SS/L to be especially made or adapted for use in an infringement of the ViaSat Patents, and that are not a staple article or commodity of commerce suitable for substantial non-infringing use.  On information and belief, at least some components and/or technologies of SS/L's satellites, including Jupiter, are used only to infringe the '043 patent.

95.     On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

96.     SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

97.     ViaSat has been and continues to be damaged by SS/L's infringement of the '043 patent in an amount to be determined at trial.

98.     On information and belief, SS/L's infringement of the '043 patent was and is willful and deliberate because SS/L knew or should have known of the '043 patent and that its acts described above would infringe the '043 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

## FOURTH CLAIM FOR RELIEF

### (Infringement of Patent No. 8,010,043 by Loral)

99.     ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-98.

100.     Loral has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '043 patent.  Loral is liable for SS/L's infringement as, on information and belief, Loral formulates, directs and/or controls SS/L's operations, management and/or policies.  Further, Loral knowingly induced infringement and possessed specific intent to encourage SS/L's direct infringement.  On information and belief, Loral induced SS/L to make, use, sell, or offer for sale certain devices, including but not limited to the Jupiter satellite, knowing or willfully blind to the fact that such acts constituted patent infringement.

101.     On information and belief, Loral's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

102.     Loral's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless Loral's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

103.     ViaSat has been and continues to be damaged by Loral's infringement of the '043 patent in an amount to be determined at trial.

104.     On information and belief, Loral's infringement of the '043 patent was and is willful and deliberate because Loral knew or should have known of the '043 patent and that its acts described above would infringe the '043 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

### FIFTH CLAIM FOR RELIEF

### (Infringement of Patent No. 8,068,827 by SS/L)

105.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-104.

106.    The '827 patent, entitled "Non-interfering Utilization of Non-Geostationary Satellite Frequency Band for Geostationary Satellite Communication," was duly and lawfully issued on November 29, 2011.  A true and correct copy of the '827 patent is attached to this Complaint as Exhibit C.

107.    ViaSat is the owner of all rights, title, and interest in the '827 patent, including the right to bring this suit for injunctive relief and damages.

108.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '827 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '827 patent.

109.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to actively induce and encourage infringement of the '827 patent.  The '827 patent has been, is currently, and will continue to be infringed by at least SS/L's customers, including Hughes, using the satellites manufactured by SS/L, including the Jupiter satellite. SS/L was aware of the '827 Patent no later than February 1, 2012, and has actively encouraged and continues to actively encourage infringement with specific intent or at a minimum with willful blindness to the known risk of such infringement.

110.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to contribute to the infringement of the '827 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States, satellites that constitute at least a material part of the inventions recited in one or more claims of the ViaSat Patents, that are and are known by SS/L to be especially made or adapted for use in an infringement of the ViaSat Patents, and that are not a staple article or commodity of commerce suitable for substantial non-

1  infringing use.  On information and belief, at least some components and/or technologies of

2  SS/L's satellites, including Jupiter, are used only to infringe the '827 patent.

3      111.    On information and belief, SS/L's infringement is literal or, in the alternative,

4  infringement under the doctrine of equivalents.

5      112.    SS/L's infringing activities have caused and will continue to cause ViaSat

6  irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities

7  are enjoined by this Court in accordance with 35 U.S.C. § 283.

8      113.    ViaSat has been and continues to be damaged by SS/L's infringement of the '827

9  patent in an amount to be determined at trial.

10      114.    On information and belief, SS/L's infringement of the '827 patent was and is

11  willful and deliberate because SS/L knew or should have known of the '827 patent and that its acts

12  described above would infringe the '827 patent, but acted despite an objectively high likelihood

13  that such acts would infringe the patent.

14

15                            **SIXTH CLAIM FOR RELIEF**

16                   **(Infringement of Patent No. 8,068,827 by Loral)**

17      115.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-

18  114.

19      116.    Loral has been, is currently, and unless enjoined, will continue to directly and

20  indirectly infringe one or more claims of the '827 patent.  Loral is liable for SS/L's infringement

21  as, on information and belief, Loral formulates, directs and/or controls SS/L's operations,

22  management and/or policies.  Further, Loral knowingly induced infringement and possessed

23  specific intent to encourage SS/L's direct infringement.  On information and belief, Loral induced

24  SS/L to make, use, sell, or offer for sale certain devices, including but not limited to the Jupiter

25  satellite, knowing or willfully blind to the fact that such acts constituted patent infringement.

26      117.    On information and belief, Loral's infringement is literal or, in the alternative,

27  infringement under the doctrine of equivalents.

28

118.    Loral's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless Loral's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

119.    ViaSat has been and continues to be damaged by Loral's infringement of the '827 patent in an amount to be determined at trial.

120.    On information and belief, Loral's infringement of the '827 patent was and is willful and deliberate because Loral knew or should have known of the '827 patent and that its acts described above would infringe the '827 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

## SEVENTH CLAIM FOR RELIEF

### (Infringement of Patent No. 7,773,942 by SS/L)

121.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-120.

122.    The '942 patent, entitled "Redundant Communication Path for Satellite Communication Data," was duly and lawfully issued on August 10, 2010.  A true and correct copy of the '942 patent is attached to this Complaint as Exhibit D.

123.    ViaSat is the owner of all rights, title, and interest in the '942 patent, including the right to bring this suit for injunctive relief and damages.

124.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '942 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States certain devices, including but not limited to the Jupiter satellite.  These devices embody and/or practice one or more claims of the '942 patent.

125.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to actively induce and encourage infringement of the '942 patent.  The '942 patent has been, is currently, and will continue to be infringed by at least SS/L's customers, including Hughes, using the satellites manufactured by SS/L, including the Jupiter satellite. SS/L was aware

of the '942 Patent no later than February 1, 2012, and has actively encouraged and continues to actively encourage infringement with specific intent or at a minimum with willful blindness to the known risk of such infringement.

126.    On information and belief, SS/L has been, is currently, and unless enjoined, will continue to contribute to the infringement of the '942 patent by making, using, offering to sell, and selling within the United States and/or importing into the United States, satellites that constitute at least a material part of the inventions recited in one or more claims of the ViaSat Patents, that are and are known by SS/L to be especially made or adapted for use in an infringement of the ViaSat Patents, and that are not a staple article or commodity of commerce suitable for substantial non-infringing use.  On information and belief, at least some components and/or technologies of SS/L's satellites, including Jupiter, are used only to infringe the '942 patent.

127.    On information and belief, SS/L's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

128.    SS/L's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless SS/L's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

129.    ViaSat has been and continues to be damaged by SS/L's infringement of the '942 patent in an amount to be determined at trial.

130.    On information and belief, SS/L's infringement of the '942 patent was and is willful and deliberate because SS/L knew or should have known of the '942 patent and that its acts described above would infringe the '942 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

## EIGHTH CLAIM FOR RELIEF

### (Infringement of Patent No. 7,773,942 by Loral)

131.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-130.

132.    Loral has been, is currently, and unless enjoined, will continue to directly and indirectly infringe one or more claims of the '942 patent.  Loral is liable for SS/L's infringement as, on information and belief, Loral formulates, directs and/or controls SS/L's operations, management and/or policies.  Further, Loral knowingly induced infringement and possessed specific intent to encourage SS/L's direct infringement.  On information and belief, Loral induced SS/L to make, use, sell, or offer for sale certain devices, including but not limited to the Jupiter satellite, knowing or willfully blind to the fact that such acts constituted patent infringement.

133.    On information and belief, Loral's infringement is literal or, in the alternative, infringement under the doctrine of equivalents.

134.    Loral's infringing activities have caused and will continue to cause ViaSat irreparable harm, for which it has no adequate remedy at law, unless Loral's infringing activities are enjoined by this Court in accordance with 35 U.S.C. § 283.

135.    ViaSat has been and continues to be damaged by Loral's infringement of the '942 patent in an amount to be determined at trial.

136.    On information and belief, Loral's infringement of the '942 patent was and is willful and deliberate because Loral knew or should have known of the '942 patent and that its acts described above would infringe the '942 patent, but acted despite an objectively high likelihood that such acts would infringe the patent.

## NINTH CLAIM FOR RELIEF

### (Breach of Contract by SS/L)

137.    ViaSat incorporates by reference the preceding averments set forth in paragraphs 1-136.

138.    On March 8, 2006, ViaSat and SS/L executed the Non-Disclosure Agreement.

139.    On April 27, 2007, ViaSat and SS/L executed Amendment Number 1 To Non-Disclosure Agreement.

140.    On January 7, 2008, ViaSat and SS/L executed the Build Contract.

141.    On April 18, 2007, WildBlue and SS/L executed the WildBlue NDA.

142.    On July 21, 2009, WildBlue and SS/L executed Amendment Number 1 To the WildBlue NDA.

143.    On information and belief, SS/L breached the ViaSat NDA by using and disclosing ViaSat's proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to file its own patent applications, to further its relationship with ViaSat competitors, and to develop the Jupiter and other high-capacity satellites, without ViaSat's consent and in direct violation of the terms of the ViaSat NDA.

144.    On information and belief, SS/L breached the Build Contract by using and disclosing ViaSat's intellectual property and proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to file and prosecute its own patent applications, to further its relationship with ViaSat competitors, and to develop the Jupiter and other high-capacity satellites, without ViaSat's consent and in direct violation of the terms of the Build Contract.

145.    On information and belief, SS/L breached the WildBlue NDA by using and disclosing WildBlue's proprietary and confidential information for SS/L's benefit, including without limitation using and disclosing such information to further its relationship with WildBlue's competitors, and to develop aspects of the Jupiter and other high-capacity satellites, without WildBlue's consent and in direct violation of the terms of the WildBlue NDA.

146.    As a direct and proximate result of SS/L's above breaches, ViaSat has been damaged in an amount to be proven at trial, including but not limited to lost profits, loss of business, indirect, special, incidental, exemplary, consequential, and/or punitive damages.  As specified in the ViaSat NDA, the Build Contract and the WildBlue NDA and acknowledged by the parties, the damages incurred by ViaSat and WildBlue due to SS/L's unlawful use and disclosure of ViaSat and WildBlue's intellectual property and proprietary and confidential information cannot be adequately remedied by damages alone, and ViaSat and WildBlue are also entitled to equitable relief.

## TENTH CLAIM FOR RELIEF

### (Breach of Contract by Loral)

147.    Plaintiffs incorporate by reference the preceding averments set forth in paragraphs 1-146.

148.    On January 28, 2008, ViaSat and Loral executed the Loral NDA.

149.    On December 4, 2009, ViaSat and Loral executed a supplemental clarification to the Loral NDA.

150.    On information and belief, Loral breached the Loral NDA by using and disclosing ViaSat's proprietary and confidential information for Loral's benefit, including without limitation using and disclosing such information to further its relationship with ViaSat competitors, and to develop the Jupiter and other high-capacity satellites, without ViaSat's consent and in direct violation of the terms of the Loral NDA.

151.    As a direct and proximate result of Loral's above breaches, ViaSat has been damaged in an amount to be proven at trial, including but not limited to lost profits, loss of business, indirect, special, incidental, exemplary, consequential, and/or punitive damages. As specified in the Loral NDA and acknowledged by the parties, the damages incurred by ViaSat due to Loral's unlawful use and disclosure of ViaSat's proprietary and confidential information cannot be adequately remedied by damages alone, and ViaSat is also entitled to equitable relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

A.      Judgment be entered that Defendants have infringed one or more claims of each of the Patents-in-Suit;

B.      Judgment be entered permanently enjoining Defendants, their directors, officers, agents, servants, and employees, and those acting in privity or in concert with them, and their subsidiaries, divisions, successors and assigns, from further acts of infringement of the Patents-in-Suit;

1       C.     Judgment be entered awarding ViaSat all damages adequate to compensate it for

2  Defendants' infringement of the Patents-in-Suit, including trebling of all damages awarded with

3  respect to infringement of the '875, '827, '043, and '942 patents, and all pre-judgment and post-

4  judgment interest on all damages awarded for infringement of the Patents-in-Suit at the maximum

5  rate permitted by law;

6       D.     Judgment be entered that this is an exceptional case and awarding Plaintiffs

7  attorneys' fees and costs;

8       E.     Judgment be entered that Defendants have breached their contracts with Plaintiffs;

9       F.     Judgment be entered permanently enjoining Defendants from further breach of their

10  contracts with Plaintiffs;

11       G.     Judgment be entered awarding ViaSat all appropriate damages for Defendants'

12  breach of their contracts with ViaSat;

13       H.     Judgment be entered awarding all other relief as the Court deems proper.

DATED:  November 14, 2013       Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By  */s/ Sean S. Pak*
    Sean S. Pak

Attorneys for Plaintiff ViaSat, Inc.

1

## DEMAND FOR JURY TRIAL

2        In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff ViaSat, Inc. demands a

3   trial by jury on all issues triable by jury.

4

5   DATED:  November 14, 2013              QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP

6

7                                         By  /s/ Sean S. Pak
                                              Sean S. Pak

8
                                          Attorneys for Plaintiff ViaSat, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that, on November 14, 2013, I caused the foregoing **FOURTH AMENDED COMPLAINT** to be served on Defendants' counsel via the Court's CM/ECF system.

DATED:  November 14, 2013

By _s/ Sean S. Pak_____

Sean S. Pak

-40-
**FOURTH AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**