William Christopher Carmody
(Admitted *pro hac vice*)
Jacob W. Buchdahl
(Admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone:   (212) 336-8330
Facsimile:    (212) 336-8340
Email: bcarmody@susmangodfrey.com
Email: jbuchdahl@susmangodfrey.com

Marc M. Seltzer (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:   (310) 789-3100
Facsimile:    (310) 789-3150
Email: mseltzer@susmangodfrey.com

[Additional counsel listed below signature line]
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.,<br><br>          Plaintiff,<br><br>     vs.<br><br>SPACE SYSTEMS/LORAL, INC.,<br>LORAL SPACE &<br>COMMUNICATIONS INC.,<br><br>          Defendants/Counterclaim<br>          Plaintiffs. | Case No. 3:12-cv-00260-H-WVG<br><br>Hon. Marilyn L. Huff<br><br>**[PUBLIC-REDACTED]**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**<br><br>Date: January 24, 2014<br>Time: 9:00 am<br>Place: Courtroom 15A |

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................1

II.     RULE 702 LEGAL STANDARD .......................................................3

III.    DR. SLOTTJE'S LOST PROFIT OPINIONS SHOULD BE
        EXCLUDED AS SPECULATIVE AND UNRELIABLE ..........................4

        A.  ViaSat's Burden to Prove Lost Profits .......................................4

        B.  Because ViaSat and SS/L Do Not Compete In Either the Satellite
            Manufacturing Market or the Broadband Internet Market, There Is
            No Legal Basis to Award Lost Profits........................................6

        C.  Dr. Slottje's Lost Profits Opinion is Speculative, Unreliable, and
            Lacks Evidentiary Support .......................................................6

            1.  Absence of Non-Infringing Alternatives Precludes Lost
                Profits.............................................................................7

            2.  Dr. Slottje's Opinion on ViaSat's "But For" Capture Rate is
                Purely Speculative. ..........................................................9

IV.     DR. SLOTTJE'S REASONABLE ROYALTY OPINIONS FOR
        JUPITER SHOULD BE EXCLUDED AS UNRELIABLE ...................14

        A.  Dr. Slottje's Assumption that SS/L Would Have Paid 31 Times Its
            Anticipated Profits for a License to Use ViaSat's Patents on
            Jupiter-1 Has No Factual or Economic Basis.........................14

            1.  SS/L Had No Contractual Obligation to Hughes Requiring It
                to Lease Capacity or Pay Such a Large Royalty, and Dr.
                Slottje Failed to Consider SS/L's Non-Infringing
                Alternatives....................................................................15

            2.  Dr. Slottje's Opinion That SS/L Would Pay Such a Royalty to
                Avoid "Reputational Damage" Is Pure Speculation.....................17

        B.  Dr. Slottje Unreliably Bases His Reasonable Royalty Calculations
            On Non-Comparable Agreements and Proposals That Are
            Irrelevant as a Matter of Law and Are Not Proper Benchmarks.............18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

C.   Dr. Slottje's "Reasonableness Checks" Considering the Price of
     SS/L, Hughes, and WildBlue, and the Total Market Value of
     ViaSat's Subscribers Must Be Excluded ................................................. 22

V.    CONCLUSION ............................................................................................ 24

2985303v1/013090

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Apple, Inc. v. Motorola, Inc.*,
  No. 1:11-cv-08540, 2012 WL 1959560 (N.D. Ill. May 22, 2012)........2, 13, 17

4

5

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
  1 F.3d 1214 (Fed. Cir. 1993) ........................................................................4, 7

6

7

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992) .........................................................................5

8

*Crystal Semiconductor Corp. v. TiriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) .........................................................................4

9

10

*DataQuill Ltd. v. High Tech. Computer Corp.*,
  No. 08-cv-543, 2012 WL 1284381 (S.D. Cal. April 16, 2012) ................20, 21

11

12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ...................................4

13

*Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*,
  446 F.2d 295 (2d Cir. 1971) ............................................................................15

14

15

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................................24

16

17

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) .....................................................................2, 5

18

*Herbert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ...........................................................................6

19

20

*IP Innovation L.L.C. v. Red Hat, Inc.*,
  705 F. Supp. 2d 687 (E.D. Tex. 2010) .......................................................18, 20

21

22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ......................................................................4, 18

23

24

*Lindemann Maschinefabrik GmbH v. Am. Hoist & Derrick Co., Harris
  Press & Shear Div.*,
  895 F.2d 1403 (Fed. Cir. 1990) .......................................................................15

2985303v1/013090

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ................................................................ 19, 20

*Lucent Techs., Inc. v. Microsoft Corp.*,
No. 07-CV-2000, 2011 WL 2728317 (S.D. Cal. July 13, 2011) ....................... 4

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005) ....................................................................... 4

*Milos Misha Subotincic v. 1274274 Ontario Inc.*,
SACV 10-01946, 2013 WL 3964994 (C.D. Cal. Apr. 9, 2013) ........................ 9

*PACT XPP Techs., AG v. Xilinx, Inc.*,
No. 07-CV-563-RSP, 2012 WL 2774971 (E.D. Tex. May 13, 2012) ............. 23

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978) .......................................................................... 5

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) ....................................................................... 6

*Quad/Graphics, Inc. v. One2One Comms., LLC*,
No. 09-CV-99-JPS, 2011 WL 4478440 (E.D. Wis. Sept. 23, 2011) .............. 17

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ....................................................................... 20

*Riles v. Shell Expl. & Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002) ................................................................. 5, 15

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) ................................................................... 5, 18

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989) ....................................................................... 7

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
750 F.2d 1552 (Fed. Cir. 1984) ..................................................................... 15

*TruePosition Inc. v. Andrew Corp.*,
568 F. Supp. 2d 500(D. Del. 2008) ................................................................. 5

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ............................................... 19, 22, 23, 24

1

2

*United States v. Rosacker*,
   314 F.3d 422 (9th Cir. 2002) ............................................................. 13

*Wechsler v. Macke Int'l Trade, Inc.*,
   486 F.3d 1286 (Fed. Cir. 2007) .......................................................... 6

**Rules**

Federal Rule of Evidence 702 ......................................................... 4, 19

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

2985303v1/013090

Defendants Space Systems/Loral, LLC and Loral Space & Communications Inc. (collectively, "SS/L") move to exclude the unreliable and speculative lost profits and "reasonable" royalty opinions of ViaSat's damages expert, Dr. Daniel Slottje.

## I.   INTRODUCTION

At the hypothetical negotiation in 2011, SS/L anticipated only ▉▉▉▉▉▉▉ in profits on the Jupiter satellite—an amount that is more than ▉▉▉▉▉▉▉ than the $▉▉▉▉▉▉▉ Dr. Slottje suggests that SS/L would have agreed to pay for a limited license to use ViaSat's patented technology on the Jupiter satellite.[1] SS/L charged Hughes only ▉▉▉▉▉▉▉ to build the entire satellite. It defies logic to suggest that SS/L would have agreed to pay ViaSat more than twice the cost of the entire satellite when it would have cost SS/L ▉▉▉▉▉▉▉ less to simply walk away from its contract with Hughes.

Dr. Slottje's heavily inflated damages calculations ignore this economic reality, however, and instead are based on speculation, irrelevant data, and a creative "but for" world that is entirely removed from the facts of this case. He renders three basic damages opinions with regard to the Jupiter satellite: First, he opines that ViaSat is entitled to ▉▉▉▉▉▉▉ in lost profits through Q2 2016—based on the lost subscribers that he alleges ViaSat would have captured from Jupiter had Hughes only launched a ▉▉▉▉▉▉▉. Second, he states that in addition to lost profits, ViaSat is entitled to a ▉▉▉▉▉▉▉ for Hughes' use of Jupiter from Q2 2016 through the expiration of the patent, based on the amount of capacity he alleges SS/L would have had to lease for Hughes in order to avoid unspecified and

---

[1] Dr. Slottje's proposed royalty would grant a license to SS/L to use the patented technology *on Jupiter-1*—not a general license to use the patented technology. "Bageant Decl." Ex. 1 at 47.

unquantifiable "reputational damages." Third, he concludes that if lost profits aren't awarded, ViaSat is entitled to ██████████ in royalties for the entire damages period. Each of these opinions fail "to meet a minimum threshold of reasonableness," and must be excluded because there "is simply too great an analytical gap between the data and the opinion proffered." *Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 1959560, at *2, 6 (N.D. Ill. May 22, 2012) (J. Posner, sitting by designation).

Dr. Slottje's lost profits analysis must be excluded because it lapses "into pure speculation" and lacks a sound economic basis. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). First, as a legal matter, lost profits are not available to ViaSat because SS/L and ViaSat are not competitors and ViaSat does not make or sell satellites that use or compete with its patented technology. Second, Dr. Slottje erroneously creates a but-for world in which ViaSat captures all of Jupiter's excess subscribers for two years notwithstanding his admission that (1) Hughes and ViaSat compete in a much larger broadband Internet market that includes alternatives including DSL, dial-up, cable, 3G/4G, and others; (2) ViaSat's own survey data indicates that ████████████████████████ ████████████████████████r; (3) ViaSat would not have had the capacity to capture all of Jupiter's subscribers on a beam-by-beam basis; and (4) ViaSat projects subscriber usage rates will ██████████ for the next three years, which will affect subscriber capacity. Furthermore, Dr. Slottje did not even consider that SS/L would have been able to build a non-infringing satellite for Hughes that would greatly exceed ████████ "but for" satellite on which Dr. Slottje bases his lost profits.

Dr. Slottje's "reasonable" royalty analysis is similarly flawed. Dr. Slottje opines that at the hypothetical negotiation SS/L would have agreed to pay ViaSat $██████[2] to license three patents for use <u>only in Jupiter</u>—an amount that is over ██████████ SS/L's total anticipated profit for Jupiter and more than double the sales price of the satellite, ████████ SS/L's total profit for the entire year on <u>all</u> of its satellites, and ██████████████████████ Dr. Slottje assumes without any factual basis that SS/L would have paid such an exorbitant royalty to avoid "reputational harm." He invents a hypothetical negotiation scenario devoid of any evidentiary basis wherein SS/L considers leasing ████████ of capacity for Hughes in order to avoid the invented and unquantifiable reputational harm, and in doing so concludes that the cost of leasing capacity on a built, launched, and insured satellite is indicative of the value of ViaSat's patents. Dr. Slottje's reliance on agreements and proposals by other companies to lease, buy, or sell capacity (and related products and services) on satellites is unsupportable. As a result, Dr. Slottje's reasonable royalty calculation is entirely unreliable and must be excluded.

Finally, Dr. Slottje's "reasonableness checks," which compare his proposed royalty to the acquisition price of WildBlue, Hughes and SS/L; and the income potential of a fully built and launched satellite, must be excluded. None of these data points are remotely reflective of the value to SS/L of licensing ViaSat's technology and must be excluded.

## II.    RULE 702 LEGAL STANDARD

Expert testimony must meet the standards of Federal Rule of Evidence 702,

---

[2] Dr. Slottje also includes an alternative royalty of ██████████ if lost profits is awarded. This motion is directed to both proposed royalties.

which requires: (1) that the testimony is based on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness applied the principles and methods reliably to the facts of the case. The trial judge must act as gatekeeper to ensure that evidence put before the jury "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[T]he district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005).

An expert's testimony regarding patent infringement damages must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). "[A]ny economic expert testifying about patent damages must base the opinion on sound economic principles meeting the test in *Daubert* and Rule 702 . . . ." *Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-CV-2000, 2011 WL 2728317, at *2 (S.D. Cal. July 13, 2011) (Huff, J.).

### III. DR. SLOTTJE'S LOST PROFIT OPINIONS SHOULD BE EXCLUDED AS SPECULATIVE AND UNRELIABLE

#### A. ViaSat's Burden to Prove Lost Profits.

To recover lost profits, "a patent owner must prove a causal relation between the infringement and its loss of profits." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). Thus, "the burden rests on the patentee to show a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Crystal Semiconductor Corp. v. TiriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001). To meet this burden, the patentee must typically establish the following factors: "(1) demand

for the patented product, (2) absence of acceptable non-infringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit it would have made." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

"This formulation requires the patentee to reconstruct the market, by definition a hypothetical enterprise, to project economic results that did not occur." *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing*, 185 F.3d at 1350.

There is a "heightened burden" requirement to prove future lost profits. *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 526 (D. Del. 2008) *amended in part on other grounds*, CIV. 05-747, 2009 WL 192470 (D. Del. Jan. 27, 2009). "The burden of proving future injury is commensurately greater than that for damages already accrued, for the future always harbors unknowns." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992). "Although projected future losses may be recovered when sufficiently supported, the amount of lost profits awarded must not be speculative." *Id.* (internal citations omitted). As a result, "uncertainties of future pricing, future competition, and future markets, in [a] fast-moving field, as well as the requirements of proof of future losses" may render evidence regarding future lost profits "too speculative to meet the threshold requirements for a sustainable jury verdict." *Id.*

1

2

      **B.**     **There is no Legal Basis to Award Lost Profits Because ViaSat and SS/L Do Not Compete in Either the Satellite Manufacturing Market or the Broadband Internet Market.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

     Dr. Slottje's lost profits analysis must be excluded because ViaSat does not make or sell a product that competes with the alleged infringing satellites. Lost profits are only available if the plaintiff's product "directly competes with the infringing device." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012) ("Because [the plaintiff] conceded that the [patent at issue] does not cover its BB capacitors, this record must show that the BB capacitors directly competed with [the defendant's accused product]" to obtain lost profits); *see Herbert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996) ("When the patentee does not seek to make and sell the patented invention, lost profits are not an appropriate measure of damages."). The Federal Circuit has made clear that "[t]he <u>only</u> exception is where the patentee has the ability to manufacture and market a product, but for some legitimate reason does not." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007). Here, because ViaSat does not compete with SS/L in the satellite manufacture or broadband markets, lost profits are unavailable as a matter of law.

18

19

      **C.**     **Dr. Slottje's Lost Profits Opinion is Speculative, Unreliable, and Lacks Evidentiary Support.**

20

21

22

23

24

     Even if the Court does not preclude lost profits as a matter of law, it should nonetheless exclude Dr. Slottje's lost profits opinions as speculative and unreliable. First, the availability of non-infringing alternatives—whether broadband alternatives or a non-infringing satellite—precludes the recovery of lost profits as a matter of law. Second, Dr. Slottje's analysis is based on the counterfactual assumption that for two years ViaSat would have captured <u>all</u> of the excess Jupiter subscribers that could

not be accommodated by a hypothetical ▓▓▓▓ "but for" satellite and for the next six quarters thereafter would have captured ▓▓▓▓ This is wrong because (1) not every excess Jupiter subscriber would have chosen ViaSat rather than any other broadband Internet service provider; (2) not all of ViaSat's beams would have been able to accommodate such subscribers; (3) the satellite as a whole would not have been able to accommodate his assumed ▓▓▓▓▓▓▓▓ due to increased subscriber usage of ▓▓▓▓; and (4) SS/L would have been able to build a non-infringing satellite for Hughes in excess of ▓▓▓▓.

### 1. Absence of Non-Infringing Alternatives Precludes Lost Profits.

To satisfy the second *Panduit* factor—the absence of noninfringing alternatives—ViaSat must either demonstrate that it competes in a two-supplier market where there are no acceptable substitutes, or it must prove its share of the broadband market. *BIC Leisure Prods., Inc. v. Windsurfing Intern, Inc.*, 1 F. 3d 1214, 1219 (Fed. Cir. 1993). Under the market share approach, "a patentee recovers lost profits on the percentage of infringing sales equal to its market share." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). Because ViaSat fails to satisfy the "two-supplier" market test—and because Dr. Slottje performs no market share analysis in the alternative—ViaSat has not established the second *Panduit* factor and Dr. Slottje's lost profits analysis must be excluded.

Yet, as Dr. Slottje admits, ViaSat and Hughes do not compete in a two-supplier market. Ex. 1 at 30. ViaSat represents to investors in SEC filings that its competitors include DSL, fiber, dial-up, DSL, mobile, and 4G providers. ViaSat 10K, March 2013, p. 11; Ex. 2 at 47-48. And ViaSat's own customer surveys show that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. Ex. 10; Ex. 2 at 51-52 Further, broadband statistics reports from the FCC reflect that 97.7% of the rural population—*i.e.*, the population in what Dr. Slottje would deem to be "underserved"—92.1% had access to three or more wireline or wireless providers; 79.6% had access to 4 or more. Ex. 2 at 46-47.

Dr. Slottje's attempt at establishing a distinct two-supplier "sub-market" for satellite broadband is conjecture. He admits that in he performed no economic market analyses to support his satellite broadband "sub-market" theory, and only relied on the "revealed preferences" theory, which is no more than a label on his conclusory assumption that satellite internet customers will choose another satellite internet provider.[3] Ex. 1 at 33-37; Ex. 3 at 239:23-241:9. Indeed, his only stated basis for his assumption that Hughes customers selected Hughes over any other broadband provider was "█████████████████████████████████████████." Ex. 3 at 231:14-22. Yet, as stated above, there are many other broadband providers in these "████████████████████████" with which ViaSat and Hughes compete.

Furthermore, Dr. Slottje ignores SS/L's proposed non-infringing alternatives to the ████████ "but for" Jupiter satellite that he assumes SS/L would have built. Dr. Slottje <u>admitted</u> that he did not consider the non-infringing satellite modifications proposed by SS/L; <u>nor did he even ask</u> ViaSat's infringement experts whether such non-infringing alternatives were available. Ex. 3 at 14:1-15:4; 16:4-14. Remarkably, Dr. Slottje did not know whether ViaSat's infringement experts had even considered

---

[3] Dr. Slottje's unreliable reliance on the "revealed preferences" theory is discussed more fully in the section that follows.

SS/L's proposed non-infringing alternatives when they told him the only available alternative would have been a ▌▌▌▌ satellite; his explanation for not asking was, "know that I would have been aware of them at the time." *Id.* at 14:25-15:4.

Dr. Slottje's failure to consider such alternatives in the "but for" world further underscores the speculative, unreliable, and counterfactual nature of Dr. Slottje's lost profits analysis. His "unsupported conclusory statement that there are no alternatives … is insufficient" to support lost profits. *Milos Misha Subotincic v. 1274274 Ontario Inc.*, 10-01946, 2013 WL 3964994, at *15 (C.D. Cal. Apr. 9, 2013). Because Dr. Slottje's lost profits analysis rests on unsupportable two-supplier market assumption, he failed to consider non-infringing alternatives, and he failed to perform an alternative market share analysis, the Court should exclude his lost profits analysis.

> 2. Dr. Slottje's Opinion on ViaSat's "But For" Capture Rate is Purely Speculative.

Dr. Slottje's lost profits analysis should also be excluded because his assumed subscriber capture rate is speculative and based on an unreliable methodology. Dr. Slottje uses the following methodology "[t]o quantify the number of Jupiter-1 subscribers ViaSat could have captured in the but-for world":

- Step 1: Dr. Slottje "calculated the difference between ▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌▌" (the number of subscribers he alleges ViaSat-1 will be able to accommodate through Q2 2016) and the actual projected number of ViaSat-1 subscribers through Q2 2016. "The resulting amount represents the number of available subscriber slots ViaSat could use to capture Jupiter-1 subscribers per quarter."

- Step 2: Dr. Slottje then "use[d] the projected Jupiter-1 subscribers not captured by Hughes' but for ▌▌▌▌ satellite" that he assumes Hughes could have launched without practicing ViaSat's asserted patents.

- Step 3: Dr. Slottje assumes that "[i]n the but-for world, ViaSat-1 would have been able to fill its beams sooner with Jupiter-1 subscribers not captured on Hughes' ▌▌▌ but-for satellite."

1    Ex. 1 at 42. This methodology is unreliable and counterfactual for four reasons.

2         First, Dr. Slottje wrongly assumes all of the "projected Jupiter-1 subscribers

3    not captured by Hughes' but for ██████ satellite" would have selected ViaSat as

4    their Internet service provider through Q4 2014, and ██████ of them would have

5    selected ViaSat for each of the next six quarters. Ex. 1 at Ex. 5A. He supports this

6    assumption by applying the economic concept of "revealed preference," suggesting

7    that subscribers for satellite Internet in particular would automatically chose another

8    satellite provider. Ex. 1 at 30. Yet he admitted that it "would be inappropriate to

9    assume a one-to-one capture rate." Ex. 3 at 225:1-5. He elaborated that the fact that

10   subscribers might choose the other forms of broadband precluded such an

11   assumption:

12
13
14
15
16   Ex. 3 at 224-225. This admission cannot be reconciled with Dr. Slottje's revealed

17   preference analysis. *See* Ex. 1 at 30. Furthermore, the only preference a customer's

18   selection of Hughes' satellite internet offerings reveals is that, at that particular point

19   in time, he prefers the "bundle" that Hughes was selling as compared with other

20   broadband service "bundles" available to him at the time of his selection. *See* Ex. 2

21   at 45-46. That bundle may include a number of features including the type of service

22   (i.e., satellite), but also speed of service, price, and the provider. *Id.* at 46 n.163.

23
24

1

2                                                                              Ex. 4 at 55:17—

3   56:21; Ex. 10. The notion that customers who select satellite Internet have a

4   "revealed preference" for satellite as opposed to other broadband Internet service

5   providers is belied by the fact that (1)

6

7

8                                                                      . Ex. 2 at Ex. 6; Ex. 10.

9         Second, Dr. Slottje's "but for" subscriber capture rate is unsupportable and

10  unreliable because Dr. Slottje failed to take into account which ViaSat beams would

11  have been able to accommodate Jupiter's "but for" available subscribers; thus, he did

12  not adequately assess ViaSat's ability to exploit demand under the third *Panduit*

13  factor. *See* Ex. 3 at 266:9-11 ("I did not do a beam-by-beam analysis...."). In the "but

14  for" world, in order for ViaSat to have captured a Jupiter subscriber from any beam,

15  ViaSat would have had to have had capacity on a <u>beam in that very same location</u>.

16  Ex. 2 at 38-39, 42-43, 80-81.

17

18                                             . Ex. 3 at 225:24-226:1. Thus, in order to

19  analyze lost profits correctly, one must take into account both the location and the

20  excess capacity of each ViaSat-1 user beam and the corresponding Jupiter beam. Dr.

21  Slottje did not conduct such an analysis.

22        Third, Dr. Slottje's assumption that ViaSat-1 would be able to accommodate

23                   subscribers through the end of Q2 2016 is similarly removed from the

24  facts of this case and renders his lost profits analysis unduly speculative. ViaSat's

own corporate representative testified that ViaSat's capacity was only "███████ ████████████████████" and even that number assumed that "all of the beams were filled up equally." Ex. 5 at 117:11-14. Dr. Slottje has done no market analysis and there is no evidence supporting the assumption that, on a beam by beam basis, there is sufficient demand to fill each of ViaSat's beams equally to maximum capacity. Ex. 6 at 10-12; Ex. 3 at 258:21-24. Indeed, Dr. Slottje admits that the beams "don't fill up at the same time. Some fill up quicker than others." Ex. 3 at 258:21-24.

Furthermore, another ViaSat corporate representative testified that ViaSat projects that the usage per subscriber is going to increase beginning four months from now at a rate of ██████████████. Ex. 4 at 103:9-104:18. He further testified that this increase in usage per subscriber will affect the maximum subscriber capacity. *Id.* at 107:9-12. Dr. Slottje also admitted that ViaSat projects a ██████████ ██████████████████████████████ Ex. 3 at 249:23-3. Yet remarkably (or perhaps not so remarkably in a post-ligation context where hundreds of millions of dollars are at stake), ViaSat and Dr. Slottje assume a fixed 1.█████████████ ███████ between now and Q2 2016.[4] Ex. 1 at 39. ViaSat's representative attempted to explain this projection by pointing to ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████. Ex. 4 at 130:17-133:5; 135:4-10. Dr. Slottje's

---

[4] ViaSat's business records do not actually project that ViaSat-1 will reach 1.1 million in subscribers at any time, which further calls into question its post-litigation "projection." ViaSat projects peak subscribers will reach 860,207. Ex. 9; Ex. 6 at 9.

assumption that ViaSat's ███████████████████ through Q2

2016 is thus unfounded and speculative and cannot support his lost profits analysis.

  Dr. Slottje attempted to explain away the shortcoming of his "but for" capture rate

by claiming that his <u>other, unrelated</u> "conservative" assumptions made doing so

unnecessary. Specifically, Dr. Slottje points to the following "conservative"

assumptions: (a) that the ██████ "but for" Jupiter satellite would launch on

schedule; (b) that the available capacity on ViaSat-1 to add subscribers from Hughes

would be ████████████████ Q1 2015; and (c) the incremental

profit rate he used. Ex. 3 at 225:24-226:19. But even if Dr. Slottje's unrelated

assumptions were conservative, this cannot make up for the fact that Dr. Slottje

applied an erroneous and unreliable capture rate methodology.

        Dr. Slottje's characterization of his <u>other</u> assumptions as "conservative"

cannot "substitute for the lack of a 'reliable evidentiary basis'" for his assumption

that for two years, 100% of Hughes subscribers would have been captured by ViaSat,

and ████████ would have been captured through 2Q 2016. *United States v. Rosacker*,

314 F.3d 422, 426 (9th Cir. 2002) ("Any estimate—including a conservative one—

must be supported by reliable information."); *see also Apple*, 2012 WL 1959560 at

*5 (excluding Mr. Napper's damages opinion, stating that "if an expert witness fails

to conduct a responsible inquiry that would have been feasible to conduct, his failure

cannot be excused by reference to the principle that speculation is permitted in the

calculation of damages"). Dr. Slottje's other alleged "conservative" assumptions

cannot support "the bizarre way" in which he determined the capture rate "to come

up with his unsupportably high damages figure." *Apple*, 2012 WL 1959560 at *6.

        Thus, because Dr. Slottje's entire lost profits analysis rests on his unreliable

and speculative "but for" capture rate, the Court should exclude his lost profits analysis relating to Jupiter under *Daubert*.

## IV. DR. SLOTTJE'S REASONABLE ROYALTY OPINIONS FOR JUPITER SHOULD BE EXCLUDED AS UNRELIABLE

Dr. Slotje's opinion that SS/L would have been willing to pay ███████ to ViaSat to use its technology on Jupiter should also be excluded because it is not based on sound economic principles or reliable data and is completely removed from the facts. His so-called "reasonableness checks" should also be excluded.

### A. Dr. Slottje's Assumption that SS/L Would Have Paid ████ Its Anticipated Profits for a License to Use ViaSat's Patents on Jupiter-1 Has No Factual or Economic Basis

Dr. Slottje's royalty calculation assumes that SS/L would have been willing to pay a whopping ████████ for a limited license to use the patented technology on Jupiter. SS/L's anticipated profit from the sale of Jupiter to Hughes at the time of the hypothetical negotiation was only ████████ [5] Ex. 7. There is no basis on which to conclude that SS/L would have paid over ██████ its expected profits for a limited license. Indeed, this royalty is so unreasonable that it not only exceeds SS/L's anticipated and actual profits for the sale of Jupiter as well as the selling price, but also exceeds the SS/L's 2011 profits from its entire satellite manufacturing business ████████████.[6]

Although anticipated profits do not serve as an absolute cap on the reasonable royalty, the Federal Circuit has in some cases concluded that expert opinions that the

---

[5] Dr. Slottje's statement that SS/L ' █████████████████████████ █████████████████████ does not accurately report SS/L's anticipated profits as of the date of the hypothetical negotiation. Ex. 1 at 51.
[6] Loral Space & Communications 2011 Annual Report on Form 10-K, pp. 52-53, *available at* < http://investor.loral.com/annuals.cfm >.

accused infringer "would agree to pay a royalty in excess of what it expected to make in profit [are] absurd." *Lindemann Maschinefabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990); *see also, e.g.*, *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 299 (2d Cir. 1971) (holding "the royalty imposed still gobbles up all of [the accused infringer's] expected profit" and finding this "a basic error which should be corrected"). Indeed, a reasonable royalty analysis "requires sound economic and factual predicates," *Riles*, 298 F.3d at 1311, and it is well accepted that "[a]mong the factors to be considered in determining [a reasonable royalty] is the infringer's anticipated profit from use of the patented invention." *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1558 (Fed. Cir. 1984).

Ignoring the economic reality, however, Dr. Slottje attempts to justify his royalty figure based on an incorrect factual assumption that as of the hypothetical negotiation, SS/L would have been "in a corner" or "a pickle" due to its contractual obligations to Hughes and the threat of harm to its reputation. Ex. 3 at 68:6-11. Specifically, he assumed that in the absence of a license, SS/L would either lose the ████████████████████████████████████████████████████████████, and would have suffered a reputation effect that he did not quantify. Ex. 1 at 45; Ex. 3 at 67:21-68:11. Both assumptions are wrong and do not support his proposed royalty.

    1.   <u>SS/L Had No Contractual Obligation to Hughes Requiring It to Lease Capacity or Pay Such a Large Royalty, and Dr. Slottje Failed to Consider SS/L's Non-Infringing Alternatives.</u>

Dr. Slottje concludes that SS/L would have paid a ████████████ to ViaSat because its only other option would have been to lease the ████ balance

of capacity in the open market due to "█████████████████████████

██████████████████" Ex. 3 at 59:18-60:18. But in the event of an intellectual

property claim, SS/L's only contractual obligation to Hughes ████████████

████████████████████████████████████████████████████████

████████████████████████. Ex. 8 at 67-68. If █████████████████

████████████████████████████████████████████████████████

███████████████████ *Id.*; Ex. 3 at 54:6-11. █████████████████████

████████████████████████[7]███████████████████████████████

███████████████████████████.█████████████████████████████

████████████████████████████████████████████████████████

█. Ex. 8 at 67-68; Ex. 3 at 54:6-11.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ ███████ ████████ █████ ████████ █ █████ █████ ████ █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████. Ex. 2 at 55-59. Doing so defies the

undisputed factual predicates and plain economic sense of the situation and "fails to

_____

[7] As discussed above, Dr. Slottje admitted that he did not consider the non-infringing satellite modifications proposed by SS/L that would produce satellite far in excess of the ████████ capacity satellite he assumed; nor did he even ask ViaSat's infringement experts whether SS/L's proposed non-infringing alternatives were available alternatives, and he did not know whether they had even considered them. Ex. 3 at 14:1-15:4. His failure to consider such alternatives further underscores the unreliable and counterfactual nature of Dr. Slottje's reasonable royalty analysis.

1   meet a minimum threshold of reasonableness." *Apple, Inc. v. Motorola, Inc.*, 1:11-

2   CV-08540, 2012 WL 1959560, at *6 (N.D. Ill. May 22, 2012).

3           2.      Dr. Slottje's Opinion That SS/L Would Pay Such a Royalty to
                    Avoid "Reputational Damage" Is Pure Speculation.
4

5           Dr. Slottje's other reason for concluding that SS/L would have paid a ▉▉▉▉

6   million royalty to license the three patents for Jupiter was due to the alleged

7   "significant harm to their reputation" that SS/L would have otherwise faced. Ex. 3 at

8   60:7-18. Yet Dr. Slottje made no effort to quantify this alleged reputational harm—

9   which would have only resulted if SS/L was <u>forced</u> to exit the contract <u>because of an

10  excessive royalty demand by ViaSat</u>.[8] Indeed, Dr. Slottje admitted he did not even

11  know how to value the alleged reputational harm and did not know of a methodology

12  that would make such a quantification possible. Ex. 3 at 67:21-68:2; 71:22-25. Nor

13  did he even attempt to analyze some of the more obvious potential measures of the

14  alleged reputational harm, such as satellite sales or profits SS/L might have lost

15  might as a result of its hypothetically tarnished reputation. Ex. 3 at 72:13-73:1. Thus,

16  Dr. Slottje admittedly did not—and could not—use any reliable methodology to

17  quantify the reputational harm such that it would justify his grossly excessive

18  proposed royalty.

19          Dr. Slottje's "reputational harm" theory must be excluded as entirely

20  speculative, not based on any scientific methodologies or formulas, and completely

21  removed from the facts. *See Quad/Graphics, Inc. v. One2One Comms., LLC*, No. 09-

22  CV-99-JPS, 2011 WL 4478440, at *1 (E.D. Wis. Sept. 23, 2011) (excluding expert

23  _____

24  [8] Nor did Dr. Slottje consider the reputational effects to ViaSat's ground system
    business as a result of demanding extortionist royalty rates.

opinion on "reputational damage" as "entirely speculative"). It does not support his opinion that SS/L would have paid a royalty for a limited license that exceeded the annual profits it earned from its entire satellite manufacturing business ███████ ██—an opinion that is "simply beyond reality." *Rite-Hite Corp.*, 56 F.3d at 1577 (Nies, J., concurring in part, dissenting in part). As a result, Dr. Slottje's royalty analysis lacks the "sound economic and factual predicates" necessary to make his royalty admissible. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *see IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) (Rule 702 requires exclusion when "sound economic and factual predicates are absent from a reasonable royalty analysis").

### B. Dr. Slottje Unreliably Bases His Reasonable Royalty Calculations On Non-Comparable Agreements and Proposals That Are Irrelevant as a Matter of Law and Are Not Proper Benchmarks

Dr. Slottje bases his reasonable royalty rate on a series of non-comparable agreements and valuations, none of which are properly considered under a reasonable royalty analysis. To arrive at his "rate/Gbps" of capacity royalty, Dr. Slottje relies on several agreements and proposals involving the lease of capacity on a finished satellite, including:



1

2



3

4

5

6

7

8

9   Dr. Slottje considers the first two transactions as "the best possible benchmarks for

10  determining a royalty for the infringing sale and operation of the Jupiter-1 satellite,"

11  and considers the remaining agreements and proposals relevant to that analysis. Ex. 1

12  at 55, 57-58.

13

14

15                                                          Ex. 2 at 67-71.

16          These agreements and proposals are not reliable benchmarks and cannot

17  support Dr. Slottje's proposed royalty. The cost of leasing capacity on a completely

18  built, launched, and insured satellite is not a valid basis for valuing a patent and

19  cannot serve as a comparable license.

20          "[A] patentee [may] not rely on license agreements that [are] 'radically

21  different from the hypothetical agreement under consideration' to determine a

22  reasonable royalty." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed.

23  Cir. 2011) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed.

24  Cir. 2009)). Instead, "there must be a basis in fact to associate the royalty rates used

in prior licenses to the particular hypothetical negotiation at issue in this case." *Id.* at 1317. Comparable licenses must be "commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872-73 (Fed. Cir. 2010).

Judge Rader's decision in the *IP Innovation* case is instructive. There, Judge Rader excluded the opinion of an expert who used considered "the average royalty rate for the Software industry" and "Computer and Electronic Products Manufacturing industry" as a percentage of revenues, where the patents at issue involved a computer switching mechanism. 705 F.Supp. 2d at 691. Judge Rader concluded that "'software industry' and 'computer electronic products manufacturing industry' encompass much more than the desktop switching feature at issue." *Id.* Likewise, the capacity agreements and proposals at issue here involve much more than the capacity enhancement techniques that ViaSat's patents allegedly teach—instead, they encompass capacity on a built, launched, and insured satellite, and many also include other products and services as well.

Dr. Slottje consideration of the capacity leases and proposed leases under *Georgia-Pacific* factor 11, rather than as "comparable licenses" under factor 1, is a distinction without a difference. In *DataQuill Ltd. v. High Tech. Computer Corp.*, the plaintiff's expert purported to consider under *Georgia-Pacific* factor 11 the accused infringer's "revenue sharing agreement" with a third party to "bolster his reasonable royalty opinion." *DataQuill Ltd. v. High Tech. Computer Corp.*, No. 08-cv-543, 2012 WL 1284381, at *6 (S.D. Cal. April 16, 2012). The court noted, however, that

in practice the expert was actually "attempting to use the [profit sharing] agreement as if it were a prior license under *Georgia-Pacific* factor 1 or 2 or a customary rate under factor 12." *Id.* (alteration in original). Here, as in *Data-Quill*, Dr. Slottje improperly attempts to back-door in a series of agreements and proposed agreements that would be plainly inadmissible as comparable licenses by compartmentalizing his analysis under *Georgia-Pacific* factor 11. The Court should not permit ViaSat to skirt clear of binding Federal Circuit precedent holding that such non-comparable agreements should be excluded simply because Dr. Slottje is clever enough to list his analysis under a different *Georgia-Pacific* factor.

Moreover, the capacity leases and proposed leases are not even instructive under factor 11. The agreements do not consider the value of SS/L's use of the patented invention, but rather (1) ██████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████ t. Ex. 1 at 55-58. Notably, not a <u>single one of these agreements</u> reflects the <u>value to SS/L</u> of technology that allegedly would allow it to design Jupiter with increased capacity.

To the extent that Dr. Slottje justifies the capacity agreements/proposals as "benchmarks" by explaining that, in the "but for world," SS/L would have considered leasing the extra capacity for Hughes, as ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

Thus, there is simply no basis to conclude that SS/L would have weighed the cost of

████████████████████████ with the cost of a license from ViaSat, much less

considered actually leasing such capacity for Hughes.

### C. Dr. Slottje's "Reasonableness Checks" Considering the Price of SS/L, Hughes, and WildBlue, and the Total Market Value of ViaSat's Subscribers Must Be Excluded

Dr. Slottje uses a so-called "reasonableness check" that examines the

acquisition price of Wildblue, Hughes, and SS/L and attempts to use that value to

gauge the reasonableness of his royalty as follows:

- Wildblue Acquisition: Dr. Slottje takes the $████████████ at which ViaSat acquired Wildblue in 2009 and divides this number by the number of Wildblue's subscribers at the time, arriving at a value of ████████ per subscriber. Ex. 1 at 63. Dr. Slottje then uses this number to assert that because he assumes the ViaSat patents enabled Hughes to capture "████████████████████████████ *Id.*

- Hughes Acquisition: Dr. Slottje notes that in 2011, EchoStar acquired Hughes for ████████ *Id.*

- SS/L Acquisition: Dr. Slottje notes that in November 2012, Loral sold its subsidiary SS/L to MDA for ████████████████████████ ████████████████████████" *Id.* at 63-64.

These so-called "reasonableness checks" must be excluded because the value of

these companies is not even remotely related to the value of ViaSat's patented

technology.

Dr. Slottje's reasonableness check is not unlike the reasonableness check that

the Federal Circuit rejected in *Uniloc*. There, the court declared that it was improper

to use a $19 billion total revenue figure "as a check," where the real purpose of the

check was to "lend[] legitimacy to the reasonableness of [the plaintiff's] $565 million damages calculation." 632 F.3d at 1321. ███████████████ ████████████, ██████████████████████████████ ████████. Because Dr. Slottje cannot base a royalty on the entire market value of these companies, *Uniloc* mandates that he also cannot use such figures as a "check."

It is indisputable that the overall acquisition prices for Wildblue, Hughes, and SS/L reflect value for any number of assets other than the incremental value of satellite capacity or of broadband Internet subscribers. *See PACT XPP Techs., AG v. Xilinx, Inc.*, No. 07-CV-563-RSP, 2012 WL 2774971, at *1 (E.D. Tex. May 13, 2012) (stating that the overall acquisition price of a company may "include [value] unrelated" to the asserted patents or the accused technology). Indeed, ViaSat's CEO Mark Dankberg publicly announced that ViaSat benefited by the Wildblue acquisition by (1) advancing its entry into the Ka-band broadband services business by over a year; (2) establishing "the financial and strategic framework to capture the value anticipated from the ViaSat-1 satellite"; and (3) gaining "the resources and skills of the Wildblue team." ViaSat 8K, filed December 18, 2009; Ex. 2 at 75. ViaSat further gained access to the Wildblue® trademark under which it later sold services on ViaSat-1, Wildblue's existing dealer network, and Wildblue's experienced management, technical capabilities, trained staff, existing sales force, marketing and infrastructure. *Id.* Dr. Slottje does not account for the value of such assets to the purchase price, nor does he make any attempt to disaggregate the components that may comprise the ████████████████ for Hughes. Ex. 1 at 63. And contrary to Dr. Slottje's bald assertion that the acquisition price for SS/L reflects "value for satellite capacity in the marketplace," SS/L is not even a service

provider like Hughes, Wildblue, or ViaSat, but instead is a company that designs and manufactures satellites. The acquisition price for SS/L is reflective of SS/L's ability to effectively design and manufacture satellites and a host of other factors ( ███████ ███████████████████████████████████ Ex. 1 at 64; Ex. 2 at 76.

Dr. Slottje's other "reasonableness check" which considers ViaSat's projected per-subscriber revenue of $██████████ revenue for "the first wave of subscribers that fill the satellite alone" should be excluded for the same reasons. Ex. 1 at 62-63. The total revenue that ViaSat will generate from its entire ViaSat-1 satellite provides no indication of the <u>value of the patented technology to either SS/L or ViaSat</u>, and consideration of the total market value of ViaSat-1—even as a so-called reasonableness check—violates the entire market value rule under *Uniloc*. Moreover, Dr. Slottje offers no explanation whatsoever why the total revenue ViaSat expects to generate reflects either (1) what SS/L would be willing to pay in a hypothetical negotiation while still being able to make a reasonable profit or (2) what ViaSat would be willing to accept to grant a license. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

## V.    CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion to exclude the lost profits and reasonable royalty opinions of Dr. Slottje.


Dated: December 16, 2013      By:   */s/ Patrick C. Bageant*

Marc M. Seltzer
Amanda K. Bonn
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
Email: abonn@susmangodfrey.com

William Christopher Carmody
(Admitted *Pro Hac Vice*)
Jacob W. Buchdahl
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340

Joseph S. Grinstein
(Admitted *Pro Hac Vice*)
William R. H. Merrill
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  713-653-7856
Facsimile:   713-654-6666
Email: jgrinstein@susmangodfrey.com
Email: bmerrill@susmangodfrey.com

Ian B. Crosby
(Admitted *Pro Hac Vice*)
Rachel S. Black
(Admitted *Pro Hac Vice*)
Patrick C. Bageant
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3861
Fax: (206) 516-3883
Email: icrosby@susmangodfrey.com

1

2

Email: rblack@susmangodfrey.com
Email: pbageant@susmangodfrey.com

3

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Space Systems/Loral, LLC (f/k/a Space*
*Systems/Loral, Inc.) and Loral Space &*
*Communications Inc.*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 16, 2013, I caused the foregoing **[PUBLIC-REDACTED] MOTION TO EXCLUDE OPINIONS OF VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE** to be served on opposing counsel via the Court's CM/ECF system.

Dated: December 16, 2013                By:    */s/ Patrick C. Bageant*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24