1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   Sean S. Pak (Bar No. 219032)
3  seanpak@quinnemanuel.com
   Eric E. Wall (Bar No. 248692)
4  ericwall@quinnemanuel.com
   50 California Street, 22nd Floor
   San Francisco, California   94111
5  Telephone:   (415) 875 6600

6  Yury Kapgan (Bar No. 218366)
   yurykapgan@quinnemanuel.com
7  Vincent M. Pollmeier (Bar No. 210684)
   vincentpollmeier@quinnemanuel.com
   Adam B. Wolfson (Bar No. 262125)
8  adamwolfson@quinnemanuel.com
   865 S Figueroa Street 10th Floor
9  Los Angeles, California 90017
   Telephone:   (213) 443-3000

10 Attorneys for Plaintiff ViaSat, Inc.

11

12            UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| VIASAT, INC., VIASAT COMMUNICATIONS, INC., f/k/a WILDBLUE COMMUNICATIONS, INC., | CASE NO. 3:12-cv-00260-H-WVG |
| | **PUBLIC REDACTED VERSION** |
| Plaintiffs, | **VIASAT'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE** |
| vs. | |
| SPACE SYSTEMS/LORAL, INC., LORAL SPACE & COMMUNICATIONS, INC., | Date:   January 24, 2014 Time: 9:00 a.m. Place: Courtroom 15A |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   PRELIMINARY STATEMENT ..................................................................... 1

II.  APPLICABLE LEGAL STANDARD ............................................................ 2

III. FACTUAL BACKGROUND ......................................................................... 3

    A.   ViaSat-1's Groundbreaking Technology ................................................ 3

    B.   SS/L's Misappropriation of ViaSat's Technology................................... 3

    C.   Prof. Slottje's Opinions ........................................................................ 5

IV.  ARGUMENT ................................................................................................. 6

    A.   ViaSat Is Entitled to Lost Profits ......................................................... 6

    B.   Prof. Slottje's Opinion That ViaSat Has Satisfied the Legal Test
        for Lost Profits Is Sound ...................................................................... 8

        1.   Prof. Slottje Has Not Used a 100% Capture Rate ......................... 9

        2.   Because Satellite Broadband Is a Sub-Market, It Is
            Reasonable To Believe that ViaSat Would Have Signed
            Up Additional Subscribers But For Competition from
            Hughes ...................................................................................... 10

        3.   Defendants Cannot Assume Away Infringement With
            Purported Satellite Design-Arounds ........................................... 13

        4.   Prof. Slottje's Opinion As To ViaSat's Capacity To Take
            On Additional Subscribers Is Well-Founded ............................. 14

    C.   Prof. Slottje's Reasonable Royalty Analysis Is Sound ........................ 17

        1.   Prof. Slottje's Opinion Is Reasonable When The Full
            Effect Of Defendants' Infringement Is Considered.................... 17

        2.   Prof. Slottje's Reliance on Market Data About the Price of
            Satellite Capacity Is Well-Founded............................................ 22

    D.   Prof. Slottje's Reasonableness Checks Are Relevant And Will
        Be Helpful to the Jury .......................................................................... 25

V.   CONCLUSION .............................................................................................. 25

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

# TABLE OF AUTHORITIES

**Page**

## Cases

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831, 852 (Fed. Cir. 2010) ............................................... 2, 9, 17

*DataQuill Ltd. v. High Tech. Computer Corp.*,
  No. 08-cv-543, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012) ........................... 24

*Datascope Corp. v. SMEC, Inc.*,
  879 F.2d 820 (Fed. Cir. 1989) ....................................................... 9

*Fiskars, Inc. v. Hunt Mfg. Co.*,
  279 F.3d 1378 (Fed. Cir. 2002) ..................................................... 16

*Fujifilm Corp. v. Benun*,
  605 F.3d 1366 (Fed. Cir. 2010) ..................................................... 19

*Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*,
  446 F.2d 295 (2d Cir. 1971) ........................................................ 22

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ...................................................... 6

*Hebert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ....................................................... 7

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*,
  No. 87 Civ. 4522 (LMM), 1995 WL 693170 (S.D.N.Y. Nov. 22, 1995) ...... 10, 11

*Kaufman Co. v. Lantech, Inc.*,
  926 F.2d 1136 (Fed. Cir. 1991) ..................................................... 10

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995) ...................................................... 6, 7

*Lindemann Maschinefabrik GmbH v. Am. Hoist & Drrick Co.*,
  895 F.2d 1403 (Fed. Cir. 1990) ..................................................... 22

*Micro Chem., Inc. v. Lextron, Inc.*,
  318 F.3d 1119 (Fed. Cir. 2003) ...................................................... 8

*Minco, Inc. v. Combustion Eng'g, Inc.*,
  95 F.3d 1109 (Fed. Cir. 1996) .................................................... 7, 14

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) .................................................... 8, 10

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) ...................................................... 7

*Quad/Graphics, Inc. v. One2One Comms., LLC*,
   No. 09-cv-99-JPS, 2011 WL 4478440 (E.D. Wis. Sep. 23, 2011) ...................... 20

*ResQNet.com, Inc. v. Lans, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) .............................................................. 23

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ........................................................ 17, 22

*Shockley v. Arcan, Inc.*,
   248 F.3d 1349 (Fed. Cir. 2001) ............................................................. 7

*TWM Mfg. Co. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986) ............................................................ 18

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984) ........................................................... 22

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .......................................................... 23

*Wechsler v. Macke Int'l Trade, Inc.*,
   486 F.3d 1286 (Fed. Cir. 2007) ............................................................. 7

## Statutes/Rules

35 U.S.C. § 284 ........................................................................... 6, 18

Fed. R. Evid. 702 ............................................................................. 2

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1    **I.      PRELIMINARY STATEMENT**

2         ViaSat's damages expert, Professor Daniel Slottje, has been studying and

3    teaching economics for more than thirty years.   He has testified as an expert witness

4    on damages issues scores of times, never having his testimony excluded.

5    Defendants do not dispute Prof. Slottje's qualifications, but rather the results of his

6    analysis.   Their critiques are misplaced.   Prof. Slottje's expert analysis in this

7    matter is sound and should be admitted.

8         Prof. Slottje's opinion that ViaSat is entitled to roughly $600 million in

9    damages correctly reflects the full impact of Defendants' willful infringement and

10   breach of contract, including the effects on ViaSat's satellite broadband internet

11   service business.   Satellites are massively expensive devices.   Their cost can only

12   be justified by the huge return on investment they promise:   billions of dollars in

13   revenue from using the satellite to provide internet services.   ViaSat's considerable

14   damages are commensurate with the economics of the satellite broadband industry.

15        ViaSat's innovations—which ViaSat deployed in ViaSat-1 and could have

16   used exclusively but for Defendants' infringement—provided a compelling

17   advantage over the only other significant satellite broadband provider in the United

18   States, Hughes Network Systems ("Hughes").   Defendants knew that ViaSat's

19   patented and proprietary technologies were important to its commercial success, and

20   that Hughes should not have access to such technologies.   To the great detriment of

21   ViaSat, however, Defendants knowingly used ViaSat's innovations to build a

22   copycat satellite for Hughes—which Hughes now uses to compete against ViaSat.

23        Throughout the Motion, Defendants ignore the foreseeable and substantial

24   harm to ViaSat's business caused by their willful infringement and breach of

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1  contract.   But that harm must be fully considered and accounted for in any damages

2  analysis.   ████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  █████████   ████████████████████████████████████████

5  As a direct result of the infringing Jupiter-1 satellite, ViaSat has lost numerous

6  subscribers to Hughes.   Prof. Slottje's conservative estimate of the number of

7  subscribers ViaSat lost, and the resulting profits those subscribers would have

8  generated, quantifies ViaSat's minimum lost profit damages.

9  Defendants similarly ignore this competitive harm to ViaSat in their critique

10  of Prof. Slottje's reasonable royalty analysis.   Instead, Defendants focus almost

11  exclusively on SS/L's profits from the infringement.   But it is well-settled—and

12  admitted by Defendants' own expert—that an accused infringer's profit is no limit

13  on a patentee's damages.   It is unreasonable to believe that ViaSat would grant its

14  only meaningful competitor in the multi-billion-dollar satellite broadband space a

15  license to ViaSat's record-breaking technologies for a few million dollars.

16  Defendants' arguments against Prof. Slottje's opinions are, at best, fodder for

17  cross-examination.   They do not justify excluding those opinions.

18  **II.    APPLICABLE LEGAL STANDARD**

19  Under Rule 702, expert testimony is admissible so long as it is reliable, based

20  on sufficient data, and helpful to the trier of fact.   FED. R. EVID. 702.   "When the

21  methodology is sound, and the evidence relied upon sufficiently related to the case

22  at hand, disputes about the degree of relevance or accuracy (above this minimum

23  threshold) may go to the testimony's weight, but not its admissibility."   *i4i Ltd.*

24  ——————————————
[1]   Ex. 18.

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

*P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (affirming trial court's decision to admit damages expert testimony in a patent case).

## III.   FACTUAL BACKGROUND

### A.   ViaSat-1's Groundbreaking Technology

ViaSat's innovations enabled ViaSat to launch the highest-capacity broadband satellite the world had ever seen.   (*See* Ex. 1 at 7-8.)[2]   Significantly, ViaSat's technology also radically altered the per-bit economics of providing internet service, ███████████████████████████████████████████ ███████████████████████████████████ (Ex. 2 at VST03334968).   The vast increase in relatively cheap satellite capacity enabled ViaSat to provide broadband internet services to more subscribers, and at greater speeds, than anything else in the market. ████████████████████ ███████████████████████████████████████████ ██████  (Ex. 3 at VST03848703; Ex. 4 at VST03848910-11.)

### B.   SS/L's Misappropriation of ViaSat's Technology

ViaSat went to great lengths to protect its innovations, including filing the applications for the patents asserted in this case. ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████  ██████████  (Ex. 5 at Art. 1.101, 28.)

---

[2]   Citations to "Ex. __" refer to exhibits to the Declaration of Matthew D. Cannon in Support of ViaSat's Opposition to Defendants' Motion to Exclude Opinions of ViaSat's Damages Expert Dr. Daniel Slottje.   Prof. Slottje's report, which is Exhibit 1 to the Cannon Declaration, contains internal exhibits.   Those internal exhibits are cited herein as "Ex. 1 at Exhibit __."



1

2   (*See* Ex. 6 at 207:11-

3   211:13; Ex. 7; Ex. 8 at 152:24-153:24, 254:6-255:23; Ex. 9 at SSL171547; Ex. 10.)

4   ViaSat and Hughes were (and still are) the only meaningful providers of satellite

5   broadband in the United States at the time.   (Ex. 11 at 76:2-77:5; Ex. 6 at 81:9-82:2;

6   Ex. 12 at 267:21-268:14.)   (*See* Ex. 13 at

7   145:4-146:13.)   (Ex. 14.)

8   That is why the launch of ViaSat-1 was such a threat to Hughes.   (*See* Ex. 15 at

9   HUGHES-274934; Ex. 3 at VST03848703; Ex. 4 at VST03848910-11.)

10

11   (Ex. 16; Ex. 17; Ex. 18.)

12       Defendants knew that Hughes intended to use its ViaSat-1 clone to compete

13   with ViaSat.

14   (Ex. 11 at 117:8-21.)

15

16

17   (Ex. 19 at 141:7-142:11; Ex. 20.)

18       Defendants forged ahead with the Jupiter-1 project notwithstanding ViaSat's

19   known concerns.   According to analysis performed by ViaSat's technical experts,

20

21   (Ex. 1 at

22   Exhibit 15.)

23

24

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████ 3

3      Once ViaSat learned that its patented and proprietary technologies had been

4  given to its main competitor, it had no choice but to file suit.

5      **C.    Prof. Slottje's Opinions**

6      Prof. Slottje examined the satellite industry and the transactions involved.

7  He developed a damages model that accurately reflects the harm to ViaSat from

8  Defendants' transfer of ViaSat's technology to Hughes, among other things.   With

9  respect to Hughes' Jupiter satellite, his model contains two major components.

10     First, Prof. Slottje identifies profits from subscribers that ViaSat would have

11  enrolled had Hughes not been able to launch the Jupiter-1 satellite with its infringing

12  design.   (*See* Ex. 1 at 41-42, Exhibits 4, 13.)   Some of the subscribers who signed

13  up for Hughes' infringing HughesNet Gen4 service would have signed up for

14  ViaSat's Exede service if Hughes had no infringing satellite.   ████████████████

15  ██████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ████████████████████████████████ (*Id.* at 27-29.)   He did not include

18  any subscribers that could have been serviced by that hypothetical satellite in his

19  lost profits calculation.   (*Id.* at Exhibits 4-5.)   He further limited the number of lost

20  subscribers based on ViaSat's estimates of the subscriber capacity of ViaSat-1.   (*Id.*

21  at Exhibit 5.)   The remaining subscribers that Hughes has enrolled for its infringing

22  service constitute lost subscribers for ViaSat—for which Prof. Slottje calculates

23  ────────────────────
    3  ████████████████████████████████████████████

24  ████████████   (*See* Ex. 2 at VST03334968.)

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   ViaSat is owed roughly $175 million.   (*Id.* at Exhibits 4, 13.)

2       The second major component of Prof. Slottje's damages model is a

3   reasonable royalty. ████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████   or approximately $460 million if lost profits

7   are awarded and $587 million if not.[4]   (*Id.* at 61.)

8   **IV.   ARGUMENT**

9       **A.   ViaSat Is Entitled to Lost Profits**

10      Defendants argue that ViaSat may not seek lost profits damages because

11  ViaSat does not manufacture satellites.   (Mot. at 6.)   That argument is false.   "[A]

12  patent owner who has suffered lost profits is entitled to lost profits damages

13  regardless of whether the patent owner has made, used, or sold the patented device."

14  *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

15      A patentee is entitled to "damages adequate to compensate" for the

16  infringement.   35 U.S.C. § 284.   "The phrase 'damages adequate to compensate'

17  means 'full compensation for "any damages" [the patent owner] suffered as a result

18  of the infringement.' . . . Full compensation includes any foreseeable lost profits the

19  patent owner can prove."   *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185

20  F.3d 1341, 1349 (Fed. Cir. 1999) (citations omitted).   "Section 284 imposes no

21  limitation on the types of harm resulting from infringement that the statute will

22  redress.   The section's broad language awards damages for any injury as long as it

23      [4]   To avoid double-counting if lost profits are awarded, Prof. Slottje prorates
24  the royalty:   He calculates a residual royalty only for those periods in which lost
    profits are not available.   (*See* Ex. 1 at Exhibit 13.)

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   resulted from the infringement." *King Instruments*, 65 F.3d at 947.

2       In this case, ViaSat sells a product that practices its patents: the Exede

3   broadband service over ViaSat-1.   And that product competes directly with an

4   infringing product: HughesNet Gen4 over the Jupiter-1 satellite.   Defendants are

5   liable for ViaSat's foreseeable loss of broadband subscribers due to Defendants' sale

6   and Hughes' infringing use of that satellite.[5]   This case is analogous to *Minco, Inc.*

7   *v. Combustion Eng'g, Inc.*, 95 F.3d 1109 (Fed. Cir. 1996) (*per curiam*).   There, the

8   defendant infringed a patent covering a kiln for making an improved fused silica

9   product.   95 F.3d at 1118.   The Federal Circuit affirmed damages based on the

10  patentee's lost profits in the downstream fused silica market, holding it "reasonably

11  foreseeable" that infringement of a patent for a kiln used in making fused silica

12  would hurt the patentee's downstream sales of fused silica.   *Id.* at 1118-19 (noting

13  that defendant also competed in the downstream market).

14      Defendants cite an irrelevant line of cases in arguing that lost profits are not

15  available if ViaSat does not manufacture satellites.   (Mot. at 6.)   Those cases

16  address situations in which the plaintiff did not lose profits on any product

17  practicing the patent.[6]   Even in one of those cases, *Hebert v. Lisle Corp.*, the Court

18  ***denied*** judgment of no lost profits because the plaintiff might have practiced the

19  patent in a but-for world.   99 F.3d 1109, 1119-20 (Fed. Cir. 1996).

20      These cases do not apply to a situation like the present, in which ViaSat uses

21

22      [5]   Indirect infringers, like Defendants, are jointly and severally liable with direct infringers, like Hughes, for damages from the direct infringer's actions. *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1364 (Fed. Cir. 2001).

23      [6]   *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293-94 (Fed. Cir.

24  2007); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012).

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

its patented technology to provide a service on which it earns a profit.   The infringing Jupiter-1 satellite made by SS/L and used by Hughes to compete against ViaSat directly cuts into ViaSat's profits.   Those profits are thus fairly compensable patent damages.[7]

## B.   Prof. Slottje's Opinion That ViaSat Has Satisfied the Legal Test for Lost Profits Is Sound

Although not the only test for lost profits, the most common formulation is the four-factor inquiry of *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).   According to that test, "but for" causation of lost profits can be inferred when the patentee proves four factors by a preponderance of the evidence:   (1) demand for the patented product; (2) the absence of acceptable non-infringing substitute products; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profits lost.   575 F.2d at 1156.

The Federal Circuit has relaxed the *Panduit* test in certain market circumstances.   For example, where only two parties compete in the relevant product market, the absence of acceptable non-infringing substitute products is implicit in the market definition.   *See Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124-25 (Fed. Cir. 2003).   It is a "reasonable inference" in such a two-supplier market that the patentee would have made the sales made by the infringer had the latter not infringed.   *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 826 (Fed. Cir. 1989) (reversing lower court's denial of lost profits).

---

[7]   Defendants' assertion that ViaSat and SS/L do not compete is also factually mistaken. ████████████████████████████████████████████

████████████████████████████████████████████   (*See, e.g.*, Ex. 21 at 174:10-182:18.)

Defendants do not dispute much of Prof. Slottje's lost profits analysis.   It is undisputed that there is demand for high-capacity broadband satellites and the high-speed internet services those satellites can provide.   And Defendants do not challenge Prof. Slottje's calculation of ViaSat's or Hughes' projected subscriber growth, nor the amount of profit per subscriber he calculates that ViaSat has lost.

Defendants dispute two components of Prof. Slottje's lost profits model:   the subscriber capture rate in the but-for world and the capacity of the ViaSat-1 satellite. But Defendants have not independently calculated either a capture rate or the capacity of the ViaSat-1 satellite.   Their unsubstantiated quibbles with the precision of Prof. Slottje's model go to weight, not admissibility.   *See i4i*, 598 F.3d at 852.

### 1.   Prof. Slottje Has Not Used a 100% Capture Rate

Defendants' critique of the purported 100% capture rate in Prof. Slottje's lost profits model rests on a flawed premise:   Prof. Slottje has not merely assumed that all of the subscribers to Hughes' infringing service would otherwise have gone to ViaSat.   This can be deduced by ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████ (*Compare* Ex. 1 at Exhibit 10 *and* Exhibit 5A.)

Instead, Prof. Slottje identified a subset of the projected Jupiter-1 subscribers that ViaSat would have been able to capture if Hughes had not entered the market with an infringing satellite that has incremental capacity attributable to ViaSat's patented and proprietary inventions.   Prof. Slottje's model is actually quite conservative:   ██████████████████████████████████████████████ ██████████████████████████████████████████

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   ████████████████████████████████████   (*See* Ex. 22 at

2   9:18-10:23.)   ████████████████████████████████

3   ████████████████████████████████████

4   ██████████████████████   (*Id.* at 199:1-200:9, 217:5-218:22.)

5   Though misplaced, Defendants' criticisms (even if credited) are more than

6   overcome by Prof. Slottje's numerous conservative assumptions.   (*Id.* at 226:2-19.)

### 2.   <u>Because Satellite Broadband Is a Sub-Market, It Is Reasonable To Believe that ViaSat Would Have Signed Up Additional Subscribers But For Competition from Hughes</u>

9   Even had Prof. Slottje adopted a 100% capture rate (which he did not), that

10  would have been justified here.   The satellite broadband market is a distinct two-

11  player submarket within the larger broadband space.   (Ex. 1 at 19-21.)   Treating

12  satellite broadband separately is thus justified in both legal and economic terms.

13  Legally, the Federal Circuit has made clear that the relevant market for

14  purposes of patent damages includes only products that are strong substitutes for one

15  another.   *See, e.g.*, *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1143 (Fed. Cir.

16  1991) (reversing district court's determination that there were acceptable non-

17  infringing substitutes where those substitutes did not share the advantages of the

18  patented invention and were priced higher than the patented invention); *see also*

19  *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, No. 87

20  Civ. 4522 (LMM), 1995 WL 693170, at *2 (S.D.N.Y. Nov. 22, 1995) (finding

21  plaintiff had satisfied second *Panduit* factor despite the presence of "many other

22  suppliers with comparable folding devices" due to "the unique advantages and

23  distinctive characteristics of the patented chopper in terms of speed and accuracy").

24

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1    Here, terrestrial broadband is not a strong substitute for satellite broadband, so

2 terrestrial broadband is properly excluded from the relevant market in a lost profits

3 analysis. 

4 [8] (Ex. 23

5 at 52:9-54:3.)

6

7 [9] (*Id.*

8 at 61:15-63:19 (discussing lower data caps for satellite broadband).)

9    These market characteristics support Prof. Slottje's reliance on the economic

10 doctrine of "revealed preferences."   As he explains, in the absence of the infringing

11 HughesNet Gen4 service, the most likely alternative for a subscriber to select would

12 be the only other satellite broadband service in the market:   ViaSat's Exede service.

13 (Ex. 22 at 227:9-228:17.)

14 (*Id.*; *see also*

15 Ex. 1 at 21.)

16

17 [0]  (Ex. 22 at 241:10-244:3.)

─────────────────────────

18 [8]   This analysis focuses on ***broadband*** wireline options, unlike the data cited in

19 Defendants' brief.   (Mot. at 8.)   Non-broadband options obviously would not be
strong substitutes for satellite broadband service.

20 [9]   This differentiation extends to the supply side of the equation as well:

21

22 (*See* Ex. 23 at 56:5-57:6; Ex. 1 at 20.)

23 [10]

24 (Ex. 1 at 36-37.)

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   From an economic perspective, then, Prof. Slottje reasonably concludes that satellite

2   broadband is a distinct submarket in which only ViaSat and Hughes compete

3   meaningfully.   (Ex. 1 at 18; Ex. 22 at 229:2-230:23.)

4        Prof. Slottje's differentiation of the market is consistent with ViaSat's

5   independent assessment.[11]   (Ex. 24 at 33:7-34:5.)

6   

7   

8   

9   (*Id.* at 32:7-16.)

10        In the distinct satellite broadband submarket, it is reasonable to believe that

11   ViaSat would see its number of subscribers increase with Hughes out of the market.

12   (*See* Ex. 22 at 228:1-17.)   ViaSat and Hughes are the only meaningful players in the

13   satellite broadband market.   (*See, e.g.*, Ex. 26 at VST03848827.)   ViaSat and

14   Hughes compete directly against one another, such that an advantage for one

15   typically is a disadvantage for the other.

16   

17   

18        (*See* Ex. 25 at 161:19-162:12; Ex. 15 at HUGHES-274934; Ex. 3 at

19   [11]

20        (Mot. at 10-11.)

21   

22   

23   

24        (*See* Ex. 25 at 150:15-151:4.)

-12-

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1    VST03848703; Ex. 4 at VST03848910-11.) ████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████ (*See* Ex. 27 at

4    HUGHES-003157-58.)

5        It is beyond reasonable dispute that arming ViaSat's main satellite broadband

6    competitor with a high-capacity satellite would result in ViaSat losing some

7    subscribers.   The only question is how many such subscribers ViaSat lost.

8    Defendants have not calculated that figure for themselves, and Prof. Slottje has

9    offered a highly conservative calculation of that sum.   It should be up to the jury to

10   determine whether his analysis supports ViaSat's damages claims.

11              **3.    Defendants Cannot Assume Away Infringement With
                        Purported Satellite Design-Arounds**

12       Defendants also fault Prof. Slottje for failing to consider alternative satellite

13   technologies that Defendants could have built for Hughes.   (Mot. at 8-9.)   But Prof.

14   Slottje did take such satellite alternatives into account. ████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████ (Ex. 1 at 27-29; Ex. 22 at 34:25-35:9.)

18       Defendants' critique of Prof. Slottje is based on his purported failure to

19   consider non-infringing alternative satellite designs that were identified by

20   Defendants only after Prof. Slottje submitted his report and have still not been fully

21   disclosed.   (Mot. at 8-9.)   That Defendants criticize Prof. Slottje for failing to rebut

22   allegations that had not yet been made highlights the prejudice to ViaSat from

23   Defendants' late disclosure of those alternatives.   (*See* Dkt. 533.)

24

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

It is for the lawyers and technical experts to debate, and the jury to decide, whether alternative technologies were available and acceptable.   If they were, Defendants can argue to the jury how the presence of those alternatives affects the accuracy of Prof. Slottje's lost profits calculation.   The possibility that Defendants "might have been able to design around a patent does not, in itself, defeat a claim for lost profits." *Minco*, 95 F.3d at 1119.   In any event, Prof. Slottje has testified that his approach permits adjustments to the damages calculations if, for example, the incremental capacity parameter changes.   (Ex. 22 at 22:24-23:3.)

### 4.   Prof. Slottje's Opinion As To ViaSat's Capacity To Take On Additional Subscribers Is Well-Founded

Defendants also criticize Prof. Slottje's assessment of the subscriber capacity of ViaSat-1.   (Mot. at 11-13.)   But Prof. Slottje amply justified his reliance on ViaSat's conservative subscriber capacity calculations.   Defendants' arguments at best go to the weight of Prof. Slottje's opinions—not to their admissibility.

It is important to note at the outset that Defendants have not offered any opinion as to the actual subscriber capacity of the ViaSat-1 satellite.   Defendants' purported expert on satellite capacity never calculated the actual subscriber capacity of ViaSat-1.   (Ex. 23 at 6:11-15, 15:12-16.) ███████████████████

███████████████████████████████████████

███████████████████████████ (Ex. 28 at 14, 18.)

███████████████████████████████

████████████████████ (Ex. 23 at 69:15-70:24.)   One expert's doubts about the evidence relied upon by another expert cannot possibly justify exclusion.

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1     █████████████████████████████████

2 █████████████████████████████████████

3 ██████████████████████████████████████

4 ████████████████████████████████ (*See* Ex. 24

5 192:12-194:19; *see also* Ex. 21 at 80:13-16.)   Prof. Slottje's reliance on the

6 subscriber capacity model that ViaSat uses for business planning is appropriate.

7     ViaSat goes to great lengths to ensure that its subscriber capacity calculations

8 are, if anything, conservative. █████████████████████████

9 ██████████████████████████████████

10 ████████████████████ (Ex. 24 at 83:6-84:12.) ████████

11 █████████████████████████████████████████

12 ███████████████ (*See id.*)   Prof. Slottje's reliance on such a conservative

13 estimate is reasonable.

14     Defendants suggest, despite the conservative nature of ViaSat's calculations,

15 ████████████████████████████████

16 █████████████ (Mot. at 11-13.)   This is false. ██████████

17 ████████████████████████████████

18 ███████████████ (Ex. 24 at 103:4-104:13.) ██████████

19 ██████████████████████████ (*Id.* at 84:23-

20 85:5.) ██████████████████████████████████

21 ████████████████████ (*Id.* 107:13-108:10, 213:1-13.)

22 Prof. Slottje's reliance on the calculation, in light of this unequivocal testimony, is

23 not unreasonable.

24

1          The last of Defendants' scattershot attacks on Prof. Slottje's analysis of

2   ViaSat's capacity to take on additional subscribers relates to beam-by-beam

3   variation in satellite fill rates.   (Mot. at 11-12.)   The satellites in question are "spot-

4   beam" satellites, which direct multiple beams toward the Earth's surface.

5   Defendants argue that certain beams may be more or less full, such that there may

6   be some variation in the number of Hughes' subscribers ViaSat-1 could

7   accommodate in the but-for world.   (*Id.*)   Again, however, Defendants make no

8   effort to quantify the effect of this variation on Prof. Slottje's model—their criticism

9   is founded on nothing more than speculation. ████████████████████████

10  █████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ██   (*See* Ex. 24 at 83:6-84:12.)

13          In any event, Defendants' beam-by-beam criticism is mistaken. ████████

14  ████████████████████████████████████████████████

15  ████████████████████████   (Ex. 1 at 38-39.)   ██████████████████

16  ███████████████████████████████████████████████████████

17  █████████   (Ex. 22 at 261:5-264:6; *see also* Ex. 30 at 109:2-21; Ex. 24 at 100:14-19.)

18          Defendants raise a number of issues that ***might*** affect Prof. Slottje's lost

19  profits analysis, but which they cannot definitively state have any material effect at

20  all.   At most, Defendants dispute the precision of the evidence on which Prof.

21  Slottje relies.   Such is the stuff of cross-examination.   *See Fiskars, Inc. v. Hunt*

22  *Mfg. Co.*, 279 F.3d 1378, 1383 (Fed. Cir. 2002) ("Although the parties must support

23  their positions with sound economic proof, absolute certainty is not required, for

24  reconstruction of the but for market is by definition a hypothetical enterprise based

-16-

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF**
**VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   on the evidence introduced at trial.") (internal quotations omitted).

2   **C.      Prof. Slottje's Reasonable Royalty Analysis Is Sound**

3         Defendants' challenges to Prof. Slottje's reasonable royalty opinions are just

4   as weak as their misplaced attacks on his lost profits opinions.   In effect,

5   Defendants complain that Prof. Slottje's calculated royalty is too large—because

6   Defendants would not want to pay so much.   But "what an infringer would prefer to

7   pay is not the test for damages."   *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555

8   (Fed. Cir. 1995).   Were it so, no defendant would ever pay for infringing a patent.

9         Prof. Slottje offers a different view of the relevant factors in the hypothetical

10  negotiation than that presented by the Defendants.   In Prof. Slottje's view, any

11  hypothetical negotiation would take into account the full economic reality of the

12  parties' relationships, including the fact that Defendants sold the Jupiter-1 satellite

13  to ViaSat's main competitor for use in the marketplace against ViaSat.   Defendants

14  would ignore the fact of downstream competition entirely, and focus solely on their

15  profits from the infringing sale.   This is not a dispute that can justify excluding

16  expert testimony on damages:   "Questions about what facts are most relevant or

17  reliable to calculating a reasonable royalty are for the jury."   *i4i*, 598 F.3d at 856.

18  **1.      Prof. Slottje's Opinion Is Reasonable When The Full Effect Of Defendants' Infringement Is Considered**

19        Section 284 of the Patent Act provides that damages for patent infringement

20  must be "adequate to compensate for the infringement, but in no event less than a

21  reasonable royalty for the use made of the invention by the infringer."   35 U.S.C.

22  § 284.   In this case, "the use made by the infringer" includes Defendants' sale of a

23  satellite embodying ViaSat's patented technologies to ViaSat's principal competitor

24

-17-

in the satellite broadband market.   Defendants' sale of the Jupiter-1 satellite to Hughes, like their inducement of Hughes' infringing use of the satellite, ████ ██████████████████████████████████—at ViaSat's expense.   It was this complete picture of the economic relationships involved that was the basis for Prof. Slottje's well-reasoned analysis.   (*See* Ex. 22 at 47:3-48:5, 68:3-70:5.)

Indeed, Prof. Slottje's reasonable royalty calculations ($459.9 million if lost profits are awarded; $587.1 million if no lost profits are awarded) are commensurate with the scale of investments and profits in the satellite industry.   Prof. Slottje bases his calculations in part on the market value of satellite capacity, which will be discussed in greater detail below.   But his calculations are also reasonable when they are judged from any angle wide enough to encompass the economic reality of the satellite market.   For example, ████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ (*Id.* at 39:7-40:1; 101:7-102:16.)   As Defendants' damages expert concedes, a patentee negotiating a royalty would take into account both actual and perceived costs of competing against an opponent strengthened by use of infringing technology.   (Ex. 31 at ¶ 37.)

A substantial royalty rate is also independently justified under the so-called "analytical approach" to reasonable royalty damages, which bases damages on the incremental profits gained by the accused infringer due to infringement.   *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (discussed in Ex. 1 at 62).   As explained above in Section III.A, the per-Gbps cost of satellite capacity falls by an order of magnitude when ViaSat's patented and proprietary technologies

1   are employed.   A $587 million royalty, paid by a direct competitor, is a "reasonable

2   royalty" given that █████████████████████████████████████████

3   █████████████████████████████████

4        Even if the focus were restricted solely to Defendants—ignoring completely

5   that Defendants knowingly sold the Jupiter-1 satellite to ViaSat's competitor for use

6   against ViaSat—Prof. Slottje's royalty analysis would still be reasonable.

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████   (Mot. at 1.)   But the fact

10  that SS/L *might* not have made an infringing satellite for Hughes is irrelevant.   An

11  infringing satellite *was* made, and a royalty must be determined.   *See Fujifilm Corp.*

12  *v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010) ("To determine a reasonable royalty,

13  a jury must find the royalty that would have been agreed to in a hypothetical

14  negotiation between a willing licensee and willing licensors at the time infringement

15  began.").   Even Defendants' damages expert recognizes that she must assume that

16  the patents have been infringed.   (Ex. 31 at ¶ 36.)

17  █████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ███████████   (Ex. 32 at Art. 15.1(5), 15.1(7)),   ██████████████████████

23  ██████████████████████████████████████████████████████████

24  ████████████████████████   (Ex. 19 at 141:7-142:11; Ex. 20.)   ██████████



1

2

3 [12]

4 That sum does not even take into account the reputational harm SS/L would suffer if

5 it pulled the plug on the Jupiter-1 project on the eve of infringement.

6        Defendants fault Prof. Slottje for relying on reputational harm, but that is a

7 real cost to Defendants that must be taken into account.   (Ex. 1 at 44-45.)

8

9

10        (Ex. 22 at 36:8-37:5; 40:6-41:1.)

11

12

13 [13]   The record is clear that this reputational effect would be a salient

14 concern for the Defendants.

15        (Ex. 19 at 134:22-135:16.)

16

17 (*See* Ex. 33 at 277:5-11, 283:17-284:16; Ex. 34.)

18

19 [12]

20 [13]   The case Defendants cite as justifying exclusion of testimony on
"reputational damage" as "entirely speculative" is not to the contrary.   (Mot. at 17-
21 18 (citing *Quad/Graphics, Inc. v. One2One Comms., LLC*, No. 09-cv-99-JPS, 2011
WL 4478440, at *1 (E.D. Wis. Sep. 23, 2011)).)   Unlike Prof. Slottje, the expert
22 there opined that $1 million in damages were due solely for reputational harm.
23 2011 WL 4478440, at *5.   It was the expert's quantification of reputational damage
without basis that made his opinion unreliable, not the mere mention of reputation
24 effects.   Reputation effects are well known to economists.   (Ex. 22 at 65:7-67:20.)

1 ██████████████████████████████████████████████████

2 ████████████████████████████████ (Ex. 35 at 23:5-16.) ███████████

3 █████████████████████████████████████ (*Id.* at 24:1-18.)

4 ██████████████████████████████████████████████████████

5 █████████ (*Id.* at 33:17-34:6; Ex. 11 at 24:21-25:6.)   Against this backdrop,

6 Prof. Slottje cannot ignore reputation effects in a hypothetical negotiation.

7        Implicit throughout Defendants' criticisms is the idea that a royalty greater

8 than SS/L's profit from the Jupiter-1 deal would be unreasonable.   For the reasons

9 discussed above, such a restriction on ViaSat's damages is not economically

10 reasonable in light of the far-reaching harm to ViaSat from the infringing sale to

11 Hughes.   Nor is such a limit legally appropriate.   Defendants' own damages expert

12 admits that an accused infringer's profits are not a limit on damages, citing Federal

13 Circuit case law.   (Ex. 31 at ¶ 40 n.70.)   Such a limit would be even more

14 inappropriate here, given Defendants' minimal bargaining power.   ███████

15 ██████████████████████████████████████████████████████

16 █████████████████████████████████████████████████

17 ███████████████████ (Ex. 1 at 44.)

18        Although Defendants cite cases in which damages opinions that call for an

19 award higher than the infringer's profits have been excluded, the cases they cite are

20 limited to their facts, which do not pertain here.[14]   In fact, Defendants cite a case

21

22        [14]   *Lindemann Maschinefabrik GmbH v. Am. Hoist & Drrick Co.*, 895 F.2d
1403 (Fed. Cir. 1990), cited on page 15 of Defendants' brief, was expressly limited

23 to its facts, which involved an expert whose "opinion was based on a nonexistent or
at best woefully incomplete understanding of the market and on an estimate of

24 anticipated profits that bore no relation to actual profits."   895 F.2d at 1408.

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

1   that actually supports ViaSat's position.   In *Trans-World Mfg. Corp. v. Al Nyman &*

2   *Sons, Inc.*, 750 F.2d 1552 (Fed. Cir. 1984), the Federal Circuit ruled that the trial

3   court erred in ***excluding*** evidence of the infringer's profits from selling eyeglasses

4   using the patented eyeglass display racks.   "If, for example, sales were increased

5   because of the infringing use of the displays, that fact could affect the amount of

6   royalties a potential licensee would be willing to pay."   750 F.2d at 1568.   And

7   Defendants cannot dispute that there are multiple cases affirming damages awards

8   that are greater than the infringer's profits.   *See, e.g.*, *Rite-Hite*, 56 F.3d at 1554-55

9   (collecting cases).   Prof. Slottje should be permitted to testify regarding all profits

10   from infringing use of the Jupiter-1 satellite.

11         The extent of harm to ViaSat and risk to Defendants confirms that Prof.

12   Slottje's royalty analysis is reasonable.   To the extent Defendants disagree with the

13   results of that analysis, they may explore their issues on cross-examination at trial.

### 2.   Prof. Slottje's Reliance on Market Data About the Price of Satellite Capacity Is Well-Founded

15         As discussed above, the reasonableness of Prof. Slottje's royalty analysis in

16   this case is confirmed by multiple data points.   The primary data on which he relies

17   in his report, however, are data regarding the market value of satellite capacity.

18   Such data are particularly relevant here, given that the benefit of ViaSat's patented

19   and proprietary technologies is a significant incremental gain in satellite capacity.

20   (Ex. 1 at 53-59.)   ████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████

22

      The "basic error" in *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers,*

23   *Inc.*, 446 F.2d 295, 299 (2d Cir. 1971), cited on the same page of Defendants' brief,

24   was that the trial court said it intended to award a royalty below the infringer's
      profits but did not do so.

1    ████████████████████████    (*Id.* at 50.)   The market value of the needed,

2    infringing incremental capacity therefore would have been a salient concern in any

3    royalty negotiation.   (Ex. 22 at 84:24-85:8, 85:17-86:13, 89:21-90:14.)[15]

4         Prof. Slottje focused on two transactions that he found particularly relevant:

5    leases of capacity by Barrett (a Canadian internet service provider) on the ViaSat-1

6    and Jupiter-1 satellites.   (Ex. 1 at 55-56, 58.)   Prof. Slottje opines that these

7    transactions are the best possible sources of market data on the value of satellite

8    capacity.   Because the transactions are for capacity on ViaSat-1 and Jupiter-1, they

9    involve the exact patented and proprietary technology at issue here, with its lower

10   per-bit costs.   (*Id.*)   Indeed, ████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ██████████████████████████   (Ex. 11 at 137:10-16.)

13        Defendants argue that Prof. Slottje's reliance on this market data is

14   impermissible, but their argument is based on a series of inapposite cases.[16]   Prof.

15   Slottje uses leases of satellite capacity as market data on the value of incremental

16   capacity—the benefit of the patents-in-suit.   He does not opine that these leases are

17

---

18   [15]   Defendants misunderstand Prof. Slottje's reference to capacity leases:   He
     does not opine that any lease would actually have been signed in the but-for world.
19   (Mot. at 21-22.)   Rather, the prices paid to lease capacity are one market-based data
     point in his royalty analysis—a particularly salient data point in a world where
20   Defendants do not provide Hughes with the ████████ of incremental infringing
     capacity that Hughes evidently needed.   (Ex. 22 at 155:9-156:8.)
21   [16]   *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed.
22   Cir. 2011) (finding plaintiff's reliance on 25% rule of thumb inadmissible);
     *ResQNet.com, Inc. v. Lans, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010) (determining
23   that cited licenses bore no relation to claimed invention).   Prof. Slottje reasonably
     tied his analysis of the value of the incremental satellite capacity provided by
24   ViaSat's patents to the market value of such capacity.

1   comparable patent licenses.   (*Compare* Ex. 1 at 46 *and* 53-59.)   Moreover, he does

2   not simply adopt the effective per-Gbps prices in these transactions as his royalty

3   rate, but instead uses them as a factor in bounding the negotiating range:   ████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████[17]   (*Id.* at 54-58, 61.)

6        Defendants cannot tenably maintain that consulting market data on the value

7   of the incremental benefit of patented technology is impermissible, since that is

8   what their damages expert did in analyzing Defendants' counterclaims.   ████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████ (Ex. 31 at ¶¶ 61-62 ████████

12  ████████████████████████████████████████████████████

13  ██████████████████████████████.)   However, because

14  the agreement on which Defendants rely for their damages opinion involves

15  technologies different from what Defendants patented, the link to this case is far

16  more attenuated than that to Prof. Slottje's market data, which involves the same

17  satellites and same technology as ViaSat's asserted patents.   Defendants cannot

18  reasonably dispute that it is a reliable and admissible technique for an economist to

19  consult market data on the value of the incremental gains from infringement.

20  ──────────────
    [17]   This distinguishes Prof. Slottje's analysis from that in *DataQuill Ltd. v.*

21  *High Tech. Computer Corp.*, No. 08-cv-543, 2012 WL 1284381 (S.D. Cal. Apr. 16,
    2012).   In that case, the expert used a revenue sharing agreement as the basis for

22  applying a "customary royalty rate of 3.91%."   2012 WL 1284381, at *7.   Prof.
    Slottje did not simply adopt a rate from the leases he consulted—he considered

23  those lease rates as one data point among others in determining a royalty based on
    the incremental value of the patented technology.   The royalty he calculated is

24  smaller than the per-Gbps lease prices in those leases.   (*See* Ex. 1 at 61.)

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

### D. Prof. Slottje's Reasonableness Checks Are Relevant And Will Be Helpful to the Jury

Defendants' final attack on Prof. Slottje is based on certain "reasonableness checks" he employs to confirm that his damages calculations are not out of line with the economics of the satellite industry.   Those reasonableness checks are additional data points that will be helpful to the jury:

- ██████████████████████████████████████████████████████████[8] (Ex. 1 at 62-63.)

- ██████████████████████████████████████████████████████████████ (*Id.* at 63-64.)

- That ViaSat had to pay hundreds of millions of dollars for WildBlue's established distribution network and customer base to enter into the internet service business and compete with Hughes also explains why ViaSat would seek a high royalty.   (*Id.* at 63.)

Again, Defendants' own expert opinion belies their critique: ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (Ex. 31 at

¶¶ 59-60.)   Defendants cannot proffer such an opinion on one side of the case and condemn it on the other.   Prof. Slottje's reasonableness checks are admissible.

## V.   CONCLUSION

For the foregoing reasons, ViaSat respectfully requests that the Court deny Defendants' Motion to Exclude the Testimony of Dr. Daniel Slottje in its entirety.

---

[18]     Prof. Slottje uses ViaSat's profit numbers to estimate Hughes' expected profits from operating the infringing satellite.   Defendants mischaracterize this check as the value of ViaSat's (rather than Hughes') use of the technology (Mot. at 24), but the value to ViaSat would itself be relevant in any event.

1  DATED: January 6, 2014          QUINN EMANUEL URQUHART &
2                                  SULLIVAN, LLP
3
4                              By  /s/ Sean S. Pak
                                   Sean S. Pak
5
6                                  Attorneys for Plaintiff ViaSat, Inc.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Case No. 3:12-cv-00260-H-WVG
**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**

## CERTIFICATE OF SERVICE

I hereby certify that, on January 6, 2014, I caused the foregoing **VIASAT'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE** to be served on Defendants' counsel via the Court's ECF system and via e-mail.

DATED:   January 6, 2014

By  */s/ Sean S. Pak*
Sean S. Pak

**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF
VIASAT'S DAMAGES EXPERT DR. DANIEL SLOTTJE**