fQUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Eric E. Wall (Bar No. 248692)
ericwall@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875 6600

Yury Kapgan (Bar No. 218366)
yurykapgan@quinnemanuel.com
Vincent M. Pollmeier (Bar No. 210684)
vincentpollmeier@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
865 S Figueroa Street 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000

Attorneys for Plaintiff ViaSat, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC., VIASAT COMMUNICATIONS, INC., f/k/a WILDBLUE COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> SPACE SYSTEMS/LORAL, INC., LORAL SPACE & COMMUNICATIONS, INC., <br><br> Defendants. | CASE NO. 3:12-cv-00260-H-WVG <br><br> **PUBLIC REDACTED VERSION** <br><br> **PLAINTIFF VIASAT INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** <br><br> Trial Date: March 18, 2014 <br> Time: TBD <br> Courtroom: 15A <br> Judge: Hon. Marilyn L. Huff |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

VIASAT'S CONTENTIONS OF MATERIAL FACT ........................................... 2

I.    THE PARTIES ................................................................................................ 2

II.   VIASAT'S ASSERTED PATENTS .............................................................. 4

    A.    The '875 Patent ................................................................................. 4

        1.    The Teaching of the '875 Patent .......................................... 4

        2.    Validity of the Asserted Claims of the '875 Patent .................. 16

            (a)    Priority Date of the Claims of the '875 Patent ................. 17

            (b)    Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '875 Patent ........... 17

            (c)    Secondary Considerations Support the Nonobviousness of the Asserted Claims of the '875 Patent ................................................................................ 18

        3.    Lack of Inequitable Conduct in the Prosecution of the '875 Patent ................................................................................ 19

    B.    The '827 Patent ................................................................................. 19

        1.    The Teaching of the '827 Patent .......................................... 19

        2.    Validity of the Asserted Claims of the '827 Patent .................. 26

            (a)    Priority Date of the Claims of the '827 Patent ................. 27

            (b)    Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '827 Patent ........... 28

            (c)    Secondary Considerations Support the Nonobviousness of the Asserted Claims of the Patents-in-Suit ........................................................................ 29

        3.    Lack of Inequitable Conduct in the Prosecution of the '827 Patent ................................................................................ 29

    C.    The '043 Patent ................................................................................. 30

        1.    The Teaching of the '043 Patent .......................................... 30

        2.    Validity of the Asserted Claims of the '043 Patent .................. 48

(a)   Priority Date of the Claims of the '043 Patent .................50

(b)   Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '043 Patent ..........50

(c)   Secondary Considerations Support the Nonobviousness of the Asserted Claims of the Patents-in-Suit ................51

III.   DEFENDANTS' INFRINGEMENT OF THE ASSERTED PATENT CLAIMS ...........51

   A.   Defendants' Infringement of the '875 Patent .................52

      1.   Infringement Contentions for the '875 Patent ...........52

      2.   Support for Infringement Contentions for the '875 Patent .........52

   B.   Defendants' Infringement of the '827 Patent .................52

      1.   Infringement Contentions for the '827 Patent ...........52

      2.   Support for Infringement Contentions for the '827 Patent .........52

   C.   Defendants' Infringement of the '043 Patent .................53

      1.   Infringement Contentions for the '043 Patent ...........53

      2.   Support for Infringement Contentions for the '043 Patent .........53

IV.   DEFENDANTS' BREACHES OF CONTRACT ........54

   A.   Contracts At Issue ...............54

      1.   The March 2006 NDA, Amended April 27, 2007 .........54

      2.   The WildBlue NDA, Amended July 21, 2009 ...........55

      3.   The January 7, 2008 Build Contract .............55

      4.   The LS&C NDA, Amended December 4, 2009 ...........55

   B.   To the Extent Required, ViaSat Designated its Materials Confidential Pursuant to the Applicable Terms of the Asserted Contracts ...........56

   C.   Defendants' Breaches .............56

V.   INVALIDITY OF SS/L'S ASSERTED PATENT .........60

VI.   VIASAT'S NONINFRINGEMENT OF SS/L'S ASSERTED PATENT ......60

VII.   VIASAT'S LACK OF BREACH RELATED TO THE FLEXIBLE FREQUENCY PROPOSAL ...........61

Case No. 3:12-cv-00260-H-WVG

VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

VIII.  DAMAGES ....................................................................................... 61

    A.   ViaSat's Damages ..................................................................... 61

        1.   Damages for Defendants' Infringement of the Patents-In-Suit .............................................................................. 62

            (a)   Lost Profits on Jupiter-1 ................................. 62

            (b)   Reasonable Royalty for Jupiter-1 .................... 66

            (c)   Reasonable Royalty for the NBN Satellites .................... 71

        2.   Damages for Defendants' Breach of Contract ........................... 72

    B.   Defendants' Alleged Damages ................................................. 72

        1.   Royalty Rate ............................................................... 73

            (a)   Defendants Improperly Double the Rate in the ████ ████ .................................................. 73

            ████████████████████████████████ .................................................. 74

        2.   Royalty Base ............................................................... 75

        3.   Calculation of Reasonable Royalty ................................ 75

IX.   WILLFUL INFRINGEMENT ....................................................... 75

X.    DEFENDANTS' DEFENSES ........................................................ 77

    A.   Doctrine of Equivalents and Indirect Infringement ............................. 77

    B.   Invalidity of the ViaSat Patents-in-Suit ................................... 77

    C.   Inequitable Conduct Related to the '875 and '827 Patent .................... 78

    D.   Equitable Estoppel, Laches, and/or Waiver ................................. 78

    E.   35 U.S.C. § 287 ....................................................................... 79

    F.   Unclean Hands ....................................................................... 79

    G.   Inability to Establish Basis for Injunctive Relief ............................. 80

    H.   Prosecution History Estoppel ................................................. 80

    I.   Inability to Recover Costs Pursuant to 35 U.S.C. § 288 ...................... 80

    J.   Lack of Standing ................................................................... 80

    K.   Failure to Mitigate ................................................................ 81

L.     Failure to Satisfy Conditions Precedent for Breach of Contract ......... 82

M.     License ...................................................................................... 82

XI.     VIASAT'S DEFENSES .................................................................. 83

    A.     Invalidity of the SS/L Patent-in-Suit ........................................ 83

    B.     35 U.S.C. § 287 ..................................................................... 83

    C.     Laches ................................................................................... 83

    D.     Equitable Estoppel and/or Waiver ............................................ 84

POINTS OF LAW ....................................................................................... 85

XII.     ISSUES ON WHICH VIASAT BEARS THE BURDEN OF PROOF ......... 85

    A.     Infringement .......................................................................... 85

        1.     Direct Infringement ....................................................... 85

        2.     Indirect Infringement ..................................................... 88

        3.     Willful Infringement ...................................................... 89

    B.     Breach of Contract ................................................................. 89

        1.     Contracts Governed By California Law ............................ 89

        2.     Contract Governed By New York Law .............................. 90

        3.     Contract Governed By Colorado Law ............................... 91

    C.     Damages ................................................................................ 92

        1.     Damages for Patent Infringement ..................................... 92

             (a)     Lost Profits ......................................................... 93

             (b)     Reasonable Royalty .............................................. 95

             (c)     Notice ................................................................. 99

             (d)     Attorneys' Fees ................................................... 100

        2.     Damages for Breach of Contract ..................................... 100

    D.     Invalidity of SS/L's '696 Patent ............................................ 101

        1.     Anticipation ................................................................ 102

        2.     35 U.S.C. § 102(a), (b) ................................................. 106

        3.     Obviousness ................................................................ 107

VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

| | | 4. | Definiteness | 111 |
| | | 5. | Written Description | 112 |
| | | 6. | Enablement | 116 |
| | | 7. | Best Mode | 116 |
| | E. | Defenses | | 118 |
| | | 1. | Laches | 118 |
| | | 2. | Equitable Estoppel | 119 |
| | | 3. | License/Patent Exhaustion | 119 |
| | | 4. | Inequitable Conduct & Unclean Hands | 121 |
| | | 5. | 35 U.S.C. §§ 286, 288 | 122 |
| | | 6. | 35 U.S.C. § 287 | 123 |
| | | 7. | 28 U.S.C. § 1498 | 124 |
| XIII. | ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF | | | 124 |
| | A. | Infringement of SS/L's Patent | | 124 |
| | B. | Invalidity of ViaSat's Patents-in-Suit | | 124 |
| | C. | Unenforceability of ViaSat's Patents-in-Suit | | 125 |
| | | 1. | Correction of Invention of the '827 Patent | 125 |
| | | 2. | Inequitable conduct | 126 |
| | | 3. | License | 126 |
| | D. | Breach of Contract | | 126 |
| | E. | Declaratory Judgment of Ownership over C/I Test Method | | 126 |
| | F. | Defenses | | 126 |
| | | 1. | Failure to Mitigate Damages | 127 |
| XIV. | ABANDONED ISSUES | | | 127 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.B. Dick Co. v. Burroughs Corp.*,
713 F.2d 700 (Fed. Cir. 1983) ................................................................86, 121

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ...................................................................118

*Acoustic Marketing Research, Inc. v. Technics, LLC*,
198 P.3d 96 (Colo. 2008) .............................................................................101

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
228 F.3d 1338 (Fed. Cir. 2000) ...........................................................107, 116

*Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*,
2013 WL 235181 (S.D. Cal. May 24, 2013) .................................................90

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
6 F.3d 1523 (Fed. Cir. 1993) .......................................................................123

*Am. Standard Inc. v. Pfizer Inc.*,
722 F. Supp. 86 (D. Del. 1989) ...................................................................107

*Amgen, Inc. v. Chugai Pharm. Co.*,
927 F.2d 1200 (Fed. Cir. 1991) ...................................................................117

*Amgen Inc. v. Hoescht Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ...................................................................103

*Amstar Corp. v. Envirotech Corp.*,
730 F.2d 1476 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 924 (1984) ...................87

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 178 (Fed. Cir. 1994) .......................................................................123

*Apotex USA, Inc. v. Merck & Co., Inc.*,
254 F.3d 1031 (Fed. Cir. 2001) .....................................................................78

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ...........................................................115, 125

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985) .....................................................................109

*Atlas Powder Co. v. E.I. DuPont De Nemours*,
750 F.2d 1569 (Fed. Cir. 1984) ...................................................................103

*Bandag, Inc. v. Gerrard Tire Co.*,
704 F.2d 1578 (Fed. Cir. 1983) .....................................................................99

Case No. 3:12-cv-00260-H-WVG
VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Bayer AG v. Schein Pharms., Inc.*,
    301 F.3d 1306 (Fed. Cir. 2002) ........................................................... 118

*Beckman Instruments, Inc. v. LKB Produkter AB*,
    892 F.2d 1547 (Fed. Cir. 1989) ........................................................... 100

*Bell Communications Research Inc. v. Vitalink Communications Corp.*,
    55 F.3d 615 (Fed. Cir. 1995) .................................................................. 88

*Bilstad v. Wakalopulos*,
    386 F.3d 1116 (Fed. Cir. 2004) ........................................................... 113

*Biren v. Equality Emergency Med. Grp.*,
    102 Cal. App. 4th 125 (2002) ................................................................. 90

*Brucklemeyer v. Ground Heaters, Inc.*,
    445 F.3d 1374 (Fed. Cir. 2006) ........................................................... 106

*Bruning v. Hirose*,
    161 F.3d 681 (Fed. Cir. 1998) ............................................................. 118

*Budde v. Harley-Davidson, Inc.*,
    250 F.3d 1369 (Fed. Cir. 2001) ........................................................... 102

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998) ............................................................. 87

*Capon v. Eshhar*,
    418 F.3d 1349 (Fed. Cir. 2005) ........................................................... 125

*CDF Firefighters v. Maldonado*,
    158 Cal. App. 4th 1226 (2008) ............................................................... 89

*Celador Int'l, Inc. v. Am. Broad. Cos., Inc.*,
    499 Fed. Appx. 721 (9th Cir. 2012) ...................................................... 90

*Chemcast Corp. v. Arco Indus. Corp.*,
    913 F.2d 923 (Fed. Cir. 1990) ............................................................. 118

*Clearmont Prop., LLC v. Eisner*,
    872 N.Y.S.2d 725 (N.Y. App. Div. 2009) .............................................. 90

*Coleman v. Dines*,
    754 F.2d 353 (Fed. Cir. 1985) ............................................................. 105

*Colorado v. New Mexico*,
    467 U.S. 310 (1984) ............................................................................. 102

*Constant v. Advanced Micro-Devices, Inc.*,
    848 F.2d 1560 (Fed. Cir. 1988) ........................................................... 106

*Continental Can Co. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991) .................................................... 107, 111

*Convolve, Inc. v. Compaq Computer Corp.*,
  527 Fed. Appx. 910 (Fed. Cir. 2013) ................................................................ 90

*Cooper v. Goldfarb*,
  154 F.3d 1321 (Fed. Cir. 1998) ...................................................................... 105

*Cordis Corp. v. Medtronic AVE, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003) ...................................................................... 113

*Crater Corp. v. Lucent Tech., Inc.*,
  255 F.3d 1361 (Fed. Cir. 2001) ...................................................................... 124

*Credle v. Bond*,
  25 F.3d 1566 (Fed. Cir. 1994) ........................................................................ 112

*Crown Operations Int'l Ltd. v. Solutia, Inc.*,
  289 F.3d 1367 (Fed. Cir. 2002) ................................................................ 104, 108

*D.M.I., Inc. v. Deere & Co.*,
  755 F.2d 1570 (Fed. Cir. 1985) ...................................................................... 115

*Datascope Corp. v. SMEC, Inc.*,
  879 F.2d 820 (Fed. Cir. 1989) .......................................................................... 93

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
  836 F.2d 1320 (Fed. Cir. 1987) ........................................................................ 94

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
  851 F.2d 1387 (Fed. Cir. 1988) ...................................................................... 110

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ........................................................................ 94

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*,
  109 Cal. App. 4th 1020 (2003) .......................................................................... 90

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
  257 F.3d 1364 (Fed. Cir. 2001) ........................................................................ 87

*Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*,
  720 F. Supp. 397 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990) ................ 86

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006) ........................................................................ 88

*East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*,
  109 P.3d 969 (Colo. 2005) ................................................................................ 92

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003) ........................................................................ 77

*Ecolab, Inc. v. Envirochem, Inc.*,
  264 F.3d 1358 (Fed. Cir. 2001) ................................................................. 86, 119

Case No. 3:12-cv-00260-H-WVG
VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Eli Lilly & Co. v. Barr Labs.*,
  251 F.3d 955 (Fed. Cir. 2001) ............................................................... 105, 116

*Energy Transp. Group Inc. v. William Demant Holding A/S*,
  697 F.3d 1342 (Fed. Cir. 2012) ..................................................................... 99

*Enzo Biochem, Inc. v. Calgene, Inc.*,
  188 F.3d 1362 (Fed. Cir. 1999) .................................................................... 116

*Ethicon, Inc. v. Quigg*,
  849 F.2d 1422 (Fed. Cir. 1988) .................................................................... 101

*Exxon Research and Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001) ................................................................... 112

*Fair v. Red Lion Inn*,
  943 P.2d 431 (Colo. 1997) .......................................................................... 127

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*,
  631 F.3d 1058 (9th Cir. 2011) ...................................................................... 90

*Fox Group, Inc. v. Cree, Inc.*,
  700 F.3d 1300 (Fed. Cir. 2012) ..................................................................... 78

*Fromson v. Western Litho Plate and Supply Co.*,
  853 F.2d 1568 (Fed. Cir. 1988) ................................................................. 98, 99

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp. ("Jazz Photo II")*,
  394 F.3d 1368 (Fed. Cir. 2005) ................................................................... 120

*Fujifilm Corp. v. Benun ("Jazz Photo III")*,
  605 F.3d 1366 (Fed. Cir. 2010)
  *cert. denied*, 131 S. Ct. 829, 178 L. Ed. 2d 557 (U.S. 2010) ...................... 120

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
  110 F.3d 1573 (Fed. Cir. 1997) ..................................................................... 77

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
  60 F.3d 770 (Fed. Cir. 1995) ....................................................................... 119

*Gen. Motors Corp. v. Devex Corp.*,
  461 U.S. 648 (1983) ...................................................................................... 98

*Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*,
  74 A.D.3d 516 (1st Dep't 2010) .................................................................... 91

*Glass Equip. Dev., Inc. v. Besten, Inc.*,
  174 F.3d 1337 (Fed. Cir. 1999) ................................................................... 120

*Glaxo Inc. v. Novopharm Ltd.*,
  52 F.3d 1043 (Fed. Cir. 1995) ............................................................... 102, 118

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) .................................................................................. 88

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ............................................................ 108, 109

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) ........................................... 94

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ......................................................... 91

*Gyromat Corp. v. Champion Spark Plug Co.*,
    735 F.2d 549 (Fed. Cir. 1984) ............................................ 93

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ............................................ 95

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001) .......................................... 85

*Hunter v. Croysdill*,
    169 Cal. App. 2d 307 (Cal. 1959) ..................................... 127

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) .................................. 104, 106

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011) ........................................ 113

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989) ........................................ 107

*In re Elsner*,
    381 F.3d 1125 (Fed. Cir. 2004) ........................................ 106

*In re Fritch*,
    972 F.2d 1260 (Fed. Cir. 1992) ........................................ 109

*In re Hayes Microcomputer Prods. Patent Litig.*,
    982 F.2d 1527 (Fed. Cir. 1992) ................................... 85, 115

*In re Klopfenstein*,
    380 F.3d 1345 (Fed. Cir. 2004) ........................................ 106

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ........................................ 109

*In re Seagate*,
    497 F.3d 1360 (Fed. Cir. 2007) .......................................... 89

*Innovative Scuba Concepts, Inc. v. Fed. Ind., Inc.*,
    26 F.3d, 1112 (Fed. Cir. 1994) ........................................ 104

*Intel Corp. v. Via Techs., Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003) ........................................ 112

*Intel Corp., v. U.S. Int'l Trade Comm'n,*
  946 F.2d 821 (Fed. Cir. 1991) ..................................................... 102

*Jacobs v. Nintendo of Am., Inc.,*
  370 F.3d 1097 (Fed. Cir. 2004) ................................................... 120

*Jazz Photo Corp. v. Int'l Trade Comm'n ("Jazz Photo I"),*
  264 F.3d 1094 (Fed. Cir. 2001) ................................................... 120

*Kara Tech. Inc. v. Stamps.com, Inc.,*
  582 F.3d 1341 (Fed. Cir. 2009) ................................................... 101

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.,*
  177 F.3d 968 (Fed. Cir. 1999) ...................................................... 86

*Kaufman Co., Inc. v. Lantech, Inc. ("Kaufman I"),*
  807 F.2d 970 (Fed. Cir. 1986) ...................................................... 89

*Kaufman Co., Inc. v. Lantech, Inc. ("Kaufman II"),*
  926 F.2d 1136 (Fed. Cir. 1991) ..................................................... 96

*Kearns v. Chrysler Corp.,*
  32 F.3d 1541 (Fed. Cir. 1994) ...................................................... 95

*Kemco Sales, Inc. v. Control Papers Co.,*
  208 F.3d 1352 (Fed. Cir. 2000) ..................................................... 86

*King Instruments Corp. v. Perego,*
  65 F.3d 941 (Fed. Cir. 1995) ................................................... 92, 93

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge v. Dana Corp.,*
  383 F.3d 1337 (Fed. Cir. 2004) ..................................................... 98

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC,*
  381 F.3d 1142 (Fed. Cir. 2004) ................................................... 102

*KSR Int'l. Co. v. Teleflex Inc.,*
  550 U.S. 398, 127 S. Ct. 1727 (2007) .................................... 108, 109

*Kyocera Wireless Corp. v. Int'l Trade Comm'n,*
  545 F.3d 1340 (Fed. Cir. 2008) ..................................................... 88

*Lam, Inc. v. Johns-Manville Corp.,*
  718 F.2d 1056 (Fed. Cir. 1983) ..................................................... 93

*Lans v. Digital Equip. Corp.,*
  252 F.3d 1320 (Fed. Cir. 2001) ................................................... 123

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
  47 A.D.3d 103 (N.Y. 1st Dep't 2007) .......................................... 126

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.,*
  34 Cal. 4th 960 (2004) .............................................................. 101

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
382 F.3d 1354 (Fed. Cir. 2004) ............................................. 87

*LizardTech, Inc. v. Earth Res. Mapping, Inc.,*
424 F.3d 1336 (Fed. Cir. 2005) ............................................. 125

*Lucent v Gateway,*
580 F.3d 1301 (Fed. Cir. 2009) ..................................... 96, 98, 99

*Mahurkar v. C.R. Bard Inc.,*
79 F.3d 1572 (Fed. Cir. 1996) ....................................... 104, 106

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) ............................................... 86

*Marks v. N.Y. Univ.,*
61 F. Supp. 2d 81 (S.D.N.Y. 1999) ........................................ 90

*Maxwell v. J. Baker, Inc.,*
86 F.3d 1098 (Fed. Cir. 1996) ............................................. 123

*Met-Coil Sys. Corp. v. Komer Unlimited, Inc.,*
803 F.2d 684 (Fed. Cir. 1986) ............................................. 120

*Meyers v. Asics Corp.,*
974 F.2d 1304 (Fed. Cir. 1992) ............................................ 119

*Miles Lab., Inc. v. Shandon Inc.,*
997 F.2d 870 (Fed. Cir. 1993) ............................................. 112

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,*
976 F.2d at 1559 (Fed. Cir. 1992) ..................................... 85, 102

*Mondis Tech. v. Top Victory Elecs. Co.,*
No. 07-cv-565, 2011 WL. 2417367 (E.D. Tex. June 14, 2011) ............... 98

*Motorola, Inc. v. Interdigital Tech. Corp.,*
121 F.3d 1461 (Fed. Cir. 1997) ............................................ 103

*Nat'l Presto Indus. v. W. Bend Co.,*
76 F.3d 1185 (Fed. Cir. 1996) ............................................. 88

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,*
166 F.3d 1190 (Fed. Cir. 1999) ............................................ 116

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.,*
298 F.3d 1290 (Fed. Cir. 2002) ............................................ 105

*Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n,*
667 F.3d 1373 (Fed. Cir. 2012) ............................................ 120

*North Am. Vaccine, Inc. v. American Cyanamid Co.,*
7 F.3d 1571 (Fed. Cir. 1993) ............................................. 111

Case No. 3:12-cv-00260-H-WVG
VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Okajima v. Bourdeau,*
  261 F.3d 1350 (Fed. Cir. 2001) ........................................... 107

*Oney v. Ratliff,*
  182 F.3d 893 (Fed. Cir. 1999) ............................................ 101

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage,*
  69 Cal. 2d 33 (1968) ...................................................... 90

*Panduit Corp. v. Stahlin Bros. Fiber Works,*
  575 F.2d 1152 (6th Cir. 1978) ............................................. 93

*Pannu v. Iolab Corp.,*
  155 F.3d 1344 (Fed. Cir. 1998) ........................................... 125

*Paper Converting Mach. Co. v. Magna-Graphics Corp.,*
  745 F.2d 11 (Fed. Cir. 1984) ....................................... 87, 94, 95

*Parker-Hannifin Corp. v. Champion Labs., Inc.,*
  No. 06-cv-2616, 2008 WL 3166318 (N.D. Ohio 2008) .......................... 94

*Pentec Inc. v. Graphic Controls Corp.,*
  776 F.2d 309 (Fed. Cir. 1985) ........................................... 109

*Personalized Media Communications, LLC v. Int'l Trade Comm'n,*
  161 F.3d 696 (Fed. Cir. 1998) ........................................... 112

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
  518 F.3d 1353 (Fed. Cir. 2008) .......................................... 118

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ...................................... 86, 114

*Playtex Products, Inc. v. Procter & Gamble Co.,*
  400 F.3d 901 (Fed. Cir. 2005) ............................................ 85

*PPG Indus., Inc. v. Guardian Indus. Corp.,*
  75 F.3d 1558 (Fed. Cir. 1996) ........................................... 103

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
  702 F.3d 1351 (Fed. Cir. 2012) ........................................ 94, 95

*Price v. Symsek,*
  988 F.2d 1187 (Fed. Cir. 1993) ..................................... 104, 105

*Prospero Assocs. v. Redactron Corp.,*
  682 P.2d 1193 (Colo. Ct. App. 1983) ..................................... 101

*Quanta Computer, Inc. v. LG Elec., Inc.,*
  553 U.S. 617 (2008) ..................................................... 120

*R/S Assoc. v. New York Job Development Auth.,*
  98 N.Y.2d 29 (2002) ...................................................... 91

*Ralston Purina Co. v. Far-Mar-Co,*
  772 F.2d 1570 (Fed. Cir. 1985) ............................................................. 100

*Read Corp. v. Portec, Inc.,*
  970 F.2d 816 (Fed. Cir. 1992) ............................................................... 86

*Reese v. Wong,*
  93 Cal. App. 4th 51 (2001) ................................................................... 101

*ResQNet.com, Inc. v Lansa, Inc.,*
  594 F.3d 860 (Fed. Cir. 2010) ............................................................... 96

*Richardson v. Suzuki Motor Co., Ltd.,*
  868 F.2d 1226 (Fed. Cir. 1989) ..................................................... 103, 104

*Ruiz v. A.B. Chance Co.,*
  234 F.3d 654 (Fed. Cir. 2000) ............................................................. 109

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
  927 F.2d 1565 (Fed. Cir. 1991) ........................................................... 103

*Seal-Flex, Inc. v. Athletic Track & Court Construction,*
  172 F.3d 836 (Fed. Cir. 1999) ......................................................... 85, 86

*Seidman v. Industrial Recycling Props., Inc.,*
  106 A.D.3d 983 (2d Dep't 2013) ......................................................... 101

*Sewall v. Walters,*
  21 F.3d 411 (Fed Cir. 1994) ............................................................... 105

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
  758 F.2d 613 (Fed. Cir. 1985) ..................................................... 111, 112

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.,*
  289 U.S. 689 (1933) ............................................................................. 98

*Spectra-Physics, Inc. v. Coherent, Inc.,*
  827 F.2d 1524 (Fed. Cir. 1987) ........................................................... 118

*SRI Int'l, Inc. v. Advanced Tech. Lab., Inc.,*
  127 F.3d 1462 (Fed. Cir. 1997) ........................................................... 100

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
  953 F.2d 1360 (Fed. Cir. 1991) ............................................................. 93

*Star Scientific, Inc. v. R.J, Reynolds Tobacco Co.,*
  537 F.3d 1351 (Fed. Cir. 2008) ..................................................... 122, 124

*State Indus., Inc. v. Mar-Flo Indus., Inc.,*
  883 F.2d 1573 (Fed. Cir. 1989) ............................................................. 98

*Stiftung v. Renishaw PLC,*
  945 F.2d 1173 (Fed. Cir. 1991) ............................................................. 86

-xiv-

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983) ........................................................ 109

*Streck, Inc. v. Research & Diagnostics Systems, Inc.*,
    665 F.3d 1269 (Fed. Cir. 2012) ........................................................ 125

*Stryker Corp. v. Davol, Inc.*,
    75 F. Supp. 2d 741 (W.D. Mich. 1999),
    aff'd, 234 F.3d 1252 (Fed. Cir. 2000) ................................................ 87

*Studiengesellschaft Kahle, mbH v. Dart Indus., Inc.*,
    862 F.2d 1564 (Fed. Cir. 1988) .......................................................... 98

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991) ........................................................ 111

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007) ........................................................ 108

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ........................................................ 103

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n.*,
    988 F.2d 1165 (Fed. Cir. 1993) ........................................................ 111

*The Liposome Co. v. Vestar Inc.*,
    36 U.S.P.Q. 2d 1295 (D. Del. 1994) ................................................ 112

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ........................................................ 121

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) ........................................................ 115

*Transco Prods. Inc. v. Performance Contracting, Inc.*,
    38 F.3d 551 (Fed. Cir. 1994) ............................................................ 118

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009) ........................................................ 121

*Trell v. Marlee Elecs. Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990) .......................................................... 98

*TWM Mfg. Co., Inc. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986) ............................................................ 99

*Union Pac. Resources Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (Fed. Cir. 2001) .......................................................... 116

*Unisplay S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995) .............................................................. 97

*Utter v. Hiraga*,
    845 F.2d 993 (Fed. Cir. 1988) .......................................................... 115

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ................................................................. 95

*Wahl Instruments, Inc. v. Acvious, Inc.*,
  950 F.2d 1575 (Fed. Cir. 1991) ............................................................... 118

*Wang Labs., Inc. v. Am. Online, Inc.*,
  197 F.3d 1377 (Fed. Cir. 1999) ............................................................... 115

*Wang Labs., Inc. v. Mitsubishi Elec. Am. Inc.*,
  30 U.S.P.Q. 2d 1241 (C.D. Cal. 1993) ............................................. 104, 119

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ............................................................... 120

*Wanlass v. Gen. Elec. Co.*,
  148 F.3d 1334 (Fed. Cir. 1998) ............................................................... 119

*Western Distributing Co. v. Diodosio*,
  841 P.2d 1053 (Colo. 1992) ...................................................................... 92

*Woodland Trust v. Flowertree Nursery, Inc.*,
  148 F.3d 1368 (Fed. Cir. 1998) ............................................................... 106

*Z4 Techs., Inc. v. Microsoft Corp.*,
  507 F.3d 1340 (Fed. Cir. 2007) ............................................................... 105

*Zygo Corp. v. Wyko Corp.*,
  79 F.3d 1563 (Fed. Cir. 1996) ................................................................... 95

## **Statutes**

35 U.S.C. § 102 ............................................................................................ 102

35 U.S.C. § 102(a) ............................................................................... 106, 107

35 U.S.C. § 102(b) ............................................................................... 106, 107

35 U.S.C. § 102(f) ........................................................................................ 77

35 U.S.C. 102(g) ..................................................................................... 77, 79

35 U.S.C. § 103 ........................................................................................... 107

35 U.S.C. §112 ............................................................................................ 113

35 U.S.C. § 120 ........................................................................................... 125

35 U.S.C. § 271(a) ........................................................................................ 85

35 U.S.C. § 271(b) ........................................................................................ 88

35 U.S.C. § 284 ................................................................... 92, 93, 96, 98, 99

35 U.S.C. § 285 ....................................................................................... 100

35 U.S.C. § 286 ....................................................................................... 122

35 U.S.C. § 287 .............................................................. 79, 83, 99, 100, 123

35 U.S.C. § 287 ....................................................................................... 123

35 U.S.C. § 288 .............................................................................. 80, 122

28 U.S.C. § 1498 ...................................................................................... 124

28 U.S.C. § 1498(a) ................................................................................. 124

28 U.S.C. § 1961 ........................................................................................ 99

28 U.S.C. § 2201 ...................................................................................... 100

**INTRODUCTION**

2     Pursuant to Local Rule 16.1(f)(2) and this Court's scheduling orders, Plaintiff

3  ViaSat, Inc. ("ViaSat") hereby submits the following Memorandum of Contentions of

4  Fact and Law.  ViaSat notes that it has prepared this Memorandum without the benefit

5  of any pretrial disclosures from Defendants Space Systems/Loral, LLC f/k/a Space

6  Systems/Loral, Inc. ("SS/L") and Loral Space & Communications Inc. ("LS&C,"

7  collectively with SS/L, "Defendants").  Accordingly, ViaSat reserves the right to amend

8  or supplement this Memorandum in response to Defendants' disclosures.

9     This is a case about broken promises and blatant copying.  A long list of

10  Defendants' internal emails and documents, as well as third party productions from

11  Hughes, reveals that Defendants disclosed ViaSat's proprietary information to ViaSat's

12  competitors and others, extensively used that proprietary information in violation of the

13  parties' various contracts, and willfully and repeatedly infringed ViaSat's patents,

14  including ongoing projects to this date.  In depositions and in their documents,

15  Defendants' witnesses confirmed ███████████ the ██████ nature of ViaSat's

16  proprietary and patented concepts—concepts which yielded a satellite having more data

17  carrying capacity than all 40+ then-existing commercial data satellites over North

18  America combined—yet improperly used those concepts to build the Jupiter-1 satellite

19  for ViaSat's direct competitor in the U.S., Hughes, as well as two satellites for NBN

20  Co. in Australia.

21     ViaSat's experts reviewed the discovery and evidence in this case and provided

22  their expert opinions regarding the impropriety of Loral's actions and the damage it

23  caused ViaSat.  For example, Dr. Marshall Kaplan, who has 50 years of experience in

24  the satellite industry and previously consulted for Space Systems/Loral, concluded that

Defendants violated industry norms and standards with respect to the use and disclosure of ViaSat's proprietary information and intellectual property, and that they breached their contracts with ViaSat by disclosing ViaSat's proprietary information and intellectual property to third-parties such as Hughes. Reports and testimony from Mark Sturza and Dr. Chris Bartone also conclude that Loral infringed ViaSat's patents—U.S. Patent No. 8,068,827 ("the '827 patent"), U.S. Patent No. 8,010,043 ("the '043 patent") and U.S. Patent No. 8,107,875 ("the '875 patent")—and improperly used ViaSat's confidential information, including ViaSat's Capacity Maximization Tool. These same experts explained why, contrary to Loral's assertions, ViaSat's patents are neither invalid nor unenforceable. Finally, Dr. Daniel Slottje has opined that Defendants' actions have harmed ViaSat to the tune of $664 million in lost profits and reasonable royalties.

ViaSat looks forward to trial to vindicate its rights, and notes the following issues the jury and Court will help resolve.

## VIASAT'S CONTENTIONS OF MATERIAL FACT

## I. THE PARTIES

1. ViaSat, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 6155 El Camino Real, Carlsbad, California 92009.

2. ViaSat owns U.S. Patent Nos. 8,010,043; 8,068,827; and 8,107,875 (collectively, the "ViaSat Patents-in-Suit"), including the right to sue for past infringement on each of the ViaSat Patents-in-Suit.

3. Space Systems/Loral, LLC f/k/a Space Systems/Loral, Inc. ("SS/L") is a corporation organized and existing under the laws of the State of Delaware, having a

principal place of business at 3825 Fabian Way, Palo Alto, California 94303. SS/L used to be a wholly-owned subsidiary of co-defendant, LS&C, but was sold to MacDonald Dettweiler & Associates, Ltd. ("MDA") in 2012 and is now a wholly-owned subsidiary of that company.

4.      Loral Space & Communications, Inc. ("LS&C") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 600 Third Avenue, New York, New York 10016.

5.      SS/L owns U.S. Patent No. 6,400,696 ("the '696 Patent," or the "SS/L Patent-in-Suit").

6.      ViaSat's '043 Patent generally relates to maximization of capacity in a broadband satellite communications systems utilizing multiple spot-beams by selection of system parameters appropriately—for example, number of colors utilized by the system and the beam spacing.

7.      ViaSat's '827 Patent generally relates to increasing the available capacity in a broadband communication satellite by utilizing frequency spectrum not authorized for primary or co-primary use by regulatory authorities, ensuring that the satellite can discontinue utilization of the secondary frequency whenever there is the presence of an in-line interference event.

8.      ViaSat's '875 Patent generally relates to the increase in capacity allowed by particular instances of frequency reuse between service and feeder beams as described in the Expert Report of Chris G. Bartone Regarding: (1) Infringement of U.S. Patent No. 8,107,875 by the "Jupiter" Satellite and (2) Opinions Regarding ViaSat's Proprietary Concept of Providing Strategically Chosen "Partial-CONUS" Coverage in

Order to Facilitate Full Use of the Licensed Spectrum by Feeder Beams ("'875 Infringement Report").[1]

9.    SS/L's '696 Patent generally relates to a dynamic resource allocation system for a satellite communications system which is connected to a local area network, a local area network edge device, and a gateway and uses a non-asynchronous transfer mode (ATM) protocol overlaid with one or more dynamic assignment/multiple access communication protocols.

## II.    VIASAT'S ASSERTED PATENTS

### A.    The '875 Patent

#### 1.    The Teaching of the '875 Patent

10.    Among other things, and as described in the '875 Infringement Report (Dkt. 526 Ex. 2), the '875 Patent makes several key realizations that fundamentally change the allocation of frequency resources between feeder beams and service beams in a spot-beam satellite system employing a star or partial-star network architecture.

11.    A first key insight of the '875 Patent was that service beam coverage could be sacrificed in order to permit a degree of frequency re-use between feeder beams and service beams that had never before been accomplished by the prior-art. The inventors of the '875 Patent realized that by omitting service beams in sparsely populated regions and placing gateway terminals in these sparsely populated regions, the feeder beam could reuse all of the colors that were allocated to the service beams:

_____

[1]    Previously filed as Exhibit 2 to the December 16, 2013 Declaration of Amanda Bonn.  (Dkt. 526.)

The present invention relates to systems and methods for operating a multibeam satellite system utilizing subscriber terminal and gateway terminal positioning and frequency re-use.

*See* '875 Patent at col. 2, ll. 3-6.

According to an embodiment of the invention, a satellite system is presented that adopts multiple levels of frequency re-use to maximize usage of available frequency bandwidth. In addition to employing frequency re-use amongst multiple service beams such that different service beams may occupy a common frequency channel, the system further employs frequency re-use between service beams and feeder beams by locating gateways in regions separated from coverage areas of service beams.

*See* '875 Patent at col. 14, ll. 9-14.

As shown in FIG. 2A, there is complete geographic exclusivity between the feeder and service spot beams **205, 225**. . . . By locating gateway terminals **210** outside of the service spotbeam regions (e.g., the third gateway **210-3**), geographic separation is achieved to allow for re-use of the allocated frequencies.

*See* '875 Patent at col. 7, ll. 22-24, 38-41.



FIG. 2A

*See* '875 Patent at Fig. 2A.

12.     Claim 1 of the '875 Patent seeks to facilitate "color" re-use, where a "color" has a unique combination of frequency band and polarization.    Therefore, rather than having to allocate portions of the frequency spectrum specifically to the forward or return link (as is in the prior art approach exemplified by U.S. Patent No. 7,525,934 ("Ames")), the '875 Patent allows the satellite to make use of the entire available spectrum for both types of beams.  Because satellite communications systems are normally constrained by the forward link, the ability to use the entire available uplink spectrum for feeder beams and the entire available downlink spectrum for service beams can vastly improve the data-carrying capacity of the overall system.

13. A second key insight of the '875 Patent was that feeder beams, themselves, were associated with a coverage region on the surface of the Earth. In the prior art, satellite designers often represented the *service* beam coverage area as the region bounding the group of users that would receive a usable service signal from the spot-beam satellite. Because feeder beams were located wholly within service beam coverage areas, however, the feeder beam was conceptualized as a mere "link" between the satellite and the single gateway location on the surface of the Earth. *See* Ames at Fig. 1.

14. Realizing that their idea to re-use service beam colors for feeder beams would create interference between feeder beams and service beams, the inventors of the '875 Patent introduced the concept of a "feeder beam coverage area." As taught by the '875 Patent, the "feeder beam coverage area" bounds the area in which unacceptable interference will result between the feeder beam and a subscriber terminal transmitting or receiving signals of the same color as the service beam.

> As shown in FIG. 2A, there is complete geographic exclusivity between the feeder and service spot beams **205, 225**. But that is not the case for FIG. 2B where they may in some instances be service spot beam overlap (e.g., **205-c**, **205-d**, **205-e**), while there is no overlap in other areas. However, with overlap, there are certain interference issues that may inhibit frequency band re-use in the overlapping regions.



FIG. 2B

*See* '875 Patent at col. 7, ll. 22-29 & Fig 2B. The graphic below depicts the interference that might occur between a feeder beam and subscriber terminal links associated with subscriber terminals in the portion of the service beam coverage area that overlaps with a feeder beam coverage area:

**Area of Interference**

15. A teaching of the '875 Patent is that complete spatial isolation of gateway terminals is desirable because it allows for *complete* re-use of the uplink and downlink frequency bandwidth by the feeder beam and its associated service beams:

> Next, four uplink service beams **4006** are shown as being sent from subscriber terminals to the satellite. Here, the same 4 colors used to transmit uplink feeder beam **4002** may be re-used to transmit the four uplink service beams **4008**. . . . This is possible because the gateway sending uplink feeder beam **4002** is positioned at a different location on Earth than the subscriber terminals sending uplink service beams **4006**. Directional antennas on the satellite are therefore able to separately receive uplink feeder beam **4002** and uplink service beam **4008**, even though they may be transmitted using the same uplink frequencies and polarizations.

See '875 Patent col. 15, ll. 5-18.

400

| Signal | | 17.7 ~ 18.2 GHz | 19.7 ~ 20.2 GHz | 27.5 ~ 28.0 GHz | 29.5 ~ 30.0 GHz |
|---|---|---|---|---|---|
| Uplink Feeder Beam | (4002) | | | LHCP RHCP | LHCP RHCP |
| Downlink Service Beams | (4004) | LHCP* RHCP* | LHCP* RHCP* | | |
| Uplink Service Beams | (4006) | | | LHCP* RHCP* | LHCP* RHCP* |
| Downlink Feeder Beam | (4008) | LHCP RHCP | LHCP RHCP | | |

\* frequency/polarization options for service beams

FIG. 14

See '875 Patent at Fig. 14.

16.     The '875 Patent also acknowledges that in a system striving to strike a balance between color re-use and service beam coverage, instances of overlap between the feeder beam coverage areas and the service beam coverage areas can occur.  Indeed, additional service beam coverage areas simultaneously means that (1) more gateways (with their associated feeder beams) are required, and (2) less space is available to position the gateways.

17.     Claim 1 of the '875 Patent is directed to an instance in which the feeder beam coverage area associated with a feeder beam is proximate to "one or more" service beam coverage areas.  In this instance, complete re-use of the feeder beam frequencies

by the service beams is not possible. However, Claim 1 discloses a spot-beam satellite wherein (1) the uplink feeder beam and an uplink service beam "associated with each of the one or more service beam coverage areas proximate to the feeder beam coverage area are allocated different colors from the beam pattern," and (2) "a set of colors allocated to a service beam associated with each of the one or more service beam coverage areas not proximate to the feeder beam coverage area includes at least one same color allocated to the at least one feeder beam." *See* '875 Patent at Claim 1.

18. While other portions of the specification fully and adequately disclose the invention and the key insights of the '875 Patent, Figure 16 provides helpful guidance as to the scope of Claim 1.



FIG. 16

19. *First*, Figure 16 makes clear that the "at least one feeder beam" of Claim 1 can comprise of more than one feeder beam, each with its own separate "feeder beam coverage area." Figure 16, along with its accompanying text, describes embodiments

wherein the "at least one feeder beam" comprises more than one feeder beam. *See* '875 Patent at col. 20 l. 57 – col. 21 l. 14; col. 21 ll. 15-44.

20. _Second_, Figure 16 makes clear that where the "at least one feeder beam" comprises more than one feeder beam, not all feeder beam coverage areas associated with the at least one feeder beam must be proximate to a service beam coverage area. Therefore, an embodiment of Figure 16 shows feeder beam coverage area 225-2 proximate to one or more service beam coverage areas, but also shows feeder beam coverage area 225-1 not proximate to any service beam coverage area. Therefore, a person of skill in the art would understand that, as used in Claim 1, proximity to "the feeder beam coverage" area associated with the "at least one feeder beam," means proximity to any one of the feeder beam coverage areas associated with a feeder beam comprising the at least one feeder beam.

21. _Third_, Figure 16 makes clear that to the extent any one of the feeder beams comprising the "at least one feeder beam" is proximate to one or more service beam coverage areas, that feeder beam must be allocated different colors than the colors allocated to each of the service beams associated with the proximate service beam coverage areas. Therefore, in one embodiment, the feeder beam associated with feeder beam coverage area 225-2 is prohibited from using color "A" because it is located proximate to the service beam coverage area of a service beam using color "A." At the same time, however, the feeder beam associated with feeder beam coverage area 225-1 can use "A" because it is not proximate to the service beam coverage area using color "A." Therefore, a person of skill in the art would understand that for "the at least one feeder beam" and "a service beam associated with each of the one or more service beam coverage areas proximate to the feeder beam coverage area" to be "allocated

different colors from the beam pattern," the service beam whose service beam coverage area is proximate to any one of the feeder beam coverage areas must be allocated different colors from any one of the feeder beams that comprise the at least one feeder beam.

22. _Fourth_, Figure 16 makes clear that *each* of the service beams whose service beam coverage areas are not proximate to one of the feeder beam coverage areas are allocated at least one same color as the colors allocated to the set of feeder beams comprising the "at least one feeder beam." For example, in Figure 16, there are 16 service beam coverage areas associated with 16 service beams. Each of these 16 service beam coverage areas is not proximate to at least one of the feeder beam coverage areas. Further, each of these service beams reuse one of the set of colors "A," "B," "C", or "D," which is the set of colors allocated to the feeder beams comprising the "at least one feeder beam." Therefore, a person of skill in the art would understand that for "a set of colors allocated to a service beam" associated with "each of the one or more service beam coverage areas not proximate to the feeder beam coverage areas" to include "at least one same color allocated to the at least one feeder beam," every one of the service beams that receive information from or relay information to one of the feeder beams comprising the at least one feeder beam must use at least one same color as that allocated to any one of the feeder beams that comprise the at least one feeder beam.

23. Asserted claim 1 of the '875 Patent reads as follows:

> A spot beam satellite comprising:
>
> an antenna system configured to create a beam pattern having a plurality of different colors, wherein a color has a unique combination of frequency band and polarization, the spot beam satellite being configured

to receive data from a plurality of service beams and from at least one feeder beam, each service beam having an associated service beam coverage area and the at least one feeder beam having an associated feeder beam coverage area,

wherein the feeder beam coverage area is proximate to one or more of the service beam coverage areas,

wherein the at least one feeder beam and a service beam associated with each of the one or more service beam coverage areas proximate to the feeder beam coverage area are allocated different colors from the beam pattern, such that signals associated with different colors differ by a frequency band, a polarization, or both a frequency band and a polarization,

wherein the feeder beam coverage area is not proximate to one or more of the service beam coverage areas, and

wherein a set of colors allocated to a service beam associated with each of the one or more service beam coverage areas not proximate to the feeder beam coverage area includes at least one same color allocated to the at least one feeder beam, such that signals associated with the same color have the same frequency band and polarization.

24. Asserted claim 2 of the '875 Patent reads as follows:

The spot beam satellite of claim 1 wherein the spot beam satellite includes a directional antenna for receiving the plurality of service beams and the at least one feeder beam, and wherein the satellite is configured to identify signals received from the service beams and the at least one feeder beam using the direction from which the beams originate and the color of the beam.

25. Asserted claim 4 of the '875 Patent reads as follows:

The spot beam satellite of claim 1 wherein if a first service beam coverage area associated with a first service beam is proximate to a second service beam coverage area associated with a second service beam, the first service beam is allocated a first set of colors from the beam pattern and the second service beam is allocated a second set of colors from the beam pattern, wherein the first set and second set are disjoint sets.

26.    Asserted claim 5 of the '875 Patent reads as follows:

The spot beam satellite of claim 1 wherein if a first service beam coverage area associated with a first service beam is not proximate to a second service beam coverage area associated with a second service beam, both the first service beam and the second service beam are allocated a same set of colors from the beam pattern.

27.    Asserted claim 6 of the '875 Patent reads as follows:

The spot beam satellite of claim 1 wherein the service beams comprise an uplink component and a downlink component, and the uplink and downlink components are assigned different frequencies.

28.    Asserted claim 7 of the '875 Patent reads as follows:

The spot beam satellite of claim 6 wherein the satellite is configured to convert a received signal from the uplink component from a first frequency associated with the uplink to a second frequency associated with the downlink.

29.    Asserted claim 8 of the '875 Patent reads as follows:

The spot beam satellite of claim 1 wherein the at least one feeder beam further comprises an uplink feeder beam having at least one common frequency channel and a downlink feeder beam having at least one common frequency channel, wherein the at least one common frequency channel associated with the uplink feeder beam employs a first frequency range and the at least one common frequency channel associated with the downlink feeder beam employs a second frequency range, and wherein the first frequency range is different than the second frequency range.

30.    Asserted claim 9 of the '875 Patent reads as follows:

The spot beam satellite of claim 8 wherein the satellite is configured to convert a received signal from the uplink component from a first frequency associated with the uplink to a second frequency associated with the downlink.

31.    Asserted claim 12 of the '875 Patent reads as follows:

The spot beam satellite of claim 8 wherein the satellite is configured to convert a received signal from the uplink component from

a first frequency associated with the uplink to a second frequency associated with the downlink.

32. Asserted claim 27 of the '875 Patent reads as follows:

> The spot beam satellite of claim 8 wherein the satellite is configured to convert a received signal from the uplink component from a first frequency associated with the uplink to a second frequency associated with the downlink.

### 2. Validity of the Asserted Claims of the '875 Patent

33. Claims 1, 2, 4, 5, 6, 7, 8, 9, 12, and 27 of the '875 Patent are not anticipated by or obvious in view of the references relied upon by Defendants. ViaSat's validity positions are set forth in detail in the Rebuttal Expert Report of Chris G. Bartone, Ph.D., P.E., Regarding: Validity of U.S. Patent 8,107,875 and ViaSat's Proprietary Technology ("'875 Validity Rebuttal Report"), and incorporated herein by reference.[2] None of the alleged prior art references relied upon by Defendants—alone or in combination—disclose each and every limitation of the asserted claims. Nor would such limitations have been obvious to one of ordinary skill in the art.

34. Based on the educational level of the inventors, the types of problems encountered in satellite design and the development of broadband satellite communications systems, the prior art solutions to those problems, and the overall system design and optimization of broadband communications systems, a person of ordinary skill in the art pertinent to the Patents-in-Suit from the approximate time of the invention of the '875 patent, mid-2006, would be a person with a bachelor's degree in electrical engineering (or some equivalent engineering discipline) and a few years of

---

[2] Previously filed as Exhibit 3 to the December 16, 2013 Declaration of Amanda Bonn. (Dkt. 526-2.)

VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

experience with antennas and/or satellite-based communication systems. However, someone with less slightly technical education but slightly more practical experience, or slightly more technical education but slightly less practical experience, could have met that standard for a person of ordinary skill in the art.

(a)   Priority Date of the Claims of the '875 Patent

35.   All of the asserted claims of the '875 Patent are entitled to at least the September 26, 2006 priority date of the earliest filed provisional patent application date referenced by the Patent.  For the reasons set forth in the Expert Reports of Dr. Bartone (and the relevant materials incorporated and cited therein), a person of skill in the art examining the disclosures of  Provisional Patent Application No. 60/827,038 and of Patent Application PCT/US2007/079567 would understand that the inventors of the '875 Patent had invented the inventions of the asserted claims as of at least September 26, 2006.

(b)   Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '875 Patent

36.   The prior art references identified by defendant's expert, Dr. Joel Schindall, do not anticipate or render obvious any of the asserted claims of the '875 Patent.  The bases and explanation for why each of the identified prior art references and combinations cited below do not invalidate any of the asserted claims is set forth and described in the '875 Validity Rebuttal Report (Dkt. 526-2 Ex. 3), incorporated herein by reference.  The references, which do not invalidate any asserted claim, include:  the Alcatel AMC-17 Reference, the Burr Reference, the DDSO Reference, any of the Intelsat V References, any of the MITRE FDMA References,  the SS/L AMC-17 Reference, the ViaSat-1 Reference, the Wang Reference, the Ames Reference, the

Anik-F1 Reference, the Asato Reference, the Astrium AMC-17 Reference, the Astrolink II Reference, the Courtney Reference, the Cyberstar Reference, the DirecTV 4S Reference or the Echostar 7 Reference, the Global Q/V Reference, the Miller Reference, the Intelsat-K ("NSS K") Reference, the Patterson Reference, the Rosen Reference, the Sharon Reference, the Schiff Reference, the Telstar 14 Reference, and any other AMC-17 References.

37.   The prior art references and combinations do not literally or equivalently disclose, teach, or render obvious the specific combination of limitations set forth in the asserted claims of the '875 Patent as those limitations are construed by the Court.

38.   A person of ordinary skill in the art would not have been motivated to combine the teachings in the asserted references in the combinations identified by defendants or their expert.  The detailed description of the bases for lack of such motivation for each identified combination is set forth and described in the '875 Validity Rebuttal Report, (Dkt. 526-2 Ex. 3).

(c)    <u>Secondary Considerations Support the Nonobviousness of the Asserted Claims of the '875 Patent</u>

39.   Multiple secondary considerations confirm that the invention of the '875 Patent was nonobvious at the relevant time.

40.   As described in the '875 Validity Rebuttal Report (Dkt. 526-2 Ex. 3), multiple secondary considerations confirming non-obviousness existed, including: the commercial success of products and processing embodying the invention, including the ViaSat-1 satellite; the long-felt and unmet need for higher capacity broadband communications satellites; the failure of others in the industry to achieve the capacity results enabled by the invention, the disbelief an skepticism of those skilled in the art,

praise given to the invention upon its success, and the deliberate copying of the invention by others, including by Defendants for the Jupiter-1 satellite.

### 3. Lack of Inequitable Conduct in the Prosecution of the '875 Patent

41. ViaSat, the inventors, and ViaSat's prosecution counsel did not at any time engage in any inequitable conduct during the prosecution of the '875 Patent and, at all times, complied with and satisfied their obligations for dealing with the patent examiner and the United States Patent and Trademark Office. The prior art Defendants allege should have been disclosed to the Patent Office was not material to the patentability of the '875 Patent. Nor is there any evidence that the inventors had any intent to deceive the Patent Office.

## B. The '827 Patent

### 1. The Teaching of the '827 Patent

42. Radio frequency spectrum is a finite resource, and efficient use of this finite resource is a key component of any successful satellite design.[3] The FCC allocates segments of the radio frequency spectrum to GSO satellite systems and other segments to NGSO satellite systems, and the simplest way to avoid interference between such systems is to ensure that the systems only use their respective primary-use frequencies.

---

[3] '827 patent at 1:40-49.



FIG. 3

**Figure 1 – '827 Patent at FIG. 3**

43.     The potential for harmful interference between GSO and NGSO satellites exists only when the two are in-line, as illustrated in Fig. 3 from the '827 patent shown above. In the illustration, NGSO satellite (labeled "215") is "in-line" with the GSO satellite (labeled "105"), and transmission of signals in the same frequencies by both satellites will result in harmful interference and impede the communications between the satellites and their respective Earth terminals (labeled "110" and "225").  During such

an "in-line" event, four interference scenarios are possible: (1) the NGSO satellite causes interference with a GSO terminal on the ground; (2) an NGSO terminal on the ground interferes with a GSO satellite; (3) a GSO terminal on the ground interferes with an NGSO satellite; or (4) the GSO satellite interferes with an NGSO terminal on the ground.[4]

44.     However, the period of time during which harmful interference—interference that would occur when the lines of sight of systems transmitting signals the same frequencies intersect—is relatively short.[5]  In other words, during the majority of a GSO satellite's operation, no NGSO satellite would be in-line with the GSO satellite, and therefore, for a majority of a GSO satellite's operation, the potential for interference is nonexistent.  In addition, if no NGSO satellites have an orbit that intersects with the line of sight of a GSO satellite, no potential for interference exists at all.

45.     While having GSO and NGSO satellites transmit signals in different frequency bands at all times eliminates the possibility of interference between the two, such a technique would not take advantage of the fact that the periods of time during which the potential for interference exists are at best nonexistent or, at worst, very small.  Moreover, the orbital positions of NGSO satellites are very regular and thus very predictable, so the occurrence of in-line interference events is very predictable as well.

46.     The invention claimed by the '827 patent takes advantage of these two key aspects of the differences between GSO satellite operation and NGSO satellite

_____

[4]  '827 patent at 8:15-19.

[5]  '827 patent at 2:24-31; Fig. 3.

operation.  Because in-line events are regular and predictable, it is possible to use this information to dynamically operate over the NGSO frequency spectrum.[6]  In other words, it is possible for a GSO satellite to dynamically enable and disable its transmissions of signals in the NGSO frequency bands based on whether an in-line event (and thus the potential for harmfully interfering with the NGSO satellite's operations) exists.

47.    When no in-line event exists, a gateway or a subscriber terminal may transmit signals in an extended uplink frequency spectrum comprised of both GSO and NGSO frequency bands up to the satellite.  The satellite may then convert those signals to the corresponding downlink frequencies (i.e., in the forward direction, the forward uplink signal transmitted by the gateway is converted to the forward downlink frequency for transmission down to the VSAT, while in the return direction, the return uplink signal transmitted by the VSAT is converted to the return downlink frequency for transmission down to the gateway) and transmit those signals back down to a gateway or subscriber terminal on Earth.  Because no in-line event exists, these downlink signals similarly are in an extended uplink frequency spectrum comprised of both GSO and NGSO frequency bands.

48.    However, if there is an impending in-line event with an NGSO satellite, the GSO satellite may halt the retransmission of any signals that are not within the GSO frequency bands used by the satellite, so as not to cause any harmful interference with the NGSO satellite.  The retransmission of signals may be controlled through a "command center" on the ground that may issue commands based on the occurrence of

_____

[6]  '827 patent at 11:28-31.

an in-line event.[7]  "[R]ight before the onset of an [in-line] event, . . . the command center [may send] a command to the satellite" such that "all emissions of the NGSO band will be attenuated below a specified level."[8]  The occurrence of an in-line event may be detected automatically, through the use of stored orbital location data of NGSO satellites.[9]  It may also be detected based on data obtained from "RF measurement equipment for measuring and evaluating interference characteristics."[10]

49.    If, for example, an NGSO satellite is in-line between the GSO satellite and a subscriber terminal, a command from the ground may instruct the satellite to halt the retransmission of any NGSO frequency signals received from the gateway.  Similarly, if the NGSO satellite is in-line between the GSO satellite and the gateway, a command from the ground may instruct the satellite to halt the retransmission of any NGSO frequency signals received from subscriber terminals.[11]  Figure 6 of the '827 patent, shown below as Figure 2, illustrates this second scenario:

_____

[7]  '827 patent at 13:25-33.

[8]  '827 patent at 13:25-33.

[9]  *See* '827 patent at 9:2-18.

[10]  '827 patent at 6:15-17.

[11]  Because the satellite systems in this case only have gateway terminals located remote from the subscriber terminals to enable frequency reuse, *see generally* '875 Infringement Report, it is not necessary to consider the situation in which an NGSO satellite is in-line between a GSO satellite and both gateway and subscriber terminals at the same time.  In GSO satellite systems with gateways positioned such that they are remote from subscriber terminals, the beam cones emanating from the GSO satellite have no overlap, so it is impossible for an NGSO satellite to intersect with both beam cones simultaneously.  *See* '827 patent at Fig. 6 (showing that the NGSO satellite is only in-line with one of the three beam cones emanating from the GSO satellite labeled "105").



**FIG. 6**

**Figure 2 – '827 Patent at FIG. 6**

50.    In Figure 2 above, the subscriber terminals (labeled "125") may be transmitting signals comprised of both GSO and NGSO frequencies up to the satellite. However, because an NGSO satellite (labeled "215") is in-line between the GSO satellite (labeled "105") and the gateway (labeled "110"), the GSO satellite does not retransmit the

signals in the NGSO frequency bands back down to the gateway, nor does the gateway transmit any signals in the NGSO frequency bands back up to the gateway.[12]

51.　　Asserted claim 7 of the '827 Patent reads as follows:

> A geostationary orbit (GSO), satellite comprising:
>
> 　　a receiver configured to receive from one or more ground stations signals in a GSO frequency band and in an extended frequency spectrum, the extended frequency spectrum including the GSO frequency band and a non-geostationary orbit (NGSO) frequency band;
>
> 　　circuitry configured to establish an activated frequency mode to activate one of a GSO frequency band mode and an extended frequency spectrum mode based on information indicating a presence or an absence of an interference situation with an NGSO satellite system; and
>
> 　　a transmitter configured to transmit in one of the GSO frequency band and in the NGSO frequency spectrum based on the activated frequency spectrum mode.

52.　　Asserted claim 8 of the '827 Patent reads as follows:

> The satellite of claim 7 further comprising:
>
> 　　a low-noise amplifier operative to amplify the transmitted signals and output an amplified signal;
>
> 　　a frequency mixer having a first input adapted to receive the amplified signal, a second input coupled to a local oscillator, and an output having a plurality of frequency products including a downlink extended frequency spectrum, the downlink extended frequency spectrum comprising a downlink GSO frequency band and a downlink NGSO frequency band;
>
> 　　a splitter having an input coupled to the mixer output, a first splitter output and a second splitter output;

---

[12] *See* '827 patent at 12:14 ("When the NGSO satellite **215** is in-line with respect to the GSO Earth terminal (shown as antenna **110**) and the GSO satellite, the command center will instruct the GSO Earth terminal and the GSO satellite **105** to use the GSO spectrum only . . . .").

a switch having a first input, a second input, and an output;

a first bandpass filter having a first bandpass input coupled to the first splitter output and a first bandpass output coupled to the first input of the switch;

a second bandpass filter having a second bandpass input coupled to the second splitter output and a second output coupled to the second input of the switch;

the first bandpass filter being configured to pass the GSO frequency band;

the second bandpass filter being configured to pass the extended frequency spectrum; and

the output of the switch being selectively coupled to either the first switch input or the second switch input.

2. <u>Validity of the Asserted Claims of the '827 Patent</u>

53. Claims 7 and 8 of the '827 Patent are not anticipated by or obvious in view of the references relied upon by Defendants. ViaSat's validity positions are set forth in detail in the Rebuttal Expert Report Of Mark A. Sturza Regarding: Validity Of U.S. Patent 8,068,827 ("'827 Validity Rebuttal Report")[13] and incorporated herein by reference. None of the alleged prior art references relied upon by Defendants—alone or in combination—disclose each and every limitation of the asserted claims. Nor would such limitations have been obvious to one of ordinary skill in the art.

54. Based on the educational level of the inventors, the types of problems encountered in satellite design and the development of broadband satellite communications systems, the prior art solutions to those problems, and the overall

---

[13] ViaSat can file a complete copy of the Report (and any others that have not been previously filed in the record) upon request but has refrained from doing so to avoid burdening the Court with an overly voluminous filing.

system design and optimization of broadband communications systems, a person of ordinary skill in the art pertinent to the Patents-in-Suit from the approximate time of the invention of the '827 patent would be a person with a bachelor's degree in electrical engineering (or some equivalent engineering discipline) and a few years of experience with antennas and/or satellite-based communication systems. However, someone with less slightly technical education but slightly more practical experience, or slightly more technical education but slightly less practical experience, could have met that standard for a person of ordinary skill in the art.

(a)     Priority Date of the Claims of the '827 Patent

55.     The claims of the '827 patent are entitled to an October 9, 2007 priority date because the patent properly claims priority to Provisional Patent Application No. 60/978,549. This is fully described in the Expert Report Of Mark Sturza Regarding: (1) Infringement of U.S. Patent 8,068,827 by the "Jupiter" Satellite and (2) Opinions Regarding ViaSat Proprietary Technology ("'827 Infringement Report),[14] incorporated herein.

---

[14]     Excerpts of the Report were previously filed as: Exhibit E to the December 16, 2013 Declaration of Patrick Bageant in Support of Defendants' Motion to Resolve Claim Construction Disputes Arising From Mr. Sturza's Opinions Regarding Claim 1 of U.S. Patent No. 8,010,043 (Dkt. 499-2); Exhibit H to the December 16, 2013 Declaration of Patrick Bageant in Support of Defendants' Motion for Summary Judgment of Non-Infringement and, Alternatively, Partial Invalidity of U.S. Patent No. 8,010,043 (Dkt. 501-2); Exhibit 5 to the January 3, 2014 Declaration of Adam Wolfson (Dkt. 573-1); and Exhibit C to the January 10, 2014 Declaration of Patrick Bageant (Dkt. 613-1). ViaSat can file a complete version of the report upon request, but has refrained from doing so to avoid burdening the court with an excessively voluminous filing.

56.     The provisional application describes "A satellite design . . . that allows the GSO system to use both GSO and NGSO spectrum on a non-interference basis with the NGSO system," which provides support for Claim 7.  Figure 6 of the provisional application is identical in all material respects to Figure 5 of the patent, which is an embodiment of Claim 8.

(b)     <u>Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '827 Patent</u>

57.     The prior art references identified by defendant's expert Dr. Joel Schindall do not anticipate or render obvious any of the asserted claims of the '827 Patent.  The bases and explanation for why each of the identified prior art references and combinations cited below do not invalidate any of the asserted claims is set forth and described in the '827 Validity Rebuttal Report, incorporated herein by reference.  The references which do not invalidate any asserted claim include: the Lockheed Martin Astrolink II Application, the Flexible Frequency Plan Option ("Chan and Mendelsohn"), the ContactMEO Reference, the NGST References, the Sherman '608 Reference, the Good Reference, the Grybos Reference, the Otten Reference, the Skybridge II References, the Vatt References, the Anselmo Reference, the Schwarz Reference, the Wachs Reference, the Wiedeman Reference, and the XTAR Reference.

58.     The prior art references and combinations do not literally or equivalently disclose, teach, or render obvious the specific combination of limitations set forth in the asserted claims of the '827 Patent as those limitations are construed by the Court.  Nor is there evidence that anyone conceived of the invention set forth in the asserted claims of the '827 Patent prior to the inventors named on the patent.

59.    A person of ordinary skill in the art would not have been motivated to combine the teachings in the asserted references in the combinations identified by Defendants or their expert.  The detailed description of the bases for lack of such motivation for each identified combination is set forth and described in the '827 Validity Rebuttal Report.

        (c)    <u>Secondary Considerations Support the Nonobviousness of the Asserted Claims of the Patents-in-Suit</u>

60.    Multiple secondary considerations confirm that the invention of the '827 Patent was nonobvious at the relevant time.

61.    As described in the '827 Validity Rebuttal Report, multiple secondary considerations confirming non-obviousness existed, including: the commercial success of products and processing embodying the invention, including the ViaSat-1 satellite; the long-felt and unmet need for higher capacity broadband communications satellites; the failure of others in the industry to achieve the capacity results enabled by the invention, the disbelief an skepticism of those skilled in the art, praise given to the invention upon its success, and the deliberate copying of the invention by others, including by Defendants for the Jupiter-1 satellite.

        3.    <u>Lack of Inequitable Conduct in the Prosecution of the '827 Patent</u>

62.    ViaSat, the inventors, and ViaSat's prosecution counsel did not at any time engage in any inequitable conduct during the prosecution of the '827 Patent and, at all times, complied with and satisfied their obligations for dealing with the patent examiner and the United States Patent and Trademark Office.  The prior art Defendants allege should have been disclosed to the Patent Office was not material to the patentability of the '827 Patent.  Nor is there any evidence that the inventors had any intent to deceive the Patent Office.

## C. The '043 Patent

### 1. The Teaching of the '043 Patent

63. The '043 Patent "relates to a method, system, and apparatus for improved satellite communications." '043 Patent, col. 2, ll. 23-24. The independent claims of the Patent disclose techniques that allow for more efficient communications in an "interference-dominated" environment.

64. As the '043 Patent describes, "[a] satellite communications system has many parameters to work with":

> (1) number of orthogonal time or frequency slots (defined as color patterns hereinafter); (2) beam spacing (characterized by the beam roll-off at the crossover point); (3) frequency re-use patterns (the re-use patterns can be regular in structures, where a uniformly distributed capacity is required); and (4) number of beams (a satellite with more beams will provide more system flexibility and better bandwidth efficiency, but requires more transponders and amplifiers that are in general traveling-wave tubes amplifiers (TWTAs). TWTAs are expensive and consume power that must be supplied on-board the satellite."

'043 Patent at col. 1, ll. 54-65.

65. The '043 Patent realizes that "[d]esign approaches of prior art satellite systems typically [did] not take into account the effects that various system parameters have on the data-carrying capacity of spot beams." '043 Patent at col. 2, ll. 11-13. For example, the '043 Patent teaches that "[t]he prior art satellite communications systems take the approach of maximizing a symbol energy-to-noise-plus-interference (SINR) to the worst-case location within a beam." '043 Patent at col. 1, l. 66 - col. 2, l. 1. According to the '043 Patent, "[t]his approach leads to an increased cost in subscriber terminals (STs) because the receiver at the STs will be over-designed to cope with the worst-case condition." '043 Patent at col. 2, ll. 2-4.

66. Additionally, prior art systems sought "to divide the available bandwidth into multiple small frequency ranges (different color patterns) and space them apart to reduce interference." '043 Patent at col. 2, ll. 4-7. However, "[t]his approach . . . reduce[d] the available frequency bandwidth for each spot beam and require[d] a large amount of TWTs and TWTAs," which in turn necessitated "a large power supply on-board the satellite." '043 Patent at col. 2, ll. 7-10.

67. In contrast to the prior art approach, the '043 Patent seeks to maximize "outbound capacity [by] selecting system parameters appropriately." '043 Patent at col. 13, ll. 46-47. Such system parameters can include the number of "colors" of frequency and polarization combinations, and/or the amount of beam spacing. '043 Patent at col. 16, ll. 13-17 ("The systems parameters that may be varied include: (1) the number of "colors" (L) used in the frequency and polarization beam pattern, (2) the amount of beam spacing, as measured by the roll-off value at the cross-over point (also referred to as the triple point).").

68. Reducing the number of colors in a spot-beam satellite system directly affects the bandwidth available to any one spot-beam, but at the same time, reduces the amount of distance between two spot beams of the same color. The diagram below illustrates this principle:

*Tradeoff: Number of Colors*



69.    Reducing the distance between two spot beams of the same color increases intra-system interference.  The series of diagrams below depict the signal response for a three color, four color, and seven color system, respectively.  The horizontal axes represent physical space.  As the diagrams clearly show, fewer colors translate to less spatial separation between signals of the same color and thus greater interference between signals of the same color.  Therefore, reducing the number of colors allocated to a spot-beam satellite system increases the frequency bandwidth available to a given service spot beam at the expense of greater interference.

### 3-Color System



### *4-Color System*



### *7-Color System*



70.      A similar tradeoff exists with respect to the beam spacing parameter.  In the '043 Patent, "beam spacing" is "characterized by the beam roll-off at the crossover point." '043 Patent at col. 1, l. 57; *see also* col. 13, ll. 57-58; col. 15, ll. 15-17, Figs. 18A-22. Therefore, assuming that the power characteristics onboard the satellite remain constant with varying beam spacings, there is a direct correlation between the beam roll-off values and how the beams are positioned relative to one another in physical space. Increasing the distance between the beam centers increases the area that is covered by any one beam and thereby increases the amount of roll-off from beam center to the cross-over point (the points at which the beam radii circumscribing the user service polygons intersect with one another).

71.      This is depicted in the diagram below where the power gradient of each beam is represented by the shading of the color (*i.e.*, the darker shade at beam center represents a higher level of power than the lighter shade at the beam edge).  The configuration on the left represents a "beam spacing" wherein there is a greater distance between the centers of any one two beams than the configuration on the right.  Therefore, there is a greater beam roll-off (*i.e.*, roll-off value is more negative as measured in decibels) at the crossover point than the configuration on the right.

*Tradeoff: Beam Spacing*



72.   A more "conservative" beam spacing (*i.e.*, one whose beam roll-off is more negative at the crossover point) results in a lower level of power at each beam edge. Although this results in a lower signal strength at the edge of any one beam, it also results in less intra-system interference because the spatial distance between the areas of the service beam coverage areas associated with the highest powers has increased. Therefore, in the diagram above, the configuration on the left ("conservative" beam spacing) is associated with low power levels at beam edge and low levels of interference. The configuration on the right ("aggressive" beam spacing) is associated with greater power levels at the beam edge and greater levels of interference.

## *"Conservative" Beam Spacing*



## *"More Aggressive" Beam Spacing*



73.     Recognizing the above-described tradeoffs, Claim 1 of the '043 Patent requires that the satellite be configured to operate in a manner "to maximize data-carrying capacity of the plurality of spot beams as measured in bits/Hz by utilizing a beam pattern having a specific number of color(s) of frequency and polarization and specific beam spacing that results in higher data-carrying capacity of the plurality of spot beams than achieved with other alternative numbers of color(s) of frequency and polarization and beam spacings."

74.     Independent Claim 1 further requires that the number of colors and beam spacing parameters be selected such that the satellite antenna produces a downlink service beam whereby the reception of signals by at least one of the subscriber terminals is "interference dominated." Where the antenna produces an "interference-dominated" location, "which has not confronted previous satellite systems," '043 Patent col. 19, ll. 9-10, "reception of signals from a spot beam at a subscriber terminal is affected by interference from sources that collectively result in a signal-to-interference ratio C/I, as well as noise at a signal-to-noise ratio C/N, such that the signal-to-interference ratio C/I is less than the signal-to-noise ratio C/N. That is C/I < C/N." '043 Patent, col. 19, ll. 1-6.

75.     To calculate capacity of a spot beam, the '043 Patent teaches that location-specific signal characteristics of the different subscriber terminals within a service beam coverage region should be taken into account. The Patent uses a parameter "$Es/N_0$," which is the energy per symbol divided by the thermal noise spectral density. '043 Patent at col. 14, ll. 33-37. Because the value "Es" is equal to the carrier power "C" divided by the signal bandwidth "BW," and the value "$N_0$" is equal to the noise

power "N" divided by the signal bandwidth "BW," Es/N$_0$ is equal in magnitude to the signal-to-noise ratio "C/N."

76.     The Patent teaches that Es/N$_0$ at any distance "r" from the center of the beam can be calculated as a function of some baseline value:

**Calculation of Signal-to-Noise Ratio at Distance "r" From Beam Center**

$$\frac{E_s}{N_0}(r) = (L)\left|h_j^{\,2}\right|\left(\frac{E_s}{N_0}\right)^*$$

**Assuming that**:

- $\frac{E_s}{N_0}(r)$ is the signal-to-noise ratio at a distance "r" from beam center

- $L$ is the number of colors of frequency and polarization used in the system

- $\left|h_j^{\,2}\right|$ is the "normalized gain," which is the beam gain relative to the maximum gain

- $\left(\frac{E_s}{N_0}\right)^*$ is the baseline signal to noise ratio at beam center for a 1-color system

*See* '043 Patent at col. 14, l. 42 – col. 15, l. 20.

77.     The Patent teaches that "the signal-to-noise ratio varies linearly with the number of colors (L) because it is assumed that the satellite is power limited and the total power radiated per beam is constant, regardless of the bandwidth of the beam (which is related to the number of colors employed)." '043 Patent at col. 15, ll. 20-24.  Therefore, "a system employing 4 colors has a bandwidth per beam that is 25% of the bandwidth per beam of a system employing 1 color.  Hence, the EIRP density, dBW/Hz, is 4 times as large for a 4 color system than a 1 color system which results in the signal-to-noise

ratio being 4 times as large for the 4 color system than the 1 color system." '043 Patent at col. 15, ll. 25-31.

78. The Patent further teaches that the signal-to-interference ratio at any distance "r" from the beam center can be calculated as a function of the victim beam's normalized gain at location r divided by the sum of all the interfering beams' normalized gain at location r:

***Calculation of Signal-to-Interference Ratio at Distance "r" From Beam Center***

$$\frac{C}{I}(r) = \frac{\left|h_j{}^2\right|}{\sum_i \left|h_j{}^2\right|}$$

'043 Patent at col. 15, l. 15.

79. The Patent then teaches that these location-specific values for signal-to-noise and signal-to-interference ratio can be combined into a total signal impairment ratio according to the following equation:

***Calculation of Signal-to-Interference Ratio at Distance "r" From Beam Center***

$$|\Upsilon(r)|^{-1} = \left|\frac{E_s}{N_0}(r)\right|^{-1} + \left|\frac{C}{I}(r)\right|^{-1}$$

'043 Patent at col. 15, l. 37.

80. The total signal impairment ratio at any given location can then be used to calculate a "[l]ocation-specific capacity," '043 Patent at Col. 15, l. 32. The theoretical maximum, or "Shannon Capacity" at location "r" is computed using the following equation:

***Calculation of Shannon Capacity at Distance "r" From Beam Center***

$$Capacity(r) = log_2(1 + \Upsilon(r))$$

'043 Patent at col. 15, l. 40.

81.   Alternatively, the "waveform based" capacity can be calculated using a "library of waveforms (modulation and codepoint)." Essentially, this waveform based capacity is determined by first comparing the value for the total signal impairment ratio to a lookup table that selects the most appropriate modulation and coding combination:

***Determining Waveform Based Capacity***



FIG. 2B



FIG. 2C

82.   The Patent describes how the total signal impairment value can be used to select an appropriate modulation and coding format:

an example of a modulation and coding (modcode table) **202** . . . . The form of modcode table **202** may, for example, be used by a gateway **115** to determine the modcode to be used for packets destined for a subscriber operating in a given signal quality range. The table contains a column listing a number of modcode formats **205**. Each modcode format **205** corresponds to a specified signal quality range **210**. The signal quality range may provide some knowledge on the channel for an associated region. For example, the signal quality range **210** can be defined as the signal-to-interference-plus-noise (SINR) ratio that may be measured at the subscriber terminals for a predetermined bit error rates (BER) and/or packet error rates (PER) and reported back to the gateway. . . . Thus, using the signal quality attributed to a destination link for a packet, a signal quality range **210** encompassing the link may be identified, and the appropriate modcode may be selected. For example, if a destination link has a signal quality within Range 7, the modcode QPSK ¾ may be used.

'043 Patent at col. 8, ll. 4-26.

83.   Each MODCOD (coding and modulation combination) implies a particular "spectral efficiency" or data rate in bits/sec divided by the signal bandwidth (*i.e.*, in units bps/Hz). Multiplying the spectral efficiency of the selected MODCOD by the channel bandwidth yields the data carrying capacity of the channel in bits per second. In real-world applications, rather than multiply the spectral efficiency by the "occupied" signal bandwidth, the spectral efficiency may be multiplied by the symbol rate, (*i.e.*, the occupied bandwidth divided by one plus a "roll-off factor") in order to account for the fact that a real-world filter will require more bandwidth than the theoretical data rate predicted by the link spectral efficiency.

84.   The Patent then teaches that average capacity can be found "by integrating the location specific capacity over locations within a beam":

### *Calculating Average Capacity*

$$Capacity_{average} = \frac{1}{A_j}\left(\int_0^r Capacity(r)\,dr\right)$$

'043 Patent at col. 15, l. 53.

85.     According to the Patent:

> [T]he capacity of the system may be systematically calculated for different choices of system parameter settings. Both types of capacity may be calculated—"worst-case" and "average" capacity. . . . "[W]orst-case" capacity may be a more appropriate measure of capacity for non-ACM systems. "Average" capacity may be a more appropriate measure of capacity for ACM systems. The systems parameters that may be varied include: (1) the number of "colors" (L) used in the frequency and polarization beam pattern, (2) the amount of beam spacing, as measured by the roll-off value at the cross-over point (also referred to as the triple point). These capacity calculations may also be performed at various levels of signal-to-noise ($Es/N_0$).

'043 Patent at col. 16, ll. 6-19.

86.     Figures 18-21 plot worst-case and average-capacity as a function of the number of colors and frequency and polarization and the amount of beam spacing, assuming a given satellite architecture (*i.e.*, a baseline value for $(Es/N_0)^*$). "By plotting the capacity of the system as these system parameters are varied, a picture begins to emerge to indicate how capacity is affected by the choices made in different parameter settings." '043 Patent at col. 16, ll. 19-22. In each of these Figures, the vertical axis depicts the data carrying capacity of the plurality of spot beams normalized by the total system bandwidth. In other words, the total data carrying capacity of the plurality of beams (*i.e.*, "beam capacity") in units bits/sec is obtained by multiplying the value on the vertical axis (in units bps/Hz) by the total system bandwidth. *See* '043 Patent at col. 16, ll. 35-37.

87.     As recognized by the '043 Patent, a design that maximizes data carrying capacity according to the teachings of the Patent creates a level of interference for some subscriber terminals that prior art satellite designers sought to avoid. '043 Patent col. 20, ll. 9-12 ("The novel design of satellite communication system[s] such as those presented here leads to a significant amount of interference from signal sources within the system."). In fact, as previously discussed, Claim 1 of the '043 Patent recognizes that a system designed to maximize capacity will require the presence of "interference dominated" locations—*i.e.*, locations where the downlink signal, as received by a subscriber terminal, is affected by interference such that C/I < C/N—within the service beam coverage area. The design of a system specifically configured and expected to produced such "interference dominated" locations is contrary to the conventional wisdom in satellite design.

88.     The '043 Patent therefore teaches techniques for designing a spot-beam satellite to mitigate the effects of this increased interference and allows for viable communications in an "interference dominated" environment.

89.     As described above, adaptive coding and modulation ("ACM") techniques existed in the prior art to address variations in satellite downlink power and/or link attenuation. For example, in response to a thunderstorm over a particular service beam coverage area (which results in "rain fade" of signals transmitted in frequencies associated with the Ka-band), ACM could be used to "change the modulation format and Forward Error Correction (FEC) codes (MODCODs) to best match the current link conditions." '043 Patent at col. 9, ll. 3-5.

90.     In addition to combating the effects of link attenuation and power variations in the downlink signal, however, the '043 Patent recognizes that ACM can be further be

used to mitigate the effects of interference in a system that accepts an "interference dominated" environment in order maximize data-carrying capacity.

91.    The '043 Patent realizes that subscriber terminals located in the "overlap regions" of service spot beam coverage areas "may see signals from two or more beams. . . ." '043 Patent col. 10, ll. 39-40.  By using ACM, however, "the coding and/or modulation are modified to slow the data rate until an acceptable signal quality is achieved." '043 Patent at col. 10, ll. 12-13.  The excerpt below describes how the '043 Patent leverages ACM techniques in order to overcome the presence of an "interference dominated" location:

> Using ACM, the modulation format and Forward Error Correction (FEC) codes (modcodes) for a data frame may be adapted to better match the link conditions for each user in a multi-user system.  ACM can be used in both directions.  A return channel or other means may be used to report the conditions of a receiving terminal.  These link conditions are often characterized by the modem's **132** signal to noise ratio (SNR) or signal-to-interference-plus-noise ratio (SINR) if the modem **132** resides in a color-beam overlap region.  In a broadcast system, for example, the data frame broadcasted to a number of users includes data packets designated only for an individual modem or small group of modems.  A message transmitted to a user requires fewer symbols and less time when a higher order modulation and higher code rate is used.  Lower order modulation and lower code rate are more reliable but require more time to transmit the same size message.  Using ACM, each packet may be transmitted at an optimized modulation and coding (modcode) level given the destination terminal's link conditions.

'043 Patent at col. 10, ll. 14-32.

92.    Therefore, the '043 Patent teaches that in the nominal, baseline mode of operation, different modulation and coding combinations can be assigned to different locations within a single service beam coverage area based on each location's unique interference characteristics.  This teaching is a novel application of ACM techniques to

mitigate interference and thereby increase the performance the satellite. These techniques are particularly useful for a satellite that seeks to exploit "interference dominated" environments in order to maximize overall data carrying capacity. *See* '043 Patent at col. 20, ll. 9-15 ("The novel design of satellite communication system[s] such as those presented here leads to a significant amount of interference . . . [,] the present invention effectively handle[s] such interference levels among spot beams and accomplish[es] efficient communication of data within the interference-dominated environment.").

93. Asserted claim 1 of the '043 Patent reads as follows:

A satellite for illuminating a geographic area with signals, the satellite comprising:

a power source;

an antenna;

a plurality of spot beams emanating from the antenna to service a plurality of service links, wherein:

the plurality of spot beams includes a first spot beam and a second spot beam,

the first spot beam illuminates a first region within the geographic area, in order to send information to a first plurality of subscriber terminals,

the second spot beam illuminates a second region within the geographic area and adjacent to the first region, in order to send information to a second plurality of subscriber terminals, whereby the first and second regions overlap,

the first spot beam as sent to at least one of the first plurality of subscriber terminals is affected by interference from other signal sources including the second spot beam at a signal-to-interference ratio C/I,

the first spot beam as sent to the at least one of the first plurality of subscriber terminals is further affected by noise at a signal-to-noise ratio C/N, whereby reception of signals from the first spot beam by the at least one of the first plurality of subscriber terminals is interference-dominated such that C/I is less than C/N, and

the satellite is operated to maximize data-carrying capacity of the plurality of spot beams as measured in bits/Hz, by utilizing a beam pattern having a specific number of color(s) of frequency and polarization and specific beam spacing that results in higher data-carrying capacity of the plurality of spot beams than achieved with other alternative numbers of color(s) of frequency and polarization and beam spacings.

94.     Asserted claim 3 of the '043 Patent reads as follows:

The satellite for illuminating a geographic area with signals of claim 1, wherein the plurality of spot beams comprise adaptive coding and modulation (ACM) signals, and the data-carrying capacity of the plurality of spot beams is maximized by maximizing average data-carrying capacity within the plurality of spot beams.

95.     Asserted claim 6 of the '043 Patent reads as follows:

The satellite for illuminating a geographic area with signals of claim 1, wherein the beam pattern has a regular frequency re-use pattern.

96.     Asserted claim 7 of the '043 Patent reads as follows:

A satellite for illuminating a geographic area with signals, the satellite comprising:

a power source;

an antenna;

a plurality of spot beams emanating from the antenna to service a plurality of service links, wherein:

the plurality of spot beams includes a first spot beam and a second spot beam,

the first spot beam illuminates a first region within the geographic area, in order to send information to a first plurality of subscriber terminals,

the second spot beam illuminates a second region within the geographic area and adjacent to the first region, in order to send information to a second plurality of subscriber terminals, whereby the first and second regions overlap,

the first spot beam as sent to at least one of the first plurality of subscriber terminals is affected by interference from other signal sources including the second spot beam at a signal-to-interference ratio C/I,

the first spot beam as sent to the at least one of the first plurality of subscriber terminals is further affected by noise at a signal-to-noise ratio C/N, whereby reception of signals from the first spot beam by the at least one of the first plurality of subscriber terminals is interference-dominated such that C/I is less than C/N,

the first spot beam including at least a first portion sent to a first subscriber terminal from the first plurality of subscriber terminals utilizing a first coding and modulation combination, and

the first spot beam including a second portion sent to a second subscriber terminal in the first plurality of subscriber terminals utilizing a second coding and modulation combination, the first coding and modulation combination being different from the second coding and modulation combination.

97.    Asserted claim 8 of the '043 Patent reads as follows:

The satellite for illuminating a geographic area with signals of claim 7, wherein the first coding and modulation combination and second coding and modulation combination are selected according to an adaptive coding and modulation (ACM) scheme.

## 2.    Validity of the Asserted Claims of the '043 Patent

98.    Claims 1, 3, 6, 7, and 8 of the '043 Patent are not anticipated by or obvious in view of the references relied upon by Defendants. ViaSat's validity positions are set forth in detail in the Rebuttal Expert Report Of Mark Sturza Regarding: (1) Validity Of

U.S. Patent 8,010,043 and (2) ViaSat's Proprietary Information ("'043 Rebuttal Validity Report")[15] and incorporated herein by reference. None of the alleged prior art references relied upon by Defendants—alone or in combination—disclose each and every limitation of the asserted claims. Nor would such limitations have been obvious to one of ordinary skill in the art.

99.     Based on the educational level of the inventors, the types of problems encountered in satellite design and the development of broadband satellite communications systems, the prior art solutions to those problems, and the overall system design and optimization of broadband communications systems, a person of ordinary skill in the art pertinent to the Patents-in-Suit from the approximate time of the invention of the '043 patent would be a person with a bachelor's degree in electrical engineering (or some equivalent engineering discipline) and a few years of experience with antennas and/or satellite-based communication systems. However, someone with slightly less technical education but slightly more practical experience, or slightly more technical education but slightly less practical experience, could have met that standard for a person of ordinary skill in the art.

---

[15]  Excerpts previously filed as Exhibit B to the December 16, 2013 "Declaration of Patrick Bageant in Support of Defendants' Motion to Resolve Claim Construction Disputes Arising From Mr. Sturza's Opinions Regarding Claim 1 of U.S. Patent No. 8,010,043" (Dkt. 499-2); Exhibit F to the December 16, 2013 Declaration of Patrick Bageant in Support of Defendants' Motion for Summary Judgment of Non-Infringement and, Alternatively, Partial Invalidity of U.S. Patent No. 8,010,043 (Dkt. 501-2); Exhibit 3 to the January 6, 2014 Declaration of Mark Sturza (Dkt. 594-3); Exhibit C to the January 6, 2014 Declaration of Adam Wolfson (Dkt. 594-1); Exhibit 6 to the January 3, 2014 Declaration of Adam Wolfson (Dkt. 573-1). ViaSat can file a complete copy of the Report upon request, but has refrained from doing so to avoid burdening the Court with an unnecessarily voluminous filing.

(a)  Priority Date of the Claims of the '043 Patent

100.  Each of the asserted claims of the '043 patent is fully supported at least U.S. Provisional Patent Application No. 60/951,178, to which the patent claims priority, as described in the Expert Report of Mark Sturza Regarding Infringement of U.S. Patent 8,010,043 ("'043 Infringement Report"), incorporated herein by reference.  Exhibit 6 to that Report provides a detailed disclosure of how that provisional application supports the asserted claims.

(b)  Prior Art Identified by Defendants' Expert Does Not Invalidate any Asserted Claim of the '043 Patent

101.  The prior art references identified by Defendants' expert, Dr. Joel Schindall, do not anticipate or render obvious any of the asserted claims of the '043 Patent.  The bases and explanation for why each of the identified prior art references and combinations cited below do not invalidate any of the asserted claims is set forth and described in the '043 Rebuttal Validity Report.  The references which do not invalidate any asserted claim include:  ESA/FMT Reference, the iPSTAR Reference, the Nakahira 2007 Reference, the Nakasuga 2003 Reference, the Rinaldo & De Gaudenzi Reference, the Sagawa 2003 Reference, the Sagawa 2004 Reference, the Schiff Reference, the TerreStar Reference, the ESA/TN1 Reference, the WildBlue-1 Reference, the Angeletti Reference, the Nakahira 2006 Reference, the Nakahira NTT Reference, the Nakasuga 2004 Reference, and the Reudink Reference.

102.  The prior art references and combinations do not literally or equivalently disclose, teach, or render obvious the specific combination of limitations set forth in the asserted claims of the '043 Patent as those limitations are construed by the Court.

103.  A person of ordinary skill in the art would not have been motivated to combine the teachings in the asserted references in the combinations identified by Defendants or their expert.  The detailed description of the bases for lack of such motivation for each identified combination is set forth and described in the '043 Rebuttal Validity Report.

>                    (c)    Secondary Considerations Support the Nonobviousness of
>                           the Asserted Claims of the Patents-in-Suit

104.  As described in the '043 Rebuttal Validity Report, multiple secondary considerations confirming non-obviousness existed, including: the commercial success of products and processing embodying the invention, including the ViaSat-1 satellite; the long-felt and unmet need for higher capacity broadband communications satellites; the failure of others in the industry to achieve the capacity results enabled by the invention, the disbelief an skepticism of those skilled in the art, praise given to the invention upon its success, and the deliberate copying of the invention by others, including by Defendants for the Jupiter-1 satellite.

## III.  DEFENDANTS' INFRINGEMENT OF THE ASSERTED PATENT CLAIMS

105.  Defendants are engaged in the design, manufacture, and marketing of infringing satellites.  This activity occurred and is occurring in the United States.

106.  Defendants' accused products include the Jupiter-1 satellite, also known as the Echostar XVII satellite, and the NBN Co. 1A and 1B satellites.

107.  ViaSat has identified the portions of the Jupiter-1 and NBN satellites that infringe the asserted claims of the ViaSat Patents-in-Suit.  ViaSat has categorized the accused portions by patent as follows:

**A.     Defendants' Infringement of the '875 Patent**

108.    ViaSat accuses the Jupiter-1 satellite (aka EchoStar XVII) of infringing the '875 Patent.

    1.      Infringement Contentions for the '875 Patent

109.    The Jupiter-1/EchoStar XVII satellite infringes Claims 1, 2, 4, 5, 6, 7, 8, 9, 12, and 27 of the '875 Patent.

110.     LS&C induced SS/L and Defendants induced Hughes to infringe Claims 1, 2, 4, 5, 6, 7, 8, 9, 12, and 27 of the '875 Patent.

    2.      Support for Infringement Contentions for the '875 Patent

111.    Direct and indirect infringement of Claims 1, 2, 4, 5, 6, 7, 8, 9, 12, and 27 of the '875 Patent is supported by, among other things, technical documentation regarding the Jupiter-1/EchoStar XVII satellite and testimony regarding its design.  Materials which provided support for ViaSat's infringement contentions may be found in the '875 Infringement Report (Dkt. 526 Ex. 2), incorporated herein.

**B.     Defendants' Infringement of the '827 Patent**

112.    ViaSat accuses the Jupiter-1/Echostar XVII satellite of infringing the '827 Patent.

    1.      Infringement Contentions for the '827 Patent

113.    The Jupiter-1/Echostar XVII satellite infringes each of the following claims of the '827 Patent: Claims 7 and 8

114.    LS&C induced SS/L and Defendants induced Hughes to infringe Claims 7 and 8 of the '827 Patent.

    2.      Support for Infringement Contentions for the '827 Patent

115.    Direct and indirect infringement of Claims 7 and 8 of the '827 Patent is supported by, among other things, technical documentation regarding the Jupiter-

1/EchoStar XVII satellite and testimony regarding its design. Materials which provided support for ViaSat's Infringement Contentions may be found in the '827 Infringement Report,[16] incorporated herein.

## C. Defendants' Infringement of the '043 Patent

116. ViaSat accuses the Jupiter-1/Echostar XVII satellite and the NBN Co. 1A and 1B satellites of infringing the '043 Patent.

### 1. Infringement Contentions for the '043 Patent

117. The Jupiter-1/Echostar XVII satellite and the NBN Co. 1A and 1B satellites satellite infringes each of the following claims of the '043 Patent: Claims 1, 3, 6, 7, and 8.

118. LS&C induced SS/L and Defendants induced Hughes to infringe Claims 1, 3, 6, 7, and 8.

### 2. Support for Infringement Contentions for the '043 Patent

119. Direct and indirect infringement of Claims 1, 3, 6, 7, and 8 of the '043 Patent is supported by, among other things, technical documentation regarding the Jupiter-1/EchoStar XVII satellite the NBN Co. 1A and 1B satellites and testimony regarding

---

[16] Excerpts of the Report were previously filed as Exhibit E to the December 16, 2013 Declaration of Patrick Bageant in Support of Defendants' Motion to Resolve Claim Construction Disputes Arising From Mr. Sturza's Opinions Regarding Claim 1 of U.S. Patent No. 8,010,043 (Dkt. 499-2); Exhibit H to the December 16, 2013 Declaration of Patrick Bageant in Support of Defendants' Motion for Summary Judgment of Non-Infringement and, Alternatively, Partial Invalidity of U.S. Patent No. 8,010,043 (Dkt. 501-2); Exhibit 5 to the January 3, 2014 Declaration of Adam Wolfson (Dkt. 573-1); and Exhibit C to the January 10, 2014 Declaration of Patrick Bageant (Dkt. 613-1). ViaSat can file a complete version of the report upon request but has refrained from doing so to avoid burdening the court with an excessively voluminous filing.

their designs and implementations.  Materials which provided support for ViaSat's Infringement Contentions may be found in the '043 Infringement Report, incorporated herein.

## IV.    DEFENDANTS' BREACHES OF CONTRACT

### A.    Contracts At Issue

120.    Defendants breached four contracts:

- the March 8, 2006 Non-Disclosure Agreement between Space Systems/Loral, Inc. and ViaSat, Inc., amended April 27, 2007 ("March 2006 NDA");

- the April 18, 2007 Confidential Disclosure Agreement between Space Systems/Loral, Inc. and WildBlue Communications, Inc., amended July 21, 2009 ("WildBlue NDA");

- the January 7, 2008 Contract Between ViaSat, Inc. and Space Systems/Loral, Inc. for the ViaSat Satellite Program ("Build Contract"); and

- the January 28, 2008 Agreement between Loral Space & Communications Inc. and ViaSat Inc., amended December 4, 2009 ("LS&C NDA").

#### 1.    The March 2006 NDA, Amended April 27, 2007

121.    The March 2006 NDA and its April 27, 2007 amendment are written contracts entered into between ViaSat, Inc. and Space Systems/Loral, Inc.  Space Systems/Loral, Inc. reorganized as Space Systems/Loral, LLC in January 2013.  ViaSat intends to rely on all terms of the March 2006 NDA and the April 27, 2007 Amendment.

122.    On April 27, 2007 the parties amended the March 2006 NDA.  The Amendment extends the disclosure, treatment, and use restriction in Paragraph 2 of the NDA from two years to five years.  The Amendment further extends the period for the exchange of proprietary information under the Agreement to March 7, 2009.

## 2.	The WildBlue NDA, Amended July 21, 2009

123.	The WildBlue NDA and its July 21, 2009 amendment are written contracts entered into between WildBlue Communications, Inc. and Space Systems/Loral, Inc. WildBlue Communications, Inc. was acquired by ViaSat, Inc. in December 2009. Space Systems/Loral, Inc. reorganized as Space Systems/Loral, LLC in January 2013. ViaSat intends to rely on all terms of the WildBlue NDA and the July 21, 2009 Amendment.

124.	On July 21, 2009 the parties amended the WildBlue NDA. The Amendment extended the period for the exchange of proprietary information under the Agreement to April 1, 2010.

## 3.	The January 7, 2008 Build Contract

125.	The January 7, 2008 Build Contract is a written contract entered into between ViaSat, Inc. and Space Systems/Loral, Inc. Space Systems/Loral, Inc. reorganized as Space Systems/Loral, LLC in January 2013. ViaSat intends to rely on at least Articles 1, 22, 27, 28, 34, and 39 of the Build Contract in support of its affirmative claims and reserves the right to rely on the contract in its entirety, including to respond to any arguments Defendants may raise in response to ViaSat's claims.

## 4.	The LS&C NDA, Amended December 4, 2009

126.	The LS&C NDA and its December 4, 2009 Amendment are written contracts entered into between ViaSat, Inc. and Loral Space & Communications Inc. ViaSat intends to rely on all terms of the LS&C NDA and the December 4, 2009 Amendment.

127.	On December 4, 2009, the parties amended the LS&C NDA. The Amendment clarified the definitions of "Project" and "Loral Assignee," and added certain other terms.

### B. To the Extent Required, ViaSat Designated its Materials Confidential Pursuant to the Applicable Terms of the Asserted Contracts

128. Throughout the contractual relationships set forth in the asserted contracts, ViaSat adequately designated its proprietary concepts—discussed further, *infra*—to the extent required by various contract terms. None of ViaSat's disclosures were subject to any caveats or exemptions in any of the asserted contracts at the time they were disclosed to Defendants or at the time of Defendants' accused breaches of contract.

129. Furthermore, to the extent any disclosures of ViaSat's confidential and/or proprietary were not designated confidential pursuant to the terms of any applicable portions of the asserted contracts, SS/L subsequently represented, through its statements and conduct, that it understood and nevertheless agreed to treat ViaSat's information, concepts, and technologies as proprietary and confidential pursuant to the asserted contracts' terms.

### C. Defendants' Breaches

130. To establish a claim for breach of contract by Defendants, ViaSat must prove the following elements by a preponderance of the evidence:

    a) ViaSat and/or its predecessors entered into a contract with SS/L and/or LS&C;

    b) ViaSat and/or its predecessors did all, or substantially all, of the significant things that the contract required it to do;

    c) All conditions required by the contract for SS/L and/or LS&C's performance had occurred;

    d) SS/L and/or LS&C failed to do something that the contract required them to do or did something that the contract forbade them from doing; and

e)    ViaSat and/or its predecessors were harmed by that failure.

131.   ViaSat contends that Defendants breached the above contracts when Defendants disclosed, used, and/or otherwise failed to take reasonable care to protect ViaSat's confidential information in connection with various third-party projects—including at least the Jupiter-1/EchoStar XVII project for ViaSat's competitor, Hughes, and the NBN Co. project—starting in 2007, and continuing through at least 2012.

132.   Defendants improperly disclosed, used, and/or failed to take reasonable care to protect  ViaSat confidential information regarding at least (i) ViaSat's proprietary C/I test, (ii) information gained from ViaSat's proprietary Capacity Measurement Tool, (iii) ViaSat's proprietary concepts regarding dynamic NGSO switches, (iv) ViaSat's proprietary concepts related to a 4-color frequency reuse scheme in which user and gateway beams share the 4 total frequency colors, (v) ViaSat's proprietary spatial separation plan aimed at reducing interference generated by a 4-color frequency reuse plan by placing gateway and user beams in, respectively, separate sections of the continental United States, (vi) ViaSat-1's beam placement plan, (vii) ViaSat's proprietary concepts related to utility gateway inventions, and (viii) portions of the specifications for the ViaSat-1 satellite.

133.   These disclosures violated the March 2006 NDA, WildBlue NDA, ViaSat-1 Build Contract, and LS&C NDA.

134.   The facts underlying the protectability of ViaSat's concepts and other information include that:  (a) it was ViaSat's standard course of conduct to identify proprietary information via written legend when it transmitted such materials in written form, (b) it was ViaSat's standard course of conduct to verbally identify proprietary information when communicated orally, and then follow up such identification with a

summary written document in the applicable time period under March 2006 NDA, WildBlue NDA, and LS&C NDA, (c) Defendants also confirmed their understanding that the concepts ViaSat conveyed to them were proprietary in subsequent written correspondence and at deposition and are now estopped from arguing otherwise, (d) the parties agreed in the January 7, 2008 ViaSat-1 Build Contract that ████████ ████████████████████████████████████████████████████████████████ ██████████████████████, (e) the parties modified and/or waived certain provisions of the contracts through their conduct and statements, including, for example, whether certain information was considered proprietary under the asserted contracts and/or subject to any caveats or exemptions from protectability under the contract(s).[17]

135. ViaSat further bases its breach allegations on various communications from, among others, Rick Baldridge and Keven Lippert to Loral personnel, in which Messrs. Baldridge and Lippert respectively summarized ViaSat confidential information that had been disclosed to Loral under ViaSat and Loral's contract. The parties subsequently discussed these communications at length and agreed to provisions in the ViaSat-1 Build Contract to protect ViaSat's property from disclosure and use on any other satellite projects.

136. ViaSat first disclosed information regarding items (iv)-(vi), discussed above in Paragraph 132, starting in August 2006 and continuing through 2007 and the ViaSat-1 satellite project. It first disclosed information regarding items (ii), (iii), (vii), and (viii)

---

[17] Nothing in the above should be taken as an admission or suggestion that ViaSat was required to summarize proprietary information it identified as such and disclosed orally pursuant to the Build Contract or LS&C NDA.

in 2007 continuing through the ViaSat-1 satellite project. It first disclosed information regarding item (i) in 2009 and continuing through the life of the ViaSat-1 satellite project. In addition to receiving written documents detailing the concepts and information at issue, Defendants acknowledged their understanding of these concepts and their proprietary nature on multiple occasions to ViaSat, including in admissions in this case.

137. Throughout the life of the ViaSat-1 satellite project and beyond, ViaSat continued to designate its concepts as proprietary, even though Defendants had already acknowledged those concepts were ViaSat's property and confidential information. Defendants nevertheless improperly disclosed, used, and/or failed to take reasonable care to protect the confidentiality of ViaSat's proprietary concepts, designs, plans, and work product. These breaches occurred in dealings with multiple third parties, including Hughes, NBN Co., Intelsat, and various potential satellite purchasers. Defendants repeatedly breached their obligations to keep these concepts confidential and/or not use them for any other purpose than the ViaSat-1 project by disclosing and using them in connection with, among other things, a patent application filed by SS/L employee, Doug Burr, in April 2007 and continuing for the next several years; the discussions preceding the Jupiter-1/Echostar XVII project and the life of that satellite project; the current NBN Co. project and its preceding discussions; and ███████

███████████████

138. ViaSat reserves its right to provide further evidence of the multiple breaches Defendants committed in their years-long Jupiter-1 and NBN Co. satellite projects. Given the nature of the present memorandum—*i.e.*, a concise statement of ViaSat's factual contentions—it cannot provide every example here or else submit a massive,

unwieldy document. Accordingly, as further explanation of its factual contentions, ViaSat incorporates by reference as if fully set forth herein its responses to Defendants' Interrogatory Nos. 22-25 and the expert testimony at trial of Dr. Marshall Kaplan, who provides the scope of his opinions in his opening and rebuttal expert reports and will discuss, in detail, various aspects of the satellite industry and Defendants' breaches of the asserted contracts.[18]

## V. INVALIDITY OF SS/L'S ASSERTED PATENT

139. As set forth in the Expert Report of Paul G. Steffes, Ph.D. Regarding the Invalidity of U.S. Patent Nos. 6,400,696 and 7,219,132,[19] incorporated herein, the asserted claims of the '696 patent are invalid. At least Claims 1, 6, and 11 of '696 Patent are anticipated by, or rendered obvious by the Linkway 2000 and 2100 systems, the Hughes ISBN system, the iSky system, the ViaSat Starwire System and/or the Gilat ISAT system, alone or in combination.

## VI. VIASAT'S NONINFRINGEMENT OF SS/L'S ASSERTED PATENT

140. As set forth in the Rebuttal Expert Report of Paul G. Steffes, Ph.D. Regarding the Non-Infringement of U.S. Patent Nos. 6,400,696 and 7,219,132, incorporated herein,[20] Defendants have failed to provide evidence that any of the accused ViaSat products, including the ViaSat Surfbeam 1 system, the ViaSat Surfbeam 2 System and the ViaSat LinkStar, infringe Claims 1, 6, or 11 of the '696 patent.

---

[18] Dr. Kaplan's expert report was previously filed as Exhibit N to the December 16, 2013 "Declaration of Patrick Bageant in Support of Defendants' Motion for Partial Summary Judgment of Material Not Subject to the Asserted Non-Disclosure Agreement" (Dkt.516), and is incorporated herein by reference.

[19] ViaSat can file a complete copy of the Report upon request but has refrained from doing so to avoid burdening the Court with an overly voluminous filing.

[20] ViaSat can file a complete copy of the Report upon request but has refrained from doing so to avoid burdening the Court with an overly voluminous filing.

## VII. VIASAT'S LACK OF BREACH RELATED TO THE FLEXIBLE FREQUENCY PROPOSAL

141. The Flexible Frequency Proposal Defendants allegedly disclosed to ViaSat in early October 2007 was created at ViaSat's request and is not Defendants' property. Nor does the Flexible Frequency Proposal embody any concept(s) unknown to ViaSat at the time of the Proposal's alleged disclosure to ViaSat. Defendants cannot show that ViaSat was obligated to keep the Flexible Frequency Proposal confidential pursuant to the parties' various contracts. Defendants similarly cannot show that ViaSat used the Flexible Frequency Proposal or disclosed the Flexible Frequency Proposal to any third parties. Finally, Defendants have no evidence that they were at all damaged by ViaSat's alleged breaches of contract with respect to the Flexible Frequency Proposal.

142. In addition to Defendants' inability to provide any of the above evidence, Defendants also indicated by their words and conduct that the concept(s) embodied in the Flexible Frequency Proposal were ViaSat's concepts and not Defendants'. Defendants also indicated by their words and conduct that they did not believe ViaSat was obligated to keep the concept(s) now at issue in their breach of contract claim secret or confidential because they were Defendants' proprietary information.

## VIII. DAMAGES

### A. ViaSat's Damages

143. ViaSat is entitled to damages adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty. ViaSat is also entitled to damages for Defendants' breaches of contract. The appropriate damages are set forth in

further detail in the expert report of Daniel Slottje[21] and incorporated herein by this reference.

        1.      Damages for Defendants' Infringement of the Patents-In-Suit

        (a)      Lost Profits on Jupiter-1

144. But for Defendants' infringement of ViaSat's patents and/or breach of the ViaSat, Loral and WildBlue NDAs and/or the Build Contract, SS/L would not have been able to provide Hughes with the Jupiter-1 satellite as planned. Faced with this situation, SS/L would have been able to present only certain options to Hughes. Assuming it had the manufacturing capacity, SS/L could have provided Hughes with multiple satellites that, in combination, would have resulted in capacity equal to the capacity of the Jupiter-1 satellite. When each of the patented technologies is factored out of the Jupiter-1 system, the resulting system would have approximately ███ of capacity.[22] A satellite built using the best available technology (and not using ViaSat's proprietary technology) would achieve approximately ██████ The majority of satellites that were launched prior to the launch of ViaSat-1 had a total capacity of well under 20 Gbps. In particular, the last satellite that was constructed for Hughes, Spaceway-3, had a capacity of about 10 Gbps.

---

[21] Previously filed as Exhibit 1 to the December 16, 2013 "Declaration of Patrick Bageant in Support of Defendants' Motion to [sic] Opinions of ViaSat's Damages Expert Dr. Daniel Slottje" (Dkt. 535-1.)

[22] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

145. In a "but-for" world, Hughes may have been able to launch a non-infringing ███ ███ satellite at the same time it launched Jupiter-1. With only a ███ satellite, SS/L would have needed to provide Hughes with three or four satellites in order to match the capacity of the Jupiter-1 satellite. This option would have cost multiples more than the Jupiter-1 satellite to build and launch, and this arrangement may have presented technical issues for Hughes to deliver the same service to its customers as was anticipated with the Jupiter-1 satellite. SS/L and Hughes would have recognized that this option was not commercially feasible, and could have continued to develop and build the best and highest capacity satellite they could without using the ViaSat technology. In this "but-for" world Hughes would be competing with ViaSat and its ViaSat-1 satellite with a lower capacity satellite. The loss of profits by ViaSat due to Defendants' infringing sale and Hughes' infringing use of the Jupiter-1 satellite is a foreseeable consequence of Defendants' infringement.

(i)     <u>Demand for the Patented Product</u>

146. There is strong consumer demand for U.S. broadband satellite Internet. For example, in 2011, a leading market research firm focused on the satellite industry, Northern Sky Research ("NSR"), published a report that contained specific market analysis on the potential of ViaSat-1 and Jupiter-1. In the report, NSR estimated a "cumulative gain of $15,000 - 20,000$ net new subscribers per month in North America" following the launch of ViaSat-1 and Jupiter-1. At the time, the satellite broadband access market was forecasted to add more than 2.2 million additional subscribers over the next ten years, with most of the growth expected to take place between 2013 and 2016.

147.   Internal documents confirm this growing demand for broadband satellite internet capacity. █████████████████████████████████████████████████████████████

(ii)   <u>Absence of Non-Infringing Substitutes</u>

148.   Satellite consumer broadband is a distinct submarket within broadband internet. Until it launched Jupiter-1, Hughes could not offer satellite broadband services that were competitive with ViaSat. ████████████████████████████████████████████████████████████████████████████████ After the launch of Jupiter-1, there is no evidence of any non-infringing broadband satellite internet service that could have provided Hughes' Jupiter-1 subscribers with the same type or quality of service other than ViaSat-1.

149.   Although there are other options available for broadband internet, satellite broadband is distinct.  Multiple aspects of satellite broadband service differentiate that service from other types of internet service.  Consumers of broadband internet have demonstrated a revealed preference for that service, Hughes and ViaSat use similar distinct distribution channels, and internet broadband requires specific hardware.  At least one distributor, Dish Network, switched from solely distributing ViaSat's internet broadband services before Jupiter-1 to distributing both ViaSat and Hughes' services after.

(iii)   <u>Sufficient Capacity</u>

150.   ViaSat had the capacity to service the customers serviced by Jupiter-1.  ViaSat-1 and Jupiter-1 have very similar coverage areas. ████████████████████████████ ██████████████████ Dish Network, for example, distributes both services and

therefore could have employed the same marketing department and resources to distribute solely ViaSat-1 capacity. Instead of installing a Hughes-powered set of DishNet hardware, the installers would simply install the ViaSat hardware. ViaSat also had sufficient marketing, manufacturing and installation capacity to absorb the other subscribers on Jupiter-1.

(iv)    Amount of Profit Lost

151.   The number of Jupiter-1 subscribers ViaSat-1 could have captured in the but-for world, is the difference between approximately ███████████████ (the subscriber capacity of ViaSat-1) and the actual number of ViaSat-1 subscribers. The resulting amount represents the number of available subscriber slots ViaSat could use to capture Jupiter-1 subscribers per quarter. This quantity and the projected Jupiter-1 subscribers not captured by Hughes' but-for ██████ satellite can be used to calculate the incremental profits lost by ViaSat because of Defendants' infringement.

152.   Profits per lost subscriber include a recurring profit figure of ████ to new incremental (from Jupiter-1) subscribers added to ViaSat-1 each quarter, and a recurring profit figure of ████ to the Jupiter-1 subscribers added to ViaSat-1 in a previous quarter. These figures were derived using ViaSat's total recurring revenue less the total recurring costs.

153.   In the but-for world, ViaSat-1 would have been able to fill its beams sooner with Jupiter- 1 subscribers not captured on Hughes' ██████ but-for satellite. The recurring revenues less recurring costs that ViaSat would have earned from these additional Jupiter-1 subscribers not captured by Hughes' ██████ but-for satellite in the but-for world represents the profit ViaSat lost due to Defendants' infringement. Under this

scenario, lost profits total approximately ██████████ This amount represents ViaSat's lost profits damages through Q2 2016.

              (b)    <u>Reasonable Royalty for Jupiter-1</u>

                      (i)    <u>Date of the Hypothetical Negotiation Regarding the Jupiter-1 Satellite</u>

154.  The hypothetical negotiation date is the date of first infringement. The hypothetical negotiation would have occurred shortly before the date the '043 Patent issued in August 2011. If Defendants are found not to infringe the '043 Patent, then the hypothetical negotiation would have occurred shortly before the date the '827 Patent issued in November 2011. If Defendants are found to only infringe the '875 Patent, then the hypothetical negotiation would have occurred shortly before the date the '875 Patent issued in January 2012. The later the hypothetical negotiation, the less likely Defendants would have been able to seek alternatives to the hypothetical license because they would have invested in the design and construction process related to Jupiter-1 and had more to lose by changing course.

                      (ii)    <u>The Parties' Bargaining Positions</u>

155.  At the hypothetical negotiation, the parties would have bargained for a non-exclusive license covering Accused Products made, used, or sold within the United States. This would include a license for SS/L's customer Hughes to use the Jupiter-1 satellite in the United States—where Hughes directly competes with ViaSat for consumer subscriptions. ████████████████████████████████ ████████████████████████ ViaSat goes to great lengths to protect its intellectual property.

156. At the time of the hypothetical negotiation, 

and suffer resulting harm to its reputation.

157. SS/L's failure to provide a ▮▮▮▮ Jupiter-1 satellite would also cause Hughes to face increased subscriber churn, fewer gross adds, and decreased sales and profits. The only design-around option to a license for the ViaSat Patents would have been a noninfringing ▮▮▮▮ satellite. Building only one such satellite would have put Hughes at a competitive disadvantage to ViaSat, at a time when the market opportunity was ripe to transition subscribers from prior-generation, inferior service to the faster next-generation service needed to cost-effectively deliver what customers demanded. Building, insuring and launching three or four ▮▮▮▮ satellites to replace the ▮▮▮▮ ▮▮▮▮ Jupiter-1 satellite would have cost many times as much. Geostationary satellites tend to cost roughly $200-250 million each. In addition, for each satellite there are

costs associated with launch, insurance, and ground equipment that can total roughly $240 million.  Hughes would not likely have chosen either option.  Against this backdrop, SS/L would have entered the hypothetical negotiation with ViaSat with limited bargaining power.

158.   At the same time, ViaSat would be faced with a request to license the manufacture of a satellite for use by its largest competitor in the U.S. satellite broadband market.  ViaSat would understand that doing so would enable Hughes to more aggressively and effectively compete with it by servicing more customers and at better levels of service.  ViaSat also competed with SS/L for providing broadband capacity to network operators.  ViaSat would therefore take these considerations into account and insist that any royalty be sufficient to compensate it for that increased competition.

159.   ViaSat would also take into account the incremental revenue it could have obtained from customers that would have otherwise been serviced by ViaSat-1, had the Jupiter-1 satellite not been built.  ViaSat earns approximatel ███ in recurring revenues per month per subscriber and experiences recurring costs of approximately ██ per month per subscriber.

160.   The parties would take into account the increased capacity that the patents in suit allowed.  The three patents teach parameter configuration, capacity maximization, and NGSO usage technology, which together account for a capacity increase of 347% in the Jupiter-1 system.

161.   The parties would also be aware of increasing consumer demand for bandwidth as well as Hughes need to compete with ViaSat's higher bandwidth Exede service

162. The parties would be aware of the following "prior art" Ka-band satellites were available in the U.S. prior to Jupiter-1 and ViaSat-1:

1. Anik F2 is reported to have a 2-3 Gbps capacity and was built by Boeing and launched in July 2004. This satellite provides broadband Internet service over the US and Canada.

2. Wildblue-1 is reported to have 8 Gbps capacity and was built by SS/L and launched in 2006. This satellite provides broadband Internet service over the U.S.

3. SpaceWay 3 is reported to have a 10 Gbps, and was built by Boeing and launched in August 2007. This satellite was owned by Hughes and was available to Hughes prior to the launch of Jupiter-1.

These satellites do not begin to approach the capacity levels of ViaSat-1 or Jupiter-1, and the maximum capacity of an available alternative to SS/L at the time offered only 32 Gbps.

(iii) Royalty Rate Per Gbps

163. There are two transactions related to broadband satellite capacity which serve as benchmarks for the rates at which SS/L and/or Hughes could have licensed the capacity it needed to operate a competitive satellite broadband service: These transactions are the best possible benchmarks for determining a royalty for the infringing sale and operation of the Jupiter-1 satellite because they reflect the market price of satellite capacity using the patented technology.

164. The weight of the *Georgia-Pacific* Factors indicates that a reasonable royalty could be toward the upper bound of a range of possible figures, i.e., ████████ ████████████████████████ The result of the hypothetical negotiation would therefore be within that range.

(iv)   <u>Incremental Capacity</u>

165. The per Gbps royalty rate is applied to the additional incremental capacity achieved through use of ViaSat's inventions. As explained above and in expert reports served by ViaSat, the additional incremental capacity achieved through infringement is ████ Gbps.

(v)   <u>Calculating The Reasonable Royalty for Jupiter-1</u>

166. Applying the ████████████████████████ royalty rate to the incremental capacity achieved through use of ViaSat's patents results in a royalty range of ████ ████████████████ Acknowledging that the parties were in a negotiation, a likely result would be the midpoint or ████████████ If the trier of fact awards lost profits damages for the Q2 2013 – Q2 2016 time frame (3.25 years), then this figure should be multiplied by the percentage of the satellite's useful life for which lost profits do not apply, or (15 years – 3.25 years) / 15 years = 78.3%. The resulting reasonable royalty figure that should be added to the lost profits figure from Section III above would be approximately ████████████

(vi)   <u>The Analytic Method</u>

167. A similar reasonable royalty can be derived using the analytical method. As discussed, the '827, '043, and '875 patents provide a ████ Gbps capacity increase to the Jupiter-1 satellite without requiring significant additional incremental costs. Thus a

reasonable royalty is this additional value generated as a result of the use of the asserted patents, which can be calculated by multiplying ████████████████

168.   This number is in line with estimates of the per-Gbps cost savings facilitated by use of ViaSat's patented technology versus the technology of prior-generation satellites. ViaSat estimates that the cost of each Gbps of capacity in prior Ka-band satellites was approximately $40 million, as opposed to the ████████ cost of a Gbps of capacity on ViaSat-1.  Capacity on Ku-band satellites was even more expensive.

(c)     Reasonable Royalty for the NBN Satellites

169.   The NBN satellites practice the '043 patent.  The date of the hypothetical negotiation would be February 2012, when the contract to build the satellites was announced.  NBN intended to use the satellites to service markets where ViaSat did not compete. Therefore, unlike with respect to Jupiter-1, a license would not be providing increased capacity and resources to a direct competitor, much less its most significant competitor.

170.   SS/L expected a Net Economic Benefit ("NEB") of approximately ████████ on its sale of the NBN satellites. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Considering these estimated profit margins, the estimated capacity of the two satellites of ████████ and the contribution of the '043 patent in terms of incremental capacity, the parties would agree to a royalty

payment of ████████ related to SS/L's infringement of the '043 with respect to the NBN satellites.

### 2. Damages for Defendants' Breach of Contract

171. To the extent that the technology underlying ViaSat's unavailing patent claims is proven to be nevertheless proprietary, damages for SS/L's disclosure of that technology to Hughes or NBN in breach of the ViaSat agreements would be calculated as outlined above.

172. In addition, ViaSat is entitled to lost profits damages based on SS/L's sale of a capacity maximization tool to NBN, which SS/L made in addition to the sale of the NBN Co 1A and 1B satellites. In consideration for SS/L's capacity maximization tool, NBN agreed to pay SS/L ████████████████████████████ ██████████████████████████████████████ ViaSat is entitled to lost profits damages for SS/L's unauthorized sale of that derivative tool to NBN. There are no incremental costs associated with this sale of the software tool. As such, ██████ is also the amount of lost profits for this sale.

### B. Defendants' Alleged Damages[23]

173. Defendants' seek damages for infringement of their patents in the form of a reasonable royalty. The hypothetical negotiation for this license would occur in or around June 2002 when the '696 patent issued.

_____

[23] A full discussion of this issue is provided in the expert report of Brian Napper, incorporated herein by reference. ViaSat can file a complete copy of the Report upon request but has refrained from doing so to avoid burdening the Court with an overly voluminous filing.

1.     Royalty Rate

174.   At the time of the hypothetical negotiation, there were a number of viable non-infringing alternatives at the time of the hypothetical negotiation. One such alternative would be to have the satellites built by SS/L in which case a license would be granted and there would be no royalty due.   Another alternative would be to continue employing the Linkway approach (or using the Linkway product itself) to routing traffic through the network.   In addition to Linkway, Dr. Steffes identifies other noninfringing alternatives in his report.

175.   Even accepting the flawed methodology employed by Defendants' expert, correcting only a few of its speculative assumptions results in a royalty rate of ████
████████████████████████████████████████

(a)     Defendants Improperly Double the Rate in the ████
███████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



178.

VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

███████████████████████████████████████████████████████

### 2. Royalty Base

179.  ViaSat does not dispute the royalty base provided by Defendants' in their expert's report.

### 3. Calculation of Reasonable Royalty

180.  Accepting, for the sake of argument, Defendants' flawed methodology for determining a royalty amount for the patents-in-suit related to the SM and SMTS/Hub products, and adjusting the calculations for just two speculative assumptions, results in adjusted claimed damages of ███████ for the period June 2006 through June 2013.

## IX.  WILLFUL INFRINGEMENT

181.  Throughout and continuing after its business relationship with Defendants on the ViaSat-1 project, ViaSat repeatedly informed Defendants that it claimed intellectual property relating to its satellite design.  Defendants' employees acknowledged and discussed this fact as early as November 2, 2006, continuing through the negotiations of the ViaSat-1 project in 2007, and then into the actual project following the parties' Build Contract.  In the parties' communications, ViaSat provided Defendants with lists of its claimed intellectual property on multiple occasions in the 2007-2010 time frame. Defendants also created documents summarizing their understanding of the general concepts over which ViaSat claimed ownership, and Defendants' provided assurances that they were not using ViaSat's property on other projects than ViaSat-1.

182.  Due to their contractual obligations, as well as ViaSat's repeated statements regarding the protection of its proprietary concepts, the evidence establishes that Defendants began and continued work on the Jupiter-1 and NBN satellite projects

despite an objectively high likelihood that the very concepts promised to each client were manifested in the claims of pending applications and, later, validly-issued valid patents. Defendants had actual notice of the concepts that ViaSat regarded as its proprietary information, as well as ViaSat's commitment to protecting such concepts. Defendants were also aware of the patent applications and ViaSat's continuing patent prosecutions, and became aware of the ViaSat Patents-in-Suit shortly after they issued. Despite this knowledge, and even after the patents issued, Defendants did not change the designs on any of the accused satellites to avoid infringement.

183. Additionally, Defendants received actual notice of the asserted claims of ViaSat's Patents no later than November 11, 2011. On this date, ViaSat General Counsel Keven Lippert sent an email to Richard Currier at LS&C attaching links to U.S. Patent Application No. 12/411,315 (i.e., the Application that would mature to the '875 Patent), U.S. Patent No. 8,010,043, and U.S. Patent Application No. 12/248,714 (i.e., the Application that would mature to the '827 Patent).

184. Despite having knowledge of the claims of each of the Patents-in-Suit , Defendants subsequently built, tested, and sold the Jupiter-1 satellite to Hughes. The Jupiter-1 satellite embodies the inventions of each of the '875, '043, and '827 Patents.

185. Similarly, after acquiring actual knowledge of the '043 Patent, Defendants bid, and won, the contract to build the NBN Co. 1A and 1B satellites. Defendants secured the contract with NBN, in part, by presenting to NBN a "capacity optimization process" derived from ViaSat's proprietary Capacity Measurement Tool. The use of this capacity optimization process in the design and manufacture of the NBN Co. 1A and 1B satellites renders the offer for sale, the sale, and the building of these satellites an

infringement of the '043 Patent.  Defendants are presently in the process of building these satellites.

## X.    DEFENDANTS' DEFENSES

### A.    Doctrine of Equivalents and Indirect Infringement

186.  ViaSat respectfully directs the Court to its discussion of Defendants' infringement of its Patents-in-Suit directly through the doctrine of equivalents and through indirect infringement, *supra*, which establishes why Defendants have no evidence that they do not infringe under these theories.

### B.    Invalidity of the ViaSat Patents-in-Suit

187.  ViaSat respectfully directs the Court to its discussion of the validity of its Patents-in-Suit, *supra*, which establishes why Defendants have no evidence that the patents (or any of their claims) are invalid under any of the asserted theories.[24]

188.  The former 35 U.S.C. § 102(f), which applies to the asserted patents in this case because they all issued before March 17, 2013, a person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented."  "To prove derivation under § 102(f), 'the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee' by clear and convincing evidence."  *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003 (quoting *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1576 (Fed. Cir. 1997)).  "The communication must be sufficient to enable one of ordinary skill in the art to make the patented invention."  *Id.*

---

[24]  ViaSat respectfully directs the Court's attention to the Rebuttal Reports of Dr. Bartone and Mr. Sturza, incorporated herein by reference.

189.   The former 35 U.S.C. 102(g), "of a patentee's invention has been made by another, prior inventor who has not abandoned, suppressed, or concealed the invention, [35 U.S.C. § 102(g)] will invalidate that patent." *Fox Group, Inc. v.  Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012) (quoting *Apotex USA, Inc. v. Merck & Co., Inc.,* 254 F.3d 1031, 1035 (Fed. Cir. 2001)).  A challenger of a patent must prove "by clear and convincing evidence that 'the invention was made in this country by another inventor.' " *Id.* (quoting 35 U.S.C. § 102(g)).  "[A] challenger ... has two ways to prove that it was the prior inventor: (1) it reduced its invention to practice first ... or (2) it was the first party to conceive of the invention and then exercised reasonable diligence in reducing that invention to practice." *Id.* (quoting *Mycogen Plant Sci., Inc. v. Monsanto Co.,* 243 F.3d 1316, 1332 (Fed. Cir. 2001)).

## C.      Inequitable Conduct Related to the '875 and '827 Patent

190.   ViaSat respectfully directs the Court to its discussion of the lack of inequitable conduct in the prosecution of the '875 and '827 Patents, *supra*, which establishes why Defendants have no evidence that either of those patents is unenforceable pursuant to the doctrine of inequitable conduct.

## D.      Equitable Estoppel, Laches, and/or Waiver

191.   Defendants do not have facts that demonstrate ViaSat unreasonably and inexcusably delayed filing suit, or indicated by its words or actions that it would not sue based on the ViaSat Patents-in-Suit.

192.   ViaSat's Patents-in-Suit issued in 2011 and early 2012, and ViaSat sued for infringement of each on February 1, 2012.

193.   Starting in 2007 and continuing through 2012, ViaSat indicated to Defendants orally and in writing that it believed disclosure of its proprietary concepts to Hughes

and/or other third parties would constitute a breach of contract.  Following unsuccessful attempts at informally resolving ViaSat's claims in this regard, ViaSat filed suit for breach of contract on February 1, 2012.

194.   Defendants have no evidence of economic prejudice resulting from ViaSat's actions regarding its contractual and patent-related rights.  Notwithstanding ViaSat's continued complaints to the contrary, Defendants pitched and/or entered into contracts for sale for the accused satellites, thus improperly disclosing ViaSat's proprietary concepts despite its complaints and infringing its patents despite its warnings not to do so.  Defendants accordingly cannot show that they were economically prejudiced as a result of actions by ViaSat.   Defendants cannot show evidentiary prejudice either.

### E.   35 U.S.C. § 287

195.   Defendants do not have facts the demonstrate ViaSat's damages are limited in any way by 35 U.S.C. § 287.  Before any infringement began, ViaSat provided Defendants with actual notice of its Patents-in-Suit.  The accused products, satellites, also cannot be realistically marked pursuant to the statute.

### F.   Unclean Hands

196.   ViaSat respectfully directs the Court to its discussion of the lack of inequitable conduct in the prosecution of the '875 and '827 Patents, *supra*, which establishes why Defendants have no evidence that either of those patents is unenforceable pursuant to the doctrine of inequitable conduct, which is itself a subset of the unclean hands doctrine.

197.   Defendants have not articulated any other theories of unclean hands in this case. To the extent they do so in their memorandum of facts and law, ViaSat reserves the right to supplement the above contentions to respond to Defendants' new allegations.

### G. Inability to Establish Basis for Injunctive Relief

198. Given that the decision regarding whether or not to provide injunctive relief is not an issue for the jury, ViaSat reserves its right to argue at a later date that all of the requirements for injunctive relief are met in this case. To the extent Defendants argue at a later date that this is not so, they are incorrect as they do not have facts that demonstrate an inability to establish ViaSat's basis for injunctive relief.

### H. Prosecution History Estoppel

199. Defendants do not have facts that demonstrate ViaSat took positions during the prosecution of its Patents-in-Suit that preclude it from alleging infringement in any way now.

200. Defendants further have not articulated at any point in this case that ViaSat is estopped from taking any infringement or other positions due to prosecution history estoppel. To the extent they do so in their memorandum of facts and law, ViaSat reserves the right to supplement the above contentions to respond to Defendants' new allegations.

### I. Inability to Recover Costs Pursuant to 35 U.S.C. § 288

201. ViaSat respectfully directs the Court to its discussion of the validity of its Patents-in-Suit, *supra*, which establishes why Defendants have no evidence that the patents (or any of their claims) are invalid under any of the asserted theories. Defendants therefore do not have facts that demonstrate ViaSat is unable to recover costs pursuant to 35 U.S.C. § 288.

### J. Lack of Standing

202. Defendants do not have facts that demonstrate ViaSat lacks the standing to sue on the Patents-in-Suit or asserted contracts. ViaSat is the assignee of the right to

exclude and sue for past and future damages on each of its Patents-in-Suit, and is either the direct signatory or assignee of the four asserted contracts. ViaSat has not assigned any of these rights to any other party.

### K. Failure to Mitigate

203. Defendants do not have facts that demonstrate ViaSat failed to mitigate its damages.

204. ViaSat continuously demanded from 2007 through the present that Defendants refrain from utilizing its intellectual property, Patents-in-Suit, and/or proprietary concepts on any satellite project besides ViaSat-1. Defendants continued to do so despite these repeated demands.

205. ViaSat launched the ViaSat-1 satellite in late 2011 and began offering its ViaSat-1-based Exede internet service starting in 2012. Since that time, ViaSat has continued to expand the Exede internet service through its use of the ViaSat-1 satellite.

206. In mid-2012, Hughes launched the Jupiter-1 satellite and began offering internet services through their satellite in late 2012. Hughes and ViaSat have competed for satellite broadband internet customers, and continue to do so today. Defendants have no facts indicating ViaSat has done anything but vigorously compete in the marketplace.

207. Defendants have not articulated at any point in this case that ViaSat has failed to mitigate its damages. To the extent they do so in their memorandum of facts and law, ViaSat reserves the right to supplement the above contentions to respond to Defendants' new allegations.

**L.    Failure to Satisfy Conditions Precedent for Breach of Contract**

208.   Defendants do not have facts that demonstrate ViaSat failed to satisfy any conditions precedent in the various asserted contracts.   First, ViaSat adequately designated its materials confidential pursuant to the various nondisclosure agreement clauses in the asserted contracts.  Second ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████   To the extent the jury finds that any such conditions existed, however, ViaSat satisfied them according to the contract's terms, which is undisputed since Defendants have never claimed ViaSat breached or failed to perform the Build Contract's terms.   Third, to the extent any of ViaSat's pre-May 4, 2007 disclosures were inadequately designated confidential under the then-existing applicable contract(s), ViaSat did adequately designate that material under the contract starting at least on May 4, 2007 and moving forward and any perceived inadequacies with previous disclosures either did not affect Defendants' contractual duties with respect to the later disclosures and/or were waived by Defendants' words and actions.

**M.    License**

209.   ViaSat has not licensed its Patents-in-Suit such that Defendants' infringement is now exempted.  ViaSat only licensed its intellectual and other property to Defendants in connection with the ViaSat-1 project, and explicitly forbade Defendants from using that property on other satellite projects or pitches.  Defendants do not have a license to use ViaSat's Patents-in-Suit on either the Jupiter-1 or NBN satellite projects.

210.   ViaSat has never licensed any of its Patents-in-Suit to Hughes in connection with the Jupiter-1 satellite project.

211. ViaSat also has not licensed its intellectual or other property to NBN Co. in connection with the NBN satellite project.

## XI. VIASAT'S DEFENSES

### A. Invalidity of the SS/L Patent-in-Suit

212. ViaSat respectfully directs the Court to its discussion of the validity of SS/L's Patent-in-Suit, *supra*, which establishes why Plaintiffs can prove that the '696 Patent is invalid.

### B. 35 U.S.C. § 287

213. ViaSat was selling satellite modems licensed for use with the WildBlue-1 satellite by early 2007. None of those products were marked with the '696 Patent.

214. SS/L provided no notice to ViaSat of SS/L's alleged patent rights until it filed its counterclaims.

215. SS/L may not recover damages for acts of alleged infringement that occurred between ViaSat's first sale of licensed products and SS/L's filing of its counterclaims.

### C. Laches

216. SS/L knew or should have known of ViaSat's allegedly infringing activity prior to June 15, 2006.

217.   SS/L's greater than 6-year delay in filing suit triggers a presumption that SS/L delayed unreasonably, and to ViaSat's prejudice.  Because SS/L cannot rebut this presumption, and because it would be inequitable to permit SS/L to pursue claims that it filed only to bolster its position in settlement talks regarding ViaSat's claims, laches should bar any recovery by SS/L for pre-filing acts of alleged infringement.  In any event, ViaSat could prove that SS/L's lengthy delay was unreasonable and prejudicial, as discussed *infra* with respect to equitable estoppel and/or waiver.

### D.   Equitable Estoppel and/or Waiver

218.   During the period of delay discussed *supra* with respect to laches, SS/L acted in a manner that reasonably led ViaSat to believe that SS/L would not file suit by, *inter alia*, failing to inform ViaSat that its accused satellite modems should be marked with the '696 Patent, and failing to require common directors to recuse themselves from meetings regarding ViaSat's accused products.

219.   ViaSat has been prejudiced by SS/L's failure to timely assert its alleged patent rights both economically and in evidentiary terms.  Economically, ViaSat agreed that its exclusive right to supply ground system components for the Canadian payload on ViaSat-1 would be conditioned on ViaSat's continued sale of satellite ground systems to third parties—sales that SS/L now accuses of infringement.  Furthermore, due to SS/L's failure to notify ViaSat of its alleged patent rights, ViaSat did not obtain indemnification or other protection for WildBlue's use of ViaSat's ground systems with satellites other than ViaSat-1 or WildBlue-1.  In evidentiary terms, evidence related to ViaSat's invalidity and/or inequitable conduct defenses, as well as SS/L's damages claims, is no longer available:  One of SS/L's prosecuting attorneys is deceased, and multiple witnesses testified that they cannot recall information regarding prior art.

# POINTS OF LAW

## XII. ISSUES ON WHICH VIASAT BEARS THE BURDEN OF PROOF

### A. Infringement

#### 1. Direct Infringement

220. 35 U.S.C. § 271(a) states:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

221. Infringement is a question of fact. *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001); *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1541 (Fed. Cir. 1992). "The [patent owner] has the burden of proving infringement by a preponderance of the evidence," i.e., that it is more likely than not that all of the elements of infringement have been proven. *Id; see Seal-Flex, Inc. v. Athletic Track & Court Construction*, 172 F.3d 836, 842 (Fed. Cir. 1999).

222. "A determination of patent infringement under 35 U.S.C. § 271(a) requires a two step analysis — first, the language of the claim at issue must be interpreted to define its proper scope and, second, the evidence before the court must be examined to ascertain whether the claim has been infringed, whether the claim 'reads on' the accused product or process. The first inquiry is a question of law for the court while the second is a question of fact." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d at 1559, 1570 (Fed. Cir. 1992).

223. A patent claim defines the scope of a patentee's statutory protection. *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005). The proper construction of terms and phrases within a patent claim is a question of law.

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). The Court's construction governs the jury's ultimate determination of whether the patent claim has been infringed. *Id.* Here, the Court has issued claim-construction Orders for the Patents-in-Suit. (*See* Dkt. 206, 208.)

224. "After claim construction, the next step in an infringement analysis is comparing the properly construed claims with the allegedly infringing devices or methods. This comparison is a question of fact." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1369 (Fed. Cir. 2001) (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000)); *see also Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999) ("The second step of the infringement analysis, i.e., comparing the properly construed claims to the device accused of infringing, is a question of fact.").

225. Infringement occurs when each limitation of a properly interpreted claim is found in the accused product. *Seal-Flex*, 172 F.3d at 842; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir. 1992), *abrogated on other grounds*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). "It is axiomatic that the parameters of a patent right are defined by the claims of the patent, and that if the accused matter falls within the claims, literal infringement is made out." *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F. Supp. 397, 405 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990).

226. If each element recited in the claims is found in the accused product, the manufacturer of the accused product cannot avoid infringement merely by adding additional elements. *Stiftung v. Renishaw PLC,* 945 F.2d 1173, 1178 (Fed. Cir. 1991) (quoting *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 703 (Fed. Cir. 1983)) ("It is

fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device."). "Making improvements on a patented invention by adding features to a claim device beyond those recited in the patent does not avoid infringement." *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1365 (Fed. Cir. 2004); *see also Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 1482 (Fed. Cir. 1984) (citation omitted), *cert. denied,* 469 U.S. 924 (1984) ("An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent."). Similarly, an accused method "does not avoid literally infringing a method claim . . . simply because it employs additional steps." *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1380 (Fed. Cir. 2001) (emphasis in original) (citing *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1271 (Fed. Cir. 1986), *cert. denied,* 479 U.S. 1030 (1987)).

227.   Additionally, an accused product infringes even if it does not always infringe when it is used. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998) ("Even assuming that Nu-Kote's video establishes that its cartridge will not infringe under a particular set of controlled circumstances . . . this has little bearing on whether its cartridge will avoid infringement under other foreseeable operating conditions.").

228.   "An accused product that 'imperfectly' or 'sometimes, but not always' embodies a claimed element or method nonetheless infringes." *Stryker Corp. v. Davol, Inc*., 75 F. Supp. 2d 741, 743 (W.D. Mich. 1999) (quoting *Bell Communications Research Inc. v. Vitalink Communications Corp*., 55 F.3d 615, 622-23 (Fed. Cir. 1995)), aff'd, 234 F.3d 1252 (Fed. Cir. 2000); *Paper Converting Mach. Co. v. Magna-Graphics Corp*., 745 F.2d 11, 20 (Fed. Cir. 1984) ("That the machine was not operated in its optimum mode

is inconsequential: imperfect practice of an invention does not avoid willful infringement.").

### 2. Indirect Infringement

229. 35 U.S.C. § 271(b) states, "Whoever actively induces infringement of a patent shall be liable as an infringer."

230. The previous discussion of law and procedures related to the general infringement analysis, *supra*, fully applies to indirect infringement as well.

231. The "specific intent necessary to induce infringement 'requires more than just intent to cause the acts that produce direct infringement. Beyond the threshold knowledge, the inducer must have an affirmative intent to cause direct infringement.'" *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1354 (Fed. Cir. 2008) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)). To satisfy that standard, the plaintiff must either show actual knowledge of the patent or willful blindness to its existence, a standard that "surpasses recklessness and negligence." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). To satisfy the willful blindness requirement, "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2069.

232. "[A]s a matter of law § 271(b) does not reach actions taken before issuance of the adverse patent." *Nat'l Presto Indus. v. W. Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996). "[T]he general rule is that inducement of infringement under § 271(b) does not lie when the acts of inducement occurred before there existed a patent to be infringed." *Id.* at 1196. However, "[a]lthough technically infringing activity cannot give rise to liability if conducted before a patent issues, continuing to infringe or committing new

infringing activity after a patent issues gives rise to liability. (Dkt. 41 at 12 (citing *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970, 978-79 (Fed. Cir. 1986) (affirming district court holding of willful infringement where infringer copied invention before patent issued and continued infringing conduct after patent issued)).

### 3. Willful Infringement

233. Willful infringement must be proven by clear and convincing evidence, and requires a showing of objective recklessness. *See In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). To establish willful infringement, a plaintiff must show that the accused infringer proceeded with the activities accused of infringement with an objectively high likelihood that its actions constituted infringement of a valid patent. *Id.* The state of mind of the accused infringer is not relevant to this objective inquiry. *Id.* If this objective threshold is met, then, plaintiff must prove that the objectively high risk or likelihood of infringement was either known, or so obvious that it should have been known to the accused infringer, and the accused infringer's state of mind is relevant to this second inquiry. *Id.*

### B. Breach of Contract

#### 1. Contracts Governed By California Law

234. Under California law, the elements of a cause of action for breach of contract are: (1) the existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to the plaintiff as a result of the breach. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).

235. "[T]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the

language of the instrument is reasonably susceptible." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust,* 631 F.3d 1058, 1067 (9th Cir. 2011) (quoting *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage*, 69 Cal. 2d 33, 37 (1968)). It is only after considering whether the extrinsic evidence supports the alternate interpretation that the court is permitted to determine whether the contract is unambiguous. *Celador Int'l, Inc. v. Am. Broad. Cos., Inc.*, 499 Fed. Appx. 721, 724 (9th Cir. 2012).

236. "When one party has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be [ ] inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, 2013 WL 235181, at *4 (S.D. Cal. May 24, 2013) (cited approvingly by *Convolve, Inc. v. Compaq Computer Corp.*, 527 Fed. Appx. 910, 923 (Fed. Cir. 2013)). For this reason, such conduct acts as a waiver or modification of the written contract term. *Id.*; *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1038-39 (2003); *Biren v. Equality Emergency Med. Grp.*, 102 Cal. App. 4th 125, 141 (2002).

## 2. Contract Governed By New York Law

237. Under New York law, the elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damage. *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009); *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

238. Under New York law, which governs the Build Contract, "[t]he best evidence of what the parties to a written contract intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (quotation marks and citation omitted). Extrinsic evidence for New York-governed contracts is generally inadmissible unless the party first shows that the contract's terms are facially ambiguous. *See id.* at 569; *R/S Assoc. v. New York Job Development Auth.*, 98 N.Y.2d 29, 33 (2002) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (citations and quotations omitted).

239. New York law holds that a proposed contract interpretation must avoid inconsistencies while reasonably harmonizing the contract's terms, not rendering the contract invalid or unenforceable, and avoiding absurd results. *See Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 74 A.D.3d 516, 518 (1st Dep't 2010) ("The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms.") (citing *James v Jamie Towers Hous. Co.*, 294 A.D.2d 268, 269 (1st Dep't 2002)). "Where internal inconsistencies in a contract point to ambiguity, extrinsic evidence is admissible to determine the parties' intent." *Id.* (citing *Fed. Ins. Co. v Am. Ins. Co.*, 258 A.D.2d 39, 43 (1st Dep't 1999)). "The ultimate aim is to realize the parties' 'reasonable expectations' through a practical interpretation of the contract language." *Id.* (citing *Sutton v East River Sav. Bank*, 55 N.Y.2d 550, 555 (1982)).

### 3. Contract Governed By Colorado Law

240. Under Colorado law, the elements of a breach of contract claim are the (1) existence of a contract, (2) performance by the plaintiff, (3) failure to perform the

contract by the defendant, and (4) resulting damages to the plaintiff. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

241. Similar to California, Colorado looks to extrinsic evidence "to determine whether the contract is ambiguous." *See East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005). "Colorado has long recognized the rule that in construing a contract, the courts will follow the construction placed upon it by the parties themselves." *Id.* at 974-95 (citing *Greeley & Loveland Irr. Co. v. McCloughan,* 140 Colo. 173 (1959)). "Thus, [Colorado courts] have found the conduct of the parties before the controversy arose to be a reliable test of their interpretation of the agreement." *Id.* at 975 (citing *Town of Estes Park v. N. Colo. Water Conservancy District,* 677 P.2d 320, 327 (Colo. 1984)).

### C.   Damages

#### 1.   Damages for Patent Infringement

242. 35 U.S.C. § 284 states in pertinent part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

243. The assessment of damages is a question of fact, and is decided by the jury when trial is to a jury. "Section 284 imposes no limitation on the types of harm resulting from infringement that the statute will redress. The section's broad language awards damages for any injury as long as it resulted from the infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

244. ViaSat has the burden of proving each element of its damages by a preponderance of the evidence and is entitled to all damages that can be proven with a

reasonable certainty. Reasonable certainty may be based on opinion evidence, and does not require proof of damages with mathematical precision. *See*, *e.g., Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991). While nothing may be added to the amount of damages to punish the accused infringer or to set an example, all doubts as to the proper measure of damages must be resolved against the accused infringer. *See, e.g., Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983).

(a) <u>Lost Profits</u>

245. ViaSat is entitled to recover its lost profits from Defendants' patent infringement pursuant to 35 U.S.C. § 284. *Panduit Corp. v. Stahlin Bros. Fiber Works*, 575 F.2d 1152 (6th Cir. 1978), established that a plaintiff seeking lost profits damages must prove: (1) demand for the patented product; (2) the absence of non-infringing alternatives; (3) sufficient manufacturing and marketing capability to exploit the demand; and (4) the amount of profit lost. It is a "reasonable inference" in a two-supplier market that the patentee would have made the sales made by the infringer had the latter not infringed. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 826 (Fed. Cir. 1989) (reversing lower court's denial of lost profits).

(i) <u>Demand for the Patented Product</u>

246. Where the patentee's product competes in the same market as the infringing product, the Federal Circuit has instructed that the mere evidence of high volume of sales of the infringing product can prove the requisite demand for the patented product. *Gyromat Corp. v. Champion Spark Plug Co*., 735 F.2d 549, 552 (Fed. Cir. 1984). "Demand" only requires showing a demand for the patentee's product, not that there was a specific demand for the individual patented limitations of the claimed invention.

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1330-31 (Fed. Cir. 2009). The patentee need not market a product that practices the patent in question to recover lost profits. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp*., 702 F.3d 1351, 1360 (Fed. Cir. 2012); *King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995).

(ii)  <u>Absence of Acceptable Non-Infringing Substitutes</u>

247.  The availability of acceptable non-infringing substitutes can provide a defense to or reduce a lost profit damages award because the availability of such substitutes makes it less likely that the patentee can show that "but for" the infringement, it would have made the infringer's sales. *Del Mar Avionics, Inc. v. Quinton Instrument Co*., 836 F.2d 1320, 1326 (Fed. Cir. 1987). The patentee does not need to negate all possibilities that purchasers might have bought another product. *Paper Converting Machine Co. v. Magna-Graphics Corp*., 745 F.2d 11, 21 (Fed. Cir. 1984).

248.  To justify reduction or denial of lost profits, an alleged substitute must actually be non-infringing. *Gyromat*, 735 F.2d at 553. An alleged substitute that infringes any of the patentee's patents, including unasserted patents and unasserted claims of the patents in suit, is not a non-infringing substitute. *Parker-Hannifin Corp. v. Champion Labs., Inc*., No. 06-cv-2616, 2008 WL 3166318, at *6 (N.D. Ohio 2008).

249.  To be acceptable, the alleged alternative must have the advantages of the patented product and the same level of performance such that it could satisfy consumers' demand. *Presidio Components*, 702 F.3d at 1360.

250.  An alleged alternative must also have been available. Evidence that the defendant could have theoretically marketed an alternative product is not sufficient. *Grain Processing Corp. v. Am. Maize-Prods. Co*., 185 F.3d 1341, 1353 (Fed. Cir.

1999).  If a device was not available for purchase, a defendant cannot argue that it is an acceptable alternative.  *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996).

(iii)   <u>Capacity</u>

251.   To recover lost profits, a patentee must show that it had the capacity to make the sales made by the infringer.  *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551-52 (Fed. Cir. 1994).

(iv)   <u>Amount of Lost Profits</u>

252.   An award of lost profits can include damage due to diverted sales, price erosion, and increased expenditures due to infringement.  *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996).  To the extent that a patentee shows it would have, and could have, sold one of its products for each infringing product sold by the infringer, the patentee is generally entitled to recover as damages for infringement the profits it would have made had the sales not been diverted to the infringer.  *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1266-67 (Fed. Cir. 2013).  Where the plaintiff and defendant are the only two suppliers of competing products involving the patented technology, there is a presumption that the patentee would have made all of the sales that the infringer made.  *Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1143 (Fed. Cir. 1991).  Lost profits are often determined by determining the patentee's incremental income.  *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1983).

(b)   <u>Reasonable Royalty</u>

253.   In addition, under 35 U.S.C. § 284, ViaSat is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty.

(i)    Reasonable Royalty Determined by a Hypothetical Negotiation

254.   One method of determining a reasonable royalty is the amount of money that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer taking place just before the infringement began, assuming that both parties to the negotiation agreed the patent to be valid and infringed and were willing to enter into a license.  *See, e.g.*, *Lucent v Gateway,* 580 F.3d 1301, 1324 (Fed. Cir. 2009); *ResQNet.com, Inc. v Lansa, Inc.,* 594 F.3d 860, 868-890 (Fed. Cir. 2010).

255.   The following evidentiary facts may be relevant to the determination of the amount of a reasonable royalty for a patent license: (1) the royalties received by the licensor for the licensing of a patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold; (4) the licensor's established policy and marketing program to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business; (6) the effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales; (7) the remaining life of the patent and the term of the license; (8) the established or projected profitability of the product made under the patent, its commercial success, and its current popularity; (9)

the utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results; (10) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention; (11) the extent to which the infringer has made use of the invention, and any evidence that shows the value of that use; (12) the portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; (13) the portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the infringer; (14) the opinion testimony of qualified experts, and; (15) the amount that a licensor (such as the patent owner) and a licensee (such as the accused infringer) would have agreed upon (at the time infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license. *Unisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

256. The relevant date for the hypothetical reasonable royalty is just before infringement began. Where there may be different hypothetical dates for each of the patents, the determination of reasonable royalty damages may consider any actual profits by the alleged infringer after that time and any commercial success of the patented invention in the form of sales of the patented or infringing products after that

1   time, if it was foreseeable at the time that infringement began.  *See*, *e.g.*, *Knorr-Bremse*

2   *Systeme Fuer Nutzfahrzeuge v. Dana Corp.,* 383 F.3d 1337, 1342 (Fed. Cir. 2004);

3   *Trell v. Marlee Elecs. Corp.,* 912 F.2d 1443, 1446, 1448 (Fed. Cir. 1990); *State Indus.,*

4   *Inc. v. Mar-Flo Indus., Inc.,* 883 F.2d 1573, 1581 (Fed. Cir. 1989); *Studiengesellschaft*

5   *Kahle, mbH v. Dart Indus.,* Inc., 862 F.2d 1564, 1571-72 (Fed. Cir. 1988); *Fromson v.*

6   *Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988).

7   257.   It is economically justified to base the reasonable royalty on the market value of

8   the entire accused product where prior licenses relating to the patented technology are

9   based on the entire market value, or when defendants' licenses also base royalties on

10  the entire market value of the accused products Rule and Defendants use the same

11  royalty base.  *Mondis Tech. v. Top Victory Elecs. Co.,* No. 07-cv-565, 2011 WL

12  2417367 (E.D. Tex. June 14, 2011).

13  258.   A reasonable royalty must be paid for actual use of the patented technology, even

14  if that actual use was not predicted at the date of the hypothetical negotiation.  35

15  U.S.C. 284; *Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 698

16  (1933); *Fromson,* 853 F.2d at 1575; *Lucent,* 580 F.3d at 1333-34.  The hypothetical

17  negotiation analysis permits and often requires a court to look to events and facts that

18  occurred thereafter and that could not have been known to or predicted by the

19  hypothesized negotiators.  *Id.*;  *Fromson,* 853 F.2d at 1575; *Lucent,* 580 F.3d at 1333.

20  259.   Once damages are quantified, "prejudgment interest should be awarded under §

21  284 absent some justification for withholding such an award."  *Gen. Motors Corp. v.*

22  *Devex Corp.*, 461 U.S. 648, 657 (1983).  Similarly, judgment interest should be

23  awarded under 28 U.S.C. § 1961.

24

260. A reasonable royalty may also be determined using the "analytic method." This method determines the infringer's actual incremental profit from infringement and awards that incremental profit to the patentee. *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (ruling that the district court did not abuse its discretion in using the "analytical approach" of subtracting the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices, to arrive at a royalty rate, rather than considering all of the *Georgia Pacific* factors); *see also Energy Transp. Group Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (affirming denial of motion for new trial on damages where patentee's damages expert opined on damages using the analytic method).

(c) Notice

261. 35 U.S.C. § 287 prescribes that, on penalty of having their damages limited to times subsequent to actual notice, patentees and their agents shall mark any "patented article," thereby giving notice "to the public that the same is patented." In addition to the clear language of the statute, it is, as noted by the district court, also settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983).

262. "The criteria for actual notice under [35 U.S.C.] § 287(a) are not coextensive with the criteria for filing a declaratory judgment action. These statutory purposes are distinct, serve different policies, and are governed by different laws. The requirement of actual notice under § 287(a) is designed to assure that the recipient knew of the adverse

patent during the period in which liability accrues, when constructive notice by marking is absent. Actual notice may be achieved without creating a case of actual controversy in terms of 28 U.S.C. § 2201." *SRI Int'l, Inc. v. Advanced Tech. Lab., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

263.   "It is not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent." *Id*. "The offering of a license is actual notice." *Ralston Purina Co. v. Far-Mar-Co*, 772 F.2d 1570, 1577 (Fed. Cir. 1985). "Thus, the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI*, 127 F.3d at 1470. "When the patentee has notified a perceived infringer of a specified patent that a license may be needed, the sufficiency of the notice under § 287(a) is not negated if the proposed remedy is a license instead of cessation of activity." *Id*.

### (d)   Attorneys' Fees

264.   The patent statute authorizes the Court "in exceptional cases" to award "reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. A court may hold a case "exceptional" even though the infringer was not guilty of willful infringement. For example, in *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989), the Federal Circuit held that the district court did not commit clear error in finding the case "exceptional" because of the infringer's "strategy of vexatious activity." *Id*. at 1551-53.

### 2.   Damages for Breach of Contract

Damages for breach of contract seek to make good or replace the loss caused by the breach; thus, courts applying the law of ViaSat's asserted contracts seek to place the nonbreaching party in as good a position as it would have been had the contract been performed according to its terms.  *Seidman v. Industrial Recycling Props., Inc.*, 106 A.D.3d 983, 985 (2d Dep't 2013) (collecting cases); *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 967-68 (2004); *Acoustic Marketing Research, Inc. v. Technics, LLC*, 198 P.3d 96, 98 (Colo. 2008).  Damages for breach of contract are thus ordinarily ascertained as of the date of breach.  *Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1350 (Fed. Cir. 2009); *Reese v. Wong*, 93 Cal. App. 4th 51, 55 (2001); *Seidman*, 106 A.D.3d at 985 (citations omitted); *Prospero Assocs. v. Redactron Corp.*, 682 P.2d 1193, 1198 (Colo. Ct. App. 1983).

**D.      Invalidity of SS/L's '696 Patent**

265.   35 U.S.C. § 282 states in pertinent part:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

266.   "A patent is presumed valid."  *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999).  The granting of a patent by the Patent Office carries with it the presumption that the patent's subject matter is new, useful and constitutes an advance that was not, at the time the invention was made, obvious to one of ordinary skill in the art. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988).  The law presumes that the Patent Office acted correctly in issuing the patent.  *See id.*  "One who challenges a patent's validity must prove invalidity by clear and convincing evidence."  *Id.* (citing *Finnigan Corp. v.*

*Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) ("Because the claims of a patent are afforded a statutory presumption of validity, overcoming the presumption of validity requires that any facts supporting a holding of invalidity must be proved by clear and convincing evidence."). "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are highly probable." *Intel Corp., v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (other citation omitted).

### 1. Anticipation

267. Anticipation is a question of fact that must proved by clear and convincing evidence. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995). The burden of proving anticipation by clear and convincing evidence rests with the party asserting invalidity. *See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151 (Fed. Cir. 2004).

268. "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 'must demonstrate, among other things, identity of invention.'" *Minnesota Mining & Mfg. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir. 1992). "Identity of invention is a question of fact, and one who seeks such a finding must show that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice." *Id*.

269. "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. . . . There must be no difference

between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention. *Scripps Clinic & Research Found. v. Genentech, Inc*., 927 F.2d 1565, 1576 (Fed. Cir. 1991) (citations omitted). "Every element of the claimed invention must be literally present [in the single prior art reference], arranged as in the claim. . . . The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co., Ltd*., 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citation omitted). "[A]nticipation does not permit an additional reference to supply a missing claim limitation." *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1335 (Fed. Cir. 2002). Absence from the reference of any claimed element negates anticipation. *Atlas Powder Co. v. E.I. DuPont De Nemours*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984).

270. "A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Amgen Inc. v. Hoescht Marion Roussel, Inc*., 314 F.3d 1313, 1354 (Fed. Cir. 2003). "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp*., 75 F.3d 1558, 1566 (Fed. Cir. 1996).

271. "For a prior art reference to anticipate a claim, the reference must disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1473 (Fed. Cir. 1997). "Although this disclosure requirement presupposes the knowledge of one skilled in the art of the claimed invention, that presumed knowledge does not grant a license to read into the prior art reference teachings that are not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement

of anticipatory disclosure in the prior art reference itself." *Id*. "Every element of the claimed invention must be literally present [in a single prior art reference], arranged as in the claim. The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co*., 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citations omitted). "An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." *Crown Operations Int'l Ltd. v. Solutia, Inc*., 289 F.3d 1367, 1375 (Fed. Cir. 2002).

272. The date when a patent application is filed is presumed to be the date of invention. *Wang Labs., Inc. v. Mitsubishi Elec. Am. Inc*., 30 U.S.P.Q.2d 1241, 1246 (C.D. Cal. 1993). However when an infringer cites a reference with an effective date prior to the patentee's application date in order to show invalidity of the patent, and the patentee claims a pre-filing date of invention in order to avoid the cited reference, the infringer must prove by clear and convincing evidence that the patentee is not entitled to the pre-filing date of invention. *Mahurkar v. C.R. Bard Inc*., 79 F.3d 1572, 1578 (Fed. Cir. 1996); *Innovative Scuba Concepts, Inc. v. Fed. Ind., Inc*., 26 F.3d, 1112 1115 (Fed. Cir. 1994). A patentee is entitled to a date of conception as a date of the invention if it is established that the inventor acted with due diligence in reducing the invention to practice. *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

273. Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). Conception is complete when the inventor has formed the idea of how to

make and use every aspect of the claimed invention, and all that is required is that it be made without the need for any further inventive effort. *See, e.g., New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002); *Eli Lilly & Co. v. Barr Labs.,* 251 F.3d 955, 974 (Fed. Cir. 2001); *Sewall v. Walters*, 21 F.3d 411, 415 (Fed Cir. 1994).

274.   The Federal Circuit adheres to the "rule of reason" and "totality of the circumstances" standard for corroborating evidence. *E.g., Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). "The rule suggests a reasoned examination, analysis and evaluation of all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached. . . .   The rule of reason, however, does not dispense with the requirement for some evidence of independent corroboration." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985). When assessing corroborating evidence, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195.

275.   The actual making of the invention is referred to as "reduction to practice." An invention is said to be "reduced to practice" when it is made and shown to work for its intended purpose, for example, in a prototype or working model. "'In order to establish an actual reduction to practice, the inventor must prove that:  (1) he constructed an embodiment or performed a process that met all the limitations . . . and (2) he determined that the invention would work for its intended purpose.'" *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)).  "Constructive reduction to practice occurs

when a patent application on the claimed invention is filed." *Hybritech*, 802 F.2d at 1376.

### 2.   35 U.S.C. § 102(a), (b)

276.   "[I]n order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." *Woodland Trust v. Flowertree Nursery, Inc*., 148 F.3d 1368, 1370 (Fed. Cir. 1998). "[P]rior knowledge or use by others may invalidate a patent under § 102(a) if the prior knowledge or use was accessible to the public." *Id*.

277.   "[U]nder Section 102(a), a document is prior art only when published before the invention date." *Mahurkar*, 79 F.3d at 1576.   To constitute a publication, a document must be publicly accessible.  A document is publicly accessible if it is "'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.'" *Brucklemeyer v. Ground Heaters, Inc.,* 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citations omitted).

278.   In determining whether a reference qualifies as a "printed publication" under § 102(b), "the key inquiry is whether or not a reference has been made 'publicly accessible.'"   *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). "[A]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *In re Elsner*, 381 F.3d 1125, 1131 (Fed. Cir. 2004), quoting *Constant v. Advanced Micro-Devices, Inc*., 848 F.2d 1560, 1569 (Fed. Cir. 1988).  Where the public accessibility of a student thesis is at issue, courts look not only to whether the thesis was shelved in a public library, but also

whether the thesis was "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989); *Ajinomoto Co.*, 1998 WL 151411("The key to determining whether the [alleged prior art] thesis was publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.").

279.  Under Section 102(b), any description of the claimed invention in a printed publication prior to the critical date, i.e., one year before the effective filing date of the patent, is a statutory bar.  *See* 35 U.S.C. § 102(b).  Courts apply the same standards for determining whether a document is a printed publication and whether an invention is described in a printed publication under both 35 U.S.C. § 102(a) and § 102(b).  *See, e.g.*, 2-6 Chisum on Patents § 6.02[4] (2006).

280.  "In addition to identity of invention, anticipation [under § 102] requires that the prior art reference must be enabling, thus 'placing the allegedly disclosed matter in the possession of the public.'" *Am. Standard Inc. v. Pfizer Inc*., 722 F. Supp. 86, 109 (D. Del. 1989) (citation omitted).

### 3.  Obviousness

281.  35 U.S.C. § 103 states in pertinent part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. patentability shall not be negatived by the manner in which the invention was made.

282.  Obviousness is a question of law based upon underlying questions of facts. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001); *Continental Can Co. v. Monsanto Co*., 948 F.2d 1264, 1270 (Fed. Cir. 1991).

283.   The underlying factual issues to be considered in an obviousness analysis include "four general types, all of which must be considered by the trier of fact: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l, Ltd. v. Solutia Inc..* 289 F.3d 1367, 1376 (Fed. Cir. 2002).   The United States Supreme Court reaffirmed the primacy of those factors in determining whether a patent is invalid for obviousness.  *See KSR Int'l. Co. v. Teleflex Inc.,* 550 U.S. 398, 127 S. Ct. 1727, 1734 (2007) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966)).   "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined." *Id.* (quoting *Graham,* 383 U.S. at 17-18).

284.   "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 127 S.Ct. at 1740 (citing *United States v. Adam*, 383 U.S. 39 (1966)).

285.   "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).   The Supreme Court in *KSR* "acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' in an obviousness determination." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,*

492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at 1731).  "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR*, 127 S.Ct. at 1741; *see also In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) ("[I]dentification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention."). Indeed, "a patent is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 127 S. Ct. at 1731.  That is, decomposing an invention into its constituent elements, finding each element in the prior art, and then claiming that it is easy to reassemble these elements into the invention, is a forbidden ex post analysis.  *E.g., In re Fritch*, 972 F.2d 1260, 1265-66 (Fed. Cir. 1992).

286.   "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  *KSR*, 127 S. Ct. at 1734 (quoting *Graham v. John Deere Co*., 383 U.S. 1, 17-18 (1966)); *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 663 (Fed. Cir. 2000); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985); *Pentec Inc. v. Graphic Controls Corp*., 776 F.2d 309, 315 (Fed. Cir. 1985).  "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record.  It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art."  *Stratoflex, Inc. v. Aeroquip Corp*., 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).  "The commercial response to an invention is

significant to determinations of obviousness, and is entitled to fair weight." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). "The rationale for giving weight to the so-called 'secondary considerations' is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Id*.

287. "When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention. The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness. The burden of proof as to this connection or nexus resides with the patentee." *Id*. at 1392.

288. "In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus. . . . A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Id*. "When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger. . . . It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id*. at 1393.

289. "[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision maker must consider the

obviousness of the new structure in this light. Such objective indicia as commercial success, or filling an existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made." *Continental Can Co. v. Monsanto Co*., 948 F.2d 1264, 1273 (Fed. Cir. 1991).

290. "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*., 988 F.2d 1165, 1178 (Fed. Cir. 1993).

291. "Nonobviousness is suggested by the failure of others to 'find a solution to the problem which the patent[s] in question purport[ ] to solve. Such evidence shows indirectly the presence of a significant defect [in the prior art] . . . .'" *Symbol Techs., Inc. v. Opticon, Inc*., 935 F.2d 1569, 1578-79 (Fed. Cir. 1991) (citation omitted).

292. In light of the above principles, and against the factual record in this case, defendants cannot meet their burden of showing that the asserted claims of any of the Patents-in-Suit are obvious.

### 4. Definiteness

293. 35 U.S.C. § 112, Para. 2 states:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

294. "Compliance with the second paragraph of section 112 is generally a question of law…." *Shatterproof Glass Corp. v. Libbey-Owens Ford Co*., 758 F.2d 613, 624 (Fed. Cir. 1985). The accused infringer has the burden of showing by clear and convincing evidence that the claims are invalid for indefiniteness under § 112, second paragraph. *North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir.

1993). "A determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." *Intel Corp. v. Via Techs., Inc*., 319 F.3d 1357, 1365 (Fed. Cir. 2003) (quoting *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998)).

295. "Determining whether a claim is indefinite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification…. If the claims read in light of the specification reasonably apprize those skilled in the art of the scope of the invention, [section] 112 demands no more.'" *Credle v. Bond*, 25 F.3d 1566, 1576 (Fed. Cir. 1994) (citing *Miles Lab., Inc. v. Shandon Inc.,* 997 F.2d 870, 875 (Fed. Cir. 1993)). "To determine whether a claim is indefinite, the court looks to whether one of skill in the art, after reviewing the claims and the specification, would understand what is being claimed." *The Liposome Co. v. Vestar Inc*., 36 U.S.P.Q.2d 1295, 1315 (D. Del. 1994); *see also Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). There is no objective criteria used to determine whether a claim is definite. Rather, "[t]he amount of detail required to be included in claims depends on the particular invention and the prior art…." *Shatterproof Glass*, 758 F.2d at 624. Courts can require only that the claim language be "as precise as the subject matter permits." *Id*.

296. The asserted claims of the Patents-in-Suit are not indefinite, as evidenced by the Court's construction of those claims.

## 5.   Written Description

297. 35 U.S.C. § 112, Para. 1 states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms to enable a person skilled in the art to which it

1  pertains, or with which it is most nearly connected, to make and use the

2  same….

3  298.   The patent law requires that a patent application contain a written description of

4  the invention adequate to ensure that the inventor was in possession of the invention at

5  the time the patent application was filed.  A claim satisfies the written description

6  requirement of 35 U.S.C. §112 when the disclosure of the application relied upon

7  reasonably conveys to those skilled in the art that the inventor had possession of the

8  claimed subject matter as of the filing date.  The disclosure as originally filed does not,

9  however, have to provide word-for-word support for the claimed subject matter.  *See*

10  *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351-52 (Fed. Cir. 2011);

11  *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003) ("The

12  disclosure as originally filed does not, however, have to provide *in haec verba* support

13  for the claimed subject matter at issue"); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125-

14  26 (Fed. Cir. 2004) ("[T]his court has continued to apply the rule that disclosure of a

15  species may be sufficient written description support for a later claimed genus including

16  that species.").

17  299.   The written description requirement is satisfied if a person of ordinary skill in the

18  field, reading the patent application as originally filed, would recognize that the patent

19  application described the invention of these claims, even though the description might

20  not use the exact words found in the claim.  The written description is adequate if it

21  shows that the inventor was in possession of each claim of the invention at the time the

22  application for the patent was filed, even though the claim may have been changed or

23  new claims added during the prosecution of the application.  It is not necessary that

24  each and every aspect of the claim be explicitly discussed, as long as a person of

ordinary skill would understand that any aspect not expressly discussed is implicit in the patent application as originally filed.

300.   The specification and claims as originally filed must convey to persons skilled in the art that the inventors had invented the subject matter that is spelled out in the claims that ultimately issued as a patent.   The description must be sufficiently clear that persons skilled in the art will recognize that inventors made the invention having each of the elements described in the claims.   In the patent application process, the applicant may keep the originally filed claims, or expand, narrow or change the claims between the time the patent application is first filed and the time a patent is issued.   An applicant may amend the claims or add new claims.   These changes may broaden the scope of the claims to cover later developed modifications or improvements of the invention even if the later modifications or improvements are covered by a later patent.   The written description requirement ensures that the issued claims correspond to the scope of the written description that was provided in the original application.

301.   In deciding whether the patent satisfies this written description requirement, the description is considered from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed.   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*).   The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the original application.

302.   The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application.

The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original patent application if a person having ordinary skill in the field of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.

303.   While a patentee is "required to disclose some structure in the specification for all 'means' recitations in the claims, [the patentee is] not required to disclose every means for implementing the stated function." *In re Hayes Microcomputer Prod., Inc. Patent Litig.*, 982 F.2d 1527, 1535 (Fed. Cir. 1992).  "When the claimed function is adequately supported by structure in the specification, equivalent structure under § 112 ¶ 6 is not required to be described in the specification." *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1385 (Fed. Cir. 1999); *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1300 (Fed. Cir. 1999) ("Although [Defendant] argues that section 112 ¶ 6 requires that the asserted equivalent is described in the specification, that is an incorrect statutory interpretation, for such a requirement would render the statutory provision meaningless.").  "[Section 112, ¶ 6] was written precisely to avoid a holding that a means-plus-function limitation must be read as covering only the means disclosed in the specification." *Utter v. Hiraga*, 845 F.2d 993, 998-99 (Fed. Cir. 1988); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985).

304.   To prove a claim invalid for lack of an adequate written description, a challenger must prove by clear and convincing evidence that the patent application does not reasonably convey to a person skilled in the art that the inventors had possession of the invention (at the time of the application) as that invention was finally claimed in the issued patent. *See*, *e.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336 (Fed. Cir. 2010) (en banc).

6. <u>Enablement</u>

305. The patent laws also require that the patent's specification be sufficiently detailed

to enable those skilled in the art to practice the invention. *See*, *e.g.*, *Union Pac.*

*Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690-92 (Fed. Cir. 2001);

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345-46 (Fed. Cir.

2000); *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1369-78 (Fed. Cir. 1999);

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc*., 166 F.3d 1190, 1195-98

(Fed. Cir. 1999). The purpose of this requirement is to ensure that the public, in

exchange for the patent rights given to the inventor, obtains from the inventor a full

disclosure of how to carry out the invention. *Id.*

306. To meet this requirement, the patent disclosure must allow a person of ordinary

skill in the art to practice the invention without undue experimentation. *Id.* Because

descriptions in patents are addressed to those skilled in the art to which the invention

pertains, an applicant for a patent need not expressly include information that is

commonly understood by persons skilled in the art. *Id.* Similarly, a patent need not

contain a working example so long as the patent discloses enough information to enable a

person of ordinary skill in the art to practice the invention. *Id.* Moreover, the fact that

some experimentation may be required for a skilled person to practice the claimed

invention does not mean that the specification is not enabling. *Id.* A specification is

enabling so long as undue experimentation is not needed. *Id.*

7. <u>Best Mode</u>

307. 35 U.S.C. § 112, Para. 1 states: "The specification shall . . . set forth the best

mode contemplated by the inventor of carrying out his invention."

308.  Under section 15 of the America Invents Act, enacted on September 16, 2011, failure to disclose the best mode is no longer a basis for invalidity or unenforceability in all proceedings commenced on or after enactment.

309.  If a patent applicant develops specific instrumentalities or techniques that are recognized at the time of filing as the best way of carrying out the invention, then the best mode requirement imposes an obligation to disclose that information to the public. *See e.g.*, *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200 (Fed. Cir. 1991).  The best mode requirement focuses on what the inventors believed at the time the original patent application was filed.  It does not matter whether the best mode contemplated by any of the inventors was considered by others to have been the best way to carry out the claimed invention.  Nor does it matter that the inventors failed to disclose a better way to carry out the claimed invention if the inventors did not believe it to be better at the time they filed the original application.

310.  A party challenging satisfaction of the best mode requirement must show by clear and convincing evidence that the patent does not disclose what the inventor believed to be the best way to carry out the claimed invention at the time the patent application was filed.  This is known as the "best mode" requirement.  The best mode requirement must be determined on a claim-by-claim basis.

311.  In deciding whether or not the best mode has been included in the patent, one must consider two questions.  First, whether or not any of the inventors believed there to be a best way to practice the claimed invention at the time that application was filed.  If the inventor did not believe there to be a best way to carry out the claimed invention, there is no requirement that the patent describe a best mode.  Second, whether or not the patent describes what any of the inventors believed to be the best mode at the time the

VIASAT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

original patent application was filed for each claim at issue. The disclosure of the best mode must be detailed enough to enable a person having ordinary skill in the field of technology of the patent to carry out that best mode without undue experimentation. The patent specification need not disclose routine details concerning the quality and nature of the best mode if such details would be readily apparent to a person of ordinary skill in the field. Although a patent specification must disclose at least the best mode for each claim, it may also disclose other modes as well, and it need not state which of the modes disclosed is considered by the inventors to be the best. *See*, *e.g.*, 35 U.S.C. § 112, ¶ 1; *Pfizer, Inc. v. Teva Pharms*. USA, Inc., 518 F.3d 1353, 1364-65 (Fed. Cir. 2008); *Bayer AG v. Schein Pharms., Inc*., 301 F.3d 1306, 1320 (Fed. Cir. 2002); *Bruning v. Hirose*, 161 F.3d 681, 686-87 (Fed. Cir. 1998) (if inventor does not have a subjective awareness of a best mode for practicing the claimed invention at the time of filing of the patent application, no best mode violation can occur); *Glaxo Inc. v. Novopharm Ltd*., 52 F.3d 1043, 1049-52 (Fed. Cir. 1995); *Transco Prods. Inc. v. Performance Contracting, Inc*., 38 F.3d 551, 557-62 (Fed. Cir. 1994); *Wahl Instruments, Inc. v. Acvious, Inc*., 950 F.2d 1575, 1579-84 (Fed. Cir. 1991); *Chemcast Corp. v. Arco Indus. Corp*., 913 F.2d 923, 926-28 (Fed. Cir. 1990); *Spectra-Physics, Inc. v. Coherent, Inc*., 827 F.2d 1524, 1535-37 (Fed. Cir. 1987).

**E.     Defenses**

1.     Laches

312. Laches bars pre-filing recovery where two elements are satisfied: (1) unreasonable delay in filing suit; and (2) prejudice to the defendant. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). Both elements are presumed to be satisfied where the plaintiff has knowledge of the

allegedly infringing product(s) more than 6 years prior to filing suit. *Id.* The period of delay is measured from the time the patentee had actual or constructive knowledge of the infringement claim. *Id.*

## 2. Equitable Estoppel

313. In order to successfully raise the defense of equitable estoppel, the alleged infringer must prove: (1) that the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) that the alleged infringer relies on that conduct; and (3) that due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *See, e.g., Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001); *see also Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). The alleged infringer must prove each of these elements by a preponderance of the evidence, but even if all these elements are proven, equitable estoppel need not be found if such a finding would be unfair in light of the conduct of the parties. *See* 35 U.S.C. § 282; *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995) (to establish equitable estoppel, one must show reliance on patentee's misleading conduct); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (en banc); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992).

## 3. License/Patent Exhaustion

314. In an implied license, the plaintiff must have made an affirmative grant of permission to the accused infringer to use the patented inventions. *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997) ("The primary difference between the estoppel analysis in implied license cases and the analysis in

equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license. Equitable estoppel, on the other hand, focuses on 'misleading' conduct suggesting that the patentee will not enforce patent rights.") (citations omitted). Second, to prove the existence of an implied license, the defendant must show that the device purchased from the plaintiff has no non-infringing uses. *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1342 (Fed. Cir. 1999) ("When, as here, a party argues that the sale of a device carries with it an implied license to use that device in practicing a patented invention, that party has the burden to show that, inter alia, the purchased device has no noninfringing uses."); *Met-Coil Sys. Corp. v. Komer Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1986) ("First, the equipment involved must have no noninfringing uses.").

315.    For sales occurring within the United States, "[e]xhaustion is triggered only by a sale authorized by the patent holder." *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 636 (2008). By contrast, sales occurring outside the United States do not exhaust patent rights, as the Federal Circuit has made clear in a series of opinions issued both before and after *Quanta. See Jazz Photo Corp. v. Int'l Trade Comm'n* ("*Jazz Photo I*"), 264 F.3d 1094, 1105 (Fed. Cir. 2001); *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.* ("*Jazz Photo II*"), 394 F.3d 1368, 1376 (Fed. Cir. 2005); *Fujifilm Corp. v. Benun* ("*Jazz Photo III*"), 605 F.3d 1366, 1371 (Fed. Cir. 2010) *cert. denied*, 131 S. Ct. 829, 178 L. Ed. 2d 557 (U.S. 2010); *Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012).

316.    If a patentee grants a license to a patent, that license, subject to its terms, acts as a defense to any subsequent infringement action against the licensee and/or its downstream customers for an accused product. *See Jacobs v. Nintendo of Am., Inc.*,

370 F.3d 1097 (Fed. Cir. 2004); *see also TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009) (noting that patent exhaustion applies to downstream customers of patent licensee). ViaSat is unaware of any law supporting the proposition that a license to a downstream customer of an accused infringer exempts the infringer from liability for patent infringement stemming from manufacturing and/or selling an infringing product. To the extent Defendants assert that any law supports such a proposition, ViaSat reserves its right to respond to Defendants' arguments on that point at an appropriate time.

### 4.   Inequitable Conduct & Unclean Hands

317.   To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO. A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference. In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (internal citations and quotations omitted).

318.   "Intent and materiality are separate requirements. A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a

reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* (internal citations omitted).

319. "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Star Scientific, Inc. v. R.J, Reynolds Tobacco Co.*, 537 F.3d 1351, 1366 (Fed. Cir. 2008). "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91 (internal citations omitted).

320. Because the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence.' The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive. *Id.* at 1291 (internal citations omitted).

### 5. 35 U.S.C. §§ 286, 288

321. 35 U.S.C. § 286 states, "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

322. 35 U.S.C. § 288 states:

> Whenever a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent and Trademark Office before the commencement of the suit.

6. <u>35 U.S.C. § 287</u>

323. 35 U.S.C. § 287(a) states:

> In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

324. The marking requirement includes not just products that practice apparatus claims, but also products that are components of patented systems. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 184-85 (Fed. Cir. 1994) (explaining that marking requirement applied where patentee sold component for customers' incorporation into patented system). The marking statute applies to licensed products, in addition to products sold by the patentee itself. *See*, *e.g.*, *id.* at 185. This means that a patentee must engage in "reasonable efforts" to ensure that its licensees mark. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996) (finding statute satisfied where patentee had included marking requirement in license and licensee had marked vast majority of licensed products).

325. When patented products are sold without being marked, a patentee may only recover damages for infringement that occurs after the defendant receives actual notice of the infringement allegations. *See* 35 U.S.C. § 287(a). The notice must come from the patentee. *See Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2001); *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 n.18 (Fed. Cir. 1993). "Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted*, 24 F.3d at 187 ("It is

irrelevant…whether the defendant knew of the patent or knew of his own infringement.").

### 7.  28 U.S.C. § 1498

326.  28 U.S.C. § 1498(a) states, in relevant part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

327.  Under this statute, a defendant thus cannot be liable for the manufacture of, or sale(s) of allegedly infringing products to, the U.S. government. *See*, *e.g.*, *Crater Corp. v. Lucent Tech., Inc.*, 255 F.3d 1361, 1368 (Fed. Cir. 2001) (evidence that defendant performed allegedly infringing work for the government exempted it from liability under 28 U.S.C. § 1498(a)).

## XIII.  ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF

### A.  Infringement of SS/L's Patent

328.  ViaSat respectfully directs the Court to its discussion of the law on infringement, *supra*, which equally applies to Defendants' patent infringement claims.

### B.  Invalidity of ViaSat's Patents-in-Suit

329.  ViaSat respectfully directs the Court to its discussion of the law on invalidity, *supra*, which equally applies to Defendants' allegations that ViaSat's patent claims are invalid.

330.  Claims deserve the provisional application's earlier filing date so long as that application contains adequate written description under 35 U.S.C. § 112. *Star Scientific*, 655 F.3d at 1371; *see also* 35 U.S.C. § 120. The written-description

requirement is satisfied when the disclosure of the [invention in the parent application] reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharms.,* 598 F.3d at 1351. The test is not rigid. "[T]he description requirement does not demand any particular form of disclosure . . . or that the specification recited the claimed invention *in haec verba*." *Id.* at 1352. And it "does not demand either examples or an actual reduction to practice." *Id.* Because the written description standard is applied from the perspective of one of ordinary skill in the art, it must take into account the knowledge that such a person would have. *Id.* at 1351 (must consider "the existing knowledge in the particular field" and "the extent and content of the prior art") (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)); *LizardTech, Inc. v. Earth Res. Mapping, Inc*., 424 F.3d 1336, 1345 (Fed. Cir. 2005) ("A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before."). In *Streck, Inc. v. Research & Diagnostics Systems, Inc*., 665 F.3d 1269, 1287 (Fed. Cir. 2012), the court recently affirmed a summary judgment that the patent satisfied the written description requirement in part in light of "well-known" teachings "in the prior art."

## C. Unenforceability of ViaSat's Patents-in-Suit

### 1. Correction of Invention of the '827 Patent

331. To invalidate a patent due to incorrectly-listed inventor(s), the defendant must establish by clear and convincing evidence that the alleged unnamed inventor was, in

fact, either a co-inventor or actual inventor. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998).

### 2. Inequitable conduct

332.   ViaSat respectfully directs the Court to its discussion of the law on inequitable conduct, *supra*, which equally applies to Defendants' claims that ViaSat's '875 and '827 Patents are unenforceable pursuant to inequitable conduct.

### 3. License

333.   ViaSat respectfully directs the Court to its discussion of the law on license and patent exhaustion, *supra*, which equally applies to Defendants' claims that ViaSat's Patents-in-Suit were licensed in connection with the NBN Co. satellite project and therefore preclude infringement on those satellites in this case.

## D. Breach of Contract

334.   ViaSat respectfully directs the Court to its discussion of the law on breach of contract in California, *supra*, which equally applies to Defendants' claims that ViaSat breached the March 2006 NDA.

## E. Declaratory Judgment of Ownership over C/I Test Method

335.   ViaSat respectfully directs the Court to its discussion of the law on breach of contract in California and New York, *supra*, which equally applies to SS/L's declaratory judgment claim that it owns ViaSat's proprietary C/I test method.

## F. Defenses

336.   ViaSat respectfully directs the Court to its discussion of the law on its affirmative defenses, *supra*, which, to the extent they overlap with Defendant's affirmative defenses, equally apply to Defendants.  The below sets forth relevant legal points regarding Defendants' non-overlapping affirmative defenses.

1           1.    <u>Failure to Mitigate Damages</u>

337.    Under the asserted contracts' applicable law, it is Defendants' burden to prove that ViaSat failed to mitigate its damages. *See*, *e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 47 A.D.3d 103, 108 (N.Y. 1st Dep't 2007); *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997); *Hunter v. Croysdill*, 169 Cal. App. 2d 307, 318 (Cal. 1959). The defense is available when the injured party under a contract fails to take reasonable steps to mitigate or minimize the damages they sustained. *LaSalle*, 47 A.D.3d at 108; *Fair*, 943 P.2d at 437; *Hunter*, 169 Cal. App. 2d at 318. A plaintiff's failure to mitigate is excused, however, if mitigation would require inordinate or unreasonable measures, or if there were reasonable grounds for the alleged failure to mitigate. *LaSalle*, 47 A.D.3d at 108; *Fair*, 943 P.2d at 437; *Hunter*, 169 Cal. App. 2d at 318.

## XIV.  ABANDONED ISSUES

338.    ViaSat has not abandoned any issues raised by the pleadings. ViaSat has, however, voluntarily dismissed without prejudice its claim for infringement of U.S. Patent No. 7,773,942 and its claims for declaratory judgment that the claims of U.S. Patent No. 7,219,132 are invalid and not infringed.

DATED: January 21, 2014           QUINN     EMANUEL     URQUHART     &
                                  SULLIVAN, LLP


                                  By _/s/ Sean S. Pak_____
                                      Sean S. Pak

                                  Attorneys for Plaintiff ViaSat, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 21, 2014, I caused the foregoing **PLAINTIFF VIASAT INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** to be served on Defendants' counsel via the Court's ECF system and via e-mail.

DATED:  January 21, 2014

By  */s/ Sean S. Pak*
    Sean S. Pak