William Christopher Carmody
(Admitted *pro hac vice*)
Jacob W. Buchdahl
(Admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone:   (212) 336-8330
Facsimile:    (212) 336-8340
Email: bcarmody@susmangodfrey.com
Email: jbuchdahl@susmangodfrey.com

Marc M. Seltzer (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:   (310) 789-3100
Facsimile:    (310) 789-3150
Email: mseltzer@susmangodfrey.com

[Additional counsel listed below signature line]

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.,<br><br>              Plaintiff,<br>     vs.<br><br>SPACE SYSTEMS/LORAL, INC.,<br>LORAL SPACE &<br>COMMUNICATIONS INC.,<br><br>              Defendants/Counterclaim<br>              Plaintiffs. | Case No. 3:12-cv-00260-H-WVG<br><br>Hon. Marilyn L. Huff<br><br><br>**SS/L'S MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED), OR A NEW TRIAL (2 OF 12), REGARDING REASONABLE ROYALTY DAMAGES**<br><br>Date: July 22, 2014<br>Time: 9:00 a.m.<br>Place: Courtroom 15A |

6v-1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................... 1

II.  LEGAL STANDARD ................................................................................ 2

 A.  Judgment As A Matter of Law .................................................... 2

 B.  Motion for New Trial .................................................................. 3

 C.  Reasonable Royalty ..................................................................... 4

III. STATEMENT OF FACTS ......................................................................... 4

 A.  SS/L's Anticipated Profits on Jupiter-1 ...................................... 4

 B.  Dr. Slottje's Testimony on a "Reasonable" Royalty ................... 5

 C.  The Jury's Royalty Award ........................................................... 7

IV.  THE JURY'S $123 MILLION ROYALTY AWARD IS NOT SUPPORTED
 BY SUBSTANTIAL EVIDENCE ............................................................. 7

 A.  A $123 Million Royalty Is Not Reasonable Because It Is More
  Than Six Times SS/L's Anticipated Profits on the Jupiter Satellite ........ 7

 B.  The Capacity Lease Agreements Were Improperly Considered and
  Do Not Support the Royalty .................................................... 12

 C.  There Is Insufficient Evidence to Support the Alleged Capacity
  Increase ................................................................................... 16

 D.  Other *Georgia Pacific* Factors Do Not Support the Jury's Award ......... 22

 E.  The Analytical Method Does Not Support the Jury's Award ................. 24

 F.  The Maximum Royalty Is $1.6 Million .................................... 25

V.   CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Apple Inc. v. Motorola, Inc.*,
__ F.3d __, Nos. 2012–1548-49, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) ................................................................................................... 10

*Applied Med. Res. Corp. v. United States Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ............................................................. 8

*City Solutions, Inc. v. Clear Channel Commc'ns*,
365 F.3d 835 (9th Cir. 2004) ................................................................ 3

*DataQuill Ltd. v. High Tech Computer Corp.*,
No. 08cv543, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012) ........................ 13

*Foster v. Am. Mach. & Foundry Co.*,
492 F.2d 1317 (2d Cir. 1974) .............................................................. 12

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l., Inc.*,
No. C03-1431, 2006 WL 1390416 (N.D. Cal. May 18, 2006) ...................... 25

*Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*,
446 F.2d 295 (2d Cir. 1971) ........................................................ passim

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996) ............................................................... 3

*Hughes Tool Co. v. Dresser Indus., Inc.*,
816 F.2d 1549 (Fed. Cir. 1987) ............................................................ 8

*Lakeside–Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009) ................................................................ 3

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ................................................................ 4

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.,
Harris Press & Shear Div.*,
895 F.2d 1403 (Fed. Cir. 1990) .......................................................... 10

*Lucent Techs., Inc. v. Gateway Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .......................................................2, 12, 13, 24

*Lucent Techs., Inc. v. Microsoft Corp.*,
  837 F. Supp. 2d 1107 (S.D. Cal. 2011) .............................................................. 3

*Murphy v. City of Long Beach*,
  914 F.2d 183 (9th Cir. 1990) .............................................................................. 4

*Oiness v. Walgreen Co.*,
  88 F.3d 1025 (Fed. Cir. 1996) ............................................................................ 3

*Pavao v. Pagay*,
  307 F.3d 915 (9th Cir. 2002) .............................................................................. 2

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000) ............................................................................................ 3

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...............................................................4, 13, 15

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995) ...................................................................8, 9, 10

*Sloan Valve Co. v. Zurn Indus., Inc.*,
  __ F. Supp. 2d __, No. 10-cv-00204, 2014 WL 1245101 (N.D. Ill.
  Mar. 26, 2014) .................................................................................................. 24

*State Industries, Inc. v. Mor-Flo Industries, Inc.*,
  883 F.2d 1573 (Fed. Cir. 1989) .......................................................................... 9

*Stickle v. Heublein, Inc.*,
  716 F.2d 1550 (Fed. Cir. 1983) .....................................................................9, 10

*The Johns Hopkins Univ. v. Datascope Corp.*,
  543 F.3d 1342 (Fed. Cir. 2008) .......................................................................... 2

*Transclean Corp. v. Bridgewood Servs., Inc.*,
  290 F.3d 1364 (Fed. Cir. 2002) .......................................................................... 4

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
  750 F.2d 1552 (Fed. Cir. 1984) .......................................................................... 8

*TWM Mfg. Co., Inc. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986) ............................................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ...................................................................passim

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995) ...............................................................................3

*United States v. 4.0 Acres of Land*,
   175 F.3d 1133 (9th Cir. 1999) .............................................................................4

*United States v. Kellington*,
   217 F.3d 1084 (9th Cir. 2000) .............................................................................4

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) .......................................................................4, 23

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
   668 F.2d 1014 (9th Cir. 1981) .............................................................................3

*Wordtech Sys, Inc. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) ...........................................................................4

# I.    INTRODUCTION

At the time of the hypothetical negotiation, Defendant Space Systems/Loral, LLC ("SS/L") anticipated a profit of $18 million on the Jupiter-1 satellite. Disregarding that fundamental fact, the jury awarded ViaSat a royalty of $123 million. On its face, this result is absurd. No rational manufacturer would pay $123 million for a license that would confer on it the privilege of taking a $105 million loss. Neither the jury's verdict, nor the royalty it awarded, can possibly be considered "reasonable."

Before trial this Court expressed "serious questions" and "reservations" about ViaSat's "pie in the sky" damages theory. 2/7/14 Hearing Tr. at 43 (attached as Exhibit A to the supporting declaration of Rachel S. Black[1]). ViaSat, however, assured this Court that it had a sound economic basis for seeking a royalty that bore not even a remote relationship to SS/L's profits. ViaSat argued that SS/L would feel compelled to take a massive loss on Jupiter-1 so that its reputation in the satellite industry would not be harmed. But this Court need not now confront the serious weakness of this theory, because at trial ViaSat never once mentioned, much less proved, "reputational harm." Likewise, ViaSat argued that SS/L could be forced to pay a royalty that Hughes would have paid, because SS/L induced Hughes's infringement and would be jointly liable. The jury, however, found that SS/L did not indirectly infringe. Finally, ViaSat asserted that Loral would step in and pay that which SS/L could not afford. Yet the jury disposed of this theory too, finding

---

[1] All exhibits referenced herein are attached to the Declaration of Rachel S. Black in Support of SS/L's Motion for Judgment as a Matter of Law (Renewed), or a New Trial (2 of 12), Regarding Reasonable Royalty Damages, filed concurrently herewith.

3199903v4/013090

Loral not liable on all claims. In short, every rationale ViaSat advanced before trial to justify its unreasonable royalty disappeared by the time of the verdict.

There is no conceivable way this royalty will survive Federal Circuit review. Absent ViaSat's bait-and-switch, it would not have survived this Court's pretrial review. To allow this award to stand would result in a great miscarriage of justice. Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, SS/L moves for judgment as a matter of law ("JMOL") that ViaSat is not entitled to a $123 million royalty, pursuant to Rule 50(a) and, pursuant to Rule 50(b), renews the motion for JMOL that it made before the close of evidence. Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59.

## II.   LEGAL STANDARD

### A.   Judgment As A Matter of Law

Judgment as a matter of law ("JMOL") may be granted and a jury verdict may be overturned "only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). "[O]n posttrial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Id.* at 1336. Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008). (quotation marks and citation omitted). "Under Rule 50, a court should render judgment as a matter of law when a party has been fully heard on an issue

and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000).

Damages awards may not be based on guesswork or "speculation or optimism, but must be established by evidence." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996); *see Lakeside–Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) (judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict"); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996) (jury's damages award may not be "based only on speculation or guesswork"). Nor can a damages award stand if any part of the calculation leading to it is unsupported or contrary to law. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317, 1321 (Fed. Cir. 2011). That is, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1112 (S.D. Cal. 2011) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)).

**B.     Motion for New Trial**

Whether to grant a new trial on some or all issues, pursuant to Fed. R. Civ. P. 59, is a matter of the trial court's discretion. *City Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 843 (9th Cir. 2004). Courts apply a lower standard of proof to motions for new trial than they do to JMOL motions. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1026–27 (9th Cir. 1981) "[T]he trial court may grant a new trial, even though the verdict is supported

by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" *Wordtech Sys, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)). In deciding a motion for new trial, the court has "the right, and indeed the duty, to weigh the evidence" and may evaluate the credibility of the witnesses. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990); *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). The court is not required to view the evidence from the perspective most favorable to the prevailing party. *Kellington*, 217 F.3d at 1095.

### C.     Reasonable Royalty

ViaSat bears "the burden of proving the amount of reasonable royalty damages it is entitled to recover." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1376 (Fed. Cir. 2002). Reasonable royalty calculations must be based on sound economic principles and reliable data. *Uniloc*, 632 F.3d at 1316-17; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). "At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *ResQNet.com*, 594 F.3d at 869.

## III.    STATEMENT OF FACTS

### A.     SS/L's Anticipated Profits on Jupiter-1

The only satellite manufactured by SS/L that the jury found to infringe was

Jupiter-1. At the time of the hypothetical negotiation, SS/L anticipated to earn $18 million in profits on Jupiter-1.[2] Black Decl. Ex. B (Trial Tr. vol. IX, 2387:8-10, Apr. 8, 2014). There is no record evidence attributing any further anticipated profits to Jupiter-1. For example, there is no evidence suggesting that SS/L expected to make convoyed sales related to Jupiter-1. Nor is there any evidence linking any other profits SS/L earned on other projects to its manufacture of Jupiter-1.

### B.    Dr. Slottje's Testimony on a "Reasonable" Royalty

Dr. Slottje testified the "reasonable" royalty under both a *Georgia Pacific* analysis and under the analytical approach should be $7.5 million per Gigabit per second of capacity that the patented technology allegedly contributed to the Jupiter satellite. He based this figure on five leases and proposed downstream leases for capacity on fully built, insured, and launched Ka-band satellites. Black Decl. Ex. D (Trial Tr. vol. VII, 1788:7-10, 1788:20-22, 1790:25-18, 1791:20-1792:14, Apr. 3, 2014); Black Decl. Ex. E (Ex. V-209). Dr. Slottje testified that the leases informed him of the value of ViaSat's patented technology because, pointing to Exhibit V-209 specifically, "the ViaSat-1 technology that's at issue in this case is <u>exactly the technology that's being discussed and being leased in this agreement.</u>"[3] Black Decl.

---

[2] SS/L ended up making just under $30 million in profits on Jupiter-1. Black Decl. Ex. C (Trial Tr. vol. X, 2632:5-8, Apr. 9, 2014). The profits that SS/L anticipated at the time of the hypothetical negotiation, not its actual profits, are what is relevant to the reasonable royalty analysis. In any event, the royalty the jury awarded is unreasonable when compared either to the anticipated $18 million or the actual $30 million in profits.

[3] Indeed, Dr. Slottje testified repeatedly that the capacity leases were leases for <u>precisely</u> ViaSat's patented technology, even though they did not mention ViaSat's patents, were not patent licenses, and were downstream leases for capacity on fully built, insured, and launched satellites. *See, e.g.*, Black Decl. Ex. D (Trial Tr. 1785:6-15; 1787:14-16; 1787:23-25).

Ex. D (Trial Tr. 1787:10-12). Thus, Dr. Slottje concluded the leases reflected the value of ViaSat's technology. *See* Black Decl. Ex. D (Trial Tr. 1796:3-9). On that basis, Dr. Slottje concluded that the royalty per Gbps that SS/L and Loral should pay for use of ViaSat's patented technology on the Jupiter satellite should be "in the middle of the range" of the leases he reviewed – $7.5 million for each Gbps increase in capacity the Jupiter satellite realized that is attributable to ViaSat's patents. Black Decl. Ex. D (Trial Tr. 1797:3-13).

Dr. Slottje testified that in a hypothetical negotiation, which would be between ViaSat on the one hand, and SS/L and Loral on the other, the parties would have agreed to a total royalty of $587.1 million for the use of ViaSat's patented technology on one single satellite. Black Decl. Ex. D (Trial Tr. 1780:23-24, 1797:14-18). He did not offer an alternative royalty if the negotiation were only between ViaSat and SS/L.[4] He also offered no reason as to why SS/L would willingly to agree to pay $105 million – or six times – more than its anticipated profits on the Jupiter satellite for a one-time license to use ViaSat's patented technology on the Jupiter satellite.

Dr. Slottje testified that the royalty would be the same under the analytical method. He described the analytical method as being "based on the notion of looking at what the incremental economic benefit is of the patented invention."

---

[4] Notably, Dr. Slottje placed significance on the fact that Loral was a party to two of the leases he considered and thus had already agreed to a $5 million per Gbps price to lease capacity: "Loral is one of the parties in our hypothetical negotiation locked in that room, and we know that they were willing to pay at least $5,000,000 for a gigabit of satellite because they did it [in the ViaSat/Loral beam sharing agreement]." Black Decl. Ex. D (Trial Tr. 1792:17-20). SS/L is not a party to any of the lease agreements at issue.

Black Decl. Ex. D (Trial Tr. 1801:8-10). He explained:

> We know that there were 78 additional gigabits that were on Hughes that would not have been without the patented technology. So those 78 gigabits are the incremental benefit of the technology.
>
> Now, we also know that a reasonable royalty we've talked about would be $7.5 million. Well, that's also a good relative price of the technology. So $7.5 million times 78 we reach $587.1 million.

Black Decl. Ex. D (Trial Tr. 1802:4-11).

### C.    The Jury's Royalty Award

The jury awarded a total royalty of $123 million for the alleged infringement relating to the Jupiter satellite, in addition to $58 million in lost profits. Dkt. 1014 at 9. It allocated the royalty as follows: $33.21 million for the '875 patent; $50.43 million for the '043 patent; and $39.36 million for the '827 patent. *Id.* at 10-11

## IV.    THE JURY'S $123 MILLION ROYALTY AWARD IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    A $123 Million Royalty Is Not Reasonable Because It Is More Than Six Times SS/L's Anticipated Profits on the Jupiter Satellite

An accused infringer would not sit down with a patentholder in a hypothetical negotiation and agree to a license that would guarantee the infringer to lose money. Any rational infringer would sooner refuse to manufacture than take a license that would make manufacturing unprofitable. In short, a reasonable royalty must leave room for the infringer to earn profit somewhere, or else that royalty is *per se* not reasonable.

The case law consistently recognizes this principle. *Georgia-Pacific* factor 15, for example, includes consideration of "the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay

as a royalty, <u>and yet be able to make a reasonable profit</u>." Black Decl. Ex. C (Trial Tr. 2632:20-2633:3); Black Decl. Ex. J (Trial Tr. vol. XI, 3028:17-24, Apr. 10, 2014). Likewise, the Federal Circuit has described a reasonable royalty as "the amount that a person, desiring to manufacture[, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article in the market, <u>at a reasonable profit</u>." *Applied Med. Res. Corp. v. United States Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) (quoting *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984)). It is well-accepted that "[a]mong the factors to be considered in determining [a reasonable royalty] is the infringer's anticipated profit from use of the patented invention." *Trans-World Mfg.*, 750 F.2d at 1558; *see Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1558 (Fed. Cir. 1987) (reversing district court's damages award, noting that the district court attempted to fix the royalty "so as to leave the infringer a reasonable profit" but had erroneously calculated projected profits, and stating that the case "closely parallels" *Georgia Pacific* where the award, "which would leave no profit, was set aside on appeal as excessive"); *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 299 (2d Cir. 1971) ("[W]e feel that despite the trial court's professed intention to do so, it did not allow GP a reasonable profit after paying the suppositious royalty. This is a basic error which should be corrected.").

To be sure, as this Court observed, an infringer's expected profits are not a hard limitation on damages. 2/11/14 Order at 12 (Dkt. 772) (citing *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995)). But the Federal Circuit cases relied on for this proposition hardly disprove the general rule. For example, in

*Rite-Hite*, the Court affirmed a total royalty of $1,051,875.00, which was based on the licensee's expected profits, stating that "[t]he fact that the award was not based on the infringer's profits did not make it an unreasonable award." 56 F.3d at 1555; *see Rite-Hite Corp. v. Kelley Co., Inc.*, 774 F. Supp. 1514, 1535 (E.D. Wis. 1991), *aff'd in part, vacated in part*, 56 F.3d 1538 (Fed. Cir. 1995). Although the court did not indicate the royalty was in fact higher than the infringer's anticipated profits, it cites *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989) for the proposition that "there is no rule that a royalty be no higher than the infringer's net profit margin." *Rite-Hite*, 56 F.3d at 1555 (quoting *State Indus.*, 883 F.2d at 1580). But in *State Industries,* the affirmed royalty actually exceeded the infringer's profit margin, and the Federal Circuit noted that the accused product was used to promote the rest of the infringer's non-infringing product line.[5] *State Indus.*, 883 F.2d at 1580-81. ViaSat introduced no similar such evidence at trial relating to Jupiter-1.

　　*Rite-Hite* also cites to *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983) for the proposition that a "royalty need not be less than [the] price of [the] infringing unit." *Rite-Hite*, 56 F.3d at 1555. But in *Stickle*, the infringer <u>used</u> the infringing taco shell makers, and did not make a profit from selling the infringing equipment itself. The court merely held that the price of the taco shell equipment did not serve as a cap to the royalty the infringer should pay for using

---

[5] The Federal Circuit confirmed a royalty of 3% of infringing sales, even though the infringer's profits for the 17 months preceding the date of infringement were 2.1% of sales. 883 F.2d at 1580. But during the period of infringement, the infringer's profits ranged from 5.9% to 7.3%. *Id.* at 1581.

the equipment.[6] *Id.* at 1563.

In short, to defend a royalty that exceeds SS/L's anticipated profits by six times and by $105 million, ViaSat looks to a hodgepodge of Federal Circuit cases that never actually refute the general rule that a royalty must leave room for an infringer to profit somewhere.[7] No Federal Circuit case supports the "absurd" result ViaSat seeks here. *See Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990) (concluding that expert opinions that the accused infringer "would agree to pay a royalty in excess of what it expected to make in profit … [are] absurd").

SS/L, of course, raised these objections to Dr. Slottje's analysis at the *Daubert* stage, and they were overruled. Dr. Slottje's primary pretrial defense for his model was that "SS/L would be willing to pay far more than its profit from the Jupiter-1 satellite due to the harm and monetary exposure that would occur if SS/L failed to deliver the Jupiter-1 satellite for Hughes." 2/11/14 Order Granting in Part and Denying in Part Defs.' Mot. to Exclude Opinions of ViaSat's Damages Expert

---

[6] The Federal Circuit affirmed a royalty of 4.2% of the infringer's sales price for taco shell, totaling $1.485 million. *Stickle*, 716 F.2d at 1553, 1563.

[7] The Federal Circuit's recent statements in *Apple Inc. v. Motorola, Inc.* support vacating the Jury's award. In that case, although the court stated that the price a consumer is willing to pay for an infringing feature is not necessarily indicative of what an infringer would pay to license that feature, it specifically noted that a patentee might be willing to "sacrifice" all of its profits in a licensing negotiation if it could "make its profit elsewhere." __ F.3d __, Nos. 2012–1548-49, 2014 WL 1646435, at *31 n.4 (Fed. Cir. Apr. 25, 2014). But here, there is no evidence that SS/L had any ability to "make up its profits elsewhere" – on the contrary, because the royalty was for a single satellite, each additional satellite presumably would require an equally burdensome royalty payment – and there is no other explanation for why SS/L would have been willing to "sacrifice" all of its $18 million in anticipated profits plus an additional $105 million for the benefit of a license.

3199903v4/013090

Dr. Slottje, Dkt. # 772, at 13. This Court denied SS/L's motion to exclude Dr. Slottje's opinion on that basis, reasoning that "Dr. Slottje has provided an economic rationale for SS/L to pay for extra satellite capacity." *Id.* But at trial, Dr. Slottje offered <u>no such rationale</u>. Indeed, Dr. Slottje did not even mention the alleged "reputational harm" that he had previously leaned on so heavily to support his royalty. Nor did ViaSat get that evidence in through any other witness.

ViaSat promised this Court one thing before trial, but what it delivered was very different. Instead of "reputational harm," Dr. Slottje at trial relied on Loral's position at the bargaining table to justify the extraordinary royalty he proposed, and offered no opinion on what the royalty would be if only SS/L was found to infringe. Black Decl. Ex. D (Trial Tr. 1792:17-20). Loral's deep pockets, however, are no answer to the cases requiring a royalty to leave room for profit somewhere. If Loral had been liable for infringement along with SS/L, it would have lost money on Jupiter-1 just the same as SS/L – regardless of whether it had a better financial ability to absorb such a loss. This point is moot in any event, however, because the jury determined that Loral did not infringe. As such, there is no evidence that Loral would have stepped in to assist SS/L in paying a $123 million royalty. Nor is there evidence that SS/L, as the lone infringer, had the ability to pay a $123 million royalty – let alone would agree to pay such a royalty at the hypothetical negotiation under *Georgia Pacific* factor 15.

Hughes's anticipated profits or use of the Jupiter satellite also cannot support SS/L's payment of a $123 million royalty. Before trial, ViaSat leaned on SS/L's alleged inducement of Hughes' infringement to bring Hughes' profits into play. *E.g.*, ViaSat's Opp. to Defs.' Mot. to Exclude Opinions of Dr. Slottje, at 19 (Dkt.

595). The jury, however, determined that there is no contributory or induced infringement. Absent a finding of induced infringement by SS/L or actual infringement by Hughes, a royalty cannot be based on a third party's usage or anticipated profits.[8] *See* SS/L's Mot. for JMOL (Renewed), or a New Trial (4 of 12), Regarding Double Counting of Damages, filed simultaneously herewith and incorporated by reference herein; *see Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317, 1320-22 (2d Cir. 1974) (rejecting argument that the royalty should be based upon the extent of use of the infringing product, where the defendant only manufactured and sold the product).

## B. The Capacity Lease Agreements Were Improperly Considered and Do Not Support the Royalty

The jury's $123 million royalty award also cannot stand because the royalty depends entirely on a price per Gbps figure derived from capacity leases that are "radically different from the hypothetical agreement under consideration" and are not at all probative of the value of the patented technology. *Lucent Techs.*, 580 F.3d at 1327. The downstream capacity leases are not reflective of the value of the patented technology to SS/L – that is, the value to SS/L of the technology that allegedly would allow it to design Jupiter with increased capacity. Black Decl. Ex. C (Trial Tr. 2628:17-2632:1). Moreover, Dr. Slottje did not adjust for the value of the other consideration included in the leases. Black Decl. Ex. C (Trial Tr. 2630:23-2631:19).

"[A] patentee [may] not rely on license agreements that [are] 'radically

---

[8] Even if Hughes' use of the Jupiter satellite were a proper consideration, the jury determined that ViaSat lost $58 million in lost profits for that use. This is insufficient to support a $123 million royalty.

different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc*, 632 F.3d at 1316 (quoting *Lucent Techs.*, 580 F.3d at 1327). Instead, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in th[e] case." *Id.* at 1317. Comparable licenses must be "commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *ResQNet.com*, 594 F.3d at 872.

As a matter of law, the capacity leases upon which Dr. Slottje relied cannot provide support for a $123 million royalty. Dr. Slottje admitted that the capacity leases are not patent licenses and are not relevant as comparable licenses under *Georgia Pacific* factors 1, 2, or 12. Black Decl. Ex. F (Trial Tr. vol. VIII, 1882:15-20, 1890:21-1891:2, Apr. 4, 2014).[9] Indeed, Dr. Slottje admitted there are <u>no</u> patent licenses relevant to the determination of a reasonable royalty in this case. Black Decl. Ex. D (Trial Tr. 1781:17-1782:1). He further admitted that the capacity leases

---

[9] Dr. Slottje's consideration of the capacity leases and proposed leases under *Georgia-Pacific* factor 11, rather than as "comparable licenses" under factor 1, is a distinction without a difference. In *DataQuill Ltd. v. High Tech Computer Corp.*, the plaintiff's expert purported to consider under *Georgia-Pacific* factor 11 the accused infringer's "revenue sharing agreement" with a third party to "bolster his reasonable royalty opinion." No. 08cv543, 2012 WL 1284381, at *6 (S.D. Cal. Apr. 16, 2012). The court noted, however, that in practice the expert was actually "attempting to use the [profit sharing] agreement as if it were a prior license under *Georgia-Pacific* factor 1 or 2 or a customary rate under factor 12." *Id.* at *7. Similarly, here, Dr. Slottje improperly attempted to adopt wholesale the value of capacity leases and proposed leases as the value of the patented technology – even though he admitted they are not comparable licenses – by compartmentalizing his analysis under *Georgia-Pacific* factor 11.

are downstream leases for capacity on fully built, insured, and launched satellites; the lessors did not bear any of the risk of building or launching the satellite; and the leases do not include a license to the patented technology. Black Decl. Ex. F (Trial Tr. 1883:8-1884:5; 1890:21-1891:2). Yet he did not explain how the capacity leases reflected how the parties would value the patents at the hypothetical negotiation – as opposed to how the downstream market allegedly valued much smaller amounts of capacity, presumably sold at a profit, on a built, insured, and launched satellite. He stated only that the leases reflected "market data for what per-gigabit prices would be in free market arm's length transactions." Black Decl. Ex. F (Trial Tr. 1888:13-15).

Dr. Slottje also did not place any value on the other elements involved in the capacity leases. Each of the agreements involve, at a minimum, the sale, lease, or assignment of a portion of the capacity on a completed satellite. Many involve other price components, including the price of gateway services, launch and insurance costs, costs to manufacture a satellite, and other consideration. Black Decl. Ex. C (Trial Tr. 2630:9-22); Black Decl. Ex. F (Trial Tr. 1886:20-1887:2). Dr. Slottje did not place any value on these additional components when he determined the alleged "market value" of capacity each lease represents. Instead, he merely discounted the leases to their present value and divided the total dollars by the amount of capacity being leased. Black Decl. Ex. F (Trial Tr. 1885:20-1886:2).

The outlandishness of Dr. Slottje's analysis can be seen through simple multiplication. If one were just to multiply the approximately 110 Gbps capacity of Jupiter-1 by $7.5 million/Gbps, the resulting figure ($825 million) far exceeds the $250 million purchase price of Jupiter-1. Undeniably, therefore, Dr. Slottje's $7.5

million/Gbps in no way values capacity to SS/L, but rather purports to measure the entire value of capacity to Hughes – if Hughes ever were to decide to sell or lease capacity downstream after having purchased, insured and launched a satellite.

Nevertheless, Dr. Slottje repeatedly and misleadingly testified that the capacity leases on which he relied are "precisely what we're trying to contemplate" and that "the ViaSat-1 technology that's at issue in this case is exactly the technology that's being discussed and being leased in this agreement." Black Decl. Ex. D (Trial Tr. 1785:9, 1787:1-12). But his failure to conduct any real analyses of the leases, his failure to factor in the value of the other aspects of the leases, and the lack of evidence demonstrating the comparability of these leases to a license for ViaSat's patents makes clear that ViaSat has entirely failed to establish the necessary relationship between these capacity leases and the hypothetical negotiation in this case. *Uniloc*, 632 F.3d at 1316-17 (precluding reliance on "radically different" license agreements and requiring "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue"); *ResQNet.com*, 594 F.3d at 872 (requiring that comparable licenses be "commensurate with what the defendant has appropriated").[10]

The only possible explanation for the comparability of these leases is that

---

[10] Dr. Slottje claimed that he took these "other considerations going the other way" into account by using a 15.5% discount rate. Black Decl. Ex. F (Trial Tr. 1889:12-23). But applying a higher discount rate than Dr. Slottje otherwise would use does not make up for the fact that the amount paid in the leases was for much more than just capacity. Indeed, as this Court observed, the unavailability of comparable patent licenses is not an excuse to use other non-comparable licenses simply because "this is the best value out there." Black Decl. Ex. A (2/07/14 Hearing Tr. at 15:19). Nor can the use of a "higher" discount rate excuse other deficiencies in the analysis.

SS/L would have needed to go out and lease capacity itself for Hughes if it did not license ViaSat's patents, but there is absolutely no evidence that SS/L could or would have done so, given the lack of any such obligation under its contract with Hughes. Black Decl. Ex. F (Trial Tr. 1857:12-21); *see* Dkt. No. 535 at 15-17. Indeed, Dr. Slottje could not name a single other satellite manufacturer who had ever done so to meet a customer's capacity needs. Black Decl. Ex. F (Trial Tr. 1857:24-1858:12).[11]

Finally, it is no answer that the jury's $123 million royalty is less than the $7.5 million/Gbps that Dr. Slottje sponsored.[12] ViaSat's impermissible reliance on the lease agreements permitted it to pursue a damages figure that was ungrounded in reality, yet which conditioned the jury to large numbers. *Cf. Uniloc*, 632 F.3d at 1320 (noting that improper disclosure of total revenue from the accused product "cannot help but skew the damages horizon for the jury"). It is therefore not surprising that the jury felt comfortable in awarding ViaSat a royalty almost seven times more than SS/L's anticipated profits.

### C.      There Is Insufficient Evidence to Support the Alleged Capacity Increase

The Jury's royalty award cannot stand for the additional reason that there is

---

[11]  Jury Instruction No. 57 does not overcome the deficiencies in Dr. Slottje's analysis. His entire royalty analysis was based on incomparable capacity leases that he improperly valued that are not probative of the value of the use in the invention. Even assuming the Jury agreed and disregarded the leases from their assessment of damages, they were left with no support for a $123 million royalty.

[12] The $123 million royalty amounts to less than $7.5 million/Gbps in capacity only if one assumes that the jury found that ViaSat's inventions truly contributed 78 Gbps of capacity to Jupiter-1, a point that was disputed at trial. The jury just as easily could have awarded ViaSat its whole $7.5 million/Gbps, but found only a 16.4 Gbps capacity increase.

insufficient evidentiary support for the assumption that ViaSat's patents led to a 78 Gbps capacity increase on the Jupiter satellite. Dr. Slottje based his assumption on the opinion of ViaSat's "technical experts." Black Decl. Ex. D (Trial Tr. 1766:4-8). But the testimony of those experts (Dr. Bartone and Mr. Sturza) regarding the alleged capacity increases on a patent-by-patent basis was insufficient to support the jury's award:

**875 Capacity Increase:** Dr. Bartone testified as follows concerning the alleged increase of capacity from the '875 patent:

> In my infringement report that I produced, I went and I looked at the incremental capacity that is gained by the Jupiter satellite system as a result of using the '875 patent.
>
> So what I did was I looked at the configuration without the benefits of the '875, and I found that if you took -- you would take away 35.33 gigabytes per second, which equates to 33.02-percent reduction.
>
> Q: And how does your own analysis compare to what we just saw from Mr. Chan?
>
> A: You know, it's very close. And in fact, my estimate, which I based on the Jupiter satellite system, I divided the frequency spectrum, and I did it on a beam-by-beam basis. And my estimate is actually more conservative than Hampton Chan's estimate.
>
> Q: And just to clarify, what is the gigabits per second that you have attributed to the '875 patent?
>
> A: That's this number. That's this 36.33 gigabits per second.

Black Decl. Ex. D (Trial Tr. 1544:5-23).

Dr. Bartone's analysis is an incorrect methodology for calculating the alleged capacity increase attributable to the '875 technology because it does not focus on "the full" scope of ViaSat's claims. *Cf. Apple*, 2014 WL 1646435, at *21-22 (stating that it is proper for damages to focus on the full scope of the claims rather than a single claim limitation). Dr. Bartone focused only on one single claim

limitation – the full separation of gateway and user beams present in dependent Claim 12 – and ignored the elements in Claim 1 (on which Claim 12 depends, and which Jupiter must practice to infringe Claim 12) that actually <u>decrease</u> capacity – the overlapping gateway and user beams. Put another way, a hypothetical satellite would <u>not</u> infringe if it merely fully separated some user beams and gateways per Claim 12 – the feature upon which Dr. Bartone focused his entire capacity analysis. A satellite only infringes dependent Claim 12 if it <u>also</u> includes overlapping gateways and user beams per independent Claim 1. And adding overlapping gateways and user beams to a non-infringing, fully-separated beam map would, at most, cause a reduction in capacity of only 5%. Black Decl. Ex. F (Trial Tr. 1925:21-1927:2) (Hughes's Vice President David Roos's unrebutted testimony that if the three overlapping user beams were shut off, Jupiter would lose less than 5% capacity); *see* Black Decl. Ex. C (Trial Tr. 2502:4-10) (Chan testimony that eliminating overlapping user beams and relocating an overlapping gateway would result in a net reduction of .1 Gbps of capacity). Thus, Dr. Slottje's assumption of a 36.33 Gbps increase in capacity attributable to the '875 patent is without support.

**'043 Capacity Increase:** The expert testimony Dr. Slottje relied on for the alleged capacity increase from the '043 patent was similarly brief and conclusory:

> Q: And you testified that you conducted an analysis of the incremental capacity achieved by the Jupiter satellite by practicing these claims of the '043 patent we've already walked through?
>
> A: Yes.
>
> Q: Okay. Explain for the jury what you're showing here.
>
> A: Okay. This is an excerpt from V-176, the Jupiter critical design review presentation, and you can see the forward and return aggregate capacity. And in my analysis, I've shown that 41.34 percent of that would be lost without the use of the '043 patent.

Q: Okay. And what is this next slide, slide 53, showing?

A: This is how I did my analysis. I looked at a seven color reuse system compared to Jupiter's four, without using the '043 invention, and I computed the capacity at .31 bits per hertz compared to the .52. I computed for the four color Jupiter system.

Q: And on this next slide, what are you showing?

A: So here showing that 41.34 percent reduction in capacity, 45.48 gigabits per second capacity lost.

Black Decl. Ex. D (Trial Tr. 1663:21-1664:10). Mr. Sturza offered no explanation as to why he considered that the non-infringing alternative would be a seven-color system to calculate the increase in capacity, and there is no evidence in the record to support such an assumption. Black Decl. Ex. D (Trial Tr. 1664:3-7). Moreover, ViaSat's own evidence showed that slightly modified beam spacings would reduce capacity by only a small amount and would not infringe. Black Decl. Ex. F (Trial Tr. 2002-06; 2013:21-2014:1). Thus, Dr. Slottje's assumption that the '043 patent increased Jupiter's capacity by 45.48 Gbps is grossly overstated and without support.

**'827 Capacity Increase:** Mr. Sturza relied on the capacity available from the NGSO spectrum to calculate the capacity increase attributable to the '827 patent:

SS/L indicated that without NGSO spectrum, with NGSO disabled, the forward link would drop to 59.18, and the return aggregate on the bottom line drops to 21.6. And so that is easily calculated, which I did, as the 38.7 percent reduction of capacity on forward link and 29.2 percent on the return link. So the total capacity of the Jupiter-1 satellite using the NGSO spectrum was 110.01 gigabits per second, just adding up the numbers in Loral's table. Without the NGSO spectrum, it's 80.78 gigabits per second. Again, just adding up the numbers in the table, it's approximately 30 gigabits per second of capacity lost without the '827 invention.

…

Q: Okay. So what's this last slide here? What are you showing the jury?

1
2

> A: So this is showing that there's a total 26.58 percent reduction, equivalence of 29.23 gigabits per second capacity loss in the Jupiter-1 system without the advantage of the '827 patent.

3
4

Black Decl. Ex. D (Trial Tr. 1689:22-1692:2). Yet the capacity increase that Mr.

5

Sturza attributed to the '827 technology is not due to ViaSat's invention; instead, it

6

arises simply from Jupiter's use of the NGSO spectrum in the first place. But

7

ViaSat did not invent the use of the NGSO spectrum. Rather, ViaSat's invention

8

addresses a way to maintain use of the NGSO spectrum in the event that an NGSO

9

satellite launches – an event that has not yet occurred and is not predicted to occur

for the foreseeable future.

10

In fact, Mr. Sturza admitted that a one-way kill switch on a satellite that

11

utilized the NGSO spectrum would not infringe the '827 patent. Black Decl. Ex. D

12

(Trial Tr. 1721:6-8). At the present date, because no NGSO satellites have been

13

launched, there would be no difference in capacity between Jupiter and a non-

14

infringing alternative with such a kill switch. There is, accordingly, zero capacity

15

increase attributable to the '827 technology. Alternatively, the capacity increase

16

analysis must discount the increase in capacity attributable to use of the NGSO

17

spectrum by the risk that NGSO interference will never occur. Mr. Sturza factored

18

in no such discount. Thus, Dr. Slottje's assumed 30 Gbps increase in capacity was

19

without basis.[13]

20

---

21

[13] In any event, the jury's allocation of 32% of the royalty to the '827 technology

22

(and 28% to the '875, apparently mixing up the alleged capacity increase of the two patents) is unsupported, and Hughes's Executive Vice President and General

23

Manager North America Division, T. Paul Gaske testified that without the NGSO spectrum, Jupiter would realize only a 22 Gbps decrease in capacity. Black Decl.

24

Ex. C (Trial Tr. 2593:14-20).

Thus, there is insufficient evidentiary support for the assumption that ViaSat's patents led to a 78 Gbps capacity increase on the Jupiter satellite. To the contrary, the overwhelming evidence suggests that SS/L could have built more than a 32 Gbps satellite without using ViaSat's technology. For example, it is undisputed that SS/L built a 45 Gbps satellite (iPSTAR) that ViaSat did not accuse of infringement, and that this satellite would have achieved 110 to 130 Gbps had it been built as a Ka-band only satellite over the United states. Black Decl. Ex. F (Trial Tr. 1860-65); Black Decl. Ex. F (Trial Tr. 2102-03). Dr. Slottje's only explanation was that he understood iPSTAR used Ku-band.

Additionally, Boeing and Lockheed Martin both bid the Jupiter-1 project and proposed a satellite at or around 100 Gbps, and neither company is accused of offering to sell an infringing satellite. Black Decl. Ex. G (Trial Tr. vol. II, 279:22-24, Mar. 26, 2014). And the 45 Gbps NBN satellite – which Dr. Slottje assumed infringed and assumed had a capacity increase attributable to the '043 technology – does not infringe ViaSat's patents. Black Decl. Ex. G (Trial Tr. 279:19-24); Black Decl. Ex. D (Trial Tr. 1805:7-16).

Even Mr. Dankberg admitted on the first day of trial that one could "build and launch a 100-gigabit-per-second satellite and that doesn't necessarily mean they've stolen anything from [ViaSat]." Black Decl. Ex. H (Trial Tr. vol. I, 234, Mar. 25, 2014); Black Decl. Ex. F (Trial Tr. 1874). Dr. Slottje admitted that he had not even considered that Mr. Miller acknowledged a 100 Gbps satellite design in August 2006 that did not infringe any of the patents. Black Decl. Ex. F (Trial Tr. 1865-71); *see* Black Decl. Ex. I (Ex. S-283). Dr. Slottje's only response was that such a satellite would be "economically infeasible," but offered no analysis – even

so little as a cost estimate – to support that conclusion. Black Decl. Ex. F (Trial Tr. 1875).

Of course, SS/L also proposed a variety of non-infringing alternative designs through its experts that also belie Dr. Slottje's assumed 78 Gbps increase in capacity. Black Decl. Ex. D (Trial Tr. 1720-21); Black Decl. Ex. F (Trial Tr. 1925-30, 1936-37, 1983-84, 1995-97); Black Decl. Ex. C (Trial Tr. 2500:10-2506:16). ViaSat did not provide sufficient evidence showing that those alternatives would have been infringing, infeasible, unavailable to SS/L, or unacceptable to Hughes.[14]

### D.   Other *Georgia Pacific* Factors Do Not Support the Jury's Award

None of the other *Georgia-Pacific* factors support a $123 million royalty. Dr. Slottje admitted that there are no established or comparable licenses under *Georgia Pacific* factors 1 or 2. Black Decl. Ex. F (Trial Tr. 1882, 1890-91). He admitted the nature and scope of the license under factor 3 would not affect the royalty rate. Black Decl. Ex. D (Trial Tr. 1793:18-20). He admitted that there are no convoyed sales under factor 6 and that the duration of the patent and term under factor 7 would not affect the royalty rate. Black Decl. Ex. D (Trial Tr. 1794:20-23). Dr.

---

[14] For the '875, Dr. Bartone simply testified Jupiter would be "locked down" after the date of the critical design review such that it would be "very, very difficult" to move gateways to eliminate any overlapping gateway and user beams. Black Decl. Ex. D (Trial Tr. 1547:20-25). Mr. Sturza's testimony on the '043 non-infringing alternatives was similarly cursory; he merely stated that SS/L "had not implemented any design in terms of the design around," that he was "not aware of any commercially offered products that would provide viable noninfringing alternatives," and that the other "potential options" "would have essentially drastic reduction in capacity of the system, but they wouldn't be viable." Black Decl. Ex. D (Trial Tr. 1665:6-19). Regarding the '827, he testified that the only viable alternative was to refrain from using the NGSO spectrum altogether. Black Decl. Ex. D (Trial Tr. 1720:3 – 1721:8).

Slottje did not even discuss factors 10 and 12-14, but instead stated that the remaining factors did not require an adjustment. Black Decl. Ex. D (Trial Tr. 1796:13-15).

Dr. Slottje's analysis of the remaining *Georgia-Pacific* factors was conclusory, vague, and insufficient to support the jury's award. The evidence under factor 4, according to Dr. Slottje, was that ViaSat did not want to "license their technology unless they're involved in the project," and would not "want to be giving a license ... at any cheap rate to anybody that you are ... competing" with. Black Decl. Ex. D (Trial Tr. 1793:23-25, 1794:13-16). According to Dr. Slottje, this would "suggest a high rate." Black Decl. Ex. D (Trial Tr. 1794:17). But certainly this does not support a rate that is more than six times anticipated profit, and over half the price of the satellite itself. Nor is Dr. Slottje's conclusory and vague statement concerning the effect of this factor on the royalty rate sufficient to support any royalty. *Whitserve,* 694 F.3d at 31-32.

Dr. Slottje's of factor 6 was similarly deficient. Dr. Slottje deemed it "common sense" that because Jupiter was "going to be sold to Hughes who is the direct competitor of ViaSat," the license would not be "at any cheap rate." His conclusion was merely this: "So they would expect a high rate for that as well, and that's why those two factors [are] up there [on the demonstrative]." Black Decl. Ex. D (Trial Tr. 1794:17-19). But again, Dr. Slottje provided no basis for how this factor could support a license that is $105 million more than SS/L's anticipated profits.

Dr. Slottje's discussion of factor 8 – the established profitability of the patented product, its commercial success and its current popularity – was also

insufficient. He pointed to the $77 profit per subscriber per quarter figure he calculated for ViaSat's broadband subscription service and concluded: "So that would suggest an upward error." Black Decl. Ex. D (Trial Tr. 1795:19-20). He failed to note that the profits earned on the entire Jupiter satellite were less than $30 million, that it was one single sale, and that his profits per subscriber figure failed to include over $150 million in subscriber acquisition costs.

Under factor 9 – the utility and advantages of the patent property over any old modes or devices that had been used – Dr. Slottje merely referred to the 78 Gbps capacity increase allegedly attributable to ViaSat's patents. Black Decl. Ex. D (Trial Tr. 1795:21-24). Not only is Dr. Slottje's vague and conclusory statement concerning factor 9 insufficient to support any royalty, but as set forth above, the 78 Gbps increase he assumed is unsupported by the evidence.

### E.     The Analytical Method Does Not Support the Jury's Award

Dr. Slottje's analysis under the "analytical method" also cannot support a $123 million royalty. His analysis exclusively relied on the capacity leases described above, which are not comparable and are not probative of the value of any use of the patented technology, let alone reflective of "the infringer's projections of profit for the infringing product" – which of course, here, was only $18 million. *Lucent Techs.*, 580 F.3d at 1324 (emphasis added); *see TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (describing the analytical method as "subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices"); *Sloan Valve Co. v. Zurn Indus., Inc.*, __ F. Supp. 2d __, No. 10-cv-00204, 2014 WL 1245101, at *2 (N.D. Ill. Mar. 26, 2014) (stating that the analytical method "focuses on the

infringer's projections of profit for the infringing product"); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l., Inc.*, No. C03-1431, 2006 WL 1390416, at *7 (N.D. Cal. May 18, 2006) ("The analytical method ... takes the profits of <u>the infringer</u>, subtracts <u>the infringer's</u> normal profit, and awards some portion of the remainder to the patent owner.") (quoting the Practice Aid of the American Institute of Certified Public Accountants, "Calculating Intellectual Property Damages) (emphasis added).

### F.  The Maximum Royalty Is $1.6 Million

As set forth above, the evidence does not support a $123 million royalty. The maximum royalty supported by the evidence is the reasonable royalty that SS/L's expert suggested -- $1,636,148. Black Decl. Ex. C (Trial Tr. 2634:18-22).

## V.  CONCLUSION

For the reasons stated above, SS/L's JMOL motion should be granted that ViaSat is not entitled to any more than a reasonable royalty of $1,636,148, or in the alternative, a new trial on reasonable royalty damages should be granted.

3199903v4/013090

Dated: June 13, 2014                    By: _/s/ Rachel S. Black_____

Marc M. Seltzer
Amanda K. Bonn
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
Email: abonn@susmangodfrey.com

William Christopher Carmody
(Admitted *Pro Hac Vice*)
Jacob W. Buchdahl
(Admitted *Pro Hac Vice*)
Mark Musico
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340

Joseph S. Grinstein
(Admitted *Pro Hac Vice*)
William R. H. Merrill
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  713-653-7856
Facsimile:   713-654-6666
Email: jgrinstein@susmangodfrey.com
Email: bmerrill@susmangodfrey.com

Ian B. Crosby
(Admitted *Pro Hac Vice*)
Rachel S. Black
(Admitted *Pro Hac Vice*)
Patrick C. Bageant
SUSMAN GODFREY L.L.P.

3199903v4/013090

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3861
Fax: (206) 516-3883
Email: icrosby@susmangodfrey.com
Email: rblack@susmangodfrey.com
Email: pbageant@susmangodfrey.com

*Attorneys for Defendants/Counterclaim
Plaintiffs Space Systems/Loral, LLC (f/k/a
Space Systems/Loral, Inc.) and Loral Space
& Communications Inc.*

No. 3:12-cv-00260-H-WVG

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that, on June 13, 2014June 13, 2014 I caused the foregoing **SS/L'S**

3

**MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED), OR A**

4

**NEW TRIAL (2 OF 12), REGARDING REASONABLE ROYALTY**

5

6

**DAMAGES** to be served on opposing counsel via the Court's CM/ECF system.

7

8

Dated: June 13, 2014                              By:  _/s/ Rachel S. Black_____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3199903v4/013090