1   William Christopher Carmody
    (Admitted *pro hac vice*)
2   Jacob W. Buchdahl
    (Admitted *pro hac vice*)
3   SUSMAN GODFREY L.L.P.
4   560 Lexington Avenue, 15th Floor
    New York, New York 10022
5   Telephone:  (212) 336-8330
    Facsimile:   (212) 336-8340
6   Email: bcarmody@susmangodfrey.com
7   Email: jbuchdahl@susmangodfrey.com

8   Marc M. Seltzer (54534)
    SUSMAN GODFREY L.L.P.
9   1901 Avenue of the Stars, Suite 950
    Los Angeles, CA 90067-6029
10  Telephone:  (310) 789-3100
    Facsimile:   (310) 789-3150
11  Email: mseltzer@susmangodfrey.com

12  [Additional counsel listed below signature line]

13  *Attorneys for Defendants*

14

15              **UNITED STATES DISTRICT COURT**

16            **SOUTHERN DISTRICT OF CALIFORNIA**

17
    VIASAT, INC.,                          | Case No. 3:12-cv-00260-H-WVG
18
              Plaintiff,                    | Hon. Marilyn L. Huff
19       vs.
20  SPACE SYSTEMS/LORAL, INC.,              | **SS/L'S MOTION FOR JUDGMENT**
    LORAL SPACE &                           | **AS A MATTER OF LAW**
    COMMUNICATIONS INC.,                    | **(RENEWED), OR A NEW TRIAL**
21                                          | **(12 OF 12), REGARDING BREACH**
              Defendants/Counterclaim       | **OF CONTRACT**
22            Plaintiffs.
23                                          | Date: July 22, 2014
                                            | Time: 9:00 a.m.
24                                          | Place: Courtroom 15A

3177018v1/013090

# TABLE OF CONTENTS

**Page(s)**

I.    LEGAL STANDARD ...................................................................... 2

    A.    Judgment as a Matter of Law ............................................... 2

    B.    Motion for New Trial ........................................................... 2

II.    BUILD CONTRACT ARTICLES 22 & 39 .................................... 3

    A.    Legal Framework ................................................................. 3

    B.    Article 39 of the Build Contract .......................................... 4

        1.    Article 39.2(B) ......................................................... 5

            a.    Limited License Provision .............................. 5

            b.    No Reciprocal Promise ................................... 6

            c.    Article 39.2(B) Is Not a Non-Compete Agreement ......... 8

        2.    Article 39.2(D) ......................................................... 11

            a.    ViaSat Has No IP Rights in Option 3 ............. 11

            b.    ViaSat Has No IP Rights in Provisional Patent Applications ................................................. 13

            c.    ViaSat Has No IP Rights in Other Concepts ... 13

    C.    Article 22 of the Build Contract .......................................... 14

III.    MARCH 2006 NDA & BUILD CONTRACT ARTICLE 28 ........... 15

    A.    Contractual Prerequisites ..................................................... 15

        1.    ViaSat Concedes that No Information Exchanged Before May 4, 2007, Was Marked "Proprietary." ................. 16

        2.    The Parties Did Not Waive the Marking Requirement. ... 16

    B.    Alleged Proprietary Information ........................................... 17

        1.    C/I Test ...................................................................... 18

2.  Capacity Tool.........................................................................18

3.  Dynamic NGSO Switching ...................................................20

4.  Four-Color Reuse Scheme ....................................................22

5.  Spatially Separated Gateways and User Beams ........................22

6.  Partial CONUS Coverage .....................................................23

7.  ViaSat-1 Specification (Including Beam Placement Plan)........23

C.  Option 3 / Burr Patent Application .......................................................24

IV.  EQUITABLE ESTOPPEL .............................................................................24

V.  CONCLUSION ..............................................................................................25

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*805 Third Ave. Co. v. M.W. Realty Associates,*
  58 N.Y.2d 447, 448 N.E.2d 445 (1983) ............................................................. 3

*Am. Inst. of Chem. Engineers v. Reber-Friel Co.,*
  682 F.2d 382 (2d Cir. 1982) ..................................................................... 10

*Beal Sav. Bank v. Sommer,*
  8 N.Y.3d 318, 834 N.Y.S.2d 44 , 865 N.E.2d 1210 (2007) ............................... 4

*Bottlers' Seal Co. v. Rainey,*
  122 N.E. 200 (N.Y. 1919) ......................................................................... 5

*City Solutions, Inc. v. Clear Channel,*
  Commc'ns, 365 F.3d 835 (9th Cir. 2004) ...................................................... 2

*Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.,*
  42 N.Y.2d 496, 369 N.E.2d 4 (1977) ........................................................... 9

*Convolve, Inc. v. Compaq Computer Corp.,*
  527 F. App'x 910 (Fed. Cir. 2013) ..................................................... 12, 16, 17

*DAR & Associates, Inc. v. Uniforce Servs., Inc.,*
  37 F. Supp. 2d 192 (E.D.N.Y. 1999) ........................................................... 10

*Dillon v. Cobra Power Corp.,*
  560 F.3d 591 (6th Cir. 2009) .................................................................... 17

*Elgin Nat. Watch Co. v. Bulova Watch Co.,*
  281 A.D. 219 (N.Y. App. Div. 1953) ............................................................ 5

*Eli Lilly & Co. v. Emisphere Technologies, Inc.,*
  408 F. Supp. 2d 668 (S.D. Ind. 2006) ......................................................... 7, 8

*Eli Lilly & Co. v. Genentech, Inc.*,
 1990 WL 305392 (S.D. Ind. July 17, 1990) .......................................................5

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
 304 U.S. 175 (1938) ...........................................................................................5

*Grossman v. New York Life Ins. Co.*,
 90 A.D.3d 990 (N.Y. App. Div. 2011) ................................................................7

*Imation Corp. v. Koninklijke Philips Electronics N.V.*,
 586 F.3d 980 (Fed. Cir. 2009) .......................................................................4, 5

*In re Marriage of Recknor*,
 138 Cal. App. 3d 539 (Cal. Ct. App. 1982) .....................................................25

*Kahn v. New York Times Co.*,
 122 A.D.2d 655 (N.Y. App. Div. 1986) ..............................................................6

*Loiseau v. VISA USA Inc.*,
 2010 WL 4542896 (S.D. Cal. Feb. 10, 2010) ..................................................21

*Lucent Techs., Inc. v. Gateway Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) .........................................................................2

*Mallinckrodt, Inc. v. Medipart, Inc.*,
 976 F.2d 700 (Fed. Cir. 1992) ...........................................................................5

*Murphy v. City of Long Beach*,
 914 F.2d 183 (9th Cir. 1990) .............................................................................3

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.*,
 679 N.E.2d 624 (N.Y. 1997) .............................................................................7

*Princo Corp. v. Int'l Trade Comm'n*,
 616 F.3d 1318 (Fed. Cir. 2010) .......................................................................10

*Roseview Farms, Inc. v. Pfister*,
 198 A.D.2d 339 (N.Y. App. Div. 1993) ............................................................25

*Schron v. Troutman Sanders LLP*,
   986 N.E.2d 430 (N.Y. 2013) ........................................................................ 7

*Seidman v. Indus. Recycling Props., Inc.*,
   106 A.D.3d 983 (N.Y. 2013) ....................................................................... 21

*Silverstein v. Shell Oil Co.*,
   40 A.D.2d 34(N.Y. App. Div. 1972), ........................................................... 9

*St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*,
   101 Cal. App. 4th 1038 (2002) .................................................................... 21

*The Johns Hopkins Univ. v. Datascope Corp.*,
   543 F.3d 1342 (Fed. Cir. 2008) .................................................................... 2

*United States v. 4.0 Acres of Land*,
   175 F.3d 1133 (9th Cir. 1999) ..................................................................... 2

*United States v. Kellington*,
   217 F.3d 1084 (9th Cir. 2000) ..................................................................... 3

*Westmoreland Coal Co. v. Entech, Inc.*,
   100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003) ......................... 4

*William Inglis v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 –7 (9th Cir. 1981) ................................................................. 2

*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .................................................................... 2

**Statutes**

35 U.S.C. § 154(d) ............................................................................. 9, 12, 13

**Rules**

Fed. R. Civ. P. 50 ..................................................................................... 1

1

Fed. R. Civ. P. 59.................................................................................................2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1 | Space Systems/Loral, LLC ("SS/L") moves[1] for judgment as a matter of law
2 | that SS/L did not breach either the March 2006 NDA (Ex. B[2], S-552; Ex. C, S-547)
3 | or the ViaSat-1 Build Contract (Ex. D, V-188). Alternatively, SS/L moves for a
4 | new trial on breach of contract under Rule 59.

5 | ViaSat's breach of contract allegations can be divided into two categories:
6 | (1) those involving Articles 22 and 39 of the Build Contract, and (2) those
7 | involving the March 2006 NDA and the non-disclosure provision (Article 28) of the
8 | Build Contract (the "NDAs"). SS/L could not have breached the limited license
9 | provisions in Articles 22 and 39 of the Build Contract, whereby ViaSat merely
10 | waived its right to sue as long as SS/L used ViaSat alleged IP within the scope of
11 | its license. To the extent Articles 22 and 39 contain affirmative prohibitions on
12 | SS/L, ViaSat failed to provide substantial evidence from which the jury could
13 | reasonably find a breach. Meanwhile, by the plain terms of the NDAs, ViaSat could
14 | not prove breach of the March 2006 NDA or Article 28 of the Build Contract
15 | without proving SS/L disclosed information that was (1) marked as proprietary to
16 | ViaSat; (2) not already known to SS/L, and (3) not publicly known. The trial record
17 | is devoid of evidence from which the jury could find a disclosure by SS/L meeting
18 | all of these criteria. Judgment as a matter of law is appropriate.

19

20

21 | [1] SS/L hereby moves for judgment as a matter of law ("JMOL") pursuant to Rule 50(a) and,
22 | pursuant to Rule 50(b), renews the motion for JMOL that it made before the close of evidence. Alternatively, SS/L moves for a new trial pursuant to Rule 59.

23 | [2] Unless otherwise stated, all exhibits referenced herein are attached to the Declaration of Mark
24 | Musico in Support of Defendants' Motion for Judgment as a Matter of Law (Renewed), or a New Trial (12 of 12), Regarding Breach of Contract, filed concurrently herewith. References to "Trial Tr." are included in Exhibit A.

# I.   LEGAL STANDARD

## A.   Judgment as a Matter of Law

Judgment as a matter of law ("JMOL") may be granted and a jury verdict can be overturned "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009). "[D]istrict court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Id.* at 1336. Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008).

## B.   Motion for New Trial

Whether to grant a new trial on some or all issues, pursuant to Fed. R. Civ. P. 59, is a matter of the trial court's discretion. *City Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 843 (9th Cir. 2004). Courts apply a lower standard of proof to motions for new trial than they do to JMOL motions. *William Inglis v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1026–7 (9th Cir. 1981) "[T]he trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)). In deciding a motion for new trial, the court "has the right, and indeed the duty, to weigh the evidence" and may evaluate the credibility of the

witnesses. *Murphy v. City of Long Beach*, 914 F.2d 183 (9th Cir. 1990); *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). The court is not required to view the evidence from the perspective most favorable to the prevailing party. *Kellington*, 217 F.3d at 1095.

## II. BUILD CONTRACT ARTICLES 22 & 39

There is not substantial evidence in the record from which the jury could conclude SS/L breached Articles 22 or 39 of the Build Contract. Article 39.2(B) is a mere limited license whereby ViaSat waived its right to sue as long as SS/L used ViaSat alleged IP within the scope of its license. Article 39.2(D), meanwhile, does impose affirmative prohibitions on reverse engineering or filing for patents on ViaSat IP. But the only evidence introduced by ViaSat as to this provision related to SS/L's alleged filing of a patent on the "Option 3 email," which as a matter of law is not ViaSat IP and thus cannot form the basis for a breach of contract.

Article 22 has a parallel set of licenses and prohibitions regarding ViaSat's capacity tool. Article 22.2.3 simply grants SS/L a limited license to use the capacity tool for work on the ViaSat-1 project, so there can be no claim for "breach of this provision. While Article 22.2.4 imposes affirmative prohibitions on, for example, reverse engineering the tool, there is no evidence that SS/L breached the affirmative promises it made in Article 22.2.4.

### A. Legal Framework

The Build Contract is governed by New York law. Ex. D (V-188) at 120 § 34.12. There has been no suggestion by either party that the language of the Build Contract is ambiguous. The contract interpretation issues raised in this motion are thus purely legal matters for resolution by the Court. *805 Third Ave. Co. v. M.W.*

*Realty Associates*, 58 N.Y.2d 447, 451, 448 N.E.2d 445, 447 (1983). The Federal Circuit, applying New York law, summarized the relevant background principles of contract interpretation:

> Under New York law, "[c]onstruction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 47-48, 865 N.E.2d 1210, 1213-14 (2007). New York courts construe contracts "so as to give full meaning and effect to the material provisions," mindful that a proper "reading of the contract should not render any portion meaningless." *Id.* "Further, a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Id.* (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667, 670 (2003)).

*Imation Corp. v. Koninklijke Philips Electronics N.V.*, 586 F.3d 980, 985 (Fed. Cir. 2009). As to any factual matters, ViaSat has failed to provide sufficient evidence to establish a breach of the Build Contract.

**B.     Article 39 of the Build Contract**

The limited license provision of Article 39.2(B) provides:

> Subject to the terms of this Contract, [ViaSat] **grants to [SS/L] a nonexclusive, nontransferable, royalty-free license** during the term of this Contract, with no right to sublicense (except to Subcontractors), under Purchaser Intellectual Property only **to the extent necessary to provide the Work under this Contract**.

Ex. D at SSL0099862-63 (emphasis added). Article 39.2(D), meanwhile, imposes only two specific prohibitions on use of ViaSat IP by SS/L:

> Each Party **agrees not to reverse engineer** the Intellectual Property of the other Party provided to such Party in connection herewith (whether

provided prior to or after EDC). Each Party **agrees not to file for patents** covering the Intellectual Property Rights owned by the other Party hereto.

*Id.* at SSL009863 (emphasis added). For purposes of both provisions, ViaSat's "Intellectual Property" is limited to "matter in which an Intellectual Property Right subsists." Ex. D at SSL0099738. "Intellectual Property Right(s)," in turn, include only "common law and statutory proprietary rights with respect to Intellectual Property." *Id.*

### 1.    Article 39.2(B)

Under the plain language of the contract, Article 39.2(B) is merely a limited license for SS/L to use certain ViaSat IP. It has no additional significance, let alone the sweeping prohibitions ViaSat alleged it imposes on SS/L.

### a.    Limited License Provision

It is well-recognized under New York law that a license constitutes nothing more than a "mere waiver of the right to sue by the patentee." *See Elgin Nat. Watch Co. v. Bulova Watch Co.*, 281 A.D. 219, 221 (N.Y. App. Div. 1953); *Bottlers' Seal Co. v. Rainey*, 122 N.E. 200, 201 (N.Y. 1919) ("The licensor, in law, undertakes merely that it will not sue for infringement…."). The Supreme Court and lower federal courts around the country share this view. *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 181 (1938) (license is mere waiver of right to sue); *Eli Lilly & Co. v. Genentech, Inc.*, 1990 WL 305392, at *2-4 (S.D. Ind. July 17, 1990) (collecting cases); *see also Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 707 n.6 (Fed. Cir. 1992) (noting that "a license is simply a promise not to sue for what would otherwise be patent infringement" and declining to find that licensor had additional remedy beyond patent law for use exceeding the scope of license).

By its plain terms, Article 39.2(B) merely "grants" a "license" to SS/L that protects it against suit by ViaSat for work performed on the ViaSat-1 satellite. Article 39.2(B) is a provision that inures to SS/L's benefit, not ViaSat's. ViaSat agreed not to sue SS/L for infringement of its asserted IP so long as SS/L used that IP within the scope of the license.

### b.     No Reciprocal Promise

SS/L, moreover, made no reciprocal promise not to use the IP outside the scope of the license. When ViaSat wanted affirmative promises from SS/L it got them—for example, SS/L's promise in Article 28 not to disclose non-public proprietary information. *See* Ex. D at SSL0099835-37. The presence of a separate non-disclosure provision in the Build Contract is inconsistent with ViaSat's assertion that Article 39 restricts use of ViaSat's alleged confidential information.

Similarly, SS/L made affirmative promises in Article 39.2(D) not to file for patents on or to reverse engineer ViaSat's intellectual property. The presence of explicit reciprocal promises in Article 39.2(D) undermines any argument that Article 39.2(B) contains any implied reciprocal promise. Indeed, ViaSat's reading of Article 39.2(B) as a blanket prohibition on use of ViaSat IP would violate basic principles of contract interpretation by rendering superfluous the more specific prohibitions on use of ViaSat IP in Article 39.2(D). *Kahn v. New York Times Co.*, 122 A.D.2d 655, 661 (N.Y. App. Div. 1986) (rejecting interpretation of more general provision that would "render meaningless and superfluous" more specific provisions of the contract). The plain language of the contract explains how to read these provisions without creating impermissible superfluity: Article 39.2(D) reflects the only reciprocal promises SS/L made with respect to ViaSat IP, while Article

39.2(B) merely reflects a limited license of ViaSat IP to SS/L that waived ViaSat's right to sue on its IP for certain uses.[3]

ViaSat has relied on *Eli Lilly & Co. v. Emisphere Technologies, Inc.*, 408 F. Supp. 2d 668 (S.D. Ind. 2006), to support its reading of the Build Contract as imposing a reciprocal negative covenant. *Emisphere*, however, is distinguishable in any number of ways. First and foremost, the contract language in *Emisphere* included (1) a first provision granting a limited license, and also (2) a second provision including prohibitive language that the defendant "shall not" use the plaintiff's technology. *Id.* at 673-74. It was only the second provision that the Court found created a reciprocal negative covenant and provided a basis for a breach of contract action. Article 39.2(B) of the Build Contract only includes language parallel to the grant of a license in *Emisphere*. And only Article 39.2(D) introduces prohibitory language about what each party "agrees not to" do, parallel to the language the Court in *Emisphere* found created an affirmative prohibition. Indeed, *Emisphere* itself recognizes the distinction between the type of license-granting language in Article 39.2(B) as opposed to the language of negative covenants in

---

[3] If more were needed, a reciprocal promise also cannot be implied into Article 39.2(B) due to the Build Contract's integration clause. Ex. D at 119 ¶ 34.8. The integration clause "establish[es] the parties' intent that the Agreement is to be considered a completely integrated writing," *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 679 N.E.2d 624, 627 (N.Y. 1997), and precludes evidence of implied promises to vary the writing. *Cf. Grossman v. New York Life Ins. Co.*, 90 A.D.3d 990, 991 (N.Y. App. Div. 2011) (finding action for implied contract barred by integration clause); *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433-34 (N.Y. 2013) (merger clause requires "full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing").

Article 39.2(D). *See Emisphere*, 408 F. Supp. 2d at 688 (contrasting (1) limited license language that the "license herein granted…does not include" use of technology for certain purposes from (2) broader restrictive covenant language that a party "shall not have any right to use" technology for certain purposes).

Additionally, the Court in *Emisphere* was concerned that the plaintiff and defendant were sharing a vast amount of technical information, "only some of which might be protected by patent law." *Emisphere*, 408 F. Supp. 2d at 689. As a result, finding a mere limited license without a reciprocal negative covenant would leave what appeared to be unintended gaps in protection for the technology plaintiff disclosed to defendant. Here, by contrast, ViaSat is <u>by definition</u> protected by some common law or statutory scheme for any "intellectual property" disclosed to SS/L under the Build Contract. There is thus no similar concern that interpreting Article 39.2(B) as a limited license without any reciprocal promises would undermine the purposes of the contract. *Cf.* 23 Williston on Contracts § 63:21 (4th ed.) (reciprocal promises implied only where "absolutely necessary" to effectuate the parties' intent).

c.      Article 39.2(B) Is Not a Non-Compete Agreement

ViaSat's appears to take the unsupportable position that if any intellectual property right ever attached to ViaSat information, then SS/L was entirely prohibited from using that information—even if no one else in the world would be so constrained by ViaSat's IP rights and would remain free to incorporate it into satellite designs.[4] ViaSat, for example, asserted breaches of Article 39 based on a

---

[4] Mr. Dankberg, for example, testified that, under Article 39 of the Build Contract, "SS/L was uniquely prohibited from implementing things that other third parties might not be because of the intellectual property provisions." Trial Tr. 59.

1   variety of "patent-pending" technologies even though patent applications are

2   afforded only limited property rights under 35 U.S.C. § 154(d) that are not at issue

3   in this case. Trial Tr. 765. Nevertheless, ViaSat argued that Article 39.2(B) of the

4   Build Contract somehow transforms the narrow IP rights afforded by 35 U.S.C. §

5   154(d) into a blanket prohibition on use—and one that applies solely to SS/L.

6       ViaSat's reading of Article 39.2(B) thus improperly transforms a simple

7   grant of a limited license into a non-compete agreement. This interpretation is

8   directly contrary to New York law, which requires a clear indication of the parties'

9   intent to enter into restrictive covenants such as non-compete agreements:

10      Restrictive covenants are enforced where the intention of the parties is
        clear and the confinement agreed upon is reasonable and not offensive to
11      public policy. They are construed strictly, however, against those who
        formulate or seek to enforce them and doubts and ambiguities are
12      resolved in favor of free use of the property so that the restrictions are
        narrowed rather than broadened in their application.
13

14   *Silverstein v. Shell Oil Co.*, 40 A.D.2d 34, 36 (N.Y. App. Div. 1972), *aff'd*, 309

15   N.E.2d 131 (N.Y. 1974). Article 39.2(B) manifests no such clear intent.

16      Indeed, the non-compete agreement ViaSat attempts to read into Article

17   39.2(B) may well be impermissible under New York law. Knowing that the

18   technology in this case cannot be "proprietary" to ViaSat, ViaSat's entire argument

19   about Article 39 of the Build Contract is that it should extend beyond the

20   protections for proprietary information in Article 28. But non-compete provisions

21   under New York law are typically limited to helping protect trade secrets and other

22   confidential information. *Cf. Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A*

23   *Corp.*, 42 N.Y.2d 496, 499, 369 N.E.2d 4, 6 (1977) (invalidating restrictive

24   covenant not to compete "unrestrained by any limitations keyed to uniqueness,

trade secrets, confidentiality or even competitive unfairness"); *Am. Inst. of Chem. Engineers v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982) (restrictive covenants "rigorously examined"); *DAR & Associates, Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999) (non-compete agreements in commercial contracts must balance "competing public policies in favor of robust competition and freedom of contract").

Article 39.2(B) simply cannot bear ViaSat's proposed reading as a sweeping use prohibition. Article 39.2(B) is a limited license and nothing more. If SS/L used any ViaSat IP beyond the scope of its license, ViaSat could bring suit under the common law or statutory rights which constitute ViaSat IP. Article 39.2(B), however, does not create a free-floating cause of action for breach of contract that restrains SS/L from competing for other satellite projects in a way no other satellite manufacturer would be restrained by ViaSat IP.[5] Properly interpreted as a mere grant of a limited license, Article 39.2(B) contains no reciprocal promises for SS/L to breach, and judgment as a matter of law must enter as to ViaSat's claim for breach of this provision of the Build Contract.

---

[5] If ViaSat is correct that the Build Contract replaces ViaSat's intellectual property rights with a blanket prohibition on use under the Build Contract, it would constitute an improper contractual expansion of ViaSat's patent rights and should thereby preclude ViaSat's patent claims. *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) ("When the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant, we have held that an accused infringer may invoke the doctrine of patent misuse to defeat the patentee's claim."); *id.* ("patent misuse is thus grounded in the policy-based desire to 'prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right'"). Alternatively, such blanket contractual prohibition would make this case purely a contract matter under state law over which the Court lacks subject matter jurisdiction.

1          2.      Article 39.2(D)

2          Article 39.2(D), meanwhile, imposes two specific prohibitions: (1) filing for

3   patents on ViaSat's intellectual property; and (2) reverse engineering ViaSat's

4   intellectual property. But ViaSat failed to introduce evidence to support a finding of

5   breach of either of these narrow prohibitions. Notably, both prohibitions require

6   some ViaSat <u>intellectual property</u> on which SS/L files a patent or reverse engineers.

7   The entirety of the evidence ViaSat has introduced to prove up a breach of Article

8   39.2(D), however, involved the "Option 3 email," Ex. E (V-517), which as a matter

9   of law is not proprietary to ViaSat and does not constitute ViaSat IP. *See* Dkt. No.

10  720. ViaSat's provisional patent applications also lack common law or statutory

11  rights that could qualify them for protection under the Build Contract.

12              a.      ViaSat Has No IP Rights in Option 3

13         Option 3 is not "intellectual property" under the Build Contract because it is

14  not "matter in which an Intellectual Property Right subsists." Ex. D at SSL0099738.

15  As earlier discussed, "Intellectual Property Right(s)" include only "common law

16  and statutory proprietary rights with respect to Intellectual Property." *Id.* Option 3

17  plainly fails to meet these criteria. Yet ViaSat witnesses testified repeatedly that

18  Option 3 is somehow ViaSat "intellectual property" (if not "proprietary") even

19  though—as a matter of law—ViaSat can offer no explanation of what "common

20  law or statutory proprietary rights" subsist in Option 3 such that it could be

21  protected as intellectual property under the Build Contract.

22         First, as to purported "common law" proprietary rights in Option 3, ViaSat

23  has implied that there might be contractual rights under an asserted NDA.  But the

24  Court has already ruled that no such proprietary rights exist in Option 3. *See* Dkt.

No. 720 at 8; *see also Convolve, Inc. v. Compaq Computer Corp.*, 527 F. App'x 910 (Fed. Cir. 2013).[6] Option 3 also not contain any ViaSat trade secret because it was not a secret—it was circulated freely among SS/L, AtContact, and TimesArrow.[7]

Second, as to purported "statutory" rights in the form of statutory protection for patents, Option 3 does not contain the ideas claimed in the '875 patent because it is not conception evidence; in fact, it teaches away from the "proximate" beams that are at the heart of the '875. Trial Tr. 223. For the same reason, Option 3 does not contain the ideas claimed in any '875 patent applications. Moreover, ViaSat's General Counsel admitted that the only possible rights in patent applications were those under § 154(d), which ViaSat does not contend subsist in Option 3:

> Q: When [the Build Contract is] talking about patent applications, it's talking about the common law and statutory proprietary rights with respect to patent applications, correct?
>
> A: That's correct.
>
> Q: And do you know, sir, that there are actually statutory rights that are associated with patent applications?
>
> A: I'm not sure whether -- well, statutory rights and common law rights, we elicit both here. I mean, I think that patent applications are themselves, until they're published, probably considered trade secrets.
>
> Q: But, sir, you understand that a patent application actually can have statutory proprietary rights under 35 U.S.C. 154(d)?
>
> A: Yes, that's true.
>
> Q: And that's no an assertion in this case, that that

---

[6] The Court has ruled that, as in *Convolve*, ViaSat and SS/L waived all other common law rights by virtue of their NDAs. Dkt. No. 720 at 8. The application of Federal Circuit law to this issue is clear: the *NDAs* at issue in this case control the entirety of the parties' relationship regarding confidential disclosures. *Convolve*, 527 F. App'x at 925.

[7] In fact, ViaSat was not even a participant in the Option 3 email.

1    particular statutory provision is at issue in this case,
     correct?

2    A: I don't believe so.

3
     Trial Tr. 765. ViaSat can articulate no other common law or statutory rights in

4
     Option 3 either, because there are none. ViaSat's attempts to apply its Article 39
5
     arguments to Option 3 all fail as a matter of law.[8]
6

7              b.      ViaSat Has No IP Rights in Provisional Patent
                       Applications
8
            For similar reasons, ViaSat's provisional patent applications also cannot form
9
     the basis for breach of the Build Contract. Again, provisional patent applications
10
     are not the subject of any "common law or statutory proprietary rights" such that
11
     they could be protected under the Build Contract. *Cf.* 35 U.S.C. § 154(d) (creating
12
     provisional rights based on published patent applications, not provisional
13
     applications, and even then only under limited circumstances not at issue in this
14
     case). ViaSat's late-2006 provisional applications simply cannot constitute evidence
15
     supporting a claim for breach of Article 39.
16

17             c.      ViaSat Has No IP Rights in Other Concepts
            ViaSat similarly failed to establish statutory or common law rights any other
18
     concepts it claims might constitute Purchaser Intellectual Property under the Build
19

20   [8] In any event, ViaSat has also failed to introduce any evidence that SS/L breached
     the Build Contract based on the patent filings of its employee Doug Burr. Any
21   filings prior to the effective date of the Build Contract in January 2008 are
     irrelevant. The Court has explicitly held that the Build Contract, by its plain terms,
22   does not apply retroactively. Dkt. No. 720 at 8. ViaSat also cannot prove breach
     based on a continuation of the Burr patent filed in 2010. Ex. F (V-1193B). There
23   was no evidence whatsoever introduced at trial that any continuation of the Burr
     patent was based on Option 3.
24

Contract. And as to any intellectual property ViaSat may possess—for example, the patents in suit—ViaSat failed to provide any evidence that SS/L reverse engineered or filed for a patent on that IP, as required to establish breach of the Build Contract.

### C.    Article 22 of the Build Contract

The limited license provision of Article 22.2.3 provides:

> Purchaser hereby grants to Contractor a non-exclusive, non-transferable, non-assignable, non-sublicensable, revocable, limited license to possess and use a single copy of the Capacity Measurement Tool during the time period described above solely for purposes of Contractor's measurement of the capacity of the Satellite to be provided under this Contract.

Ex. D at SSL0099821. Article 22.2.4, meanwhile, includes a discrete set of prohibitions on use of ViaSat's Capacity Tool:

> Contractor agrees that it will not modify, adapt, create a derivative work, of, merge, translate, decompile, disassemble, or otherwise reverse engineer Purchaser's Capacity Measurement Tool.

*Id.* Article 22's structure is thus parallel to Article 39. Article 22.2.3 provides a limited license, while Article 22.2.4 imposes prohibitions. For basically the same reasons discussed above as to Article 39.2(B), ViaSat simply has no claim for breach of Article 22.2.3. And as to either provision, ViaSat has not provided sufficient evidence from which a jury could conclude that SS/L breached any of the prohibitions on use of ViaSat's capacity tool.

ViaSat's expert Mr. Sturza admitted that SS/L never possessed the source code for ViaSat's capacity tool and that SS/L "couldn't take the code it didn't have" from the ViaSat tool. Trial Tr. 1694-95. This is consistent with the testimony of SS/L's expert, Dr. Helgert. Trial Tr. 2016. Mr. Sturza also conceded he did not know of or review logs of SS/L employees who accessed the capacity tool, and

admitted that the ViaSat tool and SS/L's tools for Jupiter and NBN were written in different programming languages. *See* Trial Tr. 1693-97.

As a result, Mr. Sturza limited himself to the argument that SS/L "copies its functionality." Trial Tr. 1694-95. Even if true, mere imitation without any manipulation (*e.g.*, modification, adaptation, or reverse engineering) of the tool itself is not covered by the narrow prohibitions described in Article 22.2.4. There is no sufficient evidentiary basis for the jury to have found direct manipulation of ViaSat's capacity tool that could constitute a breach of Article 22.

## III.   MARCH 2006 NDA & BUILD CONTRACT ARTICLE 28

The remainder of ViaSat's breach of contract case involves SS/L and ViaSat's March 2006 NDA and the NDA provision (Article 28) of the Build Contract. In order to prevail its breach of NDA claims, ViaSat needed to prove that SS/L disclosed to third parties information which was not already known to SS/L, was not publicly known, and was marked as proprietary to ViaSat. ViaSat's mere insinuation that the Jupiter-1 and ViaSat-1 satellites look similar in various respects is not substantial evidence that could satisfy ViaSat's burden. Rather, as to every allegedly proprietary concept, the only reasonable conclusion based on the evidence is that such concept was known to SS/L, known publicly, and/or not marked proprietary to ViaSat at the time of SS/L's allegedly improper disclosure.

### A.   Contractual Prerequisites

The March 2006 NDA and Article 28 of the Build Contract do not apply to material that was already known to SS/L or to material that became known publicly through no fault of SS/L. *See* Exs. B-D. Additionally, to qualify for protection under the non-disclosure agreements, material must be marked "Proprietary" at or

immediately after the time of exchange by means of a written legend. *See id.*; *see also, e.g.*, Trial Tr. 196-97. That marking requirement is a material element of each contract and it is an essential element of ViaSat's claim. *Convolve, Inc. v. Compaq Computer Corp.*, 527 Fed. Appx. 910, 921 (Fed. Cir. 2013) (affirming grant of summary judgment of no liability under NDAs because the plaintiff had not complied with a marking requirement). As such, ViaSat could not prevail on its breach of contract claims unless it showed that the material it alleged SS/L disclosed was not already known to SS/L, was not publicly known, and was marked proprietary according to the terms of the NDAs.

### 1. ViaSat Concedes that No Information Exchanged Before May 4, 2007, Was Marked "Proprietary."

There is no dispute that the first time ViaSat ever marked any document "Proprietary" and sent it to SS/L was May 4, 2007. *E.g.*, Trial Tr. 376-77. That document was a draft specification of the ViaSat-1 satellite that the parties agree also contained SS/L intellectual property. Ex. G (V-1206); *see also* Dkt. No. 720.

### 2. The Parties Did Not Waive the Marking Requirement.

The Court has already rejected ViaSat's argument that the parties' waived the marking requirement. Dkt. No. 720 at 8.  To the extent ViaSat continues to press its waiver argument and seeks reconsideration of the Court's finding that the marking requirement was never waived, SS/L incorporates by reference the arguments made in their summary judgment briefing on this issue, Dkt. Nos. 516, 654, and in their opposition to ViaSat's motion for reconsideration of the Court's order that the Option 3 email is not proprietary to ViaSat, Dkt. No. 977.[9]

---

[9] As discussed at summary judgment, ViaSat itself swore under oath three times that:

## B.    Alleged Proprietary Information

ViaSat's breach of NDA claims were initially premised on SS/L's allegedly improper disclosure of the following allegedly proprietary information:

i. The in-orbit C/I test ViaSat allegedly proposed to Defendants for the ViaSat-1 satellite;

ii. The Capacity Measurement Tool allegedly proprietary to ViaSat and information gained therefrom;

iii. ViaSat's alleged proprietary concepts regarding dynamic NGSO switching;

iv. ViaSat's implementation, including the details enabling such implementation, of the 4-color frequency reuse scheme utilized in the proprietary specifications ViaSat drafted and designated for the ViaSat-1 satellite;

v. ViaSat's implementation, including the details enabling such implementation, of the spatial separation plan between the gateway and user beams utilized in the proprietary specifications ViaSat drafted and designated for the ViaSat-1 satellite;

---

(… cont'd)

> (a) it was ViaSat's standard course of conduct to identify proprietary information via written legend when it transmitted such materials in written form, and (b) it was ViaSat's standard course of conduct to verbally identify proprietary information when communicated orally, and then follow up such identification with a summary written document in the applicable time period . . . .

Dkt. No. 516-2, Ex. A at 7:17-19, 8:22-24, 10:2-4. ViaSat thus admitted that its course of conduct was to comply with the marking requirement. Such behavior does not "warrant the conclusion that the parties intended to modify the written contract." *Convolve*, 527 at 923. Rather, SS/L and ViaSat's continued marking "leads to precisely the opposite conclusion." *Id.* at 924. The evidence introduced at trial did nothing to undermine the Court's grant of summary judgment, and it would be improper to revise the Court's summary judgment ruling based on trial testimony anyway. *See Dillon v. Cobra Power Corp.*, 560 F.3d 591, 595 (6th Cir. 2009).

vi. ViaSat-1's beam placement plan, the implementation and specifics of which were set forth in the proprietary specifications ViaSat drafted and designated for the ViaSat-1 satellite; and

vii. Portions of the specifications for the ViaSat-1 satellite, both draft and final.

Dkt. No. 842 (Pre-Trial Order) at 14-15. As to each of these ideas ViaSat introduced insufficient evidence to prove that (1) SS/L did not already know them, (2) they were not already known in the industry, and (3) ViaSat had marked the information as proprietary as of SS/L's allegedly improper disclosure. The trial record does not contain a <u>single</u> disclosure meeting these criteria. No reasonable juror could look at the record and conclude that any properly-marked information sent by ViaSat to SS/L, not already known to SS/L and not known to the public, was then disclosed to Hughes or other third parties in violation of the asserted NDAs. Judgment as a matter of law is therefore appropriate.

    1. <u>C/I Test</u>

  ViaSat introduced no evidence regarding SS/L's alleged misappropriation of a C/I Test. It cannot support the verdict against SS/L on breach of contract claims.

    2. <u>Capacity Tool</u>

  ViaSat attempted to argue that SS/L disclosed secrets from ViaSat's capacity tool by creating a tool for Jupiter and NBN Co. But, as discussed above, there is no dispute that the source code for ViaSat's tool was never made available to SS/L, meaning SS/L simply could not have copied ViaSat's tool and given it to Hughes or NBN Co. Trial Tr. 1694-95 (Sturza); *id.* 2015-17 (Helgert). And it would have been impossible to use ViaSat's tool on other satellites anyway. Trial Tr. 1941-42.

  ViaSat's theory of breach thus must be limited to allegedly improper disclosure of the more general concepts underlying ViaSat's capacity tool. But

ViaSat failed to introduce evidence sufficient to show that those concepts were not already known to SS/L or to the public (including Hughes) long before any of the NDAs at issue were even signed, let alone before SS/L ostensibly "learned" about capacity measurement from ViaSat. The high-level concepts about calculating capacity that are necessarily the basis for ViaSat's claims were little more than basic link budget calculations implemented as a matter of practice within SS/L on its Direct Broadcast Satellite projects since the 1990s. *See* Trial Tr. 2014-18; 2025; 2538-41. And SS/L was familiar with the use of capacity tools on prior high-capacity broadband satellites like iPSTAR. Trial Tr. 2119-22.

There can also be no dispute as to the public nature of ViaSat's allegedly proprietary capacity measurement concepts. The sorts of calculations claimed by ViaSat have been commonly taught to college students for decades. Trial Tr. 1941. Hughes' Dave Roos confirmed that he had long been familiar with the link budgets underlying capacity measurement, and that the formulas employed date back to the 1940s. Trial Tr. 1940-41. Indeed, the evidence at trial showed it was <u>Hughes</u> that provided SS/L with the formulas and parameters it wanted to use to measure capacity, rather than the other way around. Trial Tr. 2541-43; Ex. H (S-524).

Moreover, in 2003, Nakasuga and his colleagues publicly disclosed ViaSat's allegedly proprietary approach of varying the numbers of colors and beam spacing, calculating C/I, calculating bits/Hz, and repeating the process iteratively. Ex. I (S-2428); Trial Tr. 2170-72. Indeed, the paper includes a flow chart that closely parallels one created by Mark Miller in 2007, which ViaSat used to corroborate its invention of a "statistical capacity analysis." *Compare* S-2428 fig. 2 *with* V-220 at SSL0134293. ViaSat attempted to rebut Nakasuga 2003 as invalidating prior art to

the '043 patent by arguing that it failed to disclose interference-dominated locations and failed to disclose maximization of capacity. *See* Trial Tr. 2713. But ViaSat offered no evidence to rebut the fact that Nakasuga 2003 clearly disclosed ViaSat's allegedly proprietary approach to capacity measurement, let alone substantial evidence sufficient to meet its burden that its capacity tool was not publicly known.

In 2004, Rinaldo and DeGaudenzi also publicly disclosed a 5,000-point capacity tool, compared to the 3,165-point tool used by Mark Miller. Ex. K (S-11); Trial Tr. 2175-77. Even if a capacity tool with such granularity were novel to SS/L, ViaSat cannot dispute that such a tool was already publicly available.

### 3.   Dynamic NGSO Switching

ViaSat has attempted to claim that the idea of "dynamic NGSO switching" was proprietary to it, but has produced no evidence that the idea was ever disclosed—much less used—by SS/L. ViaSat's sole piece of evidence that Jupiter-1 has a dynamic NGSO switch is Hughes' FCC application stating that "[t]here will be sufficient additional spectrum on [Jupiter-1] to allow Hughes to dynamically shift operations out of the NGSO spectrum for the duration of any in-line events." Ex. L (V-522) at SSL0397453; Trial Tr. 1710. For one thing, this statement utterly fails to establish that Jupiter-1 actually has a dynamic NGSO switch. It is undisputed that Jupiter-1 does not use a ganged/redundant switch configuration (like the switch on ViaSat-1) or a ferrite switch, as would be necessary to engage in dynamic NGSO switching. Trial Tr. 2496. And the simple, coaxial NGSO switch on Jupiter-1 has never been used even a single time, let alone dynamically. Trial Tr. 1698-99. ViaSat thus cannot have suffered any damages—an essential element of ViaSat's breach of contract claims—from any disclosure by SS/L to Hughes of

1    dynamic NGSO switching. *See Loiseau v. VISA USA Inc.*, 2010 WL 4542896, at *2
2    (S.D. Cal. Feb. 10, 2010) (Huff, J.) ("A breach of contract claim requires a showing
3    of appreciable and actual damage."); *St. Paul Fire & Marine Ins. Co. v. Am.*
4    *Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060-61 (2002); *Seidman*
5    *v. Indus. Recycling Props., Inc.*, 106 A.D.3d 983, 985 (N.Y. 2013).[10]

6          Moreover, "dynamic NGSO switching" was not a concept that qualified for
7    protection under the NDAs. First, to the extent the concept was employed on the
8    Jupiter-1 satellite, the technology used was actually invented by (and thus, needless
9    to say, known to) SS/L. *See* Defendants' JMOL (6 of 12) Regarding Inventorship of
10   the '827 Patent. Second, the evidence at trial showed that the concept of switchable
11   access to the NGSO spectrum to avoid interference was "publicly" known at least
12   to Hughes, and that Hughes actually suggested the use of switchable NGSO filters
13   to SS/L. Trial Tr. at 1927-38.

14         "Dynamic NGSO switching" was also more widely known to the public, as
15   evidenced by the AtContact (Ex. M), FCC Third Report (Ex. N), Skybridge (Ex.
16   O), and Weidman (Ex. P) references discussed by Dr. Schindall. *See* Defendants'
17   JMOL (10 of 12) Regarding Invalidity of the '827 Patent. ViaSat's cursory rebuttal
18   of, for example, the AtContact FCC Application—consisting of nothing more than
19   Mr. Sturza's say-so that the reference does not disclose dynamic NGSO
20   switching—does not constitute substantial evidence that dynamic NGSO switching
21   was not publicly disclosed by that reference. *See* Trial Tr. 2723. The same goes for
22   the Skybridge presentation, which ViaSat could only distinguish as a system of

23   ─────────────────
     [10] Defendants' arguments regarding ViaSat's failure to prove damages from breach of contract
24   more generally are discussed in Defendants' Renewed Motion for Judgment as a Matter of Law
     as to Breach of Contract Damages.

NGSO satellites sharing spectrum with other NGSO satellites. *Id.* 2724. ViaSat could provide no evidence to rebut the fact that, well before the parties' NDAs or any alleged improper disclosure by SS/L, it was publicly known how to switch the NGSO spectrum on and off to avoid interference.

### 4.  Four-Color Reuse Scheme

There is also no basis on which the jury could have found breach due to disclosure by SS/L of a four-color re-use scheme. First and foremost, SS/L and Hughes began discussing four-color re-use at least as early as March 2007, well before ViaSat first marked any information proprietary in May 2007. *See, e.g.*, Ex. Q (S-1699) at SSL0911234. SS/L's exchange of ideas regarding four-color re-use with Hughes simply cannot be the basis for a breach of the NDAs.

Moreover, such a basic concept as four-color re-use was employed and made public by the MITRE Corporation more than 30 years ago in its research for NASA. Ex. R (S-1165). Four-color re-use was also specifically known to SS/L, as established by the 2004 AMC-17 proposal it created before ViaSat ever entered the satellite business, much less started talking with SS/L. Ex. S (S-1446) at 2-2; Ex. T (S-1450). SS/L was also familiar with four-color re-use from its work on iPSTAR, a satellite that launched in 2005. Trial Tr. 2094-95. And Hughes was also already familiar with full-frequency re-use at least from its Spaceway-3 system, which again pre-dates the NDAs at issue. Trial Tr. 1953.

### 5.  Spatially Separated Gateways and User Beams

There is also no basis on which the jury could have found breach due to any disclosure by SS/L of the concept of spatially separated gateways and user beams. Once again, SS/L and Hughes began discussing four-color re-use at least as early as

March 2007, well before ViaSat first marked any information proprietary in May 2007. Trial Tr. 1914; Ex. Q (S-1699) at SSL0911241.

The concept was also known to SS/L independently of ViaSat, as again established by its 2004 proposal for AMC-17. Ex. S; Ex. T. Hughes had also used spatially-separated gateway and user beams to permit frequency re-use on Spaceway-3, and initiated the request for spatial separation on Jupiter-1. Trial Tr. 1908-10. And other satellite designers, including but not limited to the MITRE corporation, were using the concept as far back as the early 1980s. Ex. R (S-1165). This is yet another concept facially ineligible for protection under the NDAs, and as to which ViaSat provided no evidence to demonstrate otherwise.

### 6.   Partial CONUS Coverage

Any claim for breach based on alleged disclosure by SS/L of "partial CONUS coverage" could begin and end with Mark Dankberg's admission that ViaSat did not invent partial CONUS coverage. Trial Tr. 224. In any event, there is again no dispute that SS/L and Hughes were discussing partial CONUS coverage well before ViaSat's first proprietary marking. Ex. Q (S-1699); Trial Tr. 1913-16.

### 7.   ViaSat-1 Specification (Including Beam Placement Plan)

ViaSat attempted to argue that SS/L improperly sent portions of the ViaSat satellite specification to Hughes. But its only evidence on this point was metadata in draft specification sent to Hughes, which named ViaSat's Mark Miller as the author. Ex. U (V-575). On cross-examination, Mr. Miller was not able to identify a single portion of that document that actually contained ViaSat's proprietary information. Trial Tr. 1385-98. The reason is not surprising: the language sent to Hughes was SS/L's boilerplate describing SS/L's own proprietary satellite bus

design and other standard SS/L deliverables. *E.g.*, Trial Tr. 794-97. The evidence plainly showed that the only portion of the document that could contain ViaSat proprietary information—section 3.3—was entirely blank. *See* Ex. U; Trial Tr. 1943-45. The document, presented in a highly prejudicial and misleading fashion at the end of a trial day, was irrelevant to the issues in this case, and no reasonable juror could conclude from it that any ViaSat information was ever sent to Hughes.

There is similarly no evidence that SS/L <u>ever</u> disclosed ViaSat's beam placement plan was ever exchanged with anyone outside SS/L, even though ViaSat itself disclosed that beam placement plan the whole world in a public filing by ViaSat in June 2008. Ex. V (V-1328).[11]

## C.   Option 3 / Burr Patent Application

Despite the inordinate amount of trial time ViaSat spent discussing the Option 3 email and Doug Burr's April 2007 patent application, neither had any relevance to ViaSat's claims for breach of the NDAs. ViaSat attempted to argue that Doug Burr's patent application contained material described in the 2006 "Option 3" email and was improperly sent to the PTO. But the Option 3 email was not proprietary to ViaSat, Dkt. No. 720, and the Burr patent application was filed before any document marked "proprietary" to ViaSat ever existed, Ex. F-G. The Burr patent is no evidence of a breach of the NDAs.

## IV.   EQUITABLE ESTOPPEL

If the foregoing leaves any doubt that SS/L did not disclose ViaSat proprietary information, the trial record amply supports equitably estopping ViaSat

---

[11] ViaSat's June 2008 filing, for that matter, also disclosed partial CONUS coverage, separation of gateway and user beams, and information about four-color re-use. *Id.*

from asserting its breach of contract claims against SS/L.[12] To the extent any of ViaSat's allegedly proprietary concepts were disclosed to Hughes and incorporated on Jupiter-1, SS/L was simply responding to Hughes' requests and requirements. *See, e.g.*, Ex. Q  & Trial Tr. 1913-16 (partial CONUS, spatial separation, four-color re-use); Ex. W & Trial Tr. 1929-32 (NGSO switching); Ex. H & Trial Tr. 1938-41 (parameters for capacity measurement and maximization). ViaSat, however, had assured SS/L in October 2007 that SS/L could respond to customer requirements without running afoul of the parties' agreements as to the treatment of proprietary information.  *See* Ex. X (V-291); Ex. Y (V-389); Trial Tr. 1002-12. And in reliance on those promises, SS/L continued to design the Jupiter-1 satellite to Hughes' specifications when it otherwise could have entertained other design options.

## V.    CONCLUSION

SS/L respectfully requests entry of judgment as a matter of law that SS/L did not breach the March 2006 NDA or the ViaSat-1 Build Contract.


Dated: June 13, 2014                    By:   */s/ Mark Musico*

Marc M. Seltzer
Amanda K. Bonn
SUSMAN GODFREY L.L.P.

---

[12]  Equitable estoppel applies where one party acts in justifiable reliance on another's representations and permitting the enforcement of rights against the reliant party would be unjust. *See Roseview Farms, Inc. v. Pfister*, 198 A.D.2d 339, 341 (N.Y. App. Div. 1993) (equitable estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought"); *In re Marriage of Recknor*, 138 Cal. App. 3d 539, 546 (Cal. Ct. App. 1982) ("The elements of estoppel are representation or promise; made with knowledge of the facts; to a party ignorant of the truth; with the intent that the other party act on it; when the other party has, in fact, been induced to rely on it.").

1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
Email: abonn@susmangodfrey.com

William Christopher Carmody
(Admitted *Pro Hac Vice*)
Jacob W. Buchdahl
(Admitted *Pro Hac Vice*)
Mark Musico
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone: (212) 336-8330
Fax: (212) 336-8340

Joseph S. Grinstein
(Admitted *Pro Hac Vice*)
William R. H. Merrill
(Admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  713-653-7856
Facsimile:   713-654-6666
Email: jgrinstein@susmangodfrey.com
Email: bmerrill@susmangodfrey.com

Ian B. Crosby
(Admitted *Pro Hac Vice*)
Rachel S. Black
(Admitted *Pro Hac Vice*)
Patrick C. Bageant
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3861
Fax: (206) 516-3883
Email: icrosby@susmangodfrey.com
Email: rblack@susmangodfrey.com

1       Email: pbageant@susmangodfrey.com

2       *Attorneys for Defendants/Counterclaim*
        *Plaintiffs Space Systems/Loral, LLC (f/k/a*
3       *Space Systems/Loral, Inc.) and Loral Space*
        *& Communications Inc.*
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 13, 2014, I caused the foregoing **SS/L'S SS/L'S SS/L'S MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED), OR A NEW TRIAL (12 OF 12), REGARDING BREACH OF CONTRACT** to be served on opposing counsel via the Court's CM/ECF system.


Dated: June 13, 2014                          By:    */s/ Mark Musico*