1  William Christopher Carmody
   (Admitted *pro hac vice*)
2  Jacob W. Buchdahl
   (Admitted *pro hac vice*)
3  SUSMAN GODFREY L.L.P.
4  560 Lexington Avenue, 15th Floor
   New York, New York 10022
5  Telephone:  (212) 336-8330
   Facsimile:   (212) 336-8340
6  Email: bcarmody@susmangodfrey.com
7  Email: jbuchdahl@susmangodfrey.com

8  Marc M. Seltzer (54534)
   SUSMAN GODFREY L.L.P.
9  1901 Avenue of the Stars, Suite 950
   Los Angeles, CA 90067-6029
10 Telephone:  (310) 789-3100
   Facsimile:   (310) 789-3150
11 Email: mseltzer@susmangodfrey.com

12 [Additional counsel listed below signature line]

13 *Attorneys for Defendants*

14

15 **UNITED STATES DISTRICT COURT**

16 **SOUTHERN DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  VIASAT, INC., | Case No. 3:12-cv-00260-H-WVG |
| 19          Plaintiff, | Hon. Marilyn L. Huff |
|         vs. | **SS/L'S MOTION FOR JUDGMENT** |
| 20  SPACE SYSTEMS/LORAL, INC., LORAL SPACE & COMMUNICATIONS INC., | **AS A MATTER OF LAW (RENEWED), OR A NEW TRIAL (3 OF 12), REGARDING LOST PROFITS DAMAGES** |
| 21          Defendants/Counterclaim Plaintiffs. | Date: July 22, 2014 |
| 22 | Time: 9:00 a.m. |
| 23 | Place: Courtroom 15A |

24

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...........................................................................1

II.    LEGAL STANDARD .....................................................................2

III.   ARGUMENT ..................................................................................4

     A.   Damages May Not Be Awarded Based On ViaSat's Alleged Loss
          Of Customers To Hughes ..........................................................5

     B.   Dr. Slottje's Lost Profits Analysis Fails at Every Step ............9

          1.   Dr. Slottje's assumption that "but for" the alleged
              infringement, SS/L would have produced only a 32 Gbps
              alternative satellite is unsupported by the evidence. ......................10

          2.   Dr. Slottje's assumption that there would be 324,520
              overflow Jupiter subscribers is contradicted by the evidence. ........13

          3.   Dr. Slottje's assumption that all of the Jupiter overflow
              subscribers would be captured by ViaSat is unsupported by
              the evidence. ...................................................................14

          4.   Dr. Slottje's profit per subscriber figure is unsupported by the
              evidence ..........................................................................17

          5.   Dr. Slottje's lost profits analysis required the jury to speculate
              as to how to apply his model to calculate its own award. ..............18

     C.   Lost Profits Are Unavailable Under *Panduit* ..........................19

IV.    CONCLUSION ............................................................................20

1

# TABLE OF AUTHORITIES

2

3

**Cases**

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
  1 F.3d 1214 (Fed. Cir. 1993) ........................................................... 5, 6, 8

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992) ........................................................... 10

*Calico Brand, Inc. v. Ameritek Imports, Inc.*,
  527 Fed. Appx. 987 (Fed. Cir. 2013) .................................................. 10

*City Solutions, Inc. v. Clear Channel Commc'ns*,
  365 F.3d 835, (9th Cir. 2004) ............................................................... 3

*Cornell Univ. v. Hewlett-Packard Co.*,
  01-CV-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008) ................ 6

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ............................................................. 8

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003) ........................................................... 10

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ....................................................... 9, 20

*Gyromat Corp. v. Champion Spark Plug Co.*,
  735 F.2d 549 (Fed. Cir. 1984) ............................................................... 6

*Hebert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ........................................................... 3, 6

*Inglis v. ITT Cont'l Baking Co.*,
  668 F.2d 1014 (9th Cir. 1981) ............................................................... 4

*Lakeside–Scott v. Multnomah Cnty.*,
  556 F.3d 797 (9th Cir. 2009) ................................................................. 3

*Lam, Inc. v. Johns-Manville Corp.*,
  718 F.2d 1056 (Fed. Cir. 1983) ........................................................... 20

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
  895 F.2d 1403 (Fed. Cir. 1990) ............................................................. 6

*Lucent Techs., Inc. v. Gateway Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ............................................................. 2

*Lucent Techs., Inc. v. Microsoft Corp.*,
  837 F. Supp. 2d 1107 (S.D. Cal. 2011) ............................................... 3

*Micro Chem., Inc. v. Lextron, Inc.*,
    318 F.3d 1119 (Fed. Cir. 2003) ........................................................ 16

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
    499 F.3d 1284 (Fed. Cir. 2007) .......................................................... 5

*Murphy v. City of Long Beach*,
    914 F.2d 183 (9th Cir. 1990) .............................................................. 4

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) .................................................. 3, 10, 19

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ................................................... passim

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ............................................................. 2

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) .......................................................... 7

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000) ......................................................................... 3

*Rite-Hite Corp. v. Kelly Co. Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) ................................................... 5, 8, 9

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001) ....................................................... 1, 5

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics &
    Plastics, Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011) ........................................................ 16

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) ................................................... passim

*Stickle v. Heublein, Inc.*,
    716 F.2d 1550 (Fed. Cir. 1983) .......................................................... 6

*The Johns Hopkins Univ. v. Datascope Corp.*,
    543 F.3d 1342 (Fed. Cir. 2008) .......................................................... 3

*TruePosition Inc. v. Andrew Corp.*,
    568 F. Supp. 2d 500 (D. Del. 2008) .................................................. 10

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .......................................................... 3

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995) ............................................................. 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*United States v. 4.0 Acres of Land*,
   175 F.3d 1133 (9th Cir. 1999) ............................................................................4

*United States v. Kellington*,
   217 F.3d 1084 (9th Cir. 2000) ............................................................................4

*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) ..........................................................................4

# I.       INTRODUCTION

Lost profits damages may be awarded only upon a showing that "'but for' the infringing activity, the <u>patentee</u> would have made the <u>infringer's</u> sales." *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001) (emphasis added). To be eligible for lost profits damages, therefore, ViaSat was required to adduce credible evidence to allow a jury to find that, but for the infringement, <u>ViaSat</u> would have made sales that were instead made by <u>SS/L</u>. Such evidence is plainly not present here—nor could it be, because ViaSat and SS/L offer entirely different products and compete in entirely different markets. Instead, relying on allegations that SS/L contributorily infringed and induced infringement, ViaSat argued that lost profits damages should be calculated based on sales that ViaSat allegedly lost to <u>Hughes</u>. ViaSat's third-party lost profits damages theory is contrary to Federal Circuit law where, as here, there is no contributory or induced infringement.

Even if ViaSat's alleged loss of sales to Hughes were compensable through this patent infringement action against SS/L—which it is not—the evidence ViaSat introduced at trial in support of this damages theory is clearly insufficient. ViaSat's internal documents reveal no anticipated loss of subscribers to Hughes; no concern about competition from Hughes; and contain no warnings to investors that ViaSat might be affected by Hughes's Jupiter satellite. Trial Tr. vol. VIII, 1824:13-20, Apr. 4, 2014 (attached as Exhibit 1 to the supporting declaration of Rachel S. Black[1]). Indeed, ViaSat's CEO publicly admitted after filing this lawsuit that "the market for

---

[1] All exhibits referenced herein are attached to the Declaration of Rachel S. Black in Support of SS/L's Motion for Judgment as a Matter of Law (Renewed), or a New Trial (3 of 12), Regarding Lost Profits Damages, filed concurrently herewith.

high-speed satellite broadband in the United States is so large . . . that ViaSat's Exede has not been affected" by Hughes's Jupiter-based service. Black Decl. Ex. 1 (Trial Tr. 1826:1-22). The only evidence that ViaSat offered to support these damages, thus, was a speculative and economically unsound damages model. In the face of this legally and factually insufficient evidence, the jury verdict awarding lost profits damages cannot be sustained, and the award of $58 million in lost profits damages must be vacated, or in the alternative, a new trial on damages is required.[2]

## II.   LEGAL STANDARD

Judgment as a matter of law ("JMOL") may be granted and a jury verdict can be overturned "only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). "[O]n posttrial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Id.* at 1336. Substantial evidence is "more than a mere scintilla" and is "such relevant evidence

---

[2] SS/L hereby moves for judgment as a matter of law ("JMOL") pursuant to Rule 50(a) and, pursuant to Rule 50(b), renews the motion for JMOL that it made before the close of evidence. Alternatively, SS/L moves for a new trial pursuant to Rule 59.

By separate motion, which is incorporated herein by reference, SS/L has moved to vacate the lost profits award on the grounds that ViaSat may not recover damages for both lost profits and a reasonable royalty. *See* SS/L's Mot. for JMOL (Renewed), or a New Trial (4 of 12), Regarding Double Counting of Damages, filed concurrently herewith. If the Court grants this motion and enters judgment of no lost profits, that motion becomes moot.

as a reasonable mind might accept as adequate to support a conclusion." *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008) (quotation marks and citation omitted). "Under Rule 50, a court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000).

In the damages context, an award may not be based on guesswork or "speculation or optimism, but must be established by evidence." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996); *see Lakeside–Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) (judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict"); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996) (jury's damages award may not be "based only on speculation or guesswork"). Nor may a damages award stand if any part of the calculation leading to it is unsupported or contrary to law. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317, 1321 (Fed. Cir. 2011). That is, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1112 (S.D. Cal. 2011) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)).

Whether to grant a new trial on some or all issues, pursuant to Fed. R. Civ. P. 59, is a matter of the trial court's discretion. *City Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 843 (9th Cir. 2004). Courts apply a lower standard of proof to motions for new trial than they do to JMOL motions. *William Inglis v. ITT*

*Cont'l Baking Co.*, 668 F.2d 1014, 1026–7 (9th Cir. 1981) "[T]he trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)). In deciding a motion for new trial, the court "has the right, and indeed the duty, to weigh the evidence" and may evaluate the credibility of the witnesses. *Murphy v. City of Long Beach*, 914 F.2d 183 (9th Cir. 1990); *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). The court is not required to view the evidence from the perspective most favorable to the prevailing party. *Kellington*, 217 F.3d at 1095.

## III.   ARGUMENT

There is no legally sufficient basis for the jury's award of lost profits damages. Lost profits may not be based on the patentee's lost sales to a third party, where the patentee and the alleged infringer do not compete in the sale of that product and the alleged infringer does not contributorily infringe or induce infringement. Even if ViaSat's lost profits theory were sound, the evidence ViaSat offered to support the damages award is speculative, based on false assumptions, and/or unsupported by the evidence. And finally, lost profits are unavailable under *Panduit*. Dr. Slottje's lost profits analysis does not contain the sound economic proof required to support a lost profits award of any amount, and it certainly does not meet the heightened burden to support the future lost profits that the jury awarded.

**A.    Damages May Not Be Awarded Based On ViaSat's Alleged Loss Of Customers To Hughes**

"To recover lost profits, 'a patent owner must prove a causal relation between the infringement and its loss of profits.'" *Shockley*, 248 F.3d at 1362 (quoting *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993)). "In other words, the burden rests on the patentee to show a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Id.* It is undisputed that SS/L and ViaSat are not direct competitors. Black Decl. Ex. 1 (Trial Tr. 1820:19-1821:6). ViaSat does not make or sell satellites that use its patented technology or that compete with Jupiter, and SS/L does not sell broadband services. It is also undisputed that ViaSat did not lose any sales of broadband services to SS/L. Black Decl. Ex. 1 (Trial Tr. 1821:20-23). It is therefore improper to award lost profits damages based on ViaSat's alleged loss of sales to a third party using the allegedly infringing Jupiter satellite, when the jury found that SS/L does not contributorily infringe or induce infringement of ViaSat's patents.

The Federal Circuit has consistently made clear that a patentee must directly compete with the alleged infringer in order to for lost profits to be properly awarded. *See, e.g.*, *Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1291 (Fed. Cir. 2007) (affirming denial of lost profits where the patentee's and alleged infringer's "products compete for entirely different market segments" and there was no evidence "to suggest overlap among the consumers buying the companies' respective goods"); *Rite-Hite Corp. v. Kelly Co. Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) ("To recover lost profits, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales <u>that were made by the</u>

infringer.”); *BIC Leisure Prods.*, 1 F.3d at 1218 (“The patent owner must show that ‘but for’ the infringement, it would have made the infringer’s sales.”); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 553 (Fed. Cir. 1984) (“The critical inquiry in determining whether to award lost profits is whether Gyromat [the patentee] has shown a reasonable probability that it would have made the infringing sales that Champion [the alleged infringer] made.”); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561 (Fed. Cir. 1983) (“Appellees [in the business of selling fryers] suffered no loss in the sense of lost profits from [infringer’s] use of the infringing fryers.”).[3] (emphasis added to all quotations). Because ViaSat and SS/L do not compete, and SS/L does not contributorily infringe or induce infringement of ViaSat’s patents, under these well-established precedents, lost profits damages are not available.

Before trial, ViaSat defeated SS/L’s *Daubert* challenge to exclude lost profits, pointing to “Hughes’ infringing use” of the Jupiter satellite. ViaSat’s Opp. to Defs.’ Mot. to Exclude Opinions of ViaSat’s Damages Expert Dr. Slottje (Dkt. 595) at 7 & n.5. This Court denied the *Daubert* challenge before the jury’s finding

_____

[3] Likewise, the Federal Circuit has made clear that where, as here, the patentee does not practice the invention claimed by the patents in suit, lost profits damages are unavailable. *See, e.g.*, *Hebert*, 99 F.3d at 1119 (“When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages.”); *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1406 n.2 (Fed. Cir. 1990) (“Because [the patentee] did not compete in the sale of its invention in the United States, it did not, as it could not, seek damages on the basis of lost profits.”); *Cornell Univ. v. Hewlett-Packard Co.*, 01-CV-1974, 2008 WL 2222189, at *1 (N.D.N.Y. May 27, 2008) (J. Rader, sitting by designation) “Because [the patentee] does not manufacture or sell products incorporating the patented device, it has not sought and is not entitled to lost profits.”).

1
2
3
4
5
6
7
8
9
10
11
12
13
14

on contributory and induced infringement, relying on *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012), for the proposition that the Federal Circuit has not "establish[ed] a threshold requirement that the plaintiff always show direct competition between its own and an infringing product in order to receive lost profits damages." 2/11/14 Order Granting in Part and Denying in Part Defs.' Mot. to Exclude Opinions of ViaSat's Damages Expert, at 10 (Dkt. # 772). But *Presidio* did not address the issue before this Court – whether a patentee may recover lost profits from an alleged infringer based on a <u>third party's use</u> of the product, where the patentee and the alleged infringer do not compete in the sale of that product – much less where, as the jury found here, the alleged infringer does not induce infringement or contributorily infringe. Rather, the *Presidio* Court determined that the patentee's product "directly competed" with the alleged infringing product that the defendant sold – thus, that they were direct competitors. 702 F.3d at 1360.

15
16
17
18
19
20
21
22
23
24

The *Panduit* factors also make clear that the patentee and the alleged infringer must be competitors to award lost profits. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) (discussing "sales made by <u>the infringer</u>" as a basis for lost profits). Under *Panduit*, a patentee must prove four elements to demonstrate eligibility for lost profits: "(1) a demand for <u>the patented product</u>, (2) the absence of an acceptable, non-infringing substitute for <u>the patented product</u>, (3) the patent owner's manufacturing and marketing capability to exploit the demand for <u>the patented product</u>, and (4) the amount of profit the patent owner would have expected to make if the patent owner had made <u>the infringer's sales</u>." *SmithKline Diagnostics*, 926 F.2d at 1165 (emphasis added, footnote

omitted). Here, the patented product is a high capacity broadband communications satellite– not satellite broadband subscriptions – and SS/L's sale was a single sale of the Jupiter satellite to Hughes.

Again, Federal Circuit precedent is consistent. For example, the Federal Circuit has stated that the first *Panduit* factor "presupposes that demand for the infringer's and patent owner's products is interchangeable," and the second *Panduit* factor "presupposes that the patentee and the infringer sell substantially similar products in the same market." *BIC Leisure Prods*., 1 F.3d at 1218-19; *see DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009) (the first *Panduit* factor "simply asks whether demand existed for the 'patented product,' *i.e.*, a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'") (quoting *Rite-Hite*, 56 F.3d at 1548-49). But here, ViaSat and SS/L do not sell similar products and do not compete in the same market. The only evidence ViaSat offered concerned <u>Hughes's</u> similar product (a satellite broadband service) and its competition with <u>Hughes</u>.

The third *Panduit* factor requires that the patentee have "manufacturing and marketing capability to exploit the demand <u>for the patented product</u>." *SmithKline Diagnostics*, 926 F.2d at 1165 (emphasis added). Evidence that ViaSat had the manufacturing and marketing capability to sell <u>more satellite broadband subscriptions</u> cannot satisfy this. And the fourth *Panduit* factor requires that ViaSat show the amount of profit it "would have expected to make if [it] had made <u>the infringer's sales</u>." *Id.* (emphasis added). Once again, ViaSat lost no sales to SS/L. Black Decl. Ex. 1 (Trial Tr. 1821:20-23).

Finally, permitting a lost profits damages award to be based on Hughes's use

runs afoul of the requirement that lost profits under the patent statute be "objective[ly] foreseeab[le]." *Rite-Hite*, 56 F.3d at 1546; *Grain Processing*, 185 F.3d at 1349 ("Full compensation includes any <u>foreseeable</u> lost profits the patent owner can prove.") (emphasis added). It is not reasonably foreseeable that SS/L's alleged infringement would expose it to lost profits entirely based on ViaSat's alleged lost subscribers to Hughes. This is particularly the case in light of (1) the undisputed testimony that there was enough demand in the market for both ViaSat-1 and Jupiter[4]; (2) ViaSat's CEO Mark Dankberg's public statements that ViaSat's broadband service was not affected at all by Jupiter and that the market was "big enough for both" Black Decl. Ex. 1 (Trial Tr. 1826:16-19); and (3) the nature of the market such that both ViaSat's ability to gain new subscribers and Hughes's ability to allegedly take such subscribers from ViaSat is dependent upon brand recognition, marketing, and sales staff, among other factors unrelated to the patented invention, Black Decl. Ex. 2 (Trial Tr. vol. X, 2583:24-2584:8, Apr. 9, 2014).

### B.    Dr. Slottje's Lost Profits Analysis Fails at Every Step

Even if the Court determines that ViaSat may seek lost profits from SS/L based on Hughes's use of the Jupiter satellite, the jury's lost profits award is insufficient as a matter of law because the lost profits analysis proffered by ViaSat, through Dr. Slottje, is too speculative to support a lost profits award of any amount. Each of the steps in Dr. Slottje's analysis is riddled with errors, based on false

---

[4] ViaSat's President and COO, Richard Baldridge testified that there was enough demand to satisfy multiple satellites, such that both companies are building additional high capacity satellites to fill the demand. Black Decl. Ex. 3 (Trial Tr. vol. II, 376:25-7, Mar. 26, 2014); Black Decl. Ex. 2 (Trial Tr. 2602:10-21).

assumptions, and/or unsupported by the evidence.

"In general, a patent owner must prove causation in fact by showing (1) a demand for the patented product, (2) an absence of acceptable non-infringing substitutes, (3) the manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent owner would have made ('the *Panduit* factors')." *Calico Brand, Inc. v. Ameritek Imports, Inc.*, 527 Fed. Appx. 987, 995 (Fed. Cir. 2013). A patentee is not entitled to lost profits if it fails to establish any of these requirements. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1165 (Fed. Cir. 1991). "To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003). Lost profits cannot be speculative or be based on "faulty assumptions and a lack of reliable economic testimony relevant to th[e] market." *Oiness*, 88 F.3d at 1032.

There is a "heightened burden" to prove future lost profits damages. *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 526 (D. Del. 2008). "The burden of proving future injury is commensurately greater than that for damages already incurred, for the future always harbors unknowns." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992).

1.  Dr. Slottje's assumption that "but for" the alleged infringement, SS/L would have produced only a 32 Gbps alternative satellite is unsupported by the evidence.

Dr. Slottje's lost profits model was based on the incorrect assumption that because the patented technology allegedly contributed 78 Gbps of capacity to the Jupiter satellite, in his "but for world," without the use of ViaSat's patented

technology, SS/L would have been able to build only a 32 Gbps Jupiter satellite for Hughes.[5] Black Decl. Ex. 4 (Trial Tr. vol. VII, 1765:8-9, Apr. 3, 2014). He based this assumption on the "technical experts." Black Decl. Ex. 4 (Trial Tr. 1766:4-8). But the testimony of those experts (Dr. Bartone and Mr. Sturza) regarding the alleged capacity increases on a patent-by-patent basis was conclusory and is insufficient to support the 78 Gbps capacity increase on which Dr. Slottje based his lost profits model.[6] *See* SS/L's Mot. for J. as a Matter of Law (Renewed), or a New

---

[5] Dr. Slottje also incorrectly assumed that the Jupiter satellite has only 110 Gbps of capacity, whereas SS/L presented the unrebutted testimony of Hughes's Executive Vice President and General Manager North America Division, Paul Gaske, that Jupiter's actual capacity is 120 Gbps. Black Decl. Ex. 2 (Trial Tr. 2590:13-21). Even if ViaSat's technology allowed for a 78 Gbps increase in capacity, therefore, that would result in a 42 Gbps alternative satellite, not a 32 Gbps alternative. Dr. Slottje's lost profits model, based on a 32 Gbps alternative, is based on this flawed factual premise and fails for this reason alone.

[6] Dr. Bartone incorrectly calculated the '875 capacity increase based on the single claim limitation that increases capacity – the separation of gateway and user beams present in dependent Claim 12 – and did not factor in the capacity decrease from the overlapping gateways and user beams that Claim 12 also requires. Black Decl. Ex. 4 (Trial Tr. 1544:5-19); Black Decl. Ex. 1 (Trial Tr. 1925:21-1927:2); Black Decl. Ex. 2 (Trial Tr. 2502:4-10).

When calculating the capacity increase attributable to the '043 patent, Mr. Sturza offered no explanation as to why he calculated the increase as compared to a seven color system, and there is no evidence in the record to support such an assumption. Black Decl. Ex. 4 (Trial Tr. 1664:3-7). Moreover, ViaSat's own evidence showed that slightly modified beam spacings would reduce capacity by only a small amount and would not infringe. Black Decl. Ex. 1 (Trial Tr. 2002-06; 2013:21-2014:1).

Finally, Mr. Sturza relied on the capacity available from the NGSO spectrum to calculate the capacity increase allegedly attributable to the '827 patent. Black Decl. Ex. 4 (Trial Tr. 1689:22-1692:2). But ViaSat did not invent the use of the NGSO spectrum, and there is no evidence that an interfering NGSO satellite will launch during Jupiter's life. At a minimum, Mr. Sturza should have discounted the capacity increase by the risk that NGSO interference will never occur.

1
2

Trial (2 of 12), Regarding Reasonable Royalty Damages, Part IV.C, filed concurrently herewith and incorporated by reference herein.

3
4
5
6
7
8
9
10
11
12
13
14
15
16

Dr. Slottje also failed to take into account SS/L's ability to implement non-infringing alternatives that demonstrate that SS/L could have built more than a 32 Gbps satellite without using ViaSat's technology. For example, it is undisputed that SS/L built a 45 Gbps satellite (iPSTAR) that ViaSat did not accuse of infringement, and that this satellite would have achieved 110 to 130 Gbps had it been built as a Ka-band only satellite over the United States. Black Decl. Ex. 1 (Trial Tr. at 1860-65; 2102-03). Additionally, Boeing and Lockheed Martin both bid the Jupiter-1 project and proposed a satellite at or around 100 Gbps, and neither company is accused of offering to sell an infringing satellite. Black Decl. Ex. 1 (Trial Tr. 1904:22-1905:21). And the 45 Gbps NBN satellite – which Dr. Slottje assumed infringed and assumed had a capacity increase attributable to the '043 technology – does not infringe ViaSat's patents. Black Decl. Ex. 3 (Trial Tr. 279:19-24); Black Decl. Ex. 4 (Trial Tr. 1805:7-16). Dr. Slottje's failure to even consider this evidence renders his opinion unreliable.

17
18
19
20
21
22
23
24

ViaSat's two key witnesses, Mr. Dankberg and Mark Miller (ViaSat's Vice President and Chief Technical Officer), both admitted that one could "build and launch a 100-gigabit-per-second satellite and that doesn't necessarily mean they've stolen anything from [ViaSat]." Black Decl. Ex. 5 (Trial Tr. vol. I, 234:10-13, Mar. 25, 2014) (Dankberg); *see* Black Decl. Ex. 1 (Trial Tr. 1869:24-1870:10) (Miller); Black Decl. Ex. 6 (Trial Ex. S-283). Dr. Slottje's only response to this testimony— by ViaSat's own employees—was that such a satellite would be "economically infeasible," but offered no analysis to support that conclusion. Black Decl. Ex. 1

(Trial Tr. 1875:14-23).

SS/L also proposed a variety of non-infringing alternative designs through its experts that also belie Dr. Slottje's assumption that but for the alleged infringement, SS/L would have had only a 32 Gbps non-infringing satellite. Black Decl. Ex. 4 (Trial Tr. 1720-21); Black Decl. Ex. 1 (Trial Tr. 1925-30, 1936-37, 1983-84, 1995-97); Black Decl. Ex. 2 (Trial Tr. 2500:10-2506:16). ViaSat did not provide sufficient evidence showing that those alternatives would have been infringing, infeasible, unavailable to SS/L, or unacceptable to Hughes.[7]

Dr. Slottje's 32 Gbps alternative satellite, on which the entire lost profits damages award is based, is simply not credible and has insufficient evidentiary support in the record to support the lost profits award.

> 2.    Dr. Slottje's assumption that there would be 324,520 overflow Jupiter subscribers is contradicted by the evidence.

The next step of Dr. Slottje's lost profits analysis also has no evidentiary support because it was based on an incorrect number of projected Jupiter subscribers. Dr. Slottje projected future Hughes's subscribers through the end of his lost profits period – the second quarter of 2016 – using only three quarters of

---

[7] For the '875, Dr. Bartone simply testified Jupiter would be "locked down" after the date of the critical design review such that it would be "very, very difficult" to move gateways to eliminate any overlapping gateway and user beams. Black Decl. Ex. 4 (Trial Tr. 1547:20-25). Mr. Sturza's testimony on the '043 non-infringing alternatives was similarly cursory; he merely stated that SS/L "had not implemented any design in terms of the design around," that he was "not aware of any commercially offered products that would provide viable noninfringing alternatives," and that the other "potential options" "would have essentially drastic reduction in capacity of the system, but they wouldn't be viable." Black Decl. Ex. 4 (Trial Tr. 1665:6-19). Regarding the '827, he testified that the only viable alternative was to refrain from using the NGSO spectrum altogether. Black Decl. Ex. 4 (Trial Tr. 1720:3 – 1721:8).

Hughes's actual subscriber data and applied a compound quarterly growth rate of 9.54%. This resulted in a projection of over one million Jupiter subscribers by the second quarter of 2016. Black Decl. Ex. 4 (Trial Tr. 1674:8-25).

This projection has no basis in the evidence and is inconsistent with Hughes's actual projections. Mr. Gaske testified that Hughes projects that it will have only 850,000 subscribers in June 2016, will never fill to capacity, and will never have one million subscribers. Black Decl. Ex. 2 (Trial Tr. 2584:9-2585:3). Hughes's projections show a maximum of 674,651 subscribers in the fourth quarter of 2015, Black Decl. Ex. 7 (Trial Ex. V13 at HUGHES-169175), whereas Dr. Slottje's projections showed total Jupiter subscribers at 844,397 in the fourth quarter of 2015. Black Decl. Ex. 8 (Trial Demonstrative PDX11-38); *see also* Black Decl. Ex. 9 (Trial Ex. V12 at HUGHES-165494) (Hughes "unofficial estimate" projecting only 517,765 subscribers in 2015). ViaSat did not offer any alternative calculation based on Hughes' corrected projections. Thus, the 324,520 subscribers that Dr. Slottje assumed ViaSat would capture from Hughes is inaccurate, unreliable, and cannot constitute a legally sufficient evidentiary basis for an award of lost profits.

        3.    <u>Dr. Slottje's assumption that all of the Jupiter overflow subscribers would be captured by ViaSat is unsupported by the evidence.</u>

Dr. Slottje's third step in his lost profits analysis also lacks evidentiary basis. Dr. Slottje determined the number of Jupiter subscribers that he assumed would have been available for ViaSat to capture in the "but for" world by subtracting the number of subscribers he assumed that a 32 Gbps Jupiter satellite could support (315,000) from the number of Jupiter subscribers he projected. Black Decl. Ex. 4

(Trial Tr. 1767:2-4). He then calculated how many of the Jupiter overflow subscribers would have been captured by ViaSat each quarter: he assumed that for seven quarters, 100% of the available Jupiter subscribers would have been captured by ViaSat, and for the eighth quarter, he assumed that 99% would have been captured by ViaSat, until the number of captured subscribers reached 324,520. Black Decl. Ex. 4 (Trial Tr. 1771:22-25); Black Decl. Ex. 1 (Trial Tr. 1830:21-1831:6); Black Decl. Ex. 2 (Trial Tr. 2607:16-25).

Dr. Slottje performed no market analyses and did not review a single piece of market data to support this remarkable assumption that all Hughes's overflow subscribers and potential future overflow subscribers would migrate to ViaSat for seven quarters; let alone survey Hughes's subscribers to determine whether they actually subscribed to Jupiter because "they want[ed] satellite broadband" – rather than because they received a mailer or responded to advertising or a sales call, or because of price, availability, quality of bundling, brand recognition, or any other reason. Black Decl. Ex. 4 (Trial Tr. 1767:13). Rather, he relied on what he termed "revealed preferences" to support his faulty assumption that 100% of the available Jupiter subscribers (many of whom are projected future subscribers) for seven consecutive quarters were so partial to satellite broadband that they would have subscribed to ViaSat's service. Black Decl. Ex. 1 (Trial Tr. 1833:24-4).

Dr. Slottje's assumption is directly contradicted by the evidence. ViaSat itself admitted that it competes "with dial-up, with satellite, with fixed wireless, with DSL, [and] with cable," as does Jupiter.[8] *See, e.g.*, Black Decl. Ex. 1 (Trial Tr.

_____

[8] Dr. Slottje's attempt to evade this undisputed evidence by declaring the "satellite broadband market" to be a distinct sub-market with "two players" is insufficient

1827:7-10); Black Decl. Ex. 2 (Trial Tr. 2581:8-19; 2582:3-24). Moreover, Dr. Slottje admitted that there is uncertainty as to what broadband competition would exist during his future lost profits period. Black Decl. Ex. 1 (Trial Tr. 1835:10-19). He further admitted that it would be "inappropriate to assume a one-to-one capture rate <u>because of the fact that we know there are other forms of broadband that are out there</u>" that Jupiter subscribers may have purchased instead of satellite broadband, and he did not even know if the Hughes subscribers he said would have chosen ViaSat instead had even <u>heard</u> of ViaSat, leaving no support for Dr. Slottje's assumption that 100% of those subscribers could have chosen ViaSat's service in the but-for world. Black Decl. Ex. 1 (Trial Tr. 1834:12-1835:3, 1837:13-2). Indeed, even ViaSat's Senior Vice President of Broadband Services, Kevin Harkenrider, testified that it would be speculative to assume that every overflow customer who signed up for Jupiter would have signed up for ViaSat. Black Decl. Ex. 1 (Trial Tr. 1838:7-1839:4).

      In addition to these infirmities in Dr. Slottje's analysis, he failed to consider

---

(… cont'd)

under the law because there is no evidence of a two-supplier market. Black Decl. Ex. 1 (Trial Tr. 1827:6). "Accurately identifying a two-supplier market 'requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics.'" *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011) (quoting *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003)). Dr. Slottje performed no such analysis and did not consider the "realities of the marketplace." *SmithKline Diagnostics*, 926 F.2d at 1166 (affirming district court's rejection of the patentee's theory of a two-supplier market as "inaccurate, not credible and against the great weight of the evidence," reasoning that "if the realities of the market are that others would likely have captured sales made by the infringer, despite a difference in the products, it follows that the 'but for' test is not met.").

that approximately 2% of Jupiter-1 subscribers have line of site issues that would make them <u>unable</u> to subscribe to ViaSat-1. Black Decl. Ex. 2 (Trial Tr. 2583:2-19); Black Decl. Ex. 1 (Trial Tr. 1835:5-9). His calculations also captured Jupiter subscribers from Spokane, where ViaSat does not have a beam, and from California and Maine, who do not have access to ViaSat-1. Black Decl. Ex. 2 (Trial Tr. 2579:24-2581:6).

Dr. Slottje also admitted that for ViaSat-1 to capture Hughes subscribers, the overflow customers have to be in a location where ViaSat has a beam that has room to accommodate the subscribers. Black Decl. Ex. 1 (Trial Tr. 1840:8-16; 1845:22-1846:4. But when Dr. Slottje performed his lost profits calculations, he was unaware that certain ViaSat-1 beams were reaching capacity and thus could not accommodate any overflow Jupiter subscribers. Black Decl. Ex. 1 (Trial Tr. 1841:11-1842:16). Indeed, he did not even recall reviewing <u>any</u> ViaSat beam fill projections—which project that a total of 30 beams will be closed by the end of Dr. Slottje's lost profits period. Black Decl. Ex. 1 (Trial Tr. 1845:7-21; 1846:15-19); Black Decl. Ex. 10 (Trial Ex. S-186B). Nor did Dr. Slottje determine whether any of the "overflow" subscribers from Jupiter were from Jupiter beams that in the "but for" world will never fill – whereas Mr. Gaske testified that about 1/3 of Jupiter's beams are never projected to fill. Black Decl. Ex. 2 (Trial Tr. 2585:4-9).

Dr. Slottje's assumptions, with no supporting market analysis and indeed undermined and sometimes contradicted by the record evidence, are too speculative to support a lost profits award.

4.   <u>Dr. Slottje's profit per subscriber figure is unsupported by the evidence</u>

Dr. Slottje's $77 "actual profit per subscriber" per quarter, based on ViaSat-1

and WildBlue past subscription revenue through June 2013, is similarly lacking in evidentiary support. Black Decl. Ex. 1 (Trial Tr. 1848:6-21); Black Decl. Ex. 11 (Trial Ex. V-1374 at Tab Subs_Revs). In calculating this figure, Dr. Slottje not only ignored evidence that it takes up to two years for a ViaSat retail subscriber to become profitable, but also failed to include $700-$800 of subscriber acquisition costs per retail subscriber. Black Decl. Ex. 1 (Trial Tr. 1849:25-1852:8). He reasoned it would be "wrong to take … into account" such costs – which included the satellite dish that each subscriber needs outside of the home – because they were a "fixed cost" that ViaSat "would still have to incur" whether "in a but-for world or a real world." Black Decl. Ex. 1 (Trial Tr. 1852:5-8). He did not explain how ViaSat would have to incur these "fixed costs" in the actual world if it did not acquire the "but for" subscribers. The result of this omission was to exclude between $151 and $173 million of costs from the lost profits model. Black Decl. Ex. 1 (Trial Tr. 1855:11-1156:7); Black Decl. Ex. 2 (Trial Tr. 2617:21-2620:23). This omission of millions of dollars of costs from his lost profits calculation renders his model fundamentally flawed.

5.    Dr. Slottje's lost profits analysis required the jury to speculate as to how to apply his model to calculate its own award.

Using the $77 profit per subscriber per quarter figure and the 324,520 Jupiter subscribers he assumed would have subscribed to ViaSat in his "but for" world, Dr. Slottje calculated $175.2 million in lost profits. Black Decl. Ex. 4 (Trial Tr. 1772:12-18). He did not offer any alternative lost profits calculation. He failed to inform the jury how he performed the present value calculation or how a change in any of the numbers would affect the lost profits analysis. Thus, when the jury determined that not all of the lost profits Dr. Slottje suggested were appropriate, it

was left without any tools to calculate an alternative lost profits award. Because damages awards cannot be based on such guesswork, *Oiness*, 88 F.3d at 1031, even a lost profits award of less than the full amount requested cannot be supported.

### C.   Lost Profits Are Unavailable Under *Panduit*

Finally, the jury award must be vacated because ViaSat did not meet its burden of proving that lost profits are available under *Panduit*. As set forth above, the *Panduit* factors require that SS/L and ViaSat sell products that compete in the same market. Because SS/L and ViaSat are not competitors, lost profits are not available for this reason alone. But even if lost profits were legally available to ViaSat as a non-competitor, ViaSat did not provide sufficient evidence to meet the second and fourth *Panduit* factors.

The second *Panduit* factor requires ViaSat to demonstrate the absence of a non-infringing substitute. The overwhelming evidence suggests that there were non-infringing substitutes to both the Jupiter satellite and to ViaSat's satellite broadband service. As discussed above, it is undisputed that SS/L could have built a 100 Gbps satellite without infringing, and there is insufficient evidence that the patented technology contributed 78 Gbps of capacity to the Jupiter satellite on a patent-by-patent basis. Also, as discussed above, the uncontested evidence shows there are multiple broadband alternatives available on the market throughout the lost profits period, that the broadband market is an extremely competitive one, and that satellite broadband competes with DSL, cable, fiber, and wireless providers. Black Decl. Ex. 1 (Trial Tr. 1826:23-1827:10); Black Decl. Ex. 2 (Trial Tr. 2581:8-19; 2582:3-24). Moreover, Dr. Slottje provided no analysis in support of a two-supplier market. *See supra* n.8. Dr. Slottje's unsupported assumption that there is a

distinct market for satellite broadband that does not compete with other forms of broadband does not constitute "sound economic proof of the nature of the market and likely outcomes with infringement factored out" as required to claim lost profits. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

Finally, as set forth above, ViaSat did not present sufficient evidence of the amount of profit it "would have expected to make if [it] had made <u>the infringer's sales</u>" to satisfy the fourth *Panduit* factor. *SmithKline Diagnostics*, 926 F.2d at 1165 (emphasis added). ViaSat presented no evidence that ViaSat lost any sales to SS/L. But even if it were proper for ViaSat to base lost profits on the broadband subscribers it allegedly lost to Hughes, as discussed above, Dr. Slottje's lost profits model is speculative and is neither a reasonable approximation of such losses, nor is Dr. Slottje's model based on reliable economic proof. *See Grain Processing*, 185 F.2d at 1345; *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983).

## IV.   CONCLUSION

For the reasons stated above, SS/L's JMOL motion should be granted that ViaSat is not entitled to any lost profits, or in the alternative, a new trial on damages should be granted.

//

//

//

//

//

1     Dated: June 13, 2014              By:  */s/ Rachel S. Black*

2

3                                       Marc M. Seltzer
                                        Amanda K. Bonn

4                                         SUSMAN GODFREY L.L.P.
                                        1901 Avenue of the Stars, Suite 950

5                                         Los Angeles, CA 90067-6029
                                        Telephone: (310) 789-3100

6                                         Fax: (310) 789-3150
                                        Email: abonn@susmangodfrey.com

7

8                                         William Christopher Carmody
                                        (Admitted *Pro Hac Vice*)

9                                         Jacob W. Buchdahl
                                        (Admitted *Pro Hac Vice*)

10                                      Mark Musico
                                      (Admitted *Pro Hac Vice*)

11                                      SUSMAN GODFREY L.L.P.

12                                      560 Lexington Avenue, 15th Floor
                                      New York, NY 10022

13                                      Telephone: (212) 336-8330
                                      Fax: (212) 336-8340

14

15                                      Joseph S. Grinstein
                                      (Admitted *Pro Hac Vice*)

16                                      William R. H. Merrill
                                      (Admitted *Pro Hac Vice*)

17                                      SUSMAN GODFREY L.L.P

18                                      1000 Louisiana Street, Suite 5100
                                      Houston, Texas 77002-5096

19                                      Telephone:  713-653-7856
                                      Facsimile:   713-654-6666

20                                      Email: jgrinstein@susmangodfrey.com
                                      Email: bmerrill@susmangodfrey.com

21

22                                      Ian B. Crosby
                                      (Admitted *Pro Hac Vice*)

23                                      Rachel S. Black
                                      (Admitted *Pro Hac Vice*)

24                                      Patrick C. Bageant
                                      SUSMAN GODFREY L.L.P.

1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3861
Fax: (206) 516-3883
Email: icrosby@susmangodfrey.com
Email: rblack@susmangodfrey.com
Email: pbageant@susmangodfrey.com

*Attorneys for Defendants/Counterclaim*
*Plaintiffs Space Systems/Loral, LLC (f/k/a*
*Space Systems/Loral, Inc.) and Loral Space*
*& Communications Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 13, 2014, I caused the foregoing **SS/L'S MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED), OR A NEW TRIAL (3 OF 12), REGARDING LOST PROFITS DAMAGES** to be served on opposing counsel via the Court's CM/ECF system.

Dated: June 13, 2014                              By:  */s/ Rachel S. Black*