1  William Christopher Carmody
   (Admitted *pro hac vice*)
2  Jacob W. Buchdahl
   (Admitted *pro hac vice*)
3  SUSMAN GODFREY L.L.P.
4  560 Lexington Avenue, 15th Floor
   New York, New York 10022
5  Telephone:  (212) 336-8330
   Facsimile:   (212) 336-8340
6  Email: bcarmody@susmangodfrey.com
7  Email: jbuchdahl@susmangodfrey.com

8  Marc M. Seltzer (54534)
   SUSMAN GODFREY L.L.P.
9  1901 Avenue of the Stars, Suite 950
   Los Angeles, CA 90067-6029
10 Telephone:  (310) 789-3100
   Facsimile:   (310) 789-3150
11 Email: mseltzer@susmangodfrey.com

12 [Additional counsel listed below signature line]

13 *Attorneys for Defendants*

14

15              **UNITED STATES DISTRICT COURT**

16            **SOUTHERN DISTRICT OF CALIFORNIA**

17 | VIASAT, INC., | Case No. 3:12-cv-00260-H-WVG |
18 |         Plaintiff, | |
   |   vs. | Hon. Marilyn L. Huff |
19 | SPACE SYSTEMS/LORAL, INC., | |
   | LORAL SPACE & | **SS/L'S MOTION FOR A NEW** |
20 | COMMUNICATIONS INC., | **TRIAL (5 OF 12)** |
21 |         Defendants/Counterclaim | |
   |         Plaintiffs. | Date: July 22, 2014 |
22 | | Time: 9:00 a.m. |
   | | Place: Courtroom 15A |
23

24

1

# TABLE OF CONTENTS

2

I.      INTRODUCTION .............................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................ 3

III.    LEGAL STANDARD ....................................................................................... 7

IV.     ARGUMENT .................................................................................................... 8

      A.      The Erroneous Admission of "Option 3" and Burr Patent
             Evidence Substantially Prejudiced SS/L, Requiring a New Trial. ........ 8

           1.      This Evidence Is Irrelevant to Breach of Contract. .................... 8

           2.      The Evidence Is Irrelevant to Patent Validity. ......................... 13

           3.      Because Passion and Prejudice Impacted Both Liability
               and Damages, a New Trial on All Issues is Required. ............... 22

      A.      The *Allen* Charge, After the Court Learned of the Jury's
             Numerical Division, Was Per Se Error Requiring a New Trial .......... 23

V.      CONCLUSION ............................................................................................... 25

1

# TABLE OF AUTHORITIES

2

3   <u>**Cases**</u>

4   *Allied Chem. Corp. v. Daiflon,*
     449 U.S. 33 (1980) ..................................................................................7, 17

5

6   *Amazon.com, Inc.,*
     239 F.3d at 1336 .......................................................................................... 16

7   *Balboa Ins. Co. v. Trans Global Equities,*
     267 Cal. Rptr. 787 (Ct. App. 1990) ......................................................... 13, 19

8

9   *Bloom Eng'g Co. v. N. Am. Mfg. Co.,*
     129 F.3d 1247 (Fed. Cir. 1997) ................................................................... 11

10  *Brasfield v. United States,*
     272 U.S. 448 (1926) ..................................................................................... 24

11

12  *Buffets, Inc. v. Klinke,*
     73 F.3d 965 (9th Cir. 1996) .......................................................................... 12

13

14  *Burroughs Wellcome Co. v. Barr Labs., Inc.,*
     40 F.3d 1223 (Fed. Cir. 1994) ...................................................................... 15

15  *In re Grasselli,*
     713 F.2d 731 (Fed. Cir. 1983) ...................................................................... 16

16

17  *Jenkins v. United States,*
     380 U.S. 445 (1965) ..................................................................................... 24

18

19  *Magnivision, Inc. v. Bonneau Co.,*
     115 F.3d 956 (Fed. Cir. 1997) .............................................................20, 21, 22

20  *MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.,*
     731 F.3d 1258(Fed. Cir. 2013) ..................................................................... 16

21

22  *Millenkamp v. Davisco Foods Int'l, Inc.,*
     562 F.3d 971(9th Cir. 2009) ........................................................................... 7

23

24

*Minneapolis, St. Paul & Sault Ste. Marie Ry. V. Moquin*,
    283 U.S. 520 (1931) ................................................................. 7, 23

*Molski v. M.J. Cable, Inc.,*,
    471 F.3d 724 (9th Cir. 2007) ............................................................ 7

*Montgomery Ward & Co. v. Duncan*,
    311 U.S. 243 (1940) ................................................................. 7, 11

*On-Line Tech. v. Bodenseewerk Perkin-Elmer*,
    386 F.3d 1133 (Fed. Cir. 2004) ....................................................... 12

*Seymour v. Summa Vista Cinema, Inc.*,
    809 F.2d 1385 (9th Cir. 1987) ........................................................... 7

*Tavory v. NTP, Inc.*,
    297 Fed. Appx. 976 (Fed. Cir. 2008) .......................................... 13, 14

*U.S. Phillips Corp. v. Int'l Trade Comm'n*,
    424 F.3d 1179 (Fed. Cir. 2005) .................................................... 9, 10

*United States v. Ajiboye*,
    961 F.2d 892 (9th Cir. 1992) .......................................................... 24

*United States v. Beattie*,
    613 F.2d 762 (9th Cir. 1980) .................................................... 23, 24

*United States v. Brown*,
    411 F.2d 930 (7th Cir. 1969) .......................................................... 23

*United States v. Williams*,
    547 F.3d 1187 (9th Cir. 2008) ....................................................... 3, 4

**Statutes**

35 U.S.C. § 154(d) ............................................................................ 10

Defendant Space Systems/Loral, LLC ("SS/L") hereby renews its motion for a mistrial and seeks a new trial under Rule 59.

## I.    INTRODUCTION

Before trial, the Court ruled on summary judgment that the "Option 3" email was not proprietary to ViaSat under the March 8, 2006 NDA and that the "separate 'IP' provision" of the Build Contract—Article 39—did not alter that conclusion. Dkt. 720 at 8. Yet ViaSat spent nearly the entirety of its case attempting to prove that (1) the key concepts disclosed in the "Option 3" email belong to ViaSat; (2) Doug Burr stole those ideas in filing for his patent application; and (3) SS/L breached its contractual obligations by disclosing those concepts in Mr. Burr's patent filings and also to Hughes. In so doing, ViaSat devoted the lion's share of its trial presentation to an inflammatory and legally meritless breach of contract claim, turning what was billed as a patent infringement case into a smear campaign against a small number of SS/L employees who were not even in a position to transfer information from the ViaSat-1 program to Hughes. The unfair prejudice that SS/L suffered as a result of the erroneous admission of such evidence is apparent on the face of the verdict itself: the jury awarded $102 million in separate, non-overlapping contract damages despite the fact that ViaSat's own damages expert opined that no such separate breach of contract damages existed.

In light of the Court's summary judgment ruling, as a matter of law, none of the concepts in the "Option 3" email belongs to ViaSat, and therefore SS/L's disclosure of them through either the Burr patent or otherwise cannot establish a contractual breach. The Court allowed the evidence to be introduced at trial—over

SS/L's motion in limine and later objections—based in large part on ViaSat's representation that "Option 3" and the Burr patent filings would be relevant to showing "secondary indicia" of non-obviousness of the '875 patent. This representation was revealed to be false on Day 1 of the trial, when Mr. Dankberg himself admitted "Option 3" did not evidence his conception of the '875 patent.

It is difficult to overstate the extent to which the "Option 3" email, the concepts therein, and the Doug Burr patent filings influenced this trial. Because "Option 3" is not proprietary and is not the '875 patent, SS/L was <u>entitled</u> to use such concepts in any subsequent satellite—and doing so would actually <u>design-around</u> the '875 patent (which, unlike the "Option 3" email, requires at least one feeder beam be proximate to a service beam). And yet ViaSat was allowed to devote substantial time each day of the trial to (1) arguing that SS/L <u>stole</u> "Option 3" from ViaSat and (2) conflating "Option 3" with the '875 patent.

As a result, ViaSat's counsel turned this trial into a side-show about a document and the concepts it disclosed that, as a matter of law, <u>do not belong to ViaSat.</u> The prejudicial effect of this evidence was to leave the impression that SSL and its employees are "bad actors" and sway the jury to find liability and award damages based on its passion and prejudice. Because the trial was tainted by the admission of evidence and argument regarding "Option 3" and the Burr patent filings—and because the damages verdict was clearly excessive and reflects that passion and prejudice impacted both liability and damages—SS/L respectfully requests a new trial on all issues.

SS/L also renews its request for a mistrial and requests a new trial based on

the Court's issuance of an *Allen* charge to the jury after conducting an in-chambers inquiry that identified a numerical division among the jury. It is settled Ninth Circuit law that "[i]f the trial judge gives an *Allen* charge <u>after inquiring into the numerical division of the jury, the charge is per se coercive and requires reversal</u>." *United States v. Williams*, 547 F.3d 1187, 1205 (9th Cir. 2008) (quotation marks and citations omitted) (emphasis added). That is what happened here; after a juror reported feeling "physically threatened" by another juror, the Court conducted interviews of each juror, during which the Court learned that the jury was divided, with two jurors in the minority position, including the juror who had been accused of issuing a threat. Because the *Allen* charge issued after the Court's inquiry, it risked being perceived as directed to the minority-view juror, and was thus per se coercive, requiring a new trial.

## II.   STATEMENT OF FACTS

During opening statements, ViaSat argued over objection that SS/L "specifically recognized ViaSat's <u>proprietary information</u>" stemming from the "Option 3" email and "separating out the two beams, having separation between the two beams and being able to reuse the frequency of those two beams." Trial Tr. at 73-75. ViaSat argued that SS/L, through Doug Burr, filed a patent "in an attempt to <u>steal Mr. Dankberg's revolutionary idea</u>" embodied in the "Option 3" email. *Id.* at 73; 75-76 (emphasis added).

Remarkably, ViaSat's counsel then <u>admitted</u> that the Doug Burr "patent is <u>irrelevant</u>" because it is "not being asserted" against ViaSat. *Id.* at 76 (emphasis added). ViaSat urged the jury to consider it anyway: "That's not honestly. That's not

being trustworthy. That's breaching your trust." *Id.*

Following opening statement, the "Option 3" issue permeated the entirety of the trial. Nearly every witness was asked about it, either expressly by name (the "Option 3" email) or by the three-part mantra ViaSat's counsel used to describe the "Option 3" concepts: "one, partial CONUS coverage, two, gateways located outside of user beams and, three, gateways reusing all available frequency in a single system . . . ."[1] This three part mantra—which simply recites the features of the "Option 3" email—is <u>not</u> the '875 patent because it <u>lacks</u> any proximate feeder and service beams. On Day 1 of the trial, ViaSat's president Mr. Dankberg (and one of the named inventors on the '875 patent) admitted as much:

> Q.    Okay. Do you contend that this E-mail is evidence of your conception of the '875 patent?
>
> A.    I don't think so. I don't think so. I wouldn't say that.

Trial Tr. at 227.

At the end of the fourth day of ViaSat's case, the Court noted that "I thought this was a patent case and we haven't quite got there yet." Trial Tr. at 1088. ViaSat's counsel answered , "we're going to be getting to it, your Honor." Trial Tr. at 1088. It wasn't until the fifth day that ViaSat moved all of its patents into evidence. Trial Tr. at 1345 ("We haven't moved one of the patents in yet.").

Based on the erroneous admission of the "Option 3" email and Burr patent

---

[1] *E.g.*, Trial Tr. at 162-64, 219-27, 260-65, 284-85, 394-400, 406-07, 409, 411, 414-26, 464-65, 474-75, 472-74, 496, 519-21, 531-35, 568-59, 636-49, 527-35, 554-68, 671-73, 640-46, 650, 753-54, 785, 816-19, 841, 873-78, 879, 892, 924, 934, 962, 1025-56, 1049-53, 1247, 1434-35, 1456-57, 1469, 1474-75, 1557, 1586, 1591, 1953, 2522, 2689-2690.

filings—and counsel's improper arguments and questioning suggesting "Option 3" was ViaSat's proprietary information or intellectual property—SS/L repeatedly moved for a mistrial, both orally and in writing. *See, e.g.*, Trial Tr. at 546, 756, 1489-97, 2357, 3175-78. Moreover, SS/L asked on multiple occasions for a limiting instruction regarding the "Option 3" email, which the Court declined to issue in the form SS/L requested and did not issue at all until the end of the second week of trial, during the testimony of ViaSat's first expert witness, and after ViaSat had finished calling every fact witness in its case. *See, e.g.*, Trial Tr. at 362, 380-83, 394, 571, 754-55. When the Court finally issued an instruction, it told the jury only:

> The Option 3 email—and the specific exhibit number is V-517—is not proprietary to ViaSat. Under the terms of the NDA, the parties had to mark it as proprietary or within 30 days, then mark it. And this was not done. So the Court has ruled that it's not proprietary as to the nondisclosure agreement.

Trial Tr. at 1556. This instruction compounded the problem by allowing the jury to believe that the "Option 3" email might be proprietary under some <u>other</u> contract, or that its contents might otherwise be ViaSat's intellectual property, when under both the law and the terms of the contract the exact opposite was true.

Jury deliberations were, in the Court's own words, "highly unusual." For the first three days of deliberations, the jury repeatedly submitted notes with questions regarding exhibits and the law. Dkt. Nos. 978, 979, 986. On the morning of the fifth day, one juror, Juror No. 5 pressed the panic button in the jury room, which SSL understands resulted in the U.S. Marshalls being alerted of a disturbance. Trial Tr. 3099-3101. Juror No. 5 sent a note to the Court stating, "I will not return to this jury. I was physically threatened and will no longer be able to tolerate the stress."

Trial Tr. 3101; Ct. Ex. 24. The jury was excused for a day and a half. Two days later, the Court conducted individual inquiries of each juror, during which the Court and the parties learned that the jury was under remarkable stress (*Id.* at 3143-33), there was no verdict on any verdict questions (*Id.* at 3155, 3159), and, importantly, Juror No. 5, who had felt threatened, was in the majority while the juror who allegedly made the threat (Juror No. 6) was in the minority (*Id.* at 3157-58).

Juror No. 5 was excused from further service, but the Court determined that the remaining jurors could continue with their deliberations, and invited motions from either party. *Id.* at 3174. SS/L renewed its motion for a mistrial at this time. *Id.* at 3175-77. The Court denied SS/L's motion without prejudice (*id.* at 3177), but noted "it's not a frivolous motion. And no matter what the outcome of the case, then the Court will carefully look at all available options." *Id.* at 3179. The Court also told the parties that it intended to "repeat the instruction that they should not hesitate to change their views if the discussion persuades you that you should." *Id.* at 3178. Neither party objected. The Court then gave the jury an *Allen* charge in which the Court stressed the importance of "listen[ing] to the views of your fellow jurors," and instructed the jury "[d]o not hesitate to change your opinion if the discussion persuades you that you should" and "[i]t is important that you attempt to reach a unanimous verdict." *Id.* at 3116-17.

The verdict demonstrated that ViaSat's appeals to passion and prejudice—and the irrelevant and highly prejudicial evidence concerning the "Option 3" concepts and the Burr patent—worked. The jury awarded an astonishing $102 million in <u>separate</u> breach of contract damages. This, notwithstanding that (1)

ViaSat's own damages expert testified that the contract damages and the patent damages would be the <u>same</u> if all patents were valid and infringed and (2) ViaSat presented zero other evidence as to separate damages for the alleged breach of contract. *See* Dkt. No. 1046. This completely unsupported award of $102 million in separate breach of contract damages was "a surprise to the Court." Trial Tr. at 3218.

## III.   LEGAL STANDARD

The authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon*, 449 U.S. 33, 36 (1980) (per curiam). Historically recognized grounds for a new trial are that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 471 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "An erroneous ruling that affects the substantial rights of a party is grounds for reversal, unless it affirmatively appears from the whole record that it was not prejudicial." *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 976 (9th Cir. 2009) (reversing denial of new trial where erroneous admission of two exhibits and jury instructions prejudiced the defendant). The Court should order a new trial on both damages and liability if it finds that (1) the damages verdict is excessive, (2) the excessive damage award may have resulted from passion and prejudice, and (3) the verdict on liability is also tainted by passion and prejudice. *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987); *see also Minneapolis, St. Paul & Sault Ste. Marie Ry. v. Moquin*, 283 U.S. 520, 521-22 (1931) ("In actions under the federal statute no

verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice. . . . A litigant gaining a verdict thereby will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.").

## IV.   ARGUMENT

**A.     The Erroneous Admission of "Option 3" and Burr Patent Evidence Substantially Prejudiced SS/L, Requiring a New Trial.**

### 1.    <u>This Evidence Is Irrelevant to Breach of Contract.</u>

Before trial, the Court held as a matter of law that the "Option 3" email is not proprietary to ViaSat. Dkt. 720 at 8 (*Convolve, Inc. v. Compaq Computer Corp.*, 527 Fed. Appx. 910, 921-24 (Fed. Cir. 2013)). The Court held that not only is "Option 3" not proprietary under the March 8, 2006 NDA, but that its status was not subsequently changed by the "separate 'IP Provision' in the Build contract," which ViaSat argued "supercedes the earlier NDAs and prohibits SS/L's disclosure of ViaSat's information." *Id.* at 8 (citing ViaSat's brief, Dkt. 620 at 8, which referenced Article 39 of the Build Contract as "the 'IP Provision'"). The Court held that ViaSat failed to demonstrate "that the parties intended that provision"—Article 39 or the "IP Provision"—to apply retroactively to past disclosures of information," such as the "Option 3" email. *Id.* Nevertheless, ViaSat argued repeatedly throughout the trial that Doug Burr copied or "stole" the "Option 3" ideas, notwithstanding the Court's earlier ruling, based on Article 39 of the Build Contract. This was error for several reasons.

<u>First</u>, the Court had already expressly rejected both of these arguments in its Order granting SS/L's partial summary judgment motion pretrial. ViaSat argued

there, as it did in opposition to SS/L's mistrial motion, that Article 39 of the Build Contract—which ViaSat refers to as "the 'IP Provision'"—rendered the concepts in "Option 3" its Intellectual Property after the fact because ViaSat included such concepts in its patent applications. *See* Dkt. 620 at 3-4. ViaSat already had presented to the Court email exchanges and notes regarding SS/L's treatment of information exchanged with customers as "customer sensitive" and statements by Mickey Targoff to ViaSat's executives in support of its waiver argument. *See id.* at 4-10. The Court rejected all of this evidence and argument based on *Convolve*, concluding that (1) "ViaSat's argument regarding the Build Contract"—including the "separate 'IP Provision'"—"fails to raise a genuine issue of material fact" and (2) the unilateral waiver evidence "did not generate a genuine issue of material fact because it was not 'indicative of the mutual intent of both parties.'" Dkt. 720 at 8 (quoting *Convolve*, 527 Fed. Appx. At 923-24).

Second, as a matter of law, Article 39 is a limited license, with the exception that it prohibits either party from (a) filing patents on the "Intellectual Property" of another party or (b) reverse-engineering the other party's "Intellectual Property." Ex. A at Art. 39. A limited license implies no negative covenants and cannot serve as the basis for a breach of contract action based on improper disclosure. The Federal Circuit has held that "[a] nonexclusive patent license is simply a promise not to sue for infringement," and "[t]he conveyance of such a license does not obligate the licensee to do anything; it simply provides the licensee with a guarantee that it will not be sued for engaging in conduct that would infringe the patent in question." *U.S. Phillips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1189

1    (Fed. Cir. 2005) (emphasis added).

2           Third, neither Doug Burr nor SS/L's alleged copying of the "Option 3" email

3    can evidence misappropriation of "Intellectual Property" for the simple reason that

4    the "Option 3" email is not ViaSat's property. The Build Contract defines

5    "Purchaser Intellectual Property" as material "in which an Intellectual Property

6    Right subsists . . . ." Ex. A at SSL0099738. "Intellectual Property Right," in turn,

7    includes only "common law and statutory proprietary rights with respect to

8    Intellectual Property." *Id.* ViaSat had no statutory or proprietary rights in the

9    "Option 3" email as a matter of law under *Convolve*. ViaSat argued that it had

10   rights in the "Option 3" email insofar as those concepts were incorporated into

11   ViaSat's patent applications by virtue of Article 39.2(d) of the Build Contract. But

12   ViaSat had no common law or proprietary rights in any patent applications because

13   (1) patent applications are published and therefore can have no trade secret

14   protection or contractual protection as being "proprietary," and (2) statutory rights

15   in published patent applications are limited and conferred only by 35 U.S.C. §

16   154(d), and the undisputed evidence shows that ViaSat did not claim any

17   provisional rights in its patent applications under 35 U.S.C. § 154(d). See Trial Tr.

18   at 765 (Lippert testimony acknowledging that section 154(d) not at issue).

19          In any event, ViaSat did not assert provisional rights in patent applications as

20   an issue in the Pre-Trial Order, thereby waiving the issue. Dkt. 842. Furthermore,

21   35 U.S.C. § 154(d) applies only where "the invention as claimed in the patent is

22   substantially identical to the invention as claimed in the published patent

23   application." 35 U.S.C. § 154(d). Claims are substantially identical only if they are

24

"without substantive change," which changes include narrowing amendments to overcome prior art rejections. *See, e.g.*, *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997). The undisputed evidence here is that ViaSat amended its claims repeatedly in the fall of 2011—well after Mr. Burr filed any of his patent applications—to overcome rejections based on prior art. *See, e.g.*, Ex. C.

Finally, the Court at times seemed to suggest that while the "Option 3" email itself might not be proprietary, the "concepts" or "material" or "information" it disclosed still could be. For example, the Court indicated that it "didn't agree that the material—I can say the Option 3 e-mail is not proprietary" and that it did not agree to "say any concept theory, whatever, anything in the Option 3 e-mail is not proprietary." Trial Tr. at 380-81. The Court suggested that this is "a nuance, but it's a significant one." *Id.* at 382. Respectfully, that is not the case. Under the NDA, the Build Contract, and binding Federal Circuit authority set forth in *Convolve* and other cases, because the "Option 3" email itself is not proprietary, it follows as a matter of law that the concepts it contains are also not proprietary to ViaSat.

The March 8, 2006 NDA protects "Proprietary <u>Information</u>," and holds that such <u>information</u> is subject to the marking requirements. Ex. D at ¶1. Moreover, it expressly provides that "Proprietary Information" cannot "include any <u>information</u> . . . that (a) is already known to the receiving party at the time of its disclosure; (b) is or becomes publicly known through no wrongful act of the receiving party; (c) is independently developed by the receiving party . . . ." *Id.* The undisputed evidence at trial is that the "Option 3" email disclosed to SSL the "concepts" of (1) partial CONUS, (2) complete separation of gateway and user beams, and (3) full frequency

reuse between the two (the very mantra that ViaSat repeated over and over again throughout the trial). As a result, such ideas or concepts, as a matter of law, are simply not proprietary or, for the reasons discussed above, Viasat's "Intellectual Property." *Cf.*, *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret. . . . Moreover, the nondisclosure agreement in this case specifically provided that the obligation of confidentiality created by this  agreement  'will not apply to any information . . . which becomes publicly available other than by breach of this agreement.'").

In *Convolve*, for example, the plaintiff claimed trade secrets in "the concept that it is important to move to a higher order dynamic model of a disk drive for the purpose of designing trajectories to produce faster and acoustically quieter disk drives" and "the concept that 'abrupt current and voltage saturation should be avoided to optimize vibration reduction." *Convolve*, 527 Fed. Appx. at 917 (emphasis added). The court, however, found that for each alleged trade secret "the substance" of the trade secret was either (1) generally known in the industry or (2) not properly marked proprietary under the governing NDAs. *See id.* at 918-19 (at least three references to "the substance" of the "trade secret") (emphasis added). Likewise, here, any "concept" or "substance" disclosed in the "Option 3" email cannot be proprietary information or intellectual property of ViaSat.

Ninth Circuit and California case law are in accord. In *Buffets, Inc. v. Klinke*, 73 F.3d 965, 968 (9th Cir. 1996), the Ninth Circuit noted "the important distinction

between copyright law and trade secrets law," wherein "copyright does not protect an idea itself, only its particular expression" while "trade secrets law protects the author's very ideas if they possess some novelty and are . . . disclosed only on the basis of confidentiality." In *Balboa Ins. Co. v. Trans Global Equities*, 267 Cal. Rptr. 787, 800 (Ct. App. 1990), the California Court of Appeal recognized the same principle, noting that "[t]rade secret law protects <u>content</u> irrespective of <u>form of expression</u>" while "copyright law protects <u>form of expression</u> but <u>not the underlying ideas</u>." (emphasis added). In the context of proprietary information, any attempt to draw a line between the particular <u>form of expression</u> in the "Option 3" email itself and the <u>ideas</u> or <u>concepts</u> it discloses is contrary to Federal Circuit, Ninth Circuit, and California case law.

### 2.   The Evidence Is Irrelevant to Patent Validity.

ViaSat argued pretrial that the "Option 3" email was a conception document for its patent and, therefore, it should be allowed to introduce this email and question witnesses about it because any copying of the "Option 3" email would be secondary indicia of non-obviousness of the '875. That claim was shown to be false during the first witness examination at trial.

### a.   The "Option 3" Email Is Irrelevant to Conception.

Whether Mr. Dankberg conceived of the '875 patent by the date of the August 2006 "Option 3" email was not relevant to any issue in this case. The Federal Circuit has held that evidence of conception is "not relevant here where [the defendant] <u>did not plead any challenge to the named inventors' inventorship</u>." *Tavory v. NTP, Inc.*, 297 Fed. Appx. 976, 981 (Fed. Cir. 2008). SS/L introduced no prior art falling between the dates of the "Option 3" email and the '038 Provisional

to which ViaSat sought to claim priority, such that Mr. Dankberg's conception as of August 2006 would allow him to "swear behind."

Moreover, even if Mr. Dankberg's conception as of that date were an issue, the "Option 3" email is irrelevant to that inquiry as a matter of law. On Day 1 of the trial, Mr. Dankberg—the alleged inventor of the '875 patent and source of the "Option 3" concepts in the email—testified that the email is not evidence of his conception of the '875 patent:

> Q.    Okay. Do you contend that this E-mail is evidence of your conception of the '875 patent?
>
> A.    I don't think so. I don't think so. I wouldn't say that.

Trial Tr. at 227 (Dankberg testimony). As Mr. Dankberg testified, the "Option 3" email is not evidence of his conception because Claim 12 of the '875 patent requires that at least one gateway or feeder beam be <u>proximate to</u> (or overlapping) a user beam. Trial Tr. at 253; '875 Patent at Claim 1. The "Option 3" email, by contrast, discloses—in a non-proprietary communication—the key concepts of (1) partial CONUS, (2) gateway beams completely separated from user beams, and (3) full frequency reuse between the two. The email discloses covering "approximately 75%" of CONUS with—*i.e.*, partial CONUS. Ex. B at 1. It discloses "tak[ing] the other 25% or so of the US that we do not cover and put gateway beams there," *i.e.*, gateways completely separated from user beams. *Id*. And it discloses using "1.5 GHz (the entire Ka-band licensed, including the 500 MHz of co-primary plus the 1GHz of primary that we just used for user beams," *i.e.*, full frequency reuse between the gateway and user beams. *Id*. But despite the fact that the "Option 3" email provided these ideas to SS/L with <u>no</u> NDA protection, and despite the fact

that it does not represent the claims of the '875 patent, this trilogy of concepts became ViaSat's mantra at trial. *See, e.g.*, Trial Tr. at 521 ("Mr. Burr . . . prior to seeing this option three E-mail, you personally were not aware of any satellite design or proposal that included, one, partial CONUS coverage, two gateways located outside of user beams, and, three, gateways reusing all available frequency in a single system, true?"). ViaSat thus centered its entire case around ideas that were neither proprietary nor patented.

In light of its own inventor's testimony, ViaSat resorted to arguing that the "Option 3" email was evidence of the "genesis of the '875 patent," and the "motivation behind the '875 invention," rather than its "conception." ViaSat has cited no authority explaining the concepts of "genesis" or "motivation" as opposed to "conception" in patent law. To the contrary, the Federal Circuit has made clear that "[c]onception is the touchstone inventorship, the <u>completion</u> of the mental part of invention," or "[t]he formation in the mind of the inventor, of a definite and permanent idea of <u>the complete and operative invention</u> . . . ." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (internal quotation marks and citations omitted) (emphasis added). The "Option 3" email cannot evidence conception because it is not the complete '875 "invention."

b.     <u>The Burr Patent is Irrelevant to Non-Obviousness.</u>

Because the "Option 3" email is not evidence of the '875 patent's conception, any supposed linkage between it and the Doug Burr patent filings is irrelevant to secondary indicia of non-obviousness (*e.g.*, copying).

The Federal Circuit held in *Amazon* that evidence of copying "is legally irrelevant" unless the allegedly-copied item "is shown to be <u>an embodiment of the</u>

1 claims." *Amazon.com, Inc.*, 239 F.3d at 1336 (emphasis added). The "Option 3"

2 email is <u>not an embodiment</u> of Claim 12 of the '875 patent because it lacks the

3 proximate gateway feature. As a result, under Federal Circuit law, whether Doug

4 Burr copied the "Option 3" email is "legally irrelevant" to secondary indicia of non-

5 obviousness. That is because "objective evidence of non-obviousness must be

6 <u>commensurate in scope with the claims</u> which the evidence is offered to support."

7 *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983); *see also MeadWestVaco Corp.*

8 *v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1264-65 (Fed. Cir. 2013)

9 (reversing district court's findings of secondary considerations of non-obviousness

10 because "[t]he district court's analysis of the secondary considerations of

11 nonobviousness involved only fragrance-specific uses, but the claims now at issue

12 are not fragrance-specific" and "objective evidence of non-obviousness must be

13 commensurate in scope with the claims") (quotation marks and citations omitted).

14      Indeed, ViaSat's introduction of the Doug Burr patent filings was even more

15 insidious because its expert on the '875 patent's validity <u>did not even opine</u> that Mr.

16 Burr's patent filings were copied from "Option 3." Instead, ViaSat's expert opined

17 that Mr. Burr's patent filings evidenced copying of ViaSat's '038 provisional,

18 notwithstanding the lack of even a scintilla of evidence in the record that Mr. Burr

19 ever saw the '038 provisional. Trial Tr. at 2688-89.[2] In short, the admission of such

20 evidence was completely irrelevant to secondary indicia—and yet ViaSat was

21 permitted to leave the jury with the false impression that (a) SS/L's lack of any pre-

22

23 [2] Similarly, Dr. Bartone attempted to argue that the fact that SS/L hadn't built a
satellite with "Option 3" concepts evidenced failure to achieve the '875 patent—
24 notwithstanding that "Option 3" <u>is not the '875 patent.</u> *E.g.*, Trial Tr. at 2689-90.

ViaSat history building a satellite with "Option 3" shows that the '875 patent is valid and (b) any post-ViaSat history of SS/L using "Option 3" shows that it stole ViaSat's property or infringed the '875 patent. Neither is true as a matter of law.

           c.     <u>"Option 3" and the Burr Patent were Unfairly Prejudicial.</u>

Despite the irrelevance of the "Option 3" email and Burr patent filings to either the patent or contract claims in this case, they became the focal point of the trial. ViaSat's counsel discussed the "Option 3" email at length during opening statement, arguing that it reflected "ViaSat's <u>proprietary information</u>," that SSL "recogniz[ed] . . . ViaSat's technology [in] . . . spa[t]ial isolation between user and gateway beams," and that Mr. Burr filed his patent "in an <u>attempt to steal</u> Mr. Dankberg's revolutionary idea" reflected in the "Option 3" email. Trial Tr. at 73-76 (emphasis added). Remarkably, ViaSat's counsel did make one entirely accurate and telling admission about Doug Burr's patent filings in opening statement: "So <u>this patent is irrelevant</u>. It's not being asserted." *Id.* at 76 (emphasis added).

Based on ViaSat's acknowledgement that the Burr patent is irrelevant, the only explanation for ViaSat's decision to introduce it into evidence and devote substantial time during every single day of the trial to discussing it is because, as ViaSat's counsel urged in opening statement (and again in closing argument), it wanted the jury to be moved by passion and prejudice and to draw the improper inference that SSL as a company is "not honest[]" and was "not being trustworthy." Trial Tr. at 76; *see also id.* at 2694 ("These are bad actors, and they need to be taught a lesson or else they're going to go out and do it again to somebody else.").

By SS/L's count, ViaSat raised the Doug Burr patent and/or "Option 3" (or its concepts) with Mr. Dankberg, Mr. Burr, Mr. Lippert, Mr. Sawdey, Mr. Harms, Mr.

Morris, Mr. Roos, Mr. Tillman, Ms. Shockey, Dr. Helgert, Dr. Bartone, Dr. Schindall, Mr. Chan, Mr. Hoeber, and Mr. Targoff. Mr. Dankberg admitted that "Option 3" did not evidence conception of the '875 patent and even claimed on cross-examination that the "Option 3" email was how ViaSat had communicated its "proprietary" concepts to SS/L (notwithstanding the Court's summary judgment ruling that the "Option 3" email is <u>not</u> proprietary). Trial Tr. at 201:15-20. And yet the Court repeatedly declined to issue a limiting instruction until near the end of the second week of trial, by which time the damage had alreaedybeen done—ViaSat had already questioned ten different fact witnesses about this material. Trial Tr. at 162-64 (Dankberg), 394-400, 406-07, 409, 411 (Shockey), 464-65, 474-75 (Harms), 521, 531-35, 568-69, 636, 638-47, 650 (Burr), 841 (Tillman), 873-78, 879, 891-92 (Sawdey), 924, 934, 962, 1025-26 (Hoeber), 1050-53 (Chan), 1247 (Targoff), and 1434-35 (Morris); *see also* n.1.

Ms. Shockey (who had no connection to the Jupiter program and therefore could not have disclosed any confidential information to Hughes) was questioned extensively about Mr. Burr's provisional patent and its alleged relationship to the "Option 3" email. *See, e.g.*, Trial Tr. at 394-400, 406-07, 409, 414-26. Mr. Harms, via deposition, was asked about the "Option 3" mantra and its relationship to the Burr patent filings. *See, e.g.*, Trial Tr. at 464-65, 472-75, 496. Mr. Burr (who, again, had no connection to the Jupiter program) was questioned extensively about (1) whether he had copied concepts from the "Option 3" email in his patent applications; (2) whether he had taken <u>his own</u> October 6, 2006 presentation and beam map—which the Court also ruled was <u>not</u> proprietary to ViaSat as a matter of

law—and removed a ViaSat logo before including it in his patent filings; and (3) whether he had ever heard of a "design or proposal" before "Option 3" that had the "Option 3" concepts (*i.e.*, the three-part mantra). *See, e.g.*, Trial Tr. at 516-41, 553-75, 632-49, 656-58, 671-73. Mr. Lippert, when asked about <u>internal ViaSat documents</u> on cross-examination volunteered that the "Option 3" email—which was sent by someone <u>not employed by ViaSat</u> to <u>SS/L</u> (and thus was not a ViaSat document, let alone an internal one)—showed ViaSat's development of its "intellectual property." *See, e.g.*, Trial Tr. at 751-54.

ViaSat's questioning of Mr. Tillman—a marketing employee who had no assignment on the ViaSat-1 project—concluded with a dramatic recitation of partial CONUS, separation of gateway and user beams, and full frequency reuse being employed on Jupiter as well as ViaSat-1 (all of which ceased being proprietary ideas once the "Option 3" email was transmitted to SS/L), ending with improper commentary from counsel that it "sounds pretty identical to me." *See, e.g.*, Trial Tr. at 841. Mr. Hoeber was asked about "partial CONUS," "gateway separated from user beams," and "full frequency reuse" and whether "it's okay for [another SSL employee] to tell [Hughes] how they did it on ViaSat." *See, e.g.*, Trial Tr. at 962-63. Jim Sawdey, via deposition, was questioned extensively regarding the "Option 3" email and whether the concepts therein had been disclosed to Hughes. *See, e.g.*, Trial Tr. at 872-910. Hampton Chan was questioned regarding the Doug Burr patent filings and its disclosure of the "Option 3" concepts. *See, e.g.*, Trial Tr. at 1049-53. And Dr. Bartone discussed the "Option 3" email at length, opined that SSL misappropriated ViaSat's intellectual property stemming therefrom (despite the

fact that no such intellectual property exists), and went so far as to say SSL presented to Hughes "the <u>ViaSat concept</u>, which is the user beams all on the eastern part of the United States, the spatially isolated gateways in the western part of the region . . . [and] that those spatially isolated gateways are going to operate on the whole frequency . . . ." Trial Tr. at 1456-1459, 1469-71 (emphasis added).

SS/L repeatedly objected to evidence regarding the Doug Burr patent, moved for a mistrial, and requested a limiting instruction at least six times before the Court gave one. *See, e.g.*, Trial Tr. at 241-42, 362, 380-81, 394, 571, 786. Even then, the instruction the Court gave was insufficient, as the Court refused to instruct the jury that (1) the <u>concepts</u> contained in the "Option 3" email were not proprietary to ViaSat; (2) the "Option 3" email and its concepts were not protected under the "separate 'IP' Provision" of the Build Contract, which had no retroactive effect according to the Court's summary judgment ruling; or (3) that other documents were not proprietary to ViaSat (including SSL's own October 6, 2006 presentation). *See, e.g.*, Trial Tr. at Trial Tr. at 380-81. The Court's first limiting instruction did not even come until after ViaSat had examined ten different fact witnesses about the document. *See, e.g.*, Trial Tr. at 2297, 2446, 2490-93, 2547-48. And indeed, the Court's limiting instruction may have caused <u>further</u> prejudice to SSL by implying that the "Option 3" email—or the concepts it contained—while not "proprietary" under the NDA could otherwise be protected.

The Federal Circuit has not hesitated to reverse and order a new trial where, as here, irrelevant and highly prejudicial "bad actor" evidence is admitted and emphasized throughout the trial. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d

956, 958 (Fed. Cir. 1997). In that case, the district court ruled pre-trial that the defendant's inequitable conduct claim failed as a matter of law. "Despite the grant of summary judgment, at trial, [the defense] raised the same issue of improper procedures, now calling them 'prosecution irregularities.'" *Id.* at 957. Moreover, "[t]hroughout the trial, [the defense] pressed through witnesses and argument the issue of 'prosecution irregularities,' and told the court and the jury that the presumption of validity was lost." *Id.* The Federal Circuit reversed and remanded for a new trial, holding that "the pervasiveness with which [the defense] pressed the issue that the examiner had not complied with the rules," which was "[r]einforced by the incorrect jury instruction," tainted the trial with irrelevant and unfairly prejudicial evidence. *Id.* at 957-59. The Federal Circuit held that "[t]he issue of prosecution irregularities' was simply irrelevant" and also unfairly prejudicial because it "suggest[ed] decision on an improper basis . . . ." *Id.* at 961 (quotation marks and citation omitted). The Federal Circuit noted that the "presentation of this issue at trial, in over fifty pages of transcript and during six days of the nine-day trial," illustrates the fact that "if evidence of marginal probative worth necessitates lengthy rebuttal, it imparts disproportionate weight to the issue." *Id.* The fact that "[t]he assertions and innuendos of impropriety were magnified by repetition" and "implicit[ly] endors[ed]" through the jury charge "added weight to [their] prejudicial impact."

This case is on all fours with *Magnivision*. There, as here, the Court issued a pretrial ruling that rendered key disputed evidence irrelevant to any triable issue. *Magnivision, Inc.*, 115 F.3d at 959. There, as here, the proponent of the damaging

evidence attempted to side-step the Court's summary judgment ruling and introduce the evidence under a slightly-renamed theory (there, "prosecution irregularities" rather than "inequitable conduct"; here, "intellectual property" rather than "proprietary information" and "genesis" rather than "conception"). *Id.* There, as here, the evidence became the focus of the trial, being emphasized in opening statements, closing arguments, through multiple witness examinations, and in the majority of the trial days and much of the trial transcript. *Id.* at 960. There, as here, the prejudicial impact of such evidence was magnified by a jury instruction that called further attention to the issue, but presented an incomplete and potentially misleading view of the legal implications of the evidence. *Id.* For the foregoing reasons, SS/L is entitled to a new trial.

### 3. Because Passion and Prejudice Impacted Both Liability and Damages, a New Trial on All Issues is Required.

SS/L is further entitled to a new trial because it is clear that (1) the jury awarded excessive damages that were motivated by passion and prejudice and (2) such passion and prejudice likely tainted the liability finding as well. There is zero basis in the record for the jury's award of $102 million in separate, non-overlapping breach of contract damages. *See* Dkt. 1046. Moreover, as set forth in SS/L's co-pending motions, the jury's award of a "reasonable royalty" of $123 million and "lost profits" of $58 million are also excessive. *See* Dkt. 1036, 1040. The "reasonable royalty" eclipses SS/L's anticipated profits on Jupiter-1 by nearly a factor of seven—with absolutely zero evidence in the record to support that SSL would have agreed to pay such an amount. Dkt. 1036. The jury further awarded $58 million in "lost profits" <u>in addition to</u> the reasonable royalty, despite the fact that (1)

this compensates ViaSat twice for the same sale and (2) SS/L and ViaSat are not competitors (and thus ViaSat has not "lost" any sales to SSL). Dkt. 1040.

The $102 million awarded by the jury for breach of contract are not based on any evidence. They are not based on any argument by counsel. They are not based on anything except passion and prejudice of the jury. That passion and prejudice cannot be divorced from the improper "Option 3" and Doug Burr patent filing evidence that was allowed to permeate the trial, including via opening statement, extensive testimony throughout the entirety of the case, and a closing exhortation by ViaSat's counsel to punish bad actors at SS/L. Where, as here, the damages award is excessive, the excessive damages are the result of passion or prejudice, and there is a risk that such passion or prejudice also affected liability, a new trial on all issues must be ordered. *Minneapolis, St. Paul & Sault Ste. Marie Ry.*, 283 U.S. at 521-22 (holding a new trial must be ordered if the verdict is "in any degree the result of appeals to passion and prejudice"); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d. 276, 286 (5th Cir. 1975) (new trial required where excessive damages resulted from passion and prejudice, which also tainted the liability verdict).

### A.   The *Allen* Charge, After the Court Learned of the Jury's Numerical Division, Was Per Se Error Requiring a New Trial

The Ninth Circuit evaluates *Allen* charges "to determine if the instruction, when challenged, improperly affected the verdict."[3] *United States v. Beattie*, 613

---

[3] The same standards regarding the coerciveness of *Allen* instructions apply to civil cases as well. *See, e.g.*, *United States v. Brown*, 411 F.2d 930, 934 & n.4 (7th Cir. 1969) ("In order to avoid the potential for prejudice and coercion to which we have referred, district courts in this Circuit are required henceforth to charge deadlocked juries in both criminal and civil cases in a manner consistent with the recommended stanards. . . . We perceive no distinction between criminal and civil cases.").

F.2d 762, 765 (9th Cir. 1980). The Court "must examine the instruction 'in its context and under all the circumstances' to see if it had a coercive effect upon the jury." *Id.* (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965)). "If a trial judge inquires into the numerical division of the jury and <u>then gives an *Allen* charge, the charge is per se coercive and requires reversal.</u>" *Id.* (citing *Brasfield v. United States*, 272 U.S. 448, 450 (1926)) (emphasis added). The Supreme Court has noted that inquiry into numerical division "can rarely be resorted to without bringing to bear in some degree, serious, although not measurable, and improper influence upon the jury . . . ." *Brasfield v. United States*, 272 U.S. 448, 450 (1926). "Even when the judge <u>does not inquire but is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them</u>—that is, if the judge knew which jurors were the holdouts *and* each holdout juror knew that the judge knew he was a holdout." *United States v. Ajiboye*, 961 F.2d 892, 894 (9th Cir. 1992).

That is precisely the situation that arose in this case, following the Court's inquiry into a "rare" and "highly unusual incident" of potential jury misconduct. Trial Tr. at 3178. During interviews to ascertain if any juror misconduct had taken place, the Court learned that the juror whom the Court ultimately excused (Juror No.5) was in the majority and the juror alleged to have acted in a threatening manner (Juror No. 6) was one of two hold-outs. None of the jurors ever indicated that the jury was deadlocked or having trouble reaching a verdict.

Against this backdrop, and immediately after denying a renewed motion for a mistrial, the Court *sua sponte* issued an *Allen* instruction and exhorted the jury to

"listen[] to the views of your fellow jurors and "not hesitate to change your opinion if the discussion persuades you that you should." The Court reminded the jury of the importance of reaching a unanimous verdict. The *Allen* charge was per se coercive in light of (1) the Court's prior inquiries into whether Juror No. 5 was in the majority or minority and (2) the knowledge the Court thereby gained that there was a 5-2 split with Juror No. 6 in the minority. In particular, coming as it did following extensive juror interviews into whether Juror No. 6 had committed misconduct—including questions to multiple jurors as to whether Juror No. 6 had threatened to kill anyone on the jury and whether Juror No. 5 was in the majority or minority—the *Allen* charge could only be interpreted as being directed to Juror No. 6. After receiving the *Allen* charge, the jury did not send any further notes until it reported its verdict on April 24, 2014.

The incident that triggered this inquiry was certainly unusual and alarming. It was appropriate for the Court to investigate potential juror misconduct by questioning individual jurors. But after that investigation revealed that there was a divided jury, that Juror No. 6 was in the minority, and that he was perceived as threatening because of his physical stature combined with his impassioned arguments regarding the case, the Court's *sua sponte* decision to issue an *Allen* instruction immediately thereafter was *per se* coercive and reversible error under Ninth Circuit law. It ran the unacceptable risk of being perceived as directed toward Juror No. 6 and encouraging him, in particular, to consider changing his mind.

## V.    CONCLUSION

For the reasons set forth above, SS/L requests a new trial on all issues.

1

2    Dated: June 13, 2014            By:    */s/ Amanda K. Bonn*

3                                           Marc M. Seltzer
                                            Amanda K. Bonn
4                                           SUSMAN GODFREY L.L.P.
                                            1901 Avenue of the Stars, Suite 950
5                                           Los Angeles, CA 90067-6029
                                            Telephone: (310) 789-3100
6                                           Fax: (310) 789-3150
                                            Email: abonn@susmangodfrey.com
7

8                                           William Christopher Carmody
                                            (Admitted *Pro Hac Vice*)
9                                           Jacob W. Buchdahl
                                            (Admitted *Pro Hac Vice*)
10                                          SUSMAN GODFREY L.L.P.
                                            560 Lexington Avenue, 15th Floor
11                                          New York, NY 10022
                                            Telephone: (212) 336-8330
12                                          Fax: (212) 336-8340
13

14                                          Joseph S. Grinstein
                                            (Admitted *Pro Hac Vice*)
15                                          William R. H. Merrill
                                            (Admitted *Pro Hac Vice*)
16                                          SUSMAN GODFREY L.L.P
                                            1000 Louisiana Street, Suite 5100
17                                          Houston, Texas 77002-5096
                                            Telephone:  713-653-7856
18                                          Facsimile:   713-654-6666
                                            Email: jgrinstein@susmangodfrey.com
19                                          Email: bmerrill@susmangodfrey.com
20

21                                          Ian B. Crosby
                                            (Admitted *Pro Hac Vice*)
22                                          Rachel S. Black
                                            (Admitted *Pro Hac Vice*)
23                                          Patrick C. Bageant (275135)
                                            SUSMAN GODFREY L.L.P.
24

1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3861
Fax: (206) 516-3883
Email: icrosby@susmangodfrey.com
Email: rblack@susmangodfrey.com
Email: pbageant@susmangodfrey.com

*Attorneys for Defendants/Counterclaim
Plaintiffs Space Systems/Loral, LLC (f/k/a
Space Systems/Loral, Inc.) and Loral Space
& Communications Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 13, 2014, I caused the foregoing **SS/L'S MOTION FOR A NEW TRIAL (5 of 12)** to be served on opposing counsel via the Court's CM/ECF system.


Dated: June 13, 2014          By:     */s/ Amanda K. Bonn*