1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

## SOUTHERN DISTRICT OF CALIFORNIA

12
13

VIASAT, INC., VIASAT
COMMUNICATIONS, INC., f/k/a
WILDBLUE COMMUNICATIONS,
INC.,

14
15
16                              Plaintiffs,

vs.

17
18
19

SPACE SYSTEMS/LORAL, INC.,
LORAL SPACE &
COMMUNICATIONS, INC.,

20
21                              Defendants.

22
23

CASE NO. 3:12-CV-00260-H
(WVG)

**ORDER:**

**(1) GRANTING
DEFENDANT'S MOTION
FOR A NEW TRIAL ON
DAMAGES; AND**

**(2) DENYING AS MOOT
PLAINTIFF'S MOTION FOR
PREJUDGMENT AND POST-
JUDGMENT INTEREST**

**[DOC. NOS. 966, 1036, 1040,
1042, 1046, 1059]**

24          On April 10, 2014, Defendants Space Systems/Loral, Inc. and Loral Space &

25   Communications, Inc. (collectively, "SS/L") filed a motion for judgment as a matter

26   of law on damages.  (Doc. No. 966.)  On June 13, 2014, SS/L filed motions for

27   judgment as a matter of law or for new trial regarding: breach of contract damages

28   (Doc. No. 1046); reasonable royalty damages  (Doc. No. 1036); lost profit damages

12cv260

(Doc. No. 1040); and double counting of damages (Doc. No. 1042). On July 11, 2014, Plaintiff ViaSat, Inc. ("ViaSat") filed an omnibus response in opposition to SS/L's motions. (Doc. No. 1120.) On July 25, 2014, SS/L filed replies in support of its motions. (Doc. Nos. 1145, 1147, 1155, 1157.) The Court held a hearing on August 7, 2014. Charles K. Verhoeven, Sean S. Pak, Adam B. Wolfson, and Michelle A. Clark appeared for ViaSat. William C. Carmody, Jacob W. Buchdahl, Joseph S. Grinstein, and Amanda K. Bonn appeared for SS/L. For the following reasons, the Court grants Defendants' motions for a new trial on damages.

On June 13, 2014, ViaSat filed a motion for prejudgment and post-judgment interest. (Doc. No. 1059.) On July 11, 2014, SS/L filed a response in opposition to ViaSat's motion. (Doc. No. 1097.) On July 25, 2014, ViaSat filed a reply in support of its motion. (Doc. No. 1151.) In light of the Court's order for a new trial on damages, the Court denies ViaSat's motion as moot.

## I.    Background

This case arises from a dispute between two companies in the satellite communications industry over contractual provisions and intellectual property. ViaSat is a corporation that develops commercial and military satellite and digital communication technologies. (Doc. No. 475 ¶¶ 9-11.) SS/L is in the business of manufacturing communications satellites and is a wholly owned subsidiary of Loral. (Doc. No. 475 ¶ 14; Doc. No. 901 at 90.) In 2006, ViaSat and SS/L began negotiating over the possibility of collaborating on a major satellite construction project ("ViaSat-1"). (Doc. No. 475 ¶ 32; Doc. No. 486 ¶ 32.) Eventually, ViaSat and SS/L entered into contractual agreements, including a contract for the construction of ViaSat-1 (the "Build Contract") and multiple nondisclosure agreements ("NDAs"). (Doc. No. 475 ¶¶ 40-51; Doc. No. 486 ¶¶ 40-51.)

Around the same time, SS/L commenced a separate satellite project with Hughes Network Systems ("Hughes") to build a satellite known as the Jupiter-1. (Doc. No. 475 ¶ 56; Doc. No. 486 ¶ 56.) According to ViaSat, SS/L gained access to confidential

1  information about ViaSat's technologies over the course of the ViaSat-1 project and
2  then passed this information on to Hughes for use on the Jupiter-1.  (Doc. No. 475 ¶¶
3  55-72.)

4        On February 1, 2012, ViaSat filed this lawsuit, and on November 14, 2013, it
5  filed a fourth amended complaint.  (Doc. Nos. 1, 475.)  ViaSat alleged that SS/L and
6  Loral had infringed United States Patents No. 8,107,875 ("the '875 patent"), No.
7  8,010,043 ("the '043 patent"), No. 8,068,827 ("the '827 patent"), and No. 7,773,942
8  ("the '942 Patent").  (Doc. No. 475 at 73-88, 89-104, 105-120, 121-136.)  ViaSat also
9  alleged that SS/L and Loral had breached the Build Contract and NDAs.  (Id. at 137-
10 151.)  SS/L filed counterclaims alleging that ViaSat had infringed United States Patents
11 No. 6,400,696 and No. 7,219,132.  (Doc. No. 486 at 38-40, 40-41.)  ViaSat later
12 withdrew its claims based on the '942 Patent, and SS/L withdrew its counterclaims.
13 (See Doc. No. 842 at 8-9; Doc. No. 1014.)

14       The '043 Patent is entitled "Capacity Maximization for a Unicast Spot Beam
15 Satellite System."  (Doc. No. 501-2 at 6.)  The '043 Patent involves the effects that
16 interference and noise in a satellite system have on the system's data-carrying capacity.
17 According to ViaSat, prior satellite designs sought to minimize interference in a
18 satellite system so that the signal-to-interference ratio of the system ("C/I") would be
19 greater than the signal-to-noise ratio ("C/N").  (Doc. No. 990 at 91-92.)  According to
20 ViaSat, the key insight of the '043 Patent was to instead allow an interference-
21 dominated environment: that is, a satellite system in which C/I is less than C/N.  (Id.)
22 The '043 Patent discloses a method for adjusting the values of interference and noise
23 in a system in order to maximize its data-carrying capacity, rather than attempting to
24 limit interference.  (Id. at 92-95.)

25       The '827 patent is entitled "Non-interfering Utilization of Non-geostationary
26 Satellite Frequency Band for Geostationary Satellite Communication."  (Doc. No. 504-
27 3 at 2; Doc. No. 901 at 12.)  A satellite can be geostationary ("GSO"), meaning that the
28 satellite orbits the earth so that it remains in a fixed location relative to the ground, or

non-geostationary ("NGSO"), meaning that the satellite does not orbit the earth in synchronization with the earth's rotation.  (Doc. No. 901 at 83-84; Doc. No. 990 at 141.)  The Federal Communications Commission ("FCC") assigns one segment of radio frequencies preferentially to GSO satellites ("the GSO spectrum") and one segment preferentially to NGSO satellites ("the NGSO spectrum").  (See Doc. No. 1051-4.)  The '827 Patent involves technology that enables a GSO satellite to use the NGSO spectrum without interfering with NGSO satellites. (Doc. No. 990 at 141-42.)

The '875 Patent is entitled "Placement of Gateways Near Service Beams." (Doc. No. 1053-2 at 2; Doc. No. 901 at 11.)  Designers of satellite systems can achieve different outcomes through different geographic arrangements of gateway terminals and service beams.  The purpose of the '875 Patent is to increase data-carrying capacity of a satellite system through a more efficient geographic placement of gateway terminals and service beams. (Doc. No. 923 at 248-49.)

Prior to trial, SS/L moved to exclude testimony based on an expert report from ViaSat's damages expert, Dr. Slottje.  (Doc. No. 535.)  In that motion, SS/L challenged Dr. Slottje's expert report on lost profit damages, arguing that ViaSat could not recover lost profit damages because it did not compete head-to-head with SS/L, and questioning certain assumptions on which Dr. Slottje made his calculations.  (Id. at 12-17.)  SS/L also challenged Dr. Slottje's expert report as it related to reasonable royalty damages on the grounds that Dr. Slottje's royalty figure was unreasonably high and inappropriately based on non-comparable transactions.  (Id. at 20-28.)  The Court ruled that Dr. Slottje could testify on ViaSat's lost profits and reasonable royalty damages, without prejudice to contemporaneous objection at the time of trial or request for an appropriate limiting instruction.  (Doc. No. 772 at 12.)

In addition, SS/L filed a pretrial partial summary judgment motion asking the Court to limit damages stemming from ViaSat's breach of contract claims as a matter of law.  (Doc. No. 538.)  SS/L argued that no concepts disclosed in ViaSat's patent applications could be the basis for damages, nor could any pre-2008 disclosures.  (Id.

at 18-20, 20-25.)   The Court ruled that genuine issues of material fact precluded summary judgment.  (Doc. No. 710.)

The parties tried their case to a jury beginning on March 25, 2014.  (Doc. No. 901.)  The jury reached a verdict on April 24, 2014.  (Doc. No. 1021 at 3.)  The jury determined that SS/L was liable for breach of contract and infringement of the '043, '827, and '875 patents based on the Jupiter-1.  (Doc. No. 1014.)  The jury awarded reasonable royalty damages and lost profits damages for all three patents, as well as breach of contract damages.  (Id.)   The jury found no contributory or induced infringement, no infringement by the NBN satellite, and no liability for Loral.  (Id.)

In its post-trial motions, SS/L asks the Court to rule that, as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, ViaSat is not entitled to the damages that the jury awarded.  Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59.  (Doc. Nos. 966, 1036, 1040, 1042, 1046.)

## II.   Legal Standards

### A.   Legal Standard for Judgment as a Matter of Law

The law of the regional circuit, here the Ninth Circuit, governs the standards for deciding a Rule 50 motion for judgment as a matter of law.  See, e.g., Leader Techs., Inc. v. Facebook, Inc., 678 F.3d 1300, 1305 (Fed. Cir. 2012).  Under Federal Rule of Civil Procedure 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."  Fed. R. Civ. P. 50(a)(1); see Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149 (2000).  In other words, the jury verdict should be overturned and motion for judgment as a matter of law granted if the evidence "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002); accord Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1309 (Fed. Cir. 2009); see also Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1005 (9th Cir. 2004) ("Judgment as a matter of law should be granted

1   only if the verdict is 'against the great weight of the evidence, or it is quite clear that

2   the jury has reached a seriously erroneous result.'").

3        In deciding a motion for judgment as a matter of law, the district court must view

4   the evidence in the light most favorable to the non-moving party and draw all

5   reasonable evidentiary inferences in favor of the non-moving party. Reeves, 530 U.S.

6   at 150; Lakeside-Scott v. Multnomah Cnty., 556 F.3d 797, 802 (9th Cir. 2009).   A

7   district court must uphold a jury's verdict even if the record contains evidence that

8   might support a contrary conclusion to the jury's verdict. Pavao, 307 F.3d at 918.  The

9   court "is not to make credibility determinations or weigh the evidence." Wintaro v.

10  Toshiba Am. Elec. Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001).  "The court

11  must accept the jury's credibility findings consistent with the verdict." Id. (internal

12  quotation marks omitted).  Finally, the district court must "accept the jury's credibility

13  findings consistent with the verdict" and "disregard all evidence favorable to the

14  moving party that the jury is not required to believe" because "[w]hen two sets of

15  inferences find support in the record, the inferences that support the jury's verdict of

16  course win the day." Wintaro, 274 F.3d at 1283, 1286-87.

17        *B.   Legal Standard for New Trial*

18        Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial on

19  some or all of the issues and to any party after a jury trial. Fed. R. Civ. P. 59(a)(1).

20  Rule 59 does not specify specific grounds for new trial, but a court is bound to grant

21  a new trial for "grounds that have been historically recognized." Zhang v. Am. Gem

22  Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003); Molski v. M.J. Cable, Inc., 481

23  F.3d 724, 729 (9th Cir. 2007) (internal citations and quotation marks omitted).   In

24  patent cases, the law of the regional circuit, here the Ninth Circuit, governs the

25  standards for deciding a Rule 59 motion for new trial. Finisar Corp. v. DirecTV Grp.,

26  Inc., 523 F.3d 1323, 1328 (Fed. Cir. 2008).  In the Ninth Circuit, "a district court may

27  not grant a new trial simply because it would have arrived at a different verdict."

28  Wallace v. City of San Diego, 479 F.3d 616, 630 (9th Cir. 2007) (quoting Silver Sage

Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001)) (internal quotation marks omitted).  But "the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice."  Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 742 F.3d 377, 390 (9th Cir. 2014).

## III.   Discussion

In its post-trial motions, SS/L asks the Court to rule that, as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, ViaSat is not entitled to the damages that the jury awarded.  Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59.  (Doc. Nos. 966, 1036, 1040, 1042, 1046.)

### A.   Breach of Contract Damages

In its motion, SS/L argues that the evidence presented at trial does not support the jury's finding of $102 million dollars in breach of contract damages separate from patent damages. (Doc. No. 1046 at 13-15.)  Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59.  (Id.)  SS/L argues that ViaSat presented no evidence at trial to support separate breach of contract damages based on the NBN satellite.  (Id. at 15-18.)  Thus, SS/L explains that to award both patent and breach of contract damages would lead to an improper double recovery.  (Id. at 18-19.)  SS/L contends that ViaSat presented insufficient evidence to satisfy the causation and foreseeability requirements for an award of damages for breach of contract.  (Id. at 20-27.)

In its opposition, ViaSat argues that the jury's award of $102 million dollars in breach of contract damages separate from patent damages could have been based on ViaSat's ideas that were contractually protected but not patented.  (Doc. No. 1120 at 94-96.)  ViaSat argues that the jury could have found that SS/L's patent infringement and breach of contract, in combination, allowed SS/L to provide Hughes with the 78 gigabytes per second ("Gbps") of incremental capacity that it contends is the source of ViaSat's injury.  (Id. at 96.)

During direct examination of ViaSat's damages expert, Dr. Slottje, ViaSat asked Dr. Slottje whether the jury should add breach of contract damages and patent

infringement damages together if it found SS/L liable for both.  (Doc. No. 990 at 275.)
Dr. Slottje responded "No. . . . You only get - - you get one or the other.  You don't get
them both."   (Id.)   ViaSat presented no other evidence of damages stemming
specifically from breach of contract that did not overlap with patent infringement
damages.  ViaSat argues that the jury could have found damages based on SS/L's
misappropriation of ideas that were protected by contract but not by patent.  (Doc. No.
1120 at 94-96.)   But its witnesses did not testify regarding how the jury should
calculate any such damages.

"Generally, the double recovery of damages is impermissible." Aero Prods. Int'l,
Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1017 (Fed. Cir. 2006) (citing Junker v.
Eddings, 396 F.3d 1359 (Fed. Cir. 2005); Bowers v. Baystate Techs., Inc., 320 F.3d
1317 (Fed. Cir. 2003); Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277 (Fed.
Cir. 2002); Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1362 (Fed.
Cir. 1998); CPG Prods., Corp. v. Pegasus Luggage, Inc., 776 F.2d 1007, 1014 n.4 (Fed.
Cir. 1985)).  "[I]n determining whether there has been an impermissible double
recovery of damages, the inquiry focuses on whether the damages issue arose from the
same set of operative facts." Id. at 1018.   Here, Dr. Slottje cited no technologies
allegedly misappropriated by SS/L in breach of contract that were not also allegedly
covered by ViaSat's patents.  Instead, he expressly premised his contract damages
model on his patent damages model.  (See Doc. No. 990 at 273.)   According to Dr.
Slottje's testimony, contract damages and patent damages arose from the same set of
operative facts, so the jury had no basis for awarding double damages.

Moreover, the record as a whole does not sufficiently explain the nexus between
SS/L's breaches of the NDAs and Build Contract and the damages that ViaSat suffered.
To prove damages under either California or New York law,[1] a plaintiff must establish

---

[1]The parties agree that California law governs the 2006 NDA (see Tr. Ex. S-552; Doc.
No. 1037-3 at 4) and New York law governs the Build Contract (see Doc. No. 1037 at 10; Doc.
No. 1118 at 19).

causation.  See, e.g., Cal. Civ. Code §§ 3300, 3301 (providing that "no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin" and that the amount of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby"); St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co., 101 Cal. App. 4th 1038, 1060 (2002) ("Causation of damages in contract cases requires that the damages be proximately caused by the defendant's breach."); Seidman v. Indus. Recycling Props., Inc., 106 A.D.3d 983, 985 (N.Y. 2013) ("Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed.").  In ViaSat's contract analysis, Dr. Slottje never identified the date of any contractual breaches, such as when SS/L allegedly received information subject to the parties' contracts and when SS/L allegedly disclosed or used those concepts in breach of those contracts."

Furthermore, ViaSat did not dispute SS/L's evidence that many of the concepts on which its patent infringement concepts are based were public knowledge or became public knowledge at some point during the events relevant to this case.  (Doc. No. 1046 at 23.)  Both contracts involved in this lawsuit exclude from their protection any concepts that become public through no fault of the recipient.  The 2006 NDA states:

> Proprietary Information shall not include any information disclosed by a party that (a) is already known to the receiving party at the time of its disclosure; (b) is or becomes publicly known through no wrongful act of the receiving party; (c) is independently developed by the receiving party; or (d) is communicated to a third party with the express written consent of the disclosing party.

(Tr. Ex. S-552; Doc. No. 1037-3 at 2.)  Article 28 of the Build Contract states:

> Proprietary Information shall not include any information disclosed by a party that (i) is already known to the receiving party at the time of its disclosure, as evidenced by written records of the receiving party, without an obligation of confidentiality at the time of disclosure; (ii) is or becomes publicly known through no wrongful act of the receiving party; (iii) is independently developed by the receiving party as evidenced by written records of the receiving party; or (iv) is rightfully obtained by the receiving party from any third party without restriction and without breach of any confidentiality obligation by such third party.

1  (Tr. Ex. V-188; Doc. No. 1037-5 at 27.)

2      Additionally, under California and New York law, breach of contract damages
3  must be reasonably foreseeable.  See, e.g., Ash v. N. Am. Title Co., 223 Cal. App. 4th
4  1258, 1268 (2014) ("[C]ontract damages are generally limited to those within the
5  contemplation of the parties when the contract was entered into or at least reasonably
6  foreseeable by them at that time; consequential damages beyond the expectations of the
7  parties are not recoverable."); Goodstein Constr. Corp. v. City of New York, 604
8  N.E.2d 1356, 1361 (N.Y. 1992) ("[I]t must be shown 'that the particular damages were
9  fairly within the contemplation of the parties to the contract at the time it was made.'");
10  Kenford Co., Inc. v. Erie County, 493 N.E.2d 234, 235 (1986) ("If it is a new business
11  seeking to recover for loss of future profits, a stricter standard is imposed for the
12  obvious reason that there does not exist a reasonable basis of experience upon which
13  to estimate lost profits with the requisite degree of reasonable certainty.").  Thus, even
14  if the jury could have found that SS/L disclosed ViaSat's proprietary concepts that were
15  protected under the contracts but not under the patents, a separate damages award
16  cannot be based on those disclosures without specific, nonspeculative evidence of
17  those damages.  ViaSat did not provide such evidence.

18      In the Ninth Circuit, "a district court may not grant a new trial simply because
19  it would have arrived at a different verdict."  Wallace v. City of San Diego, 479 F.3d
20  616, 630 (9th Cir. 2007) (quoting Silver Sage Partners, Ltd. v. City of Desert Hot
21  Springs, 251 F.3d 814, 818 (9th Cir. 2001)) (internal quotation marks omitted).  But
22  "the district court can grant a new trial under Rule 59 on any ground necessary to
23  prevent a miscarriage of justice." Experience Hendrix L.L.C. v. Hendrixlicensing.com
24  Ltd., 742 F.3d 377, 390 (9th Cir. 2014).  In light of the jury's award of separate breach
25  of contract damages and the unclear nexus to support the separate award, a new trial
26  is necessary to prevent a miscarriage of justice.

27  //

28  //

12cv260

*B.      Reasonable Royalty Damages for Patent Infringement*

In its motion, SS/L argues that the $123 million that the jury awarded in royalty damages is not reasonable because it is more than six times SS/L's anticipated profits on the Jupiter satellite. (Doc. No. 1036 at 12-15.) Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59. (Id.) It argues that ViaSat justified its disproportionate demand for reasonable royalty damages prior to trial by claiming that SS/L would have been motivated to avoid potential reputational harm that it would suffer by failing to deliver the Jupiter-1 satellite, but that ViaSat presented no evidence of reputational harm at trial. (Id. at 15.) SS/L also argues that Hughes's anticipated profits cannot support the verdict because the jury did not find induced infringement. (Id. at 16-17.) SS/L contends that the capacity lease agreements that ViaSat introduced at trial were improperly considered because they are not comparable licenses, as required under Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970). SS/L argues further that ViaSat presented insufficient evidence to support the alleged capacity increase. (Id. at 21-27.) SS/L also argues that neither the other Georgia-Pacific factors nor the analytical method of calculating royalty damages, described in TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 899 (Fed. Cir. 1986), can support the jury's award. (Id. at 27-30.)

In its opposition, ViaSat argues that the testimony of its expert Dr. Slottje tracked the factors laid out in Georgia-Pacific Corp., 318 F. Supp. at 1121. (Doc. No. 1120 at 71-73.) It argues that the Federal Circuit favors the use of market data, like the capacity lease agreements that it presented at trial, in calculating a reasonable royalty. (Id. at 73-79.) It cites the Federal Circuit's recent ruling approving the use of benchmarks for reasonable royalty damages. (Id. at 74 (citing Apple v. Motorola, __ F.3d __, Nos. 2012-1548, 2012-1549, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014)).) ViaSat contends that courts have allowed reasonable royalty awards that exceeded the expected profit of the hypothetical licensee. (Id. at 80.) It further argues that the analytical method provides an independent basis for the jury's verdict. (Id. at 84-85.)

ViaSat also argues that the testimony of SS/L's damages expert Dr. Meyer was facially unreasonable. (<u>Id.</u> at 85-86.)

Under the Federal Rules of Evidence, "a district court judge, acting as a gatekeeper, may exclude evidence if it is based upon unreliable principles or methods, or legally insufficient facts and data." <u>Apple</u>, 2014 WL 1646453 at *19. But the court "must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility o fone expert over another. These tasks are solely reserved for the fact finder." <u>Id.</u>

The most common approach to calculating reasonable royalty damages is the "hypothetical negotiation" methodology, in which the fact finder must determine what a willing licensee in the place of the infringer reasonably would have paid and what a willing licensor in the place of the patentee reasonably would have accepted for the grant of a license under the patent-in-suit. <u>See</u> <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1325 (Fed. Cir. 2009); <u>Georgia-Pacific Corp.</u>, 318 F. Supp. at 1121. <u>See generally</u> William C. Rooklidge et al., Compensatory Damages Issues in Patent Infringement Cases 6-7 (2011). "The hypothetical negotiation tries, as best as possible, to create the <em>ex ante</em> licensing negotiation scenario and to describe the resulting agreement." <u>Id.</u> This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." <u>Id.</u> at 1325; <u>see also</u> <u>Fromson v. Western Litho Plate & Supply Co.</u>, 853 F.2d 1568, 1574 (Fed. Cir. 1988) ("Determining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge."). "Still, a reasonable royalty analysis requires a court to hypothesize, not to speculate." <u>ResQNet.com, Inc. v. Lansa, Inc.</u>, 594 F.3d 860, 869 (Fed. Cir. 2010). "A damages theory must be  based on 'sound economic and factual predicates.'" <u>LaserDynamics, Inc. v. Quanta Computer, Inc.</u>, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting <u>Riles v. Shell Exploration & Prod. Co.</u>, 298 F.3d 1302, 1311 (Fed. Cir. 2002)).

1    In determining the reasonable royalty that would have been agreed to at the

2    hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors

3    enunciated in Georgia-Pacific Corp., 318 F. Supp. at 1120.  The Federal Circuit has

4    expressly "sanctioned the use of the Georgia-Pacific factors to frame the reasonable

5    royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir.

6    2011).  These fifteen factors are not exclusive.  Integra Lifesciences I, Ltd. v. Merck

7    KGA, 331 F.3d 860, 871 (Fed. Cir. 2003).  "[T]here is no formula by which these

8    factors can be rated precisely in the order of their relative importance or by which their

9    economic  significance  can  be  automatically  transduced  into  their  pecuniary

10   equivalent." Georgia-Pacific, 318 F. Supp. at 1120-21.

11   Rather than superficially reciting all fifteen factors, parties arguing under the

12   Georgia-Pacific framework should fully analyze the applicable factors. See Whitserve,

13   LLC v. Computer Packages, Inc., 694 F.3d 10, 31 (Fed. Cir. 2012).  Evidence of a

14   reasonable royalty "is not necessarily limited to facts predating the date of the

15   hypothetical negotiation; in certain circumstances, 'factual developments occurring

16   after the date of the hypothetical negotiation can inform the damages calculation.'"

17   Rooklidge, supra, at 7 (quoting Lucent Techs., 580 F.3d at 1333).  According to the

18   Federal Circuit:

19   [E]stimating a 'reasonable royalty' is not an exact science.  As such, the
     record may support a range of 'reasonable' royalties, rather than a single
20   value.   Likewise,  there  may  be  more  than  one  reliable  method  for
     estimating  a  reasonable  royalty.   For  example,  a  party  may  use  the
21   royalty rate from sufficiently comparable licenses, value the infringed
     features based upon comparable features in the marketplace, or estimate
22   the value of the benefit provided by the infringed features by comparing
     the accused product to non-infringing alternatives.  All approaches have
23   certain strengths and weaknesses and, depending upon the facts, one or
     all may produce admissible testimony in a single case.  It is common for
24   parties to choose different, reliable approaches in a single case and,
     when they do, the relative strengths and weaknesses may be exposed at
25   trial or attacked during cross-examination.

26   Apple, 2014 WL 1646435 at *19.

27   Under these standards, the jury's reasonable royalty award is unsound.  At trial,

28   Dr. Slottje testified that in a hypothetical negotiation, which would be between ViaSat

and both SS/L and Loral, the parties would have agreed to a total royalty of $587.1 million for the use of ViaSat's patented technology.  (Doc. No. 990 at 249-266.)  Dr. Slottje did not offer an alternative royalty if the negotiation were only between ViaSat and SS/L.  He also offered no reason why SS/L would have willingly agreed to pay six times more than its anticipated profits on the Jupiter satellite for a one-time license to use ViaSat's patented technology on the Jupiter satellite.  But the jury found no liability for Loral.  (Doc. No. 1014 at 5-6, 8.)

The jury's royalty damages many times more than SS/L's expected profits on the Jupiter-1 are against the weight of the evidence.  A reasonable royalty is "the amount that a person, desiring to manufacture, use, or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article in the market, at a reasonable profit."  Applied Med. Res. Corp. v. United States Surgical Corp., 435 F.3d 1356, 1361 (Fed. Cir. 2006) (quoting Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984)).  Although ViaSat is correct that an infringer's expected profits are not a hard limitation on damages, the jury's award strains belief in light of the evidence presented at trial.  Moreover, prior to trial, ViaSat's main defense for Dr. Slottje's model was that SS/L would be willing to pay far more than its profit from the Jupiter-1 due to the harm and monetary exposure that would occur if SS/L failed to deliver the Jupiter-1 to Hughes.  (See Doc. No. 772 at 13.)  But ViaSat presented little, if any, evidence of such reputational harm at trial.

Hughes's anticipated profits for use of the Jupiter-1 also cannot support SS/L's payment of a $123 million royalty.  Before trial, ViaSat relied on SS/L's alleged inducement of Hughes's infringement to bring Hughes's profits into play.  See, e.g., Doc. No. 595.)  But the jury found no contributory or induced infringement.  (Doc. No. 1014 at 3-6.)  See Foster v. Am. Mach. & Foundry Co., 492 F.2d 1317, 1320-22 (2d Cir. 1974) (rejecting argument that the royalty should be based upon the extent of use of the infringing product, where the defendant only manufactured and sold the

12cv260

product).

Furthermore, Dr. Slottje's testimony depended on evidence of satellite capacity leases that were not comparable licenses under Georgia-Pacific, 318 F. Supp. at 1120-21.  As SS/L points out, the downstream capacity leases may not be reflective of the value to SS/L of the technology that allegedly would allow it to design Jupiter with increased capacity.  See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009) (ruling licensing agreements must be comparable to the product of the hypothetical negotiation).  The capacity leases may be appropriate benchmarks under Georgia-Pacific factor 11, if tied to sound economic principles.  See Apple, Inc. v. Motorola, Inc., __ F.3d __, Nos. 2012-1548, 2012-1549, 2014 WL 1646435 at *22 (Fed. Cir. Apr. 25, 2014).  But the current record does not support the jury's large award.

In the Ninth Circuit, "a district court may not grant a new trial simply because it would have arrived at a different verdict."  Wallace v. City of San Diego, 479 F.3d 616, 630 (9th Cir. 2007) (quoting Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001)) (internal quotation marks omitted).  But "the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 742 F.3d 377, 390 (9th Cir. 2014).  In light of the jury's award of royalty damages many times greater than SS/L's expected profit from the Jupiter-1 and the insufficient evidence that ViaSat presented to support that disproportionate award, a new trial is necessary to prevent a miscarriage of justice.

### C.   Lost Profit Damages for Patent Infringement

In its motion, SS/L asks the Court to rule that, as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, ViaSat is not entitled to the lost profit damages that the jury awarded for patent infringement.  (Doc. No. 1040 at 8.) Alternatively, SS/L moves for a new trial on damages pursuant to Rule 59.  (Id.) SS/L argues that ViaSat cannot recover lost profit damages because it did not compete head-

to-head with SS/L. (Id. at 10-14.) SS/L also challenges Dr. Slottje's assumptions: that but for the alleged infringement, SS/L would have produced only a 32 Gbps alternative satellite (id. at 15-18); that there would be 324,520 overflow Jupiter subscribers (id. at 18-19); that all of the Jupiter overflow subscribers would be captured by ViaSat (id. at 19-22); and that Dr. Slottje correctly calculated profits per subscriber (id. at 22-24). Finally, SS/L argues that ViaSat failed to demonstrate the absence of a non-infringing substitute and the amount of profit it would have made had it made the infringer's sales as required under Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978). (Id. at 24-25.)

In its opposition, ViaSat argues that ample evidence at trial showed that SS/L's sale of the Jupiter-1 caused ViaSat to lose sales. (Doc. No. 1120 at 60-63.) It argues that the Court already rejected SS/L's methodological attacks on Dr. Slottje's testimony when it denied SS/L's pretrial motion for exclusion. (Id. at 63-67.) ViaSat contends that there is no rule that the patentee and the infringer be direct competitors in order for the patentee to receive damages for lost profits. (Id. at 67-70.)

Courts generally calculate lost profits by determining what profits the patentee would have made "but for" the infringement. See id. at 1545; BIC Leisure Prods. v. Windsurfing Int'l, 1 F.3d 1214, 1218 (Fed. Cir. 1993). To prove lost profits, the patentee "must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." Rite-Hite, 56 F.3d at 1545. To determine whether a plaintiff has established what profits it would have made absent the infringement, courts typically rely on the test set out in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978). Under Panduit, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Id. If the plaintiff satisfies the four-part Panduit test, it creates an inference that the lost profits claimed were in fact caused by the infringing sales. See Versata Software Inc. v. SAP America,

12cv260

1  Inc., 717 F.3d 1255, 1264 (Fed. Cir. 2013).  The burden then shifts to the infringer to
2  show that the inference is unreasonable for some or all of the lost sales.  See Rite-Hite,
3  56 F.3d at 1545.

4        To satisfy the second part of the Panduit test, an acceptable non-infringing
5  substitute must have been "available or on the market" at the time of infringement.  See
6  Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637
7  F.3d 1269, 1288 (Fed. Cir. 2011).  A fact finder "must proceed with caution in
8  assessing proof of the availability of substitutes not actually sold during the period of
9  infringement."  Grain Processing Corp. v. American Maize-Products Co., 185 F.3d
10  1341, 1353 (Fed. Cir. 1999).  A substitute that was not on the market at the time of
11  infringement but could have been readily commercialized may nonetheless satisfy the
12  second part of the Panduit test.  Siemens Medical Solutions USA, 637 F.3d at 1288.
13  Where the plaintiff establishes that an alleged substitute was not on the market during
14  the damages period, the burden shifts to the accused infringer to overcome the
15  inference that the substitute was not available.  See Synqor Inc. v. Artesyn Techs., Inc.,
16  709 F.3d 1365, 1382 (Fed. Cir. 2013).

17        Under the entire market value rule, a patentee may not base its lost profit
18  calculations on the entire market value of the lost sales unless it shows, among other
19  things, that the patented feature or component is the basis for customer demand.  See
20  Rite-Hite, 56 F.3d at 1549; Funai Elec. Co., Ltd. v. Daewoo Elec. Corp., 616 F.3d
21  1357, 1375-76 (Fed. Cir. 2010) (affirming award of lost profits based on entire lost
22  sales value, where there was evidence that the benefits provided by the patented
23  technology "were the basis for customer demand").

24        At trial, ViaSat presented insufficient evidence of the amount of profits it lost
25  as a direct result of SS/L's alleged infringement of its patents.  "To recover lost profits,
26  the patentee must show a reasonable probability that, 'but for' the infringement, it
27  would have made the sales that were made by the infringer."  Rite-Hite Corp. v. Kelly
28  Co. Inc., 56 F.3d 1538, 1545 (Fed. Cir. 1995).  Before trial, ViaSat justified its demand

for lost profits damages by pointing to Hughes's infringing use of the Jupiter-1. (Doc. No. 595.)    But the jury found no contributory or induced infringement. (Doc. No. 1014 at 3-6.)

Moreover, Dr. Slottje's lost profits calculations were highly speculative.  Dr. Slottje failed to take into account SS/L's ability to implement non-infringing alternatives that demonstrate that SS/L could have built more than a 32 Gbps satellite without using ViaSat's technology.  For example, the evidence at trial showed that SS/L built a 45 Gbps satellite, iPSTAR, that did not use ViaSat's patented technology, and that this satellite would have achieved 110 to 130 Gbps had it been built as a Ka-band satellite over the United States. (Doc. No. 931 at 44; Doc. No. 931 at 286-87.)  ViaSat witnesses Mark Dankberg and Mark Miller testified that it would be possible to build a 100-gigabit-per-second satellite without using ViaSat's patented technology. (Doc. No. 901 at 234; Doc. No. 931 at 53-54.)

Furthermore, Dr. Slottje's testimony shows that he determined the number of Jupiter subscribers that ViaSat would have captured but for its infringement by subtracting the number of subscribers that a 32 Gbps Jupiter could support from the number of Jupiter subscribers he projected. (Doc. No. 990 at 236.)  He then calculated how many of the Jupiter overflow subscribers would have been captured by ViaSat each quarter: he assumed that for seven quarters, 100% of the available Jupiter subscribers would have been captured by ViaSat, and for the eighth quarter, he assumed that 99% would have been captured by ViaSat, until the number of captured subscribers reached 324,520. (Doc. No. 990 at 240; Doc. No. 931 at 14-15; Doc. No. 975 at 192.)  But ViaSat witnesses admitted that ViaSat competes with dial-up, fixed wireless, DSL, and cable as well as with other satellites. (Doc. No. 931 at 11; Doc. No. 975 at 166-67.)  Dr. Slottje justified his capture rates by stating that the satellite broadband market is a two-player market (Doc. No. 931 at 11), but this statement was also suspect. "Accurately identifying a two-supplier market 'requires an analysis which excludes alternatives to the patented product with disparately different prices or

significantly different characteristics.'" Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637 F.3d 1269, 1288 (Fed. Cir. 2011) (quoting Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003)).   Dr. Slottje performed no such analysis.

Dr. Slottje also admitted that for ViaSat-1 to capture Hughes subscribers, the overflow customers would have to be in a location where ViaSat has a beam that has room to accommodate the subscribers.   (Doc. No. 931 at 24, 29-30.)   But when Dr. Slottje performed his lost profits calculations, he did not account for the fact that certain ViaSat-1 beams were reaching capacity and thus could not accommodate any overflow Jupiter subscribers.   (Id. at 25-26.)

In the Ninth Circuit, "a district court may not grant a new trial simply because it would have arrived at a different verdict." Wallace v. City of San Diego, 479 F.3d 616, 630 (9th Cir. 2007) (quoting Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001)) (internal quotation marks omitted).   But "the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 742 F.3d 377, 390 (9th Cir. 2014).   In light of the speculative nature and unrealistic assumptions of the evidence ViaSat presented regarding lost profits damages, a new trial on damages is necessary to prevent a miscarriage of justice.

### D.   Award of Both Lost Profits and Reasonable Royalty

In its motion, SS/L argues that Federal Circuit law prohibits the award of both lost profits and a reasonable royalty for a single infringing sale.   (Doc. No. 1042 at 11-14.)   Significantly, SS/L fails to cite a Federal Circuit case that prohibits such a recovery.   Instead, SS/L cites cases in which the Federal Circuit allowed recovery of both types of damages on multiple sales and asks the Court to draw the negative inference that a party alleging only one infringing sale cannot recover both types.   See, e.g., Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538 (Fed. Cir. 1995) (sales of multiple vehicle restraints); TWM Mfg. v. Dura Corp., 789 F.2d 895 (Fed. Cir. 1986) (sales of

multiple vehicle suspension devices).  A patentee may, in certain circumstances, recover both lost profits and reasonable royalty damages.  See William C. Rooklidge et al., Compensatory Damages Issues in Patent Infringement Cases 6 n.21 (2011) ("A damages award may consist of lost profits for a portion of the accused infringements and reasonable royalty for the remainder of the infringements.").  But under all circumstances, "[a] damages theory must be  based on 'sound economic and factual predicates.'" LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002)).

In its opposition, ViaSat argues that Dr. Slottje's damages model avoided double counting.  (Doc. No. 1120 at 90-91.)  Because Dr. Slottje asked the jury to award lost profits from the date of infringement through the first half of 2016, and reasonable royalty damages for the remainder of the life of the satellite, ViaSat contends that the jury's award of both reasonable royalty and lost profits damages was not duplicative. (Id.)

In the Ninth Circuit, "a district court may not grant a new trial simply because it would have arrived at a different verdict."  Wallace v. City of San Diego, 479 F.3d 616, 630 (9th Cir. 2007) (quoting Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001)) (internal quotation marks omitted).  But "the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 742 F.3d 377, 390 (9th Cir. 2014).

Here, the Court permitted Dr. Slottje's testimony because his detailed expert report tracked the Panduit test for lost profit damages as well as the Georgia-Pacific factors for reasonable royalty.  (See Doc. No. 772 at 11-12.)  Patent damages are not an "exact science," and the Federal Circuit permits a range of methodologies. See Apple, 2014 WL 1646435 at *19.  But at trial, Dr. Slottje's testimony was very abbreviated, and it was not based on sound economic and factual predicates.  As a

result, a new trial on damages is necessary to prevent a miscarriage of justice.

**IV.    Conclusion**

In its motions for new trial regarding damages, SS/L identifies problems with the jury's award of damages in light of the evidence presented at trial.  A new trial on damages is necessary to prevent a miscarriage of justice.  Accordingly, the Court grants SS/L's motions for a new trial on damages.  The Court denies as moot ViaSat's motion for prejudgment and post-judgment interest.  (Doc. No. 1059.)

**IT IS SO ORDERED.**

DATED: August 8, 2014

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

12cv260